**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| TIME WARNER CABLE, INC. | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| vs. | § | |
| | § | C. A. No. 1:07-cv-067 *** |
| GPNE CORP. | § | Jury Trial Demanded |
| | § | |
| | § | |
| Defendant. | § | |

## GPNE'S BRIEF IN SUPPORT OF ITS MOTION TO DISMISS, STAY OR TRANSFER

Defendant GPNE Corporation ("GPNE") moves the Court to Dismiss or Stay this action pursuant to the "first to file" rule, or in the alternative, to transfer it to the Eastern District of Texas, Marshall Division pursuant to 28 U.S.C. § 1404(a) (1993).

### I.     INTRODUCTION

On January 31, 2007, GPNE filed a patent infringement case in the Eastern District of Texas against Time Warner Inc. ("Time Warner"), Comcast Cable Communications LLC ("Comcast"), and Charter Communications, Inc. ("Charter"), alleging infringement of United States Patent No. 6,282,406 ("the '406 patent") entitled "Paging Method and Apparatus" in a case captioned *GPNE Corp. v. Time Warner Inc. et al.*  No. 6:07-cv-60 ("the Texas litigation".) (attached as Exhibit A).   Two days later, on February 2, 2007, Time Warner Cable, Inc. ("TWC"), filed an action in this Court seeking a declaratory judgment of noninfringement and invalidity of the '406 patent.[1]   Time Warner, Inc. is an 84% owner of Time Warner Cable, Inc. Also, concurrently herewith GPNE has amended the complaint in the Eastern District of Texas to include Time Warner Cable, Inc. (attached as Exhibit B).

---

[1] *Time Warner Cable, Inc. v. GPNE Corp.,* C.A. No. 07-cv-067-***.

## II.    STATEMENT OF FACTS

Texas case plaintiff GPNE is the owner of the '406 patent which is directed to a method for operating a data communication system for transmitting data. Time Warner Cable, like the other defendants in the Texas case, operates a data communication system over its cable network that is based on the Data Over Cable Service Interface Specification ("DOCSIS"). GPNE has alleged in the Texas litigation that Time Warner Cable infringes the '406 patent by operating such a system. For the reasons delineated below, this Court should dismiss or stay this action pursuant to the "first to file" rule, or in the alternative, to transfer it to the Eastern District of Texas, Marshall Division pursuant to 28 U.S.C. § 1404(a).

## III.    ARGUMENT

### a.    First-to-File Rule Applies

Determining which action should have priority under the first-to-file rule "raises the issue of national uniformity in patent cases, and invokes the special obligation of the Federal Circuit to avoid creating opportunities for dispositive differences among the regional circuits." *Genentech, Inc. v. Eli Lilly Co.*, 998 F.2d 931, 937 (Fed. Cir. 1993). Accordingly, this Court should apply Federal Circuit law to this issue. In patent cases, "the forum of the first-filed case is favored, unless considerations of judicial and litigant economy, and the just and effective disposition of disputes, require otherwise." *Id.* The second-filed action may proceed only if there is sound reason that would make it unjust or inefficient to continue the first-filed action. *Id.* at 938. Further, the rule favoring the right of the first litigant to choose the forum, absent countervailing interests of justice or convenience, is supported equally when there is a mere day between filing as it is when a year intervenes between the suits. *Id.*

### b.  First-to-File Rule Does Not Require Identical Parties to Both Actions

Although the first filed action was against Time Warner, Inc. and not against its subsidiary Time Warner Cable, Inc., the first-to-file rule is applicable regardless because there is no requirement that both actions include identical parties.  A subsequent action that does not have identical parties can still substantially overlap on the substantive issues of the first-filed action, warranting dismissal or transfer.  *Good Sportsman Mktg. LLC v. Testa Assocs., LLC*, 2005 U.S. Dist. LEXIS 29182, at *7–8 (E.D. Tex. Sept. 1, 2005) (*citing Superior Sav. Ass'n v. Bank of Dallas*, 705 F. Supp. 326, 328–29 (N.D. Tex. 1989)); *see Save Power Ltd. v. Syntek Fin. Corp.*, 121 F.3d 947, 950 (5th Cir. 1997).  Accordingly, the first-to-file rule does not require identical parties in both cases.  *Versus Tech., Inc. v. Hillenbrand Indus.*, 2004 U.S. Dist. LEXIS 28331, at *16 (W.D. Mich. Nov. 23, 2004) (*citing Hartford Accident & Indem. Co. v. Margolis*, 1992 U.S. App. LEXIS 4234, at *1 (9th Cir. Mar. 5, 1992) ("Absolute identity of parties in the two cases is not required."); *Thomas & Betts Corp. v. Hayes*, 222 F. Supp. 2d 994, 996 (W.D. Tenn. 2002) ("precise identity of the parties to both actions is not required"); *EBW, Inc. v. Environ Prods., Inc.*, 1996 U.S. Dist. LEXIS 11922, at *9 (W.D. Mich. July 8, 1996) (stating that "a precise identity of parties is simply not required")).  Therefore, the first-to-file rule applies to the present case involving Time Warner Cable.  Additionally, GPNE has concurrently herewith amended the Complaint in the Eastern District of Texas to include Time Warner Cable, Inc. such that Time Warner Cable, Inc. is now a party to both this action and the Texas litigation.

### c.  First-to-File Rule Requires Dismissal or a Stay of this Case

Thus, the first-filed rule is as simple as its name suggests: "where two patent lawsuits involving the same claims are filed in different jurisdictions, the Federal Circuit requires that the first-filed action be given preference absent special circumstances." *Sony Elecs., Inc. v. Orion IP,*

*LLC*, 2006 U.S. Dist. LEXIS 9834, at *2 (D. Del. Mar. 14, 2006) (quoting *Corixa Corp. v. IDEC Pharm. Corp.*, 2002 U.S. Dist. LEXIS 2980, at *304 (D. Del. Feb. 25, 2002)).   In the instant matter, there can be no dispute as to which action was filed first or that the core issues of the two cases substantially overlap, as they involve the same patent, similar parties, and the same technology.   When a court is confronted with a declaratory judgment action, the inverse of which (i.e. an infringement action) was filed prior to the declaratory judgment action, the declaratory judgment action must be dismissed.   *Id.* at *3 (stating "[T]he court is confronted with a declaratory judgment action by SCA alone, the inverse of which (i.e. an infringement action) was filed about three months earlier in Texas.   Therefore, pursuant to the first-filed rule, SCA must be dismissed from this case.").   There are no special considerations in this case, as explained more explicitly below.

A court has the "inherent power to conserve judicial resources by controlling its own docket." *Zoetics, Inc. v. Yahoo!, Inc.*, 2006 U.S. Dist. LEXIS 46910, at *3 (D. Del. July 6, 2006) (quoting *Cost Bros., Inc. v. Travelers Indem. Co.*, 760 F.2d 58, 60 (3rd Cir. 1985)).   In ruling on a motion to stay, courts are guided by three factors: "(1) whether a stay would unduly prejudice or present a clear tactical disadvantage to the non-moving party; (2) whether a stay will simplify the issues in question and trial of the case; and (3) whether discovery is complete and whether a trial date has been set." *Pegasus Dev. Corp. v. DirecTV, Inc.*, 2003 Dist. LEXIS 8052, at *3–4 (D. Del. May 14, 2003) (quoting *Xerox Corp. v. 3Comm Corp.*, 69 F. Supp. 2d 404, 406 (W.D.N.Y. 1999)).   These factors weigh in favor of the first-filing party, GPNE.   Both litigations are in their early stages, and the presumption that the first-filed rule should apply has not been overcome.

4

### d.  Transfer Under 28 U.S.C. § 1404(a)

The statute governing transfers of venue, namely 28 U.S.C. § 1404(a), states: "For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought."  In patent cases, a district court applies the procedural law of the circuit in which it resides.  *See Storage Tech. Corp. v. Cisco Sys. Inc.*, 329 F.3d 823, 836 (Fed. Cir. 2003).  The burden of showing the need for a transfer is on the movant.  *Jumara v. State Farm Ins. Co.*, 55 F.3d 873, 879 (3rd Cir. 1995).

In considering a 1404(a) transfer, the Court must balance between several private and public interests.  *Zoetics*, 2006 U.S. Dist. LEXIS 46910, at *7 (citing *Reyno v. Piper Aircraft Co.*, 630 F.2d 149, 159 (3rd Cir. 1980)).  The private interests to be considered are: the plaintiff's choice of forum, the defendant's preferred forum, whether the claim arose elsewhere, the convenience of the witnesses, but only so far as the witnesses might be unavailable for trial if the trial is conducted in a certain forum, and the location of books and records, to the extent that these books and records could not be produced in a certain forum.  *Jumara*, 55 F.3d at 883.

The only two relevant private factors, specifically the plaintiff's choice of forum and the defendant's preferred forum, when balanced, must come out in GPNE's favor.  When ruling on a motion to transfer, this Court must "balance all of the relevant factors and respect that a plaintiff's choice of forum is entitled to substantial deference and should not be lightly disturbed." *Zoetics*, 2006 U.S. Dist. LEXIS 46910, at *8 (citing *Stratos Lightwave, Inc. v. E20 Communications, Inc.*, 2002 U.S. Dist. LEXIS 5653, at *5 (D. Del Mar. 26, 2002)).  This factor weighs heavily in favor of defendant GPNE in the Delaware case, as it is plaintiff in the first-filed action.

The public factors to be considered are:  the enforceability of the judgment, practical considerations regarding the ease, speed, or expense of the trial, the administrative difficulty due to court congestion, the local interest in deciding local controversies in the home forum, the public policies of the two fora, and the trial judge's familiarity with the applicable state law in diversity cases.  *Id.*  Thus, the public interest aspects also weigh in the favor of transfer, as where related lawsuits exist, "it is in the interests of justice to permit suits involving the same parties and issues to proceed before one court."  *Cashedge, Inc. v. Yodlee, Inc.*, 2006 U.S. Dist. LEXIS 50488, at *7–8 (D. Del. July 19, 2006) (quoting *Brunswick Corp. v. Precor Inc.*, 2000 U.S., Dist. LEXIS 22222, at *8 (D. Del. Dec. 12, 2000)).  Several factors that support a decision to transfer are present in this case: namely whether the litigation involves: (1) the same parties, (2) related or similar technologies for the judge to become familiar with, and (3) a common field of prior art.  *Id.*

The judgment would be enforceable in both jurisdictions, there is not special administrative difficulty due to court congestion, the public policies of the two fora regarding patents do not differ, and this is not a diversity case requiring application of state laws. Moreover, since the Eastern District of Texas Complaint has concurrently herewith been amended to include Time Warner Cable, Inc. the parties to both actions are the same.  Patent rights are not local or state matters and therefore cannot give rise to a local controversy, or implicate local public policy.  *Stratos Lightwave, Inc. v. E20 Communications, Inc.*, 2002 U.S. Dist. LEXIS 5653, at *8 (D. Del. Mar. 26, 2002).  Accordingly, the relevant private and public factors discussed above support a decision to transfer this case to the Eastern District of Texas.

## IV.    CONCLUSION

For the reasons outlined above, this Court should stay or dismiss this case in favor of the first-filed patent infringement case in the Eastern District of Texas.  Alternatively, this Court should transfer this case under 28 U.S.C. 1404(a) for resolution in the Eastern District.

<div align="right">

*/s/ Richard K. Herrmann*

Richard K. Herrmann #405
Morris James, LLP
500 Delaware Avenue, Suite 1500
Wilmington, DE 19801-1494
T: (302) 888-6800
rherrmann@morrisjames.com

ATTORNEYS FOR GPNE CORP.

</div>

OF COUNSEL:
Edward W. Goldstein
egoldstein@gfpiplaw.com
Corby R. Vowell
cvowell@gfpiplaw.com
Goldstein, Faucett & Prebeg, LLP
1177 West Loop South, Suite 400
Houston, Texas  77027
(713) 877-1515 – Telephone
(713) 877-1737    Facsimile

Dated:  February 26, 2007

# EXHIBIT   A

# U.S. District Court [LIVE]
## Eastern District of TEXAS LIVE (Tyler)
## CIVIL DOCKET FOR CASE #: 6:07-cv-00060-LED

GPNE Corp
Assigned to: Judge Leonard Davis
Cause: 35:271 Patent Infringement

Date Filed: 01/31/2007
Jury Demand: Plaintiff
Nature of Suit: 830 Patent
Jurisdiction: Federal Question

**Plaintiff**

**GPNE Corp**

represented by **Edward W Goldstein**
Goldstein Faucett & Prebeg
1177 West Loop South
Suite 400
Houston, TX 77027
713/877-1515
Fax: 713/877-1145
Email: egoldstein@gfpiplaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Thomas John Ward, Jr**
Law Office of T John Ward Jr PC
P O Box 1231
Longview, TX 75606-1231
903/757-6400
Fax: 19037572323
Email: jw@jwfirm.com
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Time Warner Inc**

**Defendant**

**Comcast Cable Communications, LLC**

**Defendant**

**Charter Communications, Inc.**

| Date Filed | # | Docket Text |
|---|---|---|
| 01/31/2007 | 1 | COMPLAINT against all defendants ( Filing fee $ 350 receipt number 1010713.), filed by GPNE Corp. (Attachments: # 1 Exhibit A# 2 Civil Cover Sheet # 3 List of Parties)(Ward, Thomas) (Entered: 01/31/2007) |

| 01/31/2007 | 2 | NOTICE by GPNE Corp *of Filing Patent/Trademark Form* (Attachments: # 1 AO120)(Ward, Thomas) (Entered: 01/31/2007) |
| 01/31/2007 | 3 | E-GOV SEALED SUMMONS Issued as to Time Warner Inc, Comcast Cable Communications, LLC, Charter Communications, Inc.. (Attachments: Summons # (1) Summons# (2) Summons)(rvw, ) (Entered: 01/31/2007) |
| 02/09/2007 | 4 | Return of Service Executed as to Comcast Cable Communications, LLC on 2/8/2007, answer due: 2/28/2007. (mjc ) (Entered: 02/13/2007) |
| 02/09/2007 | 5 | Return of Service Executed as to Charter Communications, Inc. on 2/5/2007, answer due: 2/26/2007. (mjc ) (Entered: 02/13/2007) |
| 02/26/2007 | 6 | AMENDED COMPLAINT against all defendants, filed by GPNE Corp. (Attachments: # 1 Exhibit A)(Goldstein, Edward) (Entered: 02/26/2007) |

| PACER Service Center | | | |
|---|---|---|---|
| **Transaction Receipt** | | | |
| 02/26/2007 12:02:54 | | | |
| **PACER Login:** | tg0102 | **Client Code:** | 4763.005 |
| **Description:** | Docket Report | **Search Criteria:** | 6:07-cv-00060-LED |
| **Billable Pages:** | 1 | **Cost:** | 0.08 |

# EXHIBIT   B

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

| | | |
|---|---|---|
| GPNE CORP., | § | |
| | § | |
| Plaintiff | § | |
| | § | |
| v. | § | Case No: No. 6:07-cv-60 |
| | § | |
| TIME WARNER CABLE, INC.; | § | |
| COMCAST CABLE | § | |
| COMMUNICATIONS, LLC; CHARTER | § | **JURY TRIAL DEMANDED** |
| COMMUNICATIONS, INC. | § | |
| | § | |
| Defendants | § | |
| | § | |
| | § | |
| | § | |
| | § | |
| | § | |

## PLAINTIFF'S FIRST AMENDED COMPLAINT

Plaintiff, GPNE Corp. ("Plaintiff"), files this Original Complaint against Defendants, Time

Warner Cable, Inc. ("Time Warner"), Comcast Cable Communications, L.L.C. ("Comcast"), and

Charter Communications, Inc. ("Charter"), and alleges as follows:

### THE PARTIES

1. Plaintiff is a Delaware corporation with its principal place of business at 2556 Lemon Road,

   B101 Honolulu, Hawaii 96815.

2. Time Warner, on information and belief, is a corporation organized under the laws of the

   State of Delaware. Time Warner is doing business in Texas, and, on information and belief,

   has a principal place of business at 290 Harbor Drive; Stamford, CT 06902. Time Warner

may be served with process by serving its registered agent, the CT Corporation System, 350 North St. Paul St., Dallas, TX 75201.

3.   Comcast, on information and belief, is a corporation organized under the laws of the State of Delaware. Comcast is doing business in Texas, and, on information and belief, has a principal place of business at 1500 Market Street, Philadelphia, PA 19102-2148. Comcast may be served with process by serving its registered agent, Comcast Capital Corporation at 1201 Market Street, Suite 1000, Wilmington, DE 19801.

4.   Charter, on information and belief, is a corporation organized under the laws of the State of Delaware. Charter is doing business in Texas, and, on information and belief, has a principal place of business at 12405 Powerscourt Drive, St. Louis, MO 63131. Charter may be served with process by serving its registered agent, Corporation Service Company DBA CSC-Lawyers Incorporating Service Company, 701 Brazos, Suite 1050, Austin, TX 78701.

## JURISDICTION & VENUE

5.   This is an action for infringement of a United States patent. Accordingly, this action arises under the patent laws of the United States of America, 35 U.S.C. § 1 et. seq. and jurisdiction is properly based on Title 35 United States Code, particularly § 271, and title 28 United States Code, particularly § 1338(a).

6.   Time Warner, upon information and belief, transacts business in this judicial district by manufacturing, using, selling, or offering to sell products as described and claimed in United States Patent No. 6,282,406, the patent at issue in this lawsuit, and/or by conducting other business in this judicial district.

2

7.   Comcast, upon information and belief, transacts business in this judicial district by manufacturing, using, selling, or offering to sell products as described and claimed in United States Patent No. 6,282,406, the patent at issue in this lawsuit, and/or by conducting other business in this judicial district.

8.   Charter, upon information and belief, transacts business in this judicial district by manufacturing, using, selling, or offering to sell products as described and claimed in United States Patent No. 6,282,406, the patent at issue in this lawsuit, and/or by conducting other business in this judicial district.

9.   Venue is proper in this court under Title 28 United States Code § 1391(b) and 1400(b).

## PATENT INFRINGEMENT COUNT

10.  On August 28, 2001, United States Patent No. 6,282,406 ("the '406 patent") entitled "Paging Method and Apparatus" was duly and legally issued. A true and correct copy of the '406 patent is attached as Exhibit A.

11.  Pursuant to 35 U.S.C. § 282, the above-listed United States Patent is presumed valid.

12.  Plaintiff, GPNE Corp., is the owner of the '406 patent.

13.  Time Warner, on information and belief, manufactures, uses, and sells products that infringe at least Claim 1 of the '406 patent, including for example and without limitation all DOCSIS certified cable modems, as well as any other cable modems or other devices acting or capable of acting in the manner described and claimed in the '406 patent.

14.  Comcast, on information and belief, manufactures, uses, and sells products that infringe at least Claim 1 of the '406 patent, including for example and without limitation all DOCSIS

3

certified cable modems, as well as any other cable modems or other devices acting or capable of acting in the manner described and claimed in the '406 patent.

15.     Charter, on information and belief, manufactures, uses, and sells products that infringe at least Claim 1 of the '406 patent, including for example and without limitation all DOCSIS certified cable modems, as well as any other cable modems or other devices acting or capable of acting in the manner described and claimed in the '406 patent.

16.     The infringement of the '406 patent alleged above has injured the Plaintiff and thus, it is entitled to recover damages adequate to compensate for Time Warner, Comcast, and Charter's infringement, which in no event can be less than a reasonable royalty.

### DEMAND FOR JURY TRIAL

17.     Plaintiff hereby demands a jury trial on all claims and issues.

### PRAYER FOR RELIEF

Wherefore, Plaintiff prays for entry of judgment:

A.     that Defendants, Time Warner, Comcast, and Charter, have infringed one or more claims of the '406 patent;

B.     that Defendants, Time Warner, Comcast, and Charter, account for and pay to Plaintiff all damages caused by the infringement of the '406 patent, which by statute can be no less than a reasonable royalty;

C.     that Plaintiff be granted pre-judgment and post-judgment interest on the damages caused to them by reason of Defendants, Time Warner, Comcast, and Charter's infringement of the '406 patent;

D.     that Plaintiff be granted its attorneys' fees in this action;

4

E.      that costs be awarded to Plaintiff;

F.      that Plaintiff be granted such other and further relief as the Court may deem just and

proper under the current circumstances.

                                        Respectfully submitted,


Date: February 26, 2007                 /s/ Edward W. Goldstein
                                        Edward W. Goldstein
                                        Texas Bar No. 08099500
                                        egoldstein@gfpiplaw.com
                                        Christopher M. Faucett
                                        Texas Bar No. 00795198
                                        cfaucett@gfpiplaw.com
                                        Matt Prebeg
                                        Texas Bar No. 00791465
                                        mprebeg@gfpiplaw.com
                                        Corby R. Vowell
                                        Texas Bar No. 24031621
                                        cvowell@gfpiplaw.com
                                        GOLDSTEIN, FAUCETT, & PREBEG L.L.P
                                        1177 West Loop South, Suite 400
                                        Houston, TX 77027
                                        Telephone: (713) 877-1515
                                        Facsimile:  (713) 877-1737

                                        T. John Ward, Jr.
                                        Texas Bar No. 00794818
                                        Law Office of T. John Ward, Jr., P.C.
                                        111 W. Tyler Street
                                        Longview, Texas 75601
                                        Telephone: (903) 757-6400
                                        Facsimile:  (903) 757-2323
                                        Email:  jw@jwfirm.com
                                        *ATTORNEYS FOR PLAINTIFF*

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that all counsel of record who are deemed to have consented to electronic service are being served with a copy of this document via the Court's CM/ECF system per Local Rule CV-5(a)(3) on February 26, 2007. Any other counsel of record will be served by first class U.S. mail.

/s/ Edward W. Goldstein
Edward W. Goldstein

6

EXHIBIT A

US006282406B1

(12) **United States Patent**
Wong et al.

(10) Patent No.: US 6,282,406 B1
(45) Date of Patent: *Aug. 28, 2001

(54) **PAGING METHOD AND APPARATUS**

(75) Inventors: **Gabriel K. Wong; Po S. Tsui**, both of Honolulu, HI (US)

(73) Assignee: **Digicomm, Ltd.**, Honolulu, HI (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **09/594,662**

(22) Filed: **Jun. 15, 2000**

**Related U.S. Application Data**

(63) Continuation of application No. 08/264,973, filed on Jun. 24, 1994, now Pat. No. 5,542,115.

(51) Int. Cl.[7] .......................................... H04B 7/00
(52) U.S. Cl. .......................................... 455/31.3
(58) Field of Search .......................... 455/38.1, 38.4,
455/31.1, 31.2, 31.3, 509, 510, 515, 517,
224; 340/825.44, 825.2; 370/330, 336,
350, 436, 450

(56) **References Cited**

**U.S. PATENT DOCUMENTS**

| | | |
|---|---|---|
| Re. 32,365 | 5/1987 | Sebestyen . |
| Re. 33,417 | 10/2000 | Bhagat et al. . |
| 4,224,150 | 9/1980 | Neustein . |
| 4,345,491 | 8/1992 | Fascenda et al. . |
| 4,644,347 | 2/1987 | Lucas et al. . |
| 4,644,351 | 2/1987 | Zaharsky et al. . |
| 4,713,808 | 12/1987 | Gaskill et al. . |
| 4,747,122 | 5/1988 | Bhagat et al. . |
| 4,823,123 | 4/1989 | Siwiak . |
| 4,845,491 | 7/1989 | Fascenda et al. . |
| 4,870,402 | 9/1989 | DeLuca et al. . |
| 4,875,038 | 10/1989 | Siwiak et al. . |
| 4,882,579 | 11/1989 | Siwiak . |

| | | |
|---|---|---|
| 4,914,649 | 4/1990 | Schwendeman et al. . |
| 4,940,963 | 7/1990 | Gutman et al. . |
| 4,978,944 | 12/1990 | Andros et al. . |
| 5,043,721 | 8/1991 | May . |
| 5,086,501 | 2/1992 | DeLuca et al. . |
| 5,109,400 | 4/1992 | Patsiokas et al. . |
| 5,111,197 | 5/1992 | Ichikawa . |
| 5,117,449 | 5/1992 | Metroka et al. . |
| 5,142,279 | 8/1992 | Jasinski et al. . |
| 5,153,582 | 10/1992 | Davis . |
| 5,170,487 | 12/1992 | Peek . |
| 5,206,855 | 4/1993 | Schwendeman et al. . |
| 5,224,150 | 6/1993 | Neustein . |
| 5,247,700 | 9/1993 | Wohl et al. . |
| 5,260,986 | 11/1993 | Pershan . |
| 5,285,496 | 2/1994 | Frank et al. . |

(List continued on next page.)

*Primary Examiner*—Thanh Cong Le
(74) *Attorney, Agent, or Firm*—Beyer Weaver & Thomas, LLP

(57) **ABSTRACT**

A two-way paging system utilizes four local frequencies for transmissions between pager units (22) and a central control station (20). A first local frequency ($f_1$) carries a local clock; a second local frequency ($f_2$) carries communications packets from the central control station to paging units; a third local frequency ($f_3$) carries communication packets from the pager units to the central control station; and a fourth local frequency ($f_4$) carries a status or request signal from the paging units (22) to the central control station (20). Transmissions on the fourth local frequency ($f_4$) are in accordance with a time divided slot allocation among pager units accessing the central control station (20). For a two-way paging system having a plurality of central control stations (420ₓ) servicing a corresponding plurality of cells, a total of eight frequencies are utilized within any one cell. Four of the utilized frequencies are the local frequencies ($f_1$–$f_4$) [which may differ from cell to cell], and four of the utilized frequencies are lower power common frequencies or switching frequencies ($C_1$–$C_4$) which are used to switch or handoff a pager unit (422) traveling from one cell to another.

**16 Claims, 13 Drawing Sheets**



# US 6,282,406 B1

Page 2

## U.S. PATENT DOCUMENTS

| | | |
|---|---|---|
| 5,396,406 | 3/1995 | Ito et al. . |
| 5,396,537 | 3/1995 | Schwendemnan et al. . |
| 5,463,675 | 10/1995 | Gerszberg . |
| 5,485,463 | 1/1996 | Godoroja . |

| | | | |
|---|---|---|---|
| 5,491,469 | 2/1996 | Schwendeman . | |
| 5,542,115 | * | 7/1996 | Wong ................................. 455/507 |
| 5,689,807 | * | 11/1997 | Wong et al. ........................ 455/38.1 |

* cited by examiner



FIG. 1

U.S. Patent     Aug. 28, 2001     Sheet 2 of 13     US 6,282,406 B1



FIG. 2

Case 1:07-cv-00067-MPT   Document 8-2   Filed 02/26/2007   Page 16 of 90
Case 6:07-cv-00060-LED   Document 6   Filed 02/26/2007   Page 6 of 25

U.S. Patent          Aug. 28, 2001          Sheet 3 of 13          US 6,282,406 B1

# FIG. 3





FIG. 4

FIG. 5



## FIG. 6



CLOCK TRANSMITTER FREQUENCY $f_1$

CENTRAL COMPUTER TRANSMITTER FREQUENCY $f_2$

PAGER TRANSMITTER FREQUENCY $f_3$

PAGER REQUEST FLAG TRANSMITTER FREQUENCY $f_4$

TIME

$P_1$ TELL THE COMPUTER IT GOT THE REPLY (STEP 140)

$P_1$ PERMISSION SIGNAL (STEP 136)

$P_1$ REQUESTING TO SEND (STEP 214)

COMPUTER TELLS $P_1$ HAD RECEIVED THE MESSAGE (STEP 140)

$P_2$ TELLS THE COMPUTER THAT IT GOT THE MESSAGE (STEP 220)

GIVE $P_2$ PERMISSION TO SEND (STEP 136)

$P_2$ REQUEST TO TRANSMIT (STEP 214)

COMPUTER SENDING MESSAGE TO $P_2$ (STEP 140)

$P_1$ SENDING MESSAGE TO COMPUTER (STEP 220)

GIVE $P_1$ PERMISSION TO TRANSMIT (STEP 136)

$P_1$ REQUEST TO TRANSMIT (STEP 214)

# FIG. 7





FIG. 8

Case 1:07-cv-00067-MPT    Document 8-2    Filed 02/26/2007    Page 22 of 90
Case 6:07-cv-00060-LED    Document 6    Filed 02/26/2007    Page 12 of 25

# FIG. 9



P₁ ALIGN ITS CLOCK WITH S₂ FROM C₁ (STEP 504)
P₁ DETECTED NEW SYSTEM INFORMATION ON C₂ (STEP 508)
P₁ REQUESTING NEW FREQUENCIES (STEP 510)
S₂ TELLS PAGER TO IDENTIFY ITSELF (STEP 616)
P₁ SENDS ITS ID INFORMATION ON C₃ (STEP 516)
NEW TIME SLOT AND NEW FREQUENCIES
INFORMATION GIVEN ON C₂ FROM S₂ (STEPS 632 AND 634)

Case 1:07-cv-00067-MPT    Document 8-2    Filed 02/26/2007    Page 23 of 90
Case 6:07-cv-00060-LED    Document 6    Filed 02/26/2007    Page 13 of 25

U.S. Patent          Aug. 28, 2001          Sheet 10 of 13          US 6,282,406 B1



FIG. 10

U.S. Patent        Aug. 28, 2001        Sheet 11 of 13        US 6,282,406 B1

FIG. 11



FIG. 12



FIG. 13

US 6,282,406 B1

1

## PAGING METHOD AND APPARATUS

This is a continuation of application Ser. No. 08/264,973, filed Jun. 24, 1994, now U.S. Pat. No. 5,542,115, issued Jul. 30, 1996, entitled "PAGING METHOD AND APPARATUS", naming Wong et al. as inventors.

### RELATED APPLICATION DATA

The present application also relates to a number of commonly assigned, copending U.S. patent applications, including U.S. patent application Ser. No. 08/609,976, filed on Feb. 29, 1996, now U.S. Pat. No. 5,689,807, issued Nov. 18, 1997, entitled "PAGING METHOD AND APPARATUS", naming Wong et al. as inventors; U.S. patent application Ser. No. 08/608,629, filed on Feb. 29, 1996, now U.S. Pat. No. 5,729,827, issued Mar. 17, 1998 entitled "PAGER WITH STATION SWITCH REQUEST", naming Wong et al. as inventors; U.S. patent application Ser. No. 08/609,978, filed on Feb. 29, 1996, now U.S. Pat. No. 5,613,212, issued Mar. 18, 1997 entitled "PAGING METHOD AND APPARATUS", naming Wong et al. as inventors; and U.S. patent application Ser. No. 09/259,417, filed on Dec. 9, 1997, entitled "PAGING METHOD AND APPARATUS", naming Wong et al. as inventors. Each of the disclosures of these applications is incorporated herein by reference in its entirety for all purposes.

### BACKGROUND

#### 1. Field of Invention

This invention pertains to communications paging, and particularly to two-way paging method and apparatus.

#### 2. Related Art and Other Considerations

Over the last several decades, pagers have proven to be important communication devices for contacting remotely situated personnel. Whereas primitive pagers provided primarily only a tonal and/or vibratory output, more modern pagers have enhanced output capabilities such as message-bearing alphanumeric displays.

Paging systems have historically been one-way systems. That is, the user receives a paging message from a central terminal but has no way of responding to that message with the pager. Prior art attempts to provide two-way communication capabilities for a pager have included efforts to connect the pager to a telephone (e.g., to a mobile radio telephone). See, for example, U.S. Pat. No. RE 33,417 to Bhagat et al. (which combines an entire radio pager and radiotelephone linked through an automatic dialer) and U.S. Pat. No. 5,117,449 to Metroka, et. al. (which purports to combine paging and cellular radiotelephone functions in a single unit).

Some pagers have the capability of providing an acknowledgment or response to a paging signal. In some such "ack-back" systems, a user operates a reply input device (e.g., a toggle switch, pushbutton switch, or keyboard) when paged. Typically such ack-back systems involve a complex acknowledgement transmission scheme, involving numerous frequencies or frequency sub-bands. Hand-off of the pager, as the pager travels between differing geographic regions or "cells" served by differing central stations, becomes technically cumbersome when multitudinous frequencies are involved.

### SUMMARY

A two-way paging system utilizes four local frequencies for transmissions between pager units and a central control

2

station. A first local frequency carries a local clock; a second local frequency carries communications packets from the central control station to paging units; a third local frequency carries communication packets from the pager units to the central control station; and a fourth local frequency carries a status or request signal from the paging units to the central control station. Transmissions on the fourth local frequency are in accordance with a time divided slot allocation among pager units accessing the central control station.

For a two-way paging system having a plurality of central control stations servicing a corresponding plurality of cells, a total of eight frequencies are utilized within any one cell. Four of the utilized frequencies are the local frequencies, (which may differ from cell to cell), and four of the utilized frequencies are lower power common frequencies or switching frequencies which are used to switch or hand-off a pager unit traveling from one cell to another.

### BRIEF DESCRIPTION OF THE DRAWINGS

The foregoing and other objects, features, and advantages of the invention will be apparent from the following more particular description of preferred embodiments as illustrated in the accompanying drawings in which reference characters refer to the same parts throughout the various views. The drawings are not necessarily to scale, emphasis instead being placed upon illustrating the principles of the invention.

FIG. 1 is a schematic view of a central control station included in a paging system of an embodiment of the invention.

FIG. 2 is a schematic view of a pager unit included in a paging system for use with the central control station of FIG. 1.

FIG. 3 is a flowchart depicting steps executed by the central control station of FIG. 1.

FIG. 4 is a flowchart depicting steps executed by the pager unit of FIG. 2 when in a transmit mode.

FIG. 5 is a flowchart depicting steps executed by the pager unit of FIG. 2 when in a receive mode.

FIG. 6 is a timing diagram reflecting communications between the central control station of FIG. 1 and the pager unit of FIG. 2.

FIG. 7 is a schematic view of a central control station included in a paging system of a second embodiment of the invention.

FIG. 8 is a schematic view of a pager unit included in a paging system for use with the central control station of FIG. 7.

FIG. 9 is a hybrid schematic view and timing diagram for representing switching operations for the paging system of the second embodiment of the invention.

FIG. 10 is a flowchart depicting steps executed by the pager unit of FIG. 8 in connection with a channel switching operation.

FIG. 11 is a flowchart depicting steps executed by the central control station of FIG. 7 in connection with a channel switching operation.

FIG. 12 is a schematic view of a format of a communications packet utilized with embodiments of the invention.

FIG. 13 is a schematic view illustrating a time divided slot allocation technique according to the invention.

### DETAILED DESCRIPTION OF THE DRAWINGS

FIG. 1 shows a central control station 20 according to a first embodiment of the invention; FIG. 2 shows a paging unit 22 suitable for use with central control station 20.

Case 1:07-cv-00067-MPT   Document 8-2   Filed 02/26/2007   Page 28 of 90
Case 6:07-cv-00060-LED   Document 6   Filed 02/26/2007   Page 18 of 25

US 6,282,406 B1

3

As shown in FIG. 1, central control station 20 includes central computer 30; transmitter 32; receiver 34; and computerized telephone answering system 36. Transmitter 32 transmits, via transmitting antenna 42, two local frequencies, namely frequency $f_3$ and frequency $f_4$. Receiver 34 is connected to receiver antenna 44 for reception of two local frequencies, namely frequency $f_1$ and frequency $f_2$. Computerized telephone answering system 36 is connected to a bank of telephones 48.

Central computer 30 of central control station 20 comprises a conventional computer equipped with typical components including a CPU 50; I/O interface 52; and memory 54. Although shown only generally in FIG. 1, it should be understood that memory 54 includes a number of unillustrated memory devices, including (for example) a hard disk drive, RAM, and ROM. FIG. 1 shows that memory 54 has stored therein (among other things) a pager registration file 55 and a pager directory file 56. Pager files 55 and 56 are typically stored on a hard disk drive of central computer 30, and upon start-up are loadable into a RAM portion of memory 54.

Central computer 30 of central control station 20 further includes a decoder 57 (connected between receiver 34 and I/O interface 52 for decoding in-coming communications information from one or more pager units 22), as well as encoder 58 (connected between I/O interface 52 and transmitter 32 for encoding out-going communications information).

Central control station 20 also includes a clock unit 59 which generates a local clock signal $f_c$clk (which, in turn, is used to modulate frequency $f_3$).

As illustrated further herein, CPU 50 of central control station 20 prepares communications packets for transmission on frequency $f_3$. As generally illustrated in FIG. 12, the communications packets are of a predetermined format, having fields for identification of the central control station, for identification of the addressed pager unit(s) 22, for an operation code, for (optionally) alphanumeric information, and for other conventional packet-type information such as checksum, error correction, and postamble. The preamble and postamble are specially chosen patterns which can be recognized and distinguished from data for the purpose of determining the beginning and ending of a packet. The alphanumeric information can be in a customary binary 8-bit format. The format of FIG. 12 is illustrative only, as such information as the order of the fields can be varied in other embodiments.

Central control station 20 communicates with a plurality of pager units $22_1, 22_2, \ldots 22_N$. Only one such pager unit, generically referenced as pager unit 22, is specifically illustrated and described herein, it being understood that the construction and operation of other pager units may be similar to the one illustration.

As shown in FIG. 2, pager unit 22 includes a pager receiver antenna 60 which is connected to pager receiver 62. Pager receiver 62 is, in turn, connected through S/D converter 64 within pager computer 70. Receiver 62 receives the two local frequencies $f_1$ and $f_2$, which frequencies have been modulated to carry in-coming communications information (described in more detail below) to pager computer 70. On a communications output side, pager computer 70 outputs out-going communications information to pager transmitter 72 via D/S converter 74. Transmitter 72 broadcasts, on pager antenna 76, the out-going communications information on the two local frequencies $f_3$ and $f_4$.

As also shown in FIG. 2, pager computer 70 includes pager microprocessor 80 which is connected to each of an

4

arithmetic processor 82; a memory system 84 (including both ROM and RAM); and I/O interface 86. I/O interface 86 is connected to a clock unit 87. I/O interface 86 is also connected to receive in-coming decoded communications information from an 8-bit decoder 88 and to output outgoing uncoded communications information to an 8-bit encoder 90. Decoder 88 is connected to receive in-coming coded communications information from S/D converter 64; encoder 90 is connected to output out-going coded communications information to D/S converter 74.

Clock unit 87 is settable by suitable inputs thereto so that clock unit 87 generates a local clock signal $f_c$clk having a frequency corresponding to its input. It should be understood that, in other embodiments, the function of clock unit 87 can be performed at least partially by microprocessor 80 using programmed execution.

I/O interface 86 is also connected to supply an on/off signal on line 92 to pager transmitter 72, as well as to facilitate input and output with numerous input/output devices. The input/output devices connected to I/O interface 86 include keyboard 93; beeper 94; vibrator 95; and LCD (alphanumeric) display 96.

Upon manufacture, pager unit 22 is preprogrammed with an identification serial number (e.g., a 7-digit alphanumeric pre-assigned ID number) which is stored in memory 84 (ROM). Pager unit 22 is activated (e.g., at the time of purchase) by inserting a time slot assignment (explained below) both into a predetermined address in memory 84 of pager unit 22 and into pager directory file 56 (stored in memory 54 of central control station 20).

## OPERATION OF FIRST EMBODIMENT

Communication between central control station 20 and pager unit 22 occurs on the four local frequencies, in particular the frequencies $f_1$, $f_2$, $f_3$, and $f_4$ mentioned above. The first frequency ($f_1$) carries the local clock-aligning signal from central control station 20 to paging unit 22. The second frequency ($f_2$) carries a pager command and alphanumeric data from central control station 20 to paging unit 22. The third frequency ($f_3$) carries pager status data and alphanumeric data from, paging unit 22 to central control station 20. The fourth frequency ($f_4$) carries a pager request signal from paging unit 22 to central control station 20. In the illustrated embodiment, the frequencies $f_1$–$f_4$ are preferably chosen so that $f_1 = f_2 = f_3 = f_4$.

As explained in more detail below and illustrated in FIG. 13, in normal non-cell-switching operation, the pager request signal on frequency $f_4$ is transmitted in a predetermined time slot assigned to paging unit 22. The predetermined time slot on frequency $f_1$ is related to the clock-aligning signal (carried by frequency $f_1$) and assigned whereby the fourth frequency is utilizable by a plurality of other paging units. For example, as shown in FIG. 13, a first time slot on frequency $f_4$ is assigned to a pager P1; a second time slot is assigned to pager P2, and so on up to time slot n assigned to pager Pn. In the illustrated embodiment, the number of time slots (and accordingly the number of pagers) may be as many as ten thousand or more.

FIG. 3 shows steps executed by CPU 50 of central control station 20 in processing communications to and from one or more paging units. The steps depicted in FIG. 3 are indicative of instructions stored in a ROM portion of memory 54 of central control station 20.

When central control station 20 is started up (step 100), an initialization process (step 102) is conducted. Included in the initialization process is activation of transmitter 32 (so that

US 6,282,406 B1

5

transmitter 32 can transmit at the two frequencies $f_1$ and $f_2$) and activation of receiver 34 (so that receiver 34 can receive the two frequencies $f_3$ and $f_4$). Moreover, frequency $f_1$ is modulated to carry the local clock-aligning signal generated by local clock 59. Then, at step 104, the pager registration file 55 and the pager directory file 56 are loaded from hard disk into a RAM section of memory 54 (step 104).

After initialization and loading of the files 55 and 56, CPU 50 repetitively executes an instruction loop 106. Loop 106 involves checking to determine (at step 108) whether a telephone message is being received (via answering system 36 from one of the telephones in bank 48) and checking to determine (at step 110) whether a pager message is being received (via transmitter 32 from one of the pager units 22).

As used herein, a message, whether originated from a telephone or from a pager, may require a plurality of packets for transmission from a central station 20 to a pager 22 or vise versa. In the ensuing discussion, transmission and reception of messages subsumes transmission and reception one or more packets. In general, the packetization of messages will be invisible to the user, meaning that a user enters a message without regard to the number of packets which might be required to transmit the message. The message typically ends with a user-entered message termination character or message delimiter character. The transmitting device (either central station 20 or pager 22), allocates the message to one or more packets having a format similar to that of FIG. 12, with the last packet in the message bearing the message termination character. Alternatively, the packets may be formatted in a manner to indicate the number of consecutively related packets emanating from a transmitter (e.g., there may be a separate packet field indicating the continuation number of related packets).

Central computer 30 can distinguish between receipt of a telephone message (at step 108) and a pager message (at step 110) by virtue of the fact that I/O interface 52 generates different type of interrupts to CPU 50 depending on the type of message received. If it is determined at step 108 that a telephone message is being received, steps 112, 114, and 116 of FIG. 3 are executed.

In processing a received telephone message, at step 112 central computer 30 extracts out-going communications information from the predeterminately sequenced telephone-entered data. The telephone-entered data, entered via a touchpad of a calling one of the telephones in bank 48, includes by convention an identification (e.g., telephone number) of the calling telephone; an identification of the called pager unit (e.g., the 7-digit alphanumeric pre-assigned ID number); and any character data for transmission followed by a termination character. This out-going communications information is received at central computer 30 in standard DTMF format.

At step 114, using the ID number of the called pager (obtained at step 112) central computer 30 checks the pager registration file 55 and directory file 56 to determine whether the called pager unit is registered with central control station 20. Assuming that the called pager is so registered, at step 114 the central computer 30 also obtains from pager directory file 56 the slot assignment for the called pager unit.

At step 116, central control station 30 transmits communications information to the called pager unit. In this regard, central control station 20 prepares and transmits (on frequency $f_2$) a communications message which includes, among other things, the ID of the called pager unit and the character data received from the telephone for transmission to of the pager unit 22. After step 116 is executed, processing returns to loop 106.

6

If it is determined at step 110 that a pager message is being received, even numbered steps 132–140 of FIG. 3 are executed (prior to returning to loop 106). As will be seen hereinafter with respect to FIG. 4, a sending pager unit 22 transmits, in its assigned time slot, a request signal on frequency $f_4$ when the sending pager unit 22 desires to send a message. As central control station 20 is always monitoring frequency $f_4$, a request signal carried by frequency $f_4$ from any pager unit 22 is noted. With reference to the local clock 59, at step 132 CPU 50 determines in what time slot on frequency $f_4$ the request signal is detected. Upon detection of the time slot at step 132, at step 134 CPU 50 consults the pager directory file 56 to determine the identification number of the particular pager unit 22 which originated the request signal.

With the identity of the requesting pager unit 22 now known, at step 136 central control station 20 authorizes the requesting pager unit 22 to transmit its message. In particular, CPU 50 directs preparation of a communications message for transmission on frequency $f_2$. The particular communications packet prepared at step 136 includes an identification of the requesting pager unit (the addressee of the packet), as well as an operation code ("op" code) which commands/authorizes the requesting pager unit 22 to send its message.

At step 138, central control station 20 receives a communications message on frequency $f_3$ sent from the sending (e.g., requesting) pager unit 22. The communications message prepared and sent by the sending pager unit 22 includes packets of similar format to that shown in FIG. 12, and includes an identification of a pager to which the message is ultimately addressed as well as its own identification. At step 138, CPU 50 checks to ensure that the ultimate addressee pager unit is registered in pager files 55 and 56. At step 140, CPU 50 makes any necessary reformatting and/or information substitution in the message, and causes the message to be transmitted on frequency $f_2$. The transmission on frequency $f_2$ required by step 140 includes the identification of the ultimate addressee (e.g., a pager unit 22) as well as an operation code indicating that the transmission includes a relayed message from another pager unit.

Steps executed by a pager unit 22 in connection with its transmission mode are depicted in FIG. 4. Steps executed by a pager unit 22 in connection with its receive mode are depicted in FIG. 5. The term "mode" as used herein does not connote exclusivity at any particular moment, for it should be remembered that at all times pager unit 22 is receiving transmissions on frequencies $f_1$ and $f_2$.

In its transmission mode (see FIG. 4), after start-up (step 200) microprocessor 80 of the transmitting pager unit 22 executes a loop 202 wherein user alphanumeric characters (entered via keyboard 93) are repetitively fetched (at step 204) until an end of message delimiter is detected (at step 206). As entered, the characters fetched at step 204 are displayed on LCD display 96. Entry of the delimiter character at step 206 causes microprocessor 80 to exit loop 202. By convention, the message must include an addressee ID, which addressee ID is likely the ID of another one of the pager units to which the message entered in step 204 is directed.

After entry of the message awaits entry from keyboard 93 of a transmit command at step 212. Assuming that the transmit command is entered at step 212, microprocessor 80 prepares and sends a request signal on frequency $f_4$. As indicated before, the request signal is transmitted on frequency $f_4$ in a time slot assigned to the requesting pager unit

Case 1:07-cv-00067-MPT   Document 8-2   Filed 02/26/2007   Page 30 of 90
Case 6:07-cv-00060-LED   Document 6   Filed 02/26/2007   Page 20 of 25

US 6,282,406 B1

7

22. It should be kept in mind that pager unit 22 is all the while receiving the local clock-aligning signal on frequency $f_3$, which enables microprocessor 80 to cause transmission of the request signal on frequency $f_4$ at a time corresponding to the specific time slot allotted to the particular sending pager unit 22.

In the above regard, in accordance with time division techniques, each pager unit $22_1$–$22_N$ (e.g., pagers $P_1$–$P_n$ in FIG. 13) is assigned a selected one of N number of time slots on frequency $f_4$.

After transmission of the request signal at step 214, pager unit 22 awaits receipt of a transmit command from central control station 20. Preparation and transmission of the transmit command/authorization from central control station 20 is described with reference to FIG. 3. Upon receipt of the transmit command/authorization from central control station 20 (step 216), microprocessor 80 prepares (at step 218) a communications message with one or more packets having a format much like that of FIG. 12. The addressee ID and alphanumeric field of packets of the communications message is filled with the message entered in loop 202. At step 220, the sending pager unit 22 broadcasts the communications packet on frequency $f_3$.

If a transmit command is not entered at step 212, or after transmission of the message at step 220, microprocessor 80 awaits entry of at least one of several possible special function keys at step 222. For example, the user may press a function key which requires storage of the message (whether yet transmitted or not) [see step 228]. Alternatively, the user may press function keys which facilitate editing or erasure of the message (see steps 224 and 226, respectively). To complete the message and begin work on another message, a special function key for an exit operation (step 230) must be pressed.

FIG. 5 depicts steps executed by microprocessor 80 of pager unit 22 when in a receive mode. After start-up (step 302), and as indicated by step 304, pager unit 22 receives transmissions from central control station 20 on frequency $f_2$. Once a complete packet is received (determined at step 306), a check is made (at step 308) whether the addressee ID in the communications packet (see packet format of FIG. 12) is the ID of the receiving pager unit 22. If the determinations of either step 306 or 308 are negative, pager unit 22 awaits either completion of the communications packet (in the case of step 306) or receipt of another communications packet (in the case of step 308) by looping back to step 304.

Assuming that the received communications packet is designated for this particular receiving pager unit 22, at step 310 microprocessor 80 consults the operation code field of the communications packet (see FIG. 12) to determine if the operation code indicates that the message includes a command. If the operation code indicates a command, a command processing routine (framed by broken lines 312 in FIG. 5) is executed.

Assuming for the moment that the operation code does not indicate a command, at step 314 microprocessor 80 of pager unit 22 stores the alphanumeric field portion of the communications packet (which at least partially forms the message) in a RAM portion of memory 84. Since a message communicated from central processing station 20 may require several communications packets for completion of the message (with subsequent communication packets providing continuations of the message content), microprocessor 80 checks at step 316 to ensure that the entire message has been received. If not, processing continues back at step 304 for reception of a further communications packet.

8

Upon reception of an entire communications message, at step 318 microprocessor 80 determines whether pager unit 22 is in a beep mode or a vibrate mode. In this regard, there are numerous ways of setting paging unit 22 to the desired mode, either by a specifically dedicated switch on paging unit 22 or by data entry using keyboard 93. If pager unit 22 is in a beep mode, microprocessor 80 outputs a signal which causes I/O interface 86 to issue a further signal to activate beeper 94 (step 320). Alternatively, if pager unit 22 is in a vibrate mode, microprocessor 80 outputs a signal which causes I/O interface 86 to issue a further signal to activate vibrator 95 (step 322).

At step 324, microprocessor 80 directs I/O interface 86 to send the alphanumeric message data to LCD display 96, so that the received message can be viewed by the user.

After notification to the user (either via beeper 94 and/or vibrator 95, and display (on LCD 96) of the received alphanumeric data, microprocessor 80 returns to step to 304 to check whether further communications packets are being received.

The command processing routine (framed by broken lines 312 in FIG. 5) first determines (step 330) what particular operation is being commanded. This determination is based on the content of the operation code, which is different for different command types. If the operation code indicates an error shut-down, execution jumps to an error shut-down sub-routine which begins at step 340. If the operation code indicates a time slot change, execution jumps to a change time slot sub-routine which begins at step 350. If the operation code requires transmitter shut-down, execution jumps to a transmitter shut-down sub-routine which begins at step 360. If the operation code requires transmitter re-enablement, execution jumps to a transmitter re-enable sub-routine which begins at step 370. If the operation code requires clock re-set, execution jumps to a clock re-set sub-routine which begins at step 380.

In connection with the error shut down sub-routine, at step 342 microprocessor 80 obtains an indication of error type from the communications packet. The error type is stored in memory 84 (step 344) and then displayed on LCD display 96 (step 346). Then microprocessor 80 issues a command (at step 348) to shut down pager unit 22, which shut-down occurs at step 349.

In connection with the time slot changing sub-routine, at step 352 microprocessor 80 extracts, from the received communications packet, information indicative of the new time slot assigned to the receiving pager unit 22. The new time slot is entered (at step 354) into memory 84 and thereafter utilized (until further change) in connection with transmission of request signals on frequency $f_4$ (see, for example, step 214 of FIG. 4). The time slot changing sub-routine may also include other operations, if desired, including (for example) eliminating unused time slots (thereby increasing scanning rate); diagnosing and trouble shooting; and avoiding interruption of service from malfunctioning or ill-functioning equipment.

In connection with the transmitter shut down sub-routine, at step 362 microprocessor 80 directs I/O interface 86 to issue an OFF command to transmitter 72. In connection with the transmitter re-enable sub-routine, at step 372 microprocessor 80 directs I/O interface 86 to issue an ON command to transmitter 72.

In connection with the clock re-set sub-routine, at step 382 microprocessor 80 directs that clock 59 of pager unit 22 be set.

After execution of steps 354, 362, 372, or 382, execution continues back in step 304 for processing of potential further

Case 1:07-cv-00067-MPT    Document 8-2    Filed 02/26/2007    Page 31 of 90
Case 6:07-cv-00060-LED    Document 6    Filed 02/26/2007    Page 21 of 25

US 6,282,406 B1

9

communications packets. Thus, unless an error shutdown is noted, each entry of the command processing routine (framed by broken lines 312 in FIG. 5) is followed by a loop back to step 304.

FIG. 6 is a timing diagram showing the frequencies $f_1$–$f_4$ and integration of the steps depicted in FIGS. 3–5, particularly in the context of a request by a sending pager unit P1 for sending a message to a sendee pager unit P2. As employed in FIG. 6, "computer" refers to central control station 20. It should be understood that the sending pager unit P1 and the sendee pager unit P2 operate in both the transmission mode as depicted in FIG. 4 and in the receiver mode as depicted in FIG. 5. In general, FIG. 6 shows transmission of a message from pager unit P1 (via central control station 20) to pager unit P2; transmission of a confirmation message from pager unit P2 (via central control station 20) to pager unit P1; and transmission of a message from pager unit P1 to central control station 20 indicating that pager unit P1 received the confirmation message from pager unit P2.

## STRUCTURE OF SECOND EMBODIMENT

FIG. 7 shows a central control station 420 according to a second embodiment of the invention; FIG. 8 shows a paging unit 422 suitable for use with central control station 420.

FIG. 9 shows a wide area paging system including a plurality of central control stations S1–S8 (each identical to central control station 420), each preferably geographically centered within a respective cell. Each central control station S1 –S8 broadcasts its own local frequencies, as well as a set of common or switching frequencies $C_1$–$C_4$. The common frequencies $C_1$–$C_4$ are broadcast at a lower power, so that reception thereof occurs only in a relatively small neighborhood or common frequency reception region (CFRR) [also referred to as a "switching region"] about the central control station. The local frequencies are broadcast at a significantly greater power for reception substantially throughout the cell. For example, in FIG. 9, central control station S1 broadcasts its lower power common frequencies $C_1$–$C_4$ to CFRR₁ and its higher power local frequencies $f_1$–$f_4$ to CELL₁; central control station S2 broadcasts its lower power common frequencies $C_1$–$C_4$ to CFRR₂ and its higher power local frequencies $f_5$–$f_8$ to CELL₂.

As also shown in FIG. 9, CELL₁ and CELL₂ overlap in an overlap region shown in FIG. 9. Station S1 utilizes a set of local frequencies $f_1$–$f_4$; station S2 utilizes a different set of local frequencies $f_5$–$f_8$. Both stations S1 and S2 utilize the same set of common or switching frequencies $C_1$–$C_4$. Thus, each central control station utilizes two sets of frequencies, there being four frequencies in each set, resulting in a total of eight frequencies handled per station.

Thus, the second embodiment of the invention is suitable for a system having a plurality of central control stations 420₁...₈. Each central control station 420ₚ transmits and receives a set of local frequencies $f_{p,1}$, $f_{p,2}$, $f_{p,3}$, $f_{p,4}$ in an associated geographical area or cell, as well as the set of common or switch frequencies $C_1$, $C_2$, $C_3$, $C_4$. While the values of the local frequencies $f_{p,1}$, $f_{p,2}$, $f_{p,3}$, $f_{p,4}$ vary from cell to cell (e.g., differ for differing central control stations 420ₚ), the values of the common or switch frequencies $C_1$, $C_2$, $C_3$, $C_4$ are uniform through the system (e.g., for all central control stations 420ₚ).

Although not shown in FIG. 9, it should be understood that the pattern of central control stations repeats in like manner in all compass directions in accordance with the prescribed geographical boundaries of the paging system.

10

Moreover, although not specifically illustrated in FIG. 9, it should also be understood that each central control station 420 has an associated CFRR.

The common or switching frequencies $C_1$–$C_4$ have an analogous function to the corresponding local frequencies $f_1$–$f_4$, respectively. In this regard, frequency $C_1$ carries a clock frequency transmitted by central control station(s), although the clock rate on common frequency $C_1$ preferably varies among central control stations. Frequency $C_2$ is used to transmit information from central control station(s) to pager unit(s); frequency $C_3$ is used to transmit information from a pager unit to a central control station; frequency $C_4$ is used by pager units to issue a request signal. Frequency $C_2$ carries packets having a format similar to that of FIG. 12. In analogous manner to frequency $f_2$, the packets carried by frequency $C_2$ may have command codes. Among the $C_2$ command codes are a SYSTEM COMMAND CODE; a LOCAL FREQUENCY DOWNLOAD COMMAND CODE; a SLOT RECOGNITION COMMAND CODE; and a SLOT ASSIGNMENT COMMAND CODE.

As shown in FIG. 7, central control station 420 resembles central control station 20 of the embodiment of FIG. 1 (similar components being assigned the same reference numerals for simplicity). However, central control station 420 is augmented by inclusion of a further transmitter, known as common frequency transmitter 432, together with its common frequency transmission antenna 442, for transmitting the common frequencies $C_1$ and $C_2$. In contrast to the high power transmitter 32, transmitter 432 is a low power transmitter. Further, central control station 420 is augmented by inclusion of a further receiver, known as the common frequency receiver 434, together with its common frequency receiver antenna 444, for reception of the common frequencies $C_3$ and $C_4$.

Central control station 420 of FIG. 7 includes a clock unit 59' which generates two clocking signals—a first or local clocking signal $f_L$clk and a second or common clocking signal $C_L$clk. The local clocking signal $f_L$clk is used to modulate frequency $f_1$); the common clocking signal is used to modulate the common frequency $C_1$.

The central computers 30 of the central control stations 420ₚ are serially connected to one another by an output line 486A and an input line 486B. In particular, although not expressly shown as such in FIG. 7, computer 30 of FIG. 7 (like that of FIG. 1) includes an I/O interface to which the serial lines 486A and 486B are connected. Serial lines 486A and 486B are used, for example, to update contents of the pager registration file 55 and the pager directory file 56.

As shown in FIG. 8, pager unit 422 resembles pager unit 22 of the embodiment of FIG. 2 (similar components again being assigned the same reference numerals for simplicity).

However, pager unit 422 (in like manner as central control station 420) is augmented by inclusion of a further transmitter, known as common frequency transmitter 572, together with its common frequency transmission antenna 576, for transmitting the common frequencies $C_3$ and $C_4$. Further, central control station 420 is augmented by inclusion of a further receiver, known as the common frequency receiver 434, together with its common frequency receiver antenna 444, for reception of the common frequencies $C_1$ and $C_2$.

The operational frequencies of transmitter 72 and receiver 62 are changeable in accordance with values transmitted on "frequency control" lines from computer 70. In particular, the frequency control lines are connected to I/O interface 86 in computer 70. As described in more detail below, when a

Case 1:07-cv-00067-MPT    Document 8-2    Filed 02/26/2007    Page 32 of 90
Case 6:07-cv-00060-LED    Document 6    Filed 02/26/2007    Page 22 of 25

US 6,282,406 B1

11

pager unit 422 migrates into a new CFRR, signals are applied on the frequency control lines in order to switch pager unit 422 from the local frequencies of an old cell to the local frequencies of a new cell associated with the new CFRR into which pager unit 422 migrates.

Pager 422 includes a clock unit 83' which is capable of separately generating local clocking signals $f_c$clk and the common clocking signals $f_{cs}$clk for use by microprocessor 80. These clocking signals are initiated and their frequencies set by appropriate respective inputs to clock unit 83'.

FIG. 8 also shows that pager unit 422 has data I/O unit 596 which includes both an alphanumeric graphic display and a pressure sensitive writing pad. The alphanumeric graphic display is a dot matrix device which can display characters and graphics. The writing pad has a 16x48 dot area.

OPERATION OF SECOND EMBODIMENT

As shown in FIG. 9, a pager unit P1 is assumed to have been operating in CELL₁ and to have previously received the common frequencies $C_1$–$C_4$ and local frequencies $f_1$–$f_2$ from station S1. Now pager unit P1 travels on a route indicated by broken arrow-headed line ROUTE. In travelling along the ROUTE, pager unit P1 continues to operate on local frequencies $f_1$–$f_2$, even as it travels through the cellular overlap region. However, when page unit P1 enters a new common frequency reception region (i.e., CFRR₂), a switching or hand-off operation occurs. In the switching operation, as explained in more detail below, pager unit P1 obtains common frequencies $C_1$–$C_4$ from central control station S2 and, as a result, can switch from the local frequencies $f_1$–$f_4$ of CELL₁ to the local frequencies $f_5$–$f_8$ of CELL₂. In order to effect the switching or hand-off operation, pager unit P1 executes a channel switching routine; the central control station S2 executes a switching enabling routine.

In connection with the channel switching routine and the switching enabling routine, when pager unit P1 moves into CFRR₂, pager unit P1 will receive the clocking signal on frequency $C_1$ from station S2. At such point, pager unit P1 will automatically align its clock unit with the clocking signal from station S2.

Referring now to the channel switching routine executed by pager P1 subsequent to start-up (step 500), at step 506 pager unit P1 obtains information characterizing the system centered about station S2. Such characterizing information is referred to as system identification or system ID information.

At step 508, microprocessor 80 of pager unit P1 checks to determine if there is any new system ID information acquired on frequency $C_2$. That is, microprocessor 80 checks to determine if system ID information is received on frequency $C_2$ (which can occur only in a CFRR) and, if so, compares the system ID information to the immediately previously-stored system ID information. If the previous and most recently-acquired system IDs are the same, pager unit P1 realizes that it is still in the jurisdiction of the same station (e.g., station S1). If not, pager unit P1 realizes that it has now wandered into a CFRR of a new station (e.g., station S2) and, at step 510, initiates a request on frequency $C_4$ for communication with the central control station (e.g., station S2) for CELL₂.

In the above regard, since pager unit P1 has not yet been assigned a time slot for CELL₂, the request on frequency $C_4$ is randomly made. However, pager unit P1 keeps track of the time slot in which it makes its request to the new central control station (e.g., station S2).

12

Thereafter, pager unit P1 continues to monitor (step 512) communications packets from station S2 on frequency $C_2$, waiting for station S2 to issue a message which references the time slot at which pager unit P1 made its request of step 510. In particular, page unit P1 awaits a message from station S2 on frequency $C_2$ that includes both a SLOT RECOGNITION COMMAND CODE and information stored in the same time slot which pager unit P1 randomly generated. Since the message including the SLOT RECOGNITION COMMAND CODE includes station S2 as the sender and mirrors the slot randomly generated by pager unit P1, pager unit P1 recognizes the message as being addressed to pager unit P1 and considers issuance of such a message by station S2 (see step 512 of FIG. 11) to constitute authorization for pager unit P1 to communicate further with station S2. In this regard, at step 514 microprocessor 80 of pager unit P1 determines if there is a match between the time slot of a received message and the time slot at which the random request was made at step 510.

Assuming a match is eventually found at step 514, at step 516 pager unit P1 sends a communications packet on frequency $C_4$ to station S3, with the communications packet including the identification or ID of pager unit P1. Using pager registration file 55, station S2 verifies that the ID of pager unit P1 is a valid ID, and thereafter sends (on frequency $C_2$) to pager unit P1 a message with the command code LOCAL FREQUENCY DOWNLOAD, which message informs pager unit P1 of the values of the local frequencies handled by station S2 (e.g., frequencies $f_5$–$f_8$). Thereafter, as also reflected by step 518, station S2 sends (on frequency $C_2$) to pager unit P1 a message with the command code SLOT ASSIGNMENT COMMAND CODE, which message informs pager unit P1 of its slot assignment on frequency $f_8$. Microprocessor 80 then changes its slot allocation by steps which are similar to those discussed with the afore-mentioned change time slot routine (see steps 350, 352, and 354 of FIG. 5). Step 518 of FIG. 10 reflects reception of the local frequency values and reception of the slot assignment.

After acquisition of all local frequencies and the slot assignment is completed (step 520), microprocessor 80 implements (at step 522) a switch to the new local frequencies (e.g., frequencies $f_5$–$f_8$). In this regard, microprocessor 80 instructs I/O interface 86 to change transmitter 72 from frequencies $f_3$, $f_4$ to frequencies $f_7$, $f_8$; and to change receiver 62 from frequencies $f_3$, $f_2$ to frequencies $f_5$, $f_6$. I/O interface 86 accomplishes the frequency changes by applying appropriate values on the frequency control lines connecting the I/O interface to transmitter 72 and receiver 62, respectively.

After the switch to new local frequencies at step 522, microprocessor 80 loops back to step 506, ultimately to determine when any further switching may be required.

Steps involved in the switching enabling routine executed by a central control station (e.g., station S2) are depicted in FIG. 11. After start-up (step 600), CPU 50 determines executes a loop 602 which enables CPU 50 to clean up its pager directory file 56 and to check if any new pager units have wandered into the cell which it administers.

In particular, at step 604 CPU determines whether its central control station (e.g., S2) has been advised by any other central control station (e.g., S3) that a pager unit, formerly under the control of its central control station (e.g., S2), has come under the control of the other central control station (e.g., S3). Such advisement occurs on the serial links connecting the central control stations 420₃₋ and particularly input serial link 486B. If such advisement occurs, the ID for

Case 1:07-cv-00067-MPT    Document 8-2    Filed 02/26/2007    Page 33 of 90
Case 6:07-cv-00060-LED    Document 6    Filed 02/26/2007    Page 23 of 25

US 6,282,406 B1

13

the wandered-away pager is deleted from the pager directory file 56 for station S2 (as reflected by steps 606 and 608).

At step 610, CPU 50 causes messages with a SYSTEM COMMAND CODE to be transmitted on frequency $C_2$. As indicated before, messages transmitted on frequency $C_2$ include a packet(s) having a format such as that shown in FIG. 12. The message with the SYSTEM COMMAND CODE particularly includes the central station ID number in its alphanumeric data field.

At step 612, central control station 420 checks to determine if a request signal has been transmitted by any pager unit 422 on frequency $C_4$ (as occurred, for example, in context of the discussion of FIG. 10, particularly step 510). Such a request signal would likely be issued from a pager unit 422 which has just wandered into the CFRR controlled by the central control station (e.g., into CFRR$_2$ controlled by station S2). If no such request signal is detected, loop 602 is again repeated.

In the event that a request signal is detected at step 612, central control station 420 notes specifically the time slot on frequency $C_4$ at which the request occurred (step 614). At this point, such time slot is the only way central control station 420 can identify the in-wandering pager unit 422. Central control station 420 desires for the in-wandering pager unit 422 to transmit its identification (ID), but cannot specifically address the in-wandering pager other than with reference to the detected time slot. Accordingly, at step 616, central control station 420 prepares and transmits a message on frequency $C_2$ which has a SLOT RECOGNITION COMMAND CODE. The message including the SLOT RECOGNITION COMMAND CODE includes station S2 as the sender and mirrors the slot randomly generated by pager unit P1 (e.g., the time slot at which the in-wandering pager unit 422 issued its request). This transmission on frequency $C_2$ constitutes authority for pager unit P1 to transmit its identification.

Step 618 denotes acquisition by central control station 420 of the identification (ID) of the in-wandering pager unit 422. At step 620, central control station 420 checks its pager registration file 55 to determine if the pager ID is a valid ID. If not, an error message is generated and transmitted (at step 622), followed by a command for pager unit P1 to shut down (see step 624).

Assuming that the identification of pager unit 422 was validated at step 620, CPU 50 checks (at step 630) its pager directory file 56 to locate an available time slot for the in-wandering pager unit 422, and then associates the available time slot with the ID of the in-wandering pager unit 422. Then, at step 632, using a message on frequency $C_2$ with a LOCAL FREQUENCY DOWNLOAD COMMAND CODE, central control station 420 sends the values of its local frequencies (e.g., $f_5$, $f_6$, $f_7$, $f_8$) to the in-wandering pager unit 422. The central control station then (at step 634) assigns to the in-wandering pager unit 422 a new time slot on its local frequencies using a message on frequency $C_2$ with a SLOT ASSIGNMENT COMMAND CODE. Processing of the change time slot command by the in-wandering pager unit 422 is understood with analogous reference to FIG. 5, particularly steps 350, 352, and 354.

Upon completion of step 634, the in-wandering pager unit 422 is fully initiated into its new cell (e.g., CELL$_2$), and has left the jurisdiction of its former control station (e.g, CELL, and station S1). Accordingly, at step 636, CPU 50 requests its I/O interface to issue a command on serial line 486A which advises (using pager ID) that the in-wandering pager 422 is now under its jurisdiction, so that former jurisdictions

14

(e.g., S1) can delete this pager unit from their pager directory files 56. Such deletion is understood with reference to steps 604–608 as above-described.

In addition to illustrating geographical location of pager P1, stations S1 and S2, and cells CELL, and CELL$_2$, FIG. 9 shows the relative timing of communications occurring on common frequencies $C_3$–$C_4$. FIG. 9 specifically relates the timing of communications transmissions to specific ones of the aforedescribed steps executed by central control station 420 (the switching enabling routine of FIG. 11) and by pager unit 422 (the channel switching routine of FIG. 10).

Although the central control stations 420$_x$ use the same common frequencies $C_3$–$C_4$, there is no interference or confusion of these signals transmitted from the control stations 420$_x$. The common frequencies $C_3$–$C_4$ are broadcast at a relatively lower power than the local frequencies $f_3$–$f_x$, so that reception of the common frequencies $C_3$–$C_4$ occurs only in a limited neighborhood (CFRR) about the central control station 420$_x$. Accordingly, pager units 422 traveling through the system receive common frequencies $C_3$–$C_4$ only in the limited and non-overlapping CFRRs.

System operational characteristics, such as cell diameter, CFRR diameter, power level of the local frequencies (e.g., $f_3$–$f_x$), and power level of the common frequencies ($C_3$–$C_4$) can be field adjusted to suit numerous factors, including particularly the terrain and topography of the geographical region covered by the system. By way of non-limiting example, in one embodiment, the radius of each cell is on the order of about 20 miles; while the radius of each CFRR is on the order of about 10 miles or less. In the same example, the power for transmission of the local frequencies can be in a range of from about 3 watts to 1000 watts; while the power for transmission of the common frequencies $C_3$–$C_4$ is preferably less than 2 watts.

Thus, the invention provides a two-way paging system which operates independently from a telephone system for wireless data communication between users. The invention minimizes use of available frequencies allowed by the Federal Communications Commission (FCC), using only four local frequencies $f_3$–$f_4$ for any given cell and (for expanded, multi-cellular coverage) only four common or switching frequencies $C_3$–$C_4$. In order to minimize the number of frequencies (e.g, channels) utilized, techniques of time division sharing and synchronization are employed. A transmission power differential between the local frequencies and the common frequencies is also employed. These techniques allow data transmission to be kept separate from different pagers and thus eliminates merging of data.

The switching technique of the present invention provides extended geographical coverage and minimizes paging time by increasing the number of frequencies utilized in a cell from four (e.g, the four local frequencies) to eight (the four local frequencies plus the four common frequencies).

In connection with verification of pager ID, it should be understood that a single pager registration file might be stored in a memory file only one of a plurality of central control stations, and that in such case verification would constitute issuing a search command (on the serial links 486) to locate a pager ID in the one (remote) memory file, with the results of the search being reported back to the inquiring central control station.

The keyboards illustrated herein can, in some embodiments, be multi-language keyboards or writing pads which permit typing of English, Chinese, or Japanese languages, for example. The writing pad is especially useful in countries such as Japan, Thailand, the middle East or

China where English-like alphabets are not used. The writing pad could also be used to sketch and transmit graphics. Moreover, data compression/de-compression techniques can be utilized in connection with data transfer.

While the invention has been particularly shown and described with reference to the preferred embodiments thereof, it will be understood by those skilled in the art that various alterations in form and detail may be made therein without departing from the spirit and scope of the invention. For example, it should be understood that repeaters may be employed within cells to facilitate transmission when a pager unit ventures far from a central control station.

The embodiments of the invention in which an exclusive property or privilege is claimed are defined as follows:

1. A method of operating a data communication system, the data communication system including a communication controller and a plurality of nodes, the method comprising:

transmitting a first signal from the communication controller to a first node, said first signal specifying a timeslot in which the first node may transmit a capacity request signal to the communication controller;

when the first node has data to transmit, and upon receipt of the first signal, transmitting a capacity request signal from the first node to the communication controller, said capacity request signal including a request for an allocation of bandwidth capacity to transmit data from the first node to the communication controller;

in response to the capacity request signal, transmitting a data grant signal from the communication controller to the node, said data grant signal specifying at least one timeslot for the first node to transmit data to the communication controller; and

in response to receiving the data grant signal, transmitting data from the first node to the communication controller.

2. The method of claim 1 further comprising transmitting data from the first node to the communication controller at a timeslot specified by the data grant signal.

3. The method of claim 1, wherein the capacity request signal is a time slotted signal carried on a predetermined frequency.

4. The method of claim 1, wherein said capacity request signal and said data are transmitted to the communication controller via a first channel, and wherein the data grant signal and the first signal are transmitted to the first node via a second channel.

5. The method of claim 4, wherein the first channel is a time-slotted channel carried on a first frequency, and wherein the second channel is a time-slotted channel carried on a second frequency.

6. The method of claim 1 wherein said system is a pager system, wherein said communication controller comprises a base station, and wherein said first node is a pager device.

7. A method of operating a data communication network, the data communication network including a communication controller and a plurality of nodes, the method comprising:

transmitting a request-enabling signal from the communication controller to a first node;

when the first node has data to transmit, and in response to receiving the request-enabling signal, transmitting a request signal from the first node to the communication controller;

in response to receiving the request signal from the first node, transmitting an authorization signal from the communication controller to the first node; and

in response to receiving the authorization signal, transmitting data from the node to the communication controller.

8. The method of claim 7, wherein the request-enabling signal is a time slotted signal carried on a predetermined frequency, said request-enabling signal specifying a particular time slot for the first node to transmit said request signal to the communication controller.

9. The method of claim 7, wherein said request signal and said data are transmitted to the communication controller via a first channel, and wherein the authorization signal and the request-enabling signal are transmitted to the first node via a second channel.

10. The method of claim 9, wherein the first channel is a time-slotted channel carried on a first frequency, and wherein the second channel is a time-slotted channel carried on a second frequency.

11. The method of claim 7 wherein said network is a pager network, wherein said communication controller comprises a base station, and wherein said first node is a pager device.

12. A data communication system comprising:

a communication controller; and

a plurality of nodes in communication with the communication controller;

the communication controller being configured or designed to transmit a request-enabling signal to a first node;

the first node being configured or designed to transmit a request signal to the communication controller in response to receiving the request-enabling signal, the request signal relating to data to be transmitted to the communication controller;

the communication controller being further configured or designed to transmit an authorization signal to the first node in response to receiving the request signal;

the first node being further configured or designed to transmit data to the communication controller in response to receiving the authorization signal.

13. The system of claim 12, wherein the request-enabling signal is a time slotted signal carried on a predetermined frequency, said request-enabling signal specifying a particular time slot for the first node to transmit said request signal to the communication controller.

14. The system of claim 12, wherein said request signal and said data are transmitted to the communication controller via a first channel, and wherein the authorization signal and the request-enabling signal are transmitted to the first node via a second channel.

15. The system of claim 14, wherein the first channel is a time-slotted channel carried on a first frequency, and wherein the second channel is a time-slotted channel carried on a second frequency.

16. The system of claim 12 wherein said system is a pager system, wherein said communication controller comprises central control station, and wherein said first node is a pager device.

* * * * *

# UNITED STATES PATENT AND TRADEMARK OFFICE
## CERTIFICATE OF CORRECTION

PATENT NO.    : 6,282,406 B1                              Page 1 of 1
DATED         : August 28, 2001
INVENTOR(S)   : Wong et al.

It is certified that error appears in the above-identified patent and that said Letters Patent is hereby corrected as shown below:

Title page,
Item [63], **Related U.S. Application Data**, please delete the text reading:
"Continuation of application No. 08/264,973, filed on Jun. 24, 1994, now Pat. No. 5,542,115." and replace it with it following:
-- Continuation of application No. 09/259,417, filed on Dec. 9, 1997, now Pat. No. 6,108,520, issue August 22, 2000, which is a continuation of 08/608,629 filed Feb. 29, 1996 now Pat. No. 5,729,827, issued March 17, 1998, which is a divisional of 08/264,973 filed June 24, 1994, now Pat. No. 5,542,115, issued July 30, 1996. --

Signed and Sealed this

Thirteenth Day of April, 2004

JON W. DUDAS
*Acting Director of the United States Patent and Trademark Office*

## Complaints and Other Initiating Documents
6:07-cv-00060-LED GPNE Corp

### U.S. District Court [LIVE]

### Eastern District of TEXAS LIVE

Notice of Electronic Filing

The following transaction was received from Goldstein, Edward W entered on 2/26/2007 at 11:59 AM
CST and filed on 2/26/2007
**Case Name:**         GPNE Corp
**Case Number:**       6:07-cv-60
**Filer:**             GPNE Corp
**Document Number:** 6

**Docket Text:**
AMENDED COMPLAINT against all defendants, filed by GPNE Corp. (Attachments: # (1) Exhibit A)
(Goldstein, Edward)

The following document(s) are associated with this transaction:

**Document description:** Main Document
**Original filename:** n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1041545818 [Date=2/26/2007] [FileNumber=1652003-0
] [7ce1c8a79b9c6304448456d5a53843d2f08b3b0204283d3f19ef035033a0168da9a
be9106dbd2a81e3aee7ca9227952393a879fe4c42ccf914ee019118b22c19]]
**Document description:** Exhibit A
**Original filename:** n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1041545818 [Date=2/26/2007] [FileNumber=1652003-1
] [6506aeb4fa0abca0facca1e9c8ba098e0af764efe1f6aa5ff51ae63ea6112eb5081
726d244b9eec1c08e2ba48080cb5f1965859e1190aaa134fd00014c9c7166]]

**6:07-cv-60 Notice will be electronically mailed to:**

Edward W Goldstein    egoldstein@gfpiplaw.com, dmalone@gfpiplaw.com

Thomas John Ward , Jr    jw@jwfirm.com, ak@jwfirm.com; ad@jwfirm.com

**6:07-cv-60 Notice will be delivered by other means to:**

# EXHIBIT   C

LEXSEE 2000 U.S. DIST. LEXIS 22222, AT 7



Cited
As of: Feb 26, 2007

**BRUNSWICK CORPORATION, Plaintiff, v. PRECOR INCORPORATED., Defendant.**

**C.A. No. 00-691-GMS**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE**

*2000 U.S. Dist. LEXIS 22222*

**December 12, 2000, Decided**
**December 12, 2000, Filed**

**DISPOSITION:** [*1] Precor's motion to transfer granted.

**COUNSEL:** For BRUNSWICK CORPORATION, plaintiff: Robert W. Whetzel, Richards, Layton & Finger, Wilmington, DE.

For PRECOR INCORPORATED, defendant: Samuel David Brickley, II, Connolly, Bove, Lodge & Hutz, Wilmington, DE.

**JUDGES:** Gregory M. Sleet, UNITED STATES DISTRICT JUDGE.

**OPINION BY:** Gregory M. Sleet

**OPINION:**

### MEMORANDUM AND ORDER

On August 1, 2000, the plaintiff, Brunswick Corporation, and its division Life Fitness ("Life Fitness") brought this patent infringement action against Precor Incorporated ("Precor"). Life Fitness alleges that Precor is infringing its U.S. Patent No. *6,095,951* (" *'951* patent") relating to exercise treadmills. Presently before this court is Precor's motion to transfer this case to the United States District Court for the Western District of Washington, pursuant to *28 U.S.C. § 1404*(a). Because the court finds that a transfer would convenience the parties and the witnesses while serving the interests of justice, Precor's motion to transfer is granted.

### I. BACKGROUND

#### A. The parties

Life Fitness and Precor both design, manufacture, [*2] and sell exercise equipment and both directly compete with one another in the exercise fitness market. Although both parties are incorporated in Delaware, neither party maintains a physical presence (e.g., offices or facilities) in this state. Life Fitness has its principal place of business in Franklin Park, Illinois and Precor has its principal place of business in Bothell, Washington.

#### B. Prior Litigation Between the Parties

"Life Fitness and Precor are no strangers to each other, nor to patent litigation." D.I. 7, at 2. In 1994, Precor filed a patent infringement suit against Life Fitness in the United States District Court for the Western District of Washington ("1994 litigation"). At issue in the 1994 litigation were . U.S. Patent Nos *5,599,259, 5,752,897* and certain Claims of U.S. Patent No. *5,382,207* (respectively the " *'259, '897,* and *'207* patents"). The *'207* patent is the parent of the *'951* patent currently at issue in the case before the court.

In the 1994 litigation, Claims 1-36 of *'207* patent were dismissed on summary judgment in February 1996 leaving only claims 37, 38, and 39 at issue. In early September 1999, Life Fitness voluntarily stipulated to the dismissal [*3] of the claims for infringement of the *'259* and *'897* patents as well as Claims 38-39 of the *'207* patent. As a result of this stipulation, these claims were dismissed with prejudice in an order dated September 23, 1999. *See Precor Inc. v. Life Fitness*, No. C94-1586C

2000 U.S. Dist. LEXIS 22222, *

(W.D. Wash. Sept. 23, 1999) (stipulation and order of dismissal). Thus, the only infringement claim remaining for trial related to Claim 37 of the *'207* patent. In October 1999, Life Fitness lost at trial as to this one patent claim. The judgment from the 1994 litigation is currently on appeal to the Federal Circuit.

## II. DISCUSSION

Pursuant to *28 U.S.C. § 1404*(a), the court may transfer this action to "any other district where it might have been brought" when it appears that a change of venue would "convenience" the parties and the witnesses while serving the "interest of justice." *28 U.S.C. § 1404*(a) (1993). The parties here agree that Life Fitness could have brought this action in the Western District of Washington. *See 28 U.S.C. S 1391*(b)(1) (1993). Moreover, this lawsuit could have initially been filed in Washington because it is a patent [*4]  infringement matter. *See 28 U.S.C. § 1400*(b). Therefore, the court will next apply the most relevant public and private factors to the facts of the case as directed by the Third Circuit's decision in *Jumara v. State Farm Ins. Co., 55 F.3d 873, 879 (3d Cir.1995).*

In *Jumara*, the Third Circuit Court of Appeals identified a nonexclusive list of factors that have been used to guide courts in the exercise of their discretion in ruling on requests for transfer. *55 F.3d at 879-80; see also Affymetrix, Inc. v. Synteni, Inc., 28 F. Supp.2d 192, 196-97 (D. Del. 1998).* These factors fall into two groups: those relating to the private convenience of the litigants and those affecting the public interest in the fair and efficient administration of justice. *Jumara, 55 F.3d at 879-80.* n1 The court should apply these factors to determine, "on an individualized, case-by-case basis, whether convenience and fairness considerations weigh in favor of transfer." *Id. at 883* (citing *Stewart Org., Inc. v. Ricoh Corp., 487 U.S. 22, 30-31, 101 L. Ed. 2d 22, 108 S. Ct. 2239 (1988)).* [*5]  The burden is on moving party to show that balance of convenience and the interests of justice weighs in favor of transfer. *See Jumara,* at 879.

n1 The private interests may include: 1) the plaintiff's original forum preference; 2) the defendant's preference; 3) whether the claim arose elsewhere; 4) the convenience of the parties; 5) the convenience of the witnesses-- but only to the extent that the witnesses may actually be unavailable for trial in one of the fora; and 6) the location of books and records (similarly limited to the extent that the files could not be produced in the alternative forum). *Jumara, 55 F.3d at 879-880.* The public interests may include: 1) the enforceability of the judgment; 2) practical considerations that make the trial easy, expeditious, or in-

expensive; 3) the relative administrative difficulty in the two fora resulting from court congestion; 4) the local interest in deciding local controversies at home; 5) the public policies of the fora; and 6) the familiarity of the trial judge with the applicable state law in diversity cases. *Id.*

[*6]

### A. Private Factors

The court concludes that the balance of the private factors tips slightly in favor of transfer. In this case, the court finds the convenience of the parties, the convenience of the witnesses, and the location of records and books to be the most pertinent of the private factors. Although both parties are incorporated in Delaware, Precor maintains its headquarters in the Western District of Washington and Life Fitness in Franklin Park, Illinois. Additionally, neither of the parties, their witnesses, or any of the potentially relevant documents and records are located in Delaware.

Recognizing that the balance of convenience tips toward the Western District of Washington, Precor further argues that Life Fitness will suffer no greater inconvenience in traveling to Washington than Delaware. In contrast, Life Fitness argues that its choice of forum is paramount. The court acknowledges that a plaintiff's choice of forum is a "paramount" consideration that is not to be "lightly disturbed." *Schutte v. Armco Steel Corp., 431 F.2d 22, 25 (3d Cir. 1970); see also Jumara v. State Farm Ins. Co., 55 F.3d 873, 879-80 (3d Cir. 1995).* In this case, [*7]  however, the plaintiff's preference for Delaware is not given as much deference because most of the events at issue, that is, the design and manufacture of the exercise equipment, occurred outside of Delaware. *See Britamco Underwriters, Inc. v. Wallace, 56 F. Supp. 2d 542, 545 (E.D. Pa. 1999).* "The transfer of a case will generally be regarded as less inconvenient to a plaintiff if the plaintiff has not chosen . . . a forum where the alleged wrongful activity occurred." *Continental Casualty Co. v. American Home Assurance Co., 61 F. Supp. 2d 128, 131 (D. Del. 1999).* Thus, because the parties are located outside of Delaware, the witnesses as well as the relevant documents and records are located in Washington, and the product at issue was designed and manufactured in Washington, the Western District of Washington is a more convenient forum for the litigation.

### B. Public Factors and the Interest of Justice

Although the private factors tip slightly in favor of the Western District of Washington, the relevant public factors weigh heavily in favor of transfer. Most relevant to the courts inquiry is whether there are practical considerations that would make [*8]  trial "easy, expedi-

tious, or inexpensive." *Jumara, 55 F.3d at 879.* In this case, there has already been litigation on the *'207* patent, a parent patent of the one at issue here, in the Western District of Washington. This matter is on appeal. Moreover, the parties are currently litigating another patent infringement matter involving exercise equipment in the Western District of Washington. n2 Where related lawsuits exist, "it is in the interests of justice to permit suits involving the same parties and issues to proceed before one court." *See Liggett Group, Inc. v. R.J. Reynolds Tobacco Co., 102 F. Supp. 2d 518,* (D.N.J. 2000) (citations omitted). Thus, the court finds that transferring this case would promote the interests of justice.

n2 The parties disagree as to whether this is a directly related matter.

## III. CONCLUSION.

Finding that the balance of convenience and the interests of justice weigh in favor of transfer,

IT IS HEREBY ORDERED that:

1. Precor Incorporated's [*9]  Motion to Transfer is GRANTED; and

2. This matter shall be TRANSFERRED to the Western District of Washington.

Date: December 12, 2000

Gregory M. Sleet

UNITED STATES DISTRICT JUDGE

# EXHIBIT   D

LEXSEE 2006 US DIST LEXIS 50488



Analysis
As of: Feb 26, 2007

**CASHEDGE, INC., Plaintiff, v. YODLEE, INC., Defendant.**

**Civil Action No. 06-170-JJF**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE**

*2006 U.S. Dist. LEXIS 50488*

**July 19, 2006, Decided**

**SUBSEQUENT HISTORY:** Reconsideration denied by *Cashedge, Inc. v. Yodlee, Inc., 2006 U.S. Dist. LEXIS 61839 (D. Del., Aug. 30, 2006)*

**COUNSEL:** [*1] Arthur G. Connolly, III, Esquire, of CONNOLLY BOVE LODGE & HUTZ LLP, Wilmington, Delaware, Of Counsel: Drew M. Wintringham, III, Esquire, and Mark W. Rueh, Esquire, of CLIFFORD CHANCE ROGERS & WELLS LLP, New York City, New York, Attorneys for Plaintiff.

William J. Marsden, Jr., Esquire, and Kyle Wagner Compton, Esquire, of FISH & RICHARDSON, P.C., Wilmington, Delaware, Of Counsel: David M. Barken, Esquire, and Craig R. Compton, Esquire, of FISH & RICHARDSON, P.C., Redwood City, California, Attorneys for Defendant.

**JUDGES:** Joseph J. Farnan, Jr., UNITED STATES DISTRICT JUDGE.

**OPINION BY:** Joseph J. Farnan, Jr.

**OPINION:**

**MEMORANDUM OPINION**

**Farnan, District Judge.**

Pending before the Court is Defendant's Motion To Transfer (D.I. 12). For the reasons discussed, the Motion will be granted.

**I. BACKGROUND**

Plaintiff was issued *United States Patent No. 7,013,310* ("the *'310 patent*"), entitled "Method And Ap-

paratus For Retrieving And Processing Data" on March 14, 2006. That same day, Plaintiff filed its Complaint in this Court, alleging infringement of the *'310 patent*. (D.I. 1). Defendant filed its Answer and Counterclaim on April 4, 2006, and stated its intent to file a motion [*2] to transfer. (D.I. 5). On May 4, 2006, Defendant filed its Motion to Transfer. (D.I. 12).

Defendant's Motion to Transfer is based on a pending action in the Northern District of California, Case No. C-05-1550-SI. On April 14, 2005, Defendant filed a patent infringement action in the Northern District of California, alleging that Plaintiff infringed several of its U.S. Patents. In response, Plaintiff filed an action in the same court, seeking a declaratory judgment of non-infringement, invalidity, and unenforceability of the patents asserted in Defendant's case and additional patents. Those two actions were consolidated into one nine-patent case ("the California action"). The California court conducted a Markman hearing on April 26, 2006.

**II. PARTIES' CONTENTIONS**

By its Motion, Defendant contends that, pursuant to *28 U.S.C. § 1404(a)*, the Court should transfer this action to the Northern District of California. In support of this contention, Defendant argues that Plaintiff's allegations of infringement of the *'310 patent* are related to the allegations in the California action. Further, Defendant contends that certain patents in the California action [*3] are prior art to Plaintiff's *'310 patent* and form the basis of Defendant's inequitable conduct defense. n1 In response, Plaintiff contends that the Court should deny the Motion because Plaintiff chose Delaware, the California action is unrelated, and judicial economy would not be served by transfer.

n1 Defendant alleges that, at a minimum, *United States Patent Nos. 6,317,783* ("the '783 patent"), 6,199,077 ("the '077 patent"), and 6,412,073 ("the '073 patent") are material prior art to Plaintiff's *'310 patent*. (D.I. 5 at P 23).

## III. DISCUSSION

Under *28 U.S.C. § 1404(a)*, "[f]or the convenience of the parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought." *28 U.S.C. § 1404(a)*. Since it is undisputed that Plaintiff could have brought the instant action in the Northern District of California, the Court's only task is to determine whether the factors [*4] enumerated in *Section 1404(a)* warrant a transfer under the circumstances.

The Third Circuit has set forth a list of factors for district courts to consider when deciding whether or not to transfer venue. *Jumara v. State Farm Ins. Co., 55 F.3d 873, 879-80 (3d Cir. 1995)*. These factors include six private interests: (1) the plaintiff's forum preference as evidenced by his or her original choice, (2) the defendant's preference, (3) whether the claim arose elsewhere, (4) the convenience of the parties due to their relative physical and financial condition, (5) the convenience of the expected witnesses, but only so far as the witnesses might be unavailable for trial if the trial is conducted in a certain forum, and (6) the location of books and records, to the extent that the books and records could not be produced in a certain forum. *Id. at 879*. The factors also include six public interests for courts to consider: (1) the enforceability of the judgment, (2) practical considerations regarding the ease, speed, or expense of trial, (3) the administrative difficulty due to court congestion, (4) the local interest in deciding local controversies in the home [*5] forum, (5) the public policies of the two fora, and (6) the trial judge's familiarity with the applicable state law in diversity cases. *Id. at 879-80*. District courts must balance all of the relevant factors and determine whether a transfer of venue would best serve all the aforementioned interests. *Id. at 883*. The burden is on the movant to establish that the balance of the interests weighs in favor of the requested transfer, and a transfer will be denied if the factors are evenly balanced or weigh only slightly in favor of the transfer. *Continental Cas. Co. v. Am. Home Assurance Co., 61 F. Supp. 2d 128, 131 (D. Del. 1999)*.

### A. PRIVATE INTERESTS

Although the plaintiff's choice of forum is entitled to substantial deference and should not be lightly disturbed, *Shutte v. Armco Steel Corp., 431 F.2d 22, 25 (3d Cir. 1920)*, when the plaintiff lacks a rational and legitimate reason to litigate in the forum, the transfer of a case to a more appropriate forum is less inconvenient. *Brunswick Corp. v. Precor Inc., 2000 U.S. Dist. LEXIS 22222, at *7 (D. Del. Dec. 12, 2000)*; See *Waste Distillation Tech., Inc. v. Pan Am. Res., Inc., 775 F. Supp. 759, 764 (D. Del. 1991).* [*6] A corporation's decision to incorporate in a particular state is a rational and legitimate reason to choose to litigate in that state. *Stratos Lightwave, Inc. v. E2O Communs., Inc., 2002 U.S. Dist. LEXIS 5653, C.A. No. 01-309 JJF, at *7 (D. Del. March 26, 2002)*. Accordingly, the first factor weighs against transfer, and Defendant must demonstrate that the other *Jumara* factors strongly favor a transfer to California.

The Court concludes that the other private interest factors weigh in favor of transfer. Here, both parties are Delaware corporations with principal places of business outside Delaware. Plaintiff is headquartered in New York City, and Defendant is headquartered in Redwood City, California. Both parties maintain offices in the Northern District of California. Also, there are likely witnesses, such as former employees, that still reside in the Northern District of California. The location of books and records is neutral as neither party has argued that it would be unable to produce documents in either forum.

Importantly, the same parties are currently litigating in the Northern District of California. Although the Court understands that the California [*7] action and this action are different, n2 the technologies at issue all relate to data extraction, retrieval, or presentation through Internet technologies, such as web sites and web pages. The Northern District of California is more convenient for the parties because the parties and potential witnesses are located in that district, the parties have proven capable to litigate there, and the court is already familiar with the parties and their technologies.

> n2 This action requires claim construction of the claim language of the *'310 patent*, which is not part of the California action. However, Defendant's patents-in-suit in the California action are relevant to its defenses and counterclaim in this action.

### B. PUBLIC INTERESTS

The Court also concludes that the public interest factors weigh in favor of transfer. Where related lawsuits exist, "it is in the interests of justice to permit suits involving the same parties and issues to proceed before one court." *Brunswick, 2000 U.S. Dist. LEXIS 22222,* [*8]

*at \*8.* Factors supporting a decision to transfer include whether the litigation in the target forum involves: (1) the same parties, (2) related or similar technologies for the judge to become familiar with, and (3) a common field of prior art.

In this case, judicial efficiency regarding the ease, speed, or expense of trial strongly weigh in favor of transfer. The California action involves the same parties, similar technologies, and related patents-in-suit. The parties in the California action have already conducted a two-hour technology tutorial on April 19, 2006, argued Markman issues in nine patents on April 26, 2006, and commenced discovery on seemingly related products and technologies. Additionally, the Court concludes that public interests such as enforceability of the judgment, familiarity with state law in diversity actions, local interests in deciding local controversies, and court congestion are neutral or non-applicable factors in this case. *Jumara, 55 F.3d at 879-880.* Accordingly, the interests of judicial efficiency and justice are best served by transferring this case to the Northern District of California.

## IV. CONCLUSION

In sum, for the [*9] reasons discussed, the Court concludes that the balance of the private and public interest factors support transferring this case to the Northern District of California where related litigation is pending. Accordingly, the Court will grant Defendant's Motion To Transfer (D.I. 12).

An appropriate Order will be entered.

ORDER

At Wilmington, the 19 day of July 2006, for the reasons set forth in the Memorandum Opinion issued this date;

IT IS HEREBY ORDERED that the Defendant's Motion To Transfer (D.I. 12) is **GRANTED.**

Joseph J. Farnan, Jr.

UNITED STATES DISTRICT JUDGE

# EXHIBIT   E

LEXSEE 2002 US DIST LEXIS 2980



Cited
As of: Feb 26, 2007

**CORIXA CORPORATION, a Delaware corporation, et al., Plaintiffs, v. IDEC PHARMACEUTICALS CORPORATION, a Delaware corporation, Defendant.**

**C.A. No. 01-615 GMS**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE**

*2002 U.S. Dist. LEXIS 2980*

**February 25, 2002, Decided**

**DISPOSITION:** [*1] Defendant's motion to transfer action to Southern District of California GRANTED, Matter TRANSFERRED.

**COUNSEL:** For CORIXA CORPORATION, COULTER PHARMACEUTICAL INC., SMITHKLINE BEECHAM CORPORATION, plaintiffs: Thomas C. Grimm, Morris, Nichols, Arsht & Tunnell, Wilmington, DE.

For IDEC PHARMACEUTICALS CORPORATION, defendant: Philip A. Rovner, Potter Anderson & Corroon, LLP, Wilmington, DE.

**JUDGES:** Gregory M. Sleet, UNITED STATES DISTRICT JUDGE.

**OPINION BY:** Gregory Moneta Sleet

**OPINION:**

MEMORANDUM AND ORDER

I. INTRODUCTION

On September 10, 2001, IDEC Pharmaceutical Corporation ("IDEC") filed a complaint in the Southern District of California against Coulter Pharmaceutical Inc. ("Coulter"), Corixa Corporation ("Corixa"), and the Regents of the University of Michigan ("Michigan"). In its complaint, IDEC seeks a declaratory judgment of non-infringement and/or invalidity of five patents. On September 11, 2001, the Oncologic Drugs Advisory Committee ("ODAC") indicated that it would recommend a limited FDA approval of IDEC's drug Zevalin. On September 12, 2001, at approximately 8:33 A.M. PST, IDEC [*2] filed a first amended complaint which included a sixth patent.

On September 12, 2001, at 12:07 P.M. EST, Corixa, Coulter, and GlaxoSmithKline (GSK) (collectively "Corixa") filed the above-captioned action against IDEC. n1 Corixa alleges that IDEC is infringing U.S. Patent Nos. 6,015,542, ("the 542 patent"), 6,090,365 ("the 365 patent"), and 5,595,721 ("the 721 patent"). These patents are three of the patents involved in the California declaratory judgment action.

n1 On September 28, 2001, Michigan was added as a plaintiff in this action.

Presently before the court is IDEC's motion to stay the proceedings, or alternatively, to dismiss or transfer this action to the Southern District of California. n2 For the reasons that follow, the court will grant IDEC's motion to transfer.

n2 IDEC sought to stay the proceedings pending a ruling from the California court on a motion to dismiss. On January 30, 2002, the California court denied the motion to dismiss. IDEC's current motion to stay is therefore moot.

[*3]

II. BACKGROUND

IDEC is a Delaware corporation with its sole place of business in the San Diego area. Coulter is a Delaware corporation with its principle place of business in the San Francisco Bay area. Corixa is a Delaware corporation based in Seattle, Washington. GSK is a Pennsylvania corporation with its principle place of business in Philadelphia, Pennsylvania. The University of Michigan is a constitutional corporation of the State of Michigan, located in Ann Arbor, Michigan.

The patents at issue involve technology for the treatment of lymphoma using targeted radioimmunotherapy. Coulter and Michigan are co-owners of the 542, 365, and 721 patents. Corixa and GSK are the licensees of these patents. Both IDEC and Corixa are currently seeking FDA approval for a commercial embodiment of their respective inventions for the treatment of lymphoma using radioimmunotherapy.

With these facts in mind, the court will now turn to the motion presently before it.

## III. DISCUSSION

### A. The "First-Filed" Rule

Where two patent lawsuits involving the same claims are filed in different jurisdictions, the Federal Circuit requires that the first-filed action be given preference [*4] absent special circumstances. *See Genentech v. Eli Lilly & Co., 998 F.2d 931, 937 (Fed. Cir. 1993).* The first-filed doctrine also serves to prevent a multiplicity of actions and to achieve resolution in a single lawsuit of all disputes arising from common matters. *See id. at 937.* This doctrine applies equally well where the first-filed action is one for a declaratory judgment. *See id. at 938* (noting that, where the declaratory action can resolve the various issues, a first-filed declaratory action is entitled to precedence as against a later-filed patent infringement action.)

Applying the first-filed rule, IDEC argues that the present case should be transferred to the Southern District of California. Notwithstanding that the cases at issue are "mirror image" cases where the court is asked to construe the same patents, Corixa argues that the first-filed rule is inapplicable to the present situation.

Corixa first argues that GSK has not been joined in the California litigation. The record before the court indicates that GSK is Coulter's licensee. It is unclear whether GSK is an exclusive licensee. However, even were the court to accept [*5] Corixa's argument that GSK is an exclusive licensee, that alone does not indicate that GSK is a necessary party to this litigation. Corixa concedes that GSK is a licensee with fewer than all substantial rights. As such, GSK, while likely a proper party to the California lawsuit, is not a necessary party. *See Intellectual Property Development, Inc. v. TCI Cablevision of California, Inc., 248 F.3d 1333, 1348 (Fed. Cir. 2001)* (holding that an exclusive licensee possessing fewer than all substantial rights may not sue in its own name without joinder of the patent owner.) Finally, to the extent that the parties believe that GSK is a necessary party, GSK may request permission to join the California litigation. n3

> n3 Corixa expresses concern over whether the California court has subject-matter jurisdiction over an action between IDEC and GSK. As it is not the court's province to determine another court's subject matter jurisdiction, the court expresses no opinion on this.

Corixa next argues that the [*6] first-filed rule is inapplicable to the present situation because IDEC improperly "raced to the courthouse" in order to file its motion in California. In support of this contention, Corixa points out that its right to file an infringement suit against IDEC did not ripen until after ODAC recommended that the FDA approve Zevalin. However, before ODAC publicly recommended approval, but after IDEC had reason to believe they would do so, IDEC "raced" to file its declaratory judgment action.

The court acknowledges that IDEC's filing seems providential since ODAC's recommendation became public the day after IDEC filed its suit. In its November 6, 2001 Order, however, the California court specifically found that IDEC possessed a reasonable apprehension of suit when it filed its declaratory judgment action. The California court continued by stating that, "an actual controversy existed when IDEC filed the complaint under consideration. Consequently the court finds that IDEC's filing suit was not motivated by "forum shopping alone," but rather was a legitimate exercise of its opportunity under the Declaratory Judgement Act . . . ." This court sees no reason to disagree with the California court's [*7] findings.

Given the information presently before it, the court concludes that having two separate trials in mirror image cases would defeat the purposes of the first-filed rule, namely, sound judicial administration and comity among federal courts of equal rank. *See EEOC v University of Pennsylvania, 850 F.2d 969, 971 (3d Cir. 1988).* Accordingly, the court finds that the application of the rule weighs heavily in favor of transferring this case to the Southern District of California.

### B. Section 1404(a)

Transfer to the Southern District of California is also mandated under a section 1404(a) analysis. Section

1404(a) provides that "for the convenience of [the] parties and [the] witnesses, in the interest of justice," the court may transfer this action to "any other district where it might have been brought." *28 U.S.C. § 1404*(a). There is no dispute that this action could have been filed in the Southern District of California. The court will, therefore, move on with inquiry as directed by the Third Circuit. *See Jumara v. State Farm Ins. Co., 55 F.3d 873, 879 (3d Cir. 1995)*.

In *Jumara*, the Third Circuit provided [*8] a list of factors to assist the district courts in determining "whether, on balance, the litigation would more conveniently proceed and the interests of justice [would] be better served by a transfer to a different forum." *Id.* These factors include six private and five public interests which the court may consider. *See id.*

### 1. The Private Interests

The private interests most relevant to this case include: (1) the convenience of the parties as indicated by their relative physical and financial position; (2) the convenience of the witnesses, but only to the extent that they may be unavailable for trial in one of the fora; and (3) the location of records and other documents, again, only to the extent that these files cannot be produced in the alternate forum. n4

> n4 For the reasons the court discussed in a previous opinion, it will not afford any weight to the first three *Jumara* factors, specifically, the plaintiff's initial choice of forum, the defendant's preferred venue, and whether the claim arose elsewhere. *See Affymetrix, Inc. v. Synteni, Inc., 28 F. Supp. 2d 192, 197-201 (D. Del. 1998)*. In not affording weight to these factors, the court avoids the risk of double-counting these interests and thereby throwing off the transfer analysis. *See id.* Instead, the court will consider whether the Southern District of California is a more convenient forum for the parties and the witnesses, while also serving the interests of justice. *See 28 U.S.C. § 1404*(a).

[*9]

### a. The Convenience of the Parties

Geographically, California is not more inconvenient for the parties than Delaware. Michigan must travel whether the suit is in California or Delaware. GSK is one of the world's largest pharmaceutical companies, and cannot complain about location. The remainder of the parties are based on the West Coast. Furthermore, transfer to California would reduce the overall inconvenience to all parties involved. The parties must already be pre-pared to litigate the related case currently pending in the Southern District of California. Bringing witnesses and relevant documents to only one location, here California, minimizes the level of disruption caused to all parties by the litigation. This is certainly a more economical and efficient result than having each party moving witnesses and documents between two states, depending on which of these related actions is being litigated at that time. Thus, this factor weighs in favor of transfer.

### b. The Convenience of Witnesses

Party witnesses or witnesses who are employed by a party carry no weight in the "balance of convenience" analysis since each party is able, indeed obligated, to procure the attendance of its [*10] own employees for trial. *See Affymeytrix, 28 F. Supp. 2d at 203.* Expert witnesses or witnesses who are retained by a party to testify carry little weight in determining where the "balance of convenience" lies because they are "usually selected [on the basis] of their reputation and special knowledge without regard to their residences and are presumably well compensated for their attendance, labor and inconvenience, if any." *See id.* (internal citations omitted). Fact witnesses who possess first-hand knowledge of the events giving rise to the lawsuit, however, have traditionally weighed quite heavily in the "balance of convenience" analysis. *See id.*

There is no evidence on the record that would indicate that Delaware would be an inconvenient forum for potential non-party witnesses. However, the court notes that all the material witnesses in this dispute, party or otherwise, will be in California already to litigate the related matter now pending in the Southern District of California. Requiring that they come to Delaware to litigate this action separately cannot be considered convenient and in the interest of justice. However, as there is no clear evidence [*11] that a non-party witness will be unable to attend trial in Delaware, this factor must weigh against transfer.

### c. The Location of Records and Other Documents

The technological advances of recent years have significantly reduced the weight of this factor in the "balance of convenience" analysis. *See id. at 205.* There is no indication that either party would be unable to produce the relevant records and documents in Delaware. Thus, because this factor is relevant only insofar as the documents would be unavailable in one forum, the court finds that this factor must weigh against transfer.

From a practical standpoint, however, the court notes that any relevant documents will already be in California for the litigation of that case. The court sees no need to require that the parties move the same documents across the country. Rather, it would be much more

2002 U.S. Dist. LEXIS 2980, *

efficient to litigate these related actions in one location. However, these considerations are more relevant to the first factor discussed *supra.*

2. The Public Factors

As other courts have noted, depending on the circumstances of the case, some of the "public interest" factors listed in *Jumara* may play no role [*12] in the "balance of convenience." *See id.* at 205. The court thus elects to discuss only the factors most relevant to the pending case.

a. Practical Considerations Making Trial Easy, Expeditious or Inexpensive

This factor appears to substantially repeat the "first-filed" analysis advanced by IDEC, and accepted by the court, in Section III.A, *supra.* As such, the court declines to further address this issue here, since it has already taken this argument into consideration.

b. Delaware's Interest in this Controversy

Three of the parties in this action are Delaware corporations. However, while the court is mindful of Delaware's interest, that alone will not tip the "balance of convenience" in its favor. This is so because the court can hardly describe the patents as a local controversy unique to Delaware. *See Affymetrix, 28 F. Supp. 2d at 207.* Instead, the patents deal with the treatment of lymphoma. This clearly has far-reaching implications. Accordingly, this factor does not weigh against transferring this case to California.

c. Collective Travel Time and Cost

A mirror image action is currently pending in California. Thus, to require the parties [*13] to simultaneously litigate virtually the same case on different coasts would certainly increase the collective travel time and cost. Thus, this factor weighs in favor of transfer.

IV. CONCLUSION

The court concludes that the "balance of convenience" tips strongly in favor of transferring this action to the Southern District of California.

For these reasons, IT IS HEREBY ORDERED that:

1. IDEC's alternative motion to transfer this action to the Southern District of California (D.I. 8) is GRANTED.

2. The above-captioned matter is hereby TRANSFERRED to the United States District Court for the Southern District of California.

Dated: February 25, 2002

Gregory M. Sleet

UNITED STATES DISTRICT JUDGE

# EXHIBIT   F

LEXSEE 1996 US DIST LEXIS 11922



Analysis
As of: Feb 26, 2007

EBW, INC., a Michigan corporation, v. ENVIRON PRODUCTS, INC. and
MICHAEL C. WEBB, Defendants.

No. 1:96-cv-144

UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF
MICHIGAN, SOUTHERN DIVISION

*1996 U.S. Dist. LEXIS 11922*

**July 8, 1996, Decided
July 8, 1996, FILED**

**PRIOR HISTORY:**  [*1]  96-cv-04994.

**DISPOSITION:** Defendants' motion for a transfer granted and transfered action in its entirety to the United States District Court for the Eastern District of Pennsylvania

**COUNSEL:** For EBW, INC., a Michigan corporation: Marshall G. MacFarlane.

For ENVIRON PRODUCTS, INC., deft: Terence J. Linn, Van Dyke, Gardner, Linn & Burkhart, LLP, Grand Rapids, MI. John J. Marshall, Joseph R. DelMaster, Jr., James J. Kozuch, Seidel Gonda Lavorgna & Monaco, Philadelphia, PA.

For MICHAEL C. WEBB, deft: Terence J. Linn, (See above). John J. Marshall, (See above). Joseph R. Del-Master, Jr., (See above). James J. Kozuch, (See above).

**JUDGES:** Wendell A. Miles, Senior Judge

**OPINION BY:** Wendell A. Miles

**OPINION:**

OPINION AND ORDER ON DEFENDANTS' MOTION TO DISMISS FOR IMPROPER VENUE OR, IN THE ALTERNATIVE, TO TRANSFER TO THE EASTERN DISTRICT OF PENNSYLVANIA, OR TO STAY THESE PROCEEDINGS PENDING THE OUTCOME OF THE PENNSYLVANIA ACTION

On February 28, 1996, plaintiff EBW, Inc. filed this action against the defendants seeking, inter alia, a declaratory judgment that U.S. Patent No. 5,297,896 (the " '896 patent") is invalid. The defendants, Michael C. Webb, the claimed inventor of the hazardous fluid containment [*2]  system which is the subject of the '896 patent, and Environ Products, Inc., Webb's assignee, have filed a motion seeking the dismissal of this action, or, alternatively, a stay or transfer of the proceedings. The basis for the motion is that the same claims involving related parties are at issue in an earlier-filed action currently pending in the United States District Court for the Eastern District of Pennsylvania.

For the reasons to follow, the court hereby **GRANTS** the motion to transfer and hereby transfers this action to the United States District Court for the Eastern District of Pennsylvania.

FACTS

Environ is a Delaware corporation having its principal place of business in Lionville, Pennsylvania. Webb is a Pennsylvania resident. On March 25, 1992, Environ filed with the United States Patent and Trademark Office an application for a patent on a flexible, coaxial pipe for secondary containment of hazardous fluids ("the invention"). On March 29, 1994, Environ's application issued as the '896 patent.

On November 15, 1995, Environ filed suit in the United States District Court for the Eastern District of Pennsylvania against Advanced Polymer Technology, Inc. ("APT"),  [*3]  a Michigan corporation doing busi-

ness in Indiana, and Leo J. LeBlanc, alleging, inter alia, infringement of the '896 patent. LeBlanc is the majority owner and president of EBW. APT and EBW share common shareholders, officers, and directors. LeBlanc, in his capacity as owner and president of EBW, exercises active control over the activities of APT. At one point, EBW apparently owned stock in Environ and LeBlanc served on Environ's board of directors. Environ's complaint in the Eastern District of Pennsylvania action specifically alleges that LeBlanc, while a member of Environ's board, became privy to confidential information regarding the invention and copied it for APT's use. Environ's complaint also alleges that APT is currently selling underground containment chambers and underground flexible coaxial pipe for use in secondary containment systems that infringe Environ's '896 patent.

Although APT and LeBlanc filed a joint answer in the Pennsylvania action in which they contended that venue was more properly laid in the Western District of Michigan, this court's review of the docket in that proceeding indicates that they have not filed a motion for change of venue. APT and LeBlanc's [*4] joint answer also identifies EBW as APT's "predecessor in interest." n1 Finally, APT and LeBlanc's joint answer includes counterclaims against Environ for federal and state unfair competition; conversion; unjust enrichment; breach of fiduciary duties; fraud; and joint inventorship.

n1 In its brief filed in opposition to the present motion, EBW states that "LeBlanc and his co-inventors assigned all title, rights and interest to APT." Plaintiff's Reply [sic] to Defendants' Motion to Dismiss for Improper Venue or, in the Alternative, to Transfer or to Stay at p.6.

On February 28, 1996, EBW, acting through the same Michigan attorney who has identified himself as "lead counsel" for APT and LeBlanc in the Pennsylvania federal court proceeding, filed this action against Environ and Webb. EBW's eleven-count complaint alleges that its "principal," LeBlanc, is the true inventor of the subject of the '896 patent and that Webb was able to falsely claim inventorship after obtaining confidential information about the invention [*5] while participating in a joint enterprise between EBW and Environ for the development, manufacture, and sale of components for fluid storage and distribution systems. When the companies parted ways, EBW alleges, Webb and Environ filed the '896 patent application on the invention without EBW's knowledge and without obtaining an assignment, license, or other authority from LeBlanc or EBW. n2 Of EBW's eleven claims in this action, the first seven virtually mirror the counterclaims of APT and LeBlanc asserted against Environ in the Pennsylvania action. n3 As

part of its prayer for relief in the present case, EBW's complaint demands a declaratory judgment that the '896 patent is invalid; demands that the court compel Environ and Webb to "immediately execute an assignment of all right, title and interest in and to the '896 patent to [EBW]"; and demands that the court enter an order "correcting the designation of inventorship" of the '896 patent.

n2 One count of EBW's complaint, labelled "Fraud on Shareholders and Directors," alleges that Environ and Webb concealed the existence of the '896 patent application during negotiations for re-acquisition of EBW's stock in Environ. The court notes that both the Stock Purchase Agreement and the Stock Redemption Agreement, copies of which have been provided by defendants as exhibits to their motion, provide that the relationship between EBW and Environ is to be governed by Pennsylvania law.

[*6]

n3 The remaining four claims asserted by EBW against Environ and Webb in this action include claims for breach of contract; fraud on shareholders and directors; breach of employment agreement (against defendant Webb only); and a claim for a declaratory judgment that the '896 patent is invalid.

Court records reveal that the action pending in the Eastern District of Pennsylvania has proceeded through the issuance of a case management order which provides that the parties are to engage in discovery on the issue of the ownership of the rights to the invention which is the subject of the '896 patent.

ANALYSIS

In their motion, the defendants argue that venue is improper in this district under the "first-to-file rule," which provides that, in the absence of compelling circumstances, the federal court first seized of jurisdiction over a dispute should be permitted to adjudicate the controversy fully. The defendants also argue that because this action arises out of the same transactions and occurrences and involves the issue of ownership of the same patent rights as the prior-filed action, the avoidance [*7] of wasteful duplication of effort and the possibility of inconsistent verdicts weigh in favor of a dismissal of this action, a transfer to the Eastern District of Pennsylvania, or at least a stay of these proceedings pending the outcome of the Pennsylvania case.

"The federal courts long have recognized that the principle of comity requires federal district courts--courts of coordinate jurisdiction and equal rank--to exercise care to avoid interference with each other's affairs." *West Gulf Maritime Ass'n v. ILA Deep Sea Local 24, 751 F.2d 721, 728 (5th Cir. 1985)* (citing *Kerotest Mfg. Co. v. C-O-Two Fire Equipment Co., 342 U.S. 180, 96 L. Ed. 200, 72 S. Ct. 219 (1952)* and *Covell v. Heyman, 111 U.S. 176, 182, 28 L. Ed. 390, 4 S. Ct. 355 (1884)).* "'As between federal district courts, . . . the general principle is to avoid duplicative litigation.'" *West Gulf, 751 F.2d at 728* (quoting *Colorado River Water Conservation Dist. v. United States, 424 U.S. 800, 817, 47 L. Ed. 2d 483, 96 S. Ct. 1236 (1976));* see also *In re American Medical Systems, Inc., 75 F.3d at 1069, 1088 (6th Cir. 1996)* ("Although there is no precise rule that, as between federal district courts, [*8] one court should defer to the other, 'the general principle is to avoid duplicative litigation'") (citations omitted). In order to avoid such duplication and to avoid the possibility of rulings which may trench upon the authority of sister courts, a district court may dismiss an action where the issues presented can be resolved in an earlier-filed action pending in another district court. *West Gulf, 751 F.2d at 729.* In the alternative, because "primary jurisdiction attaches in the forum in which the action is first instituted[,]" a district court may transfer the later-filed action to the district where the earlier-filed action is pending, provided that the transferee district is one where the later-filed action "might have been brought." *Parker-Hannifin Corp. v. Samuel Moore and Co., 436 F. Supp. 498, 501-02 (N.D. Ohio 1977)* (citing, inter alia, *Barber-Greene Co. v. Blaw-Knox Co., 239 F.2d 774 (6th Cir. 1957)).*

Although EBW has admitted that the Eastern District of Pennsylvania is a jurisdiction in which this action could have been brought, EBW has opposed the defendants' motion. EBW makes a number of legally and factually meritless arguments in opposing the motion. [*9]

First, EBW argues that the "first-to-file" principle invoked by the defendants only applies where the pending cases involve "the same parties and the same issues[.]" Plaintiff's Reply [sic] to Defendants' Motion to Dismiss for Improper Venue or, in the Alternative, to Transfer or to Stay (hereinafter "Plaintiff's Reply") at p. 9. This is simply not true; a precise identity of parties is simply not required. Had EBW bothered to review the case law cited in its own brief or in the defendants' motion, EBW undoubtedly would not have made such a meritless argument.

As for EBW's suggestion that all of the issues raised in both actions must be identical, this proposition is likewise unsupported by any citation to authority. The same invention, the same patent, and same series of events are at issue in both actions; this common subject matter and the substantial overlap between the two actions clearly supports the defendants' argument that duplication of effort and possibly inconsistent outcomes are threatened. That this action involves additional claims not raised in the Pennsylvania action--claims clearly arising out of the same subject matter and facts--may support a conclusion that [*10] a transfer would be proper rather than a dismissal, but it does not support the proposition that both cases should proceed independently in different districts.

Seemingly ignoring the contents of its own complaint, however, EBW makes the rather incredible argument that the two cases are "not related" (Plaintiff's Reply at p. 14) because EBW does not claim ownership of the '896 patent. Incredibly, EBW repeats this argument at various points throughout its brief filed in opposition to the defendants' motion. See Plaintiff's Reply at p. 12 ("plaintiff EBW does not claim ownership of the '896 patent"); id. at p. 13 ("Again, Plaintiff EBW has not made a claim of ownership with respect to the '896 patent in this case, and APT and LeBlanc certainly do not require Plaintiff EBW as a party in the Pennsylvania action in order to preserve their claims of ownership regarding the '896 patent"); id. ("Plaintiff EBW does not claim ownership of the '896 patent"); id. ("Plaintiff EBW is not a co-owner or co-inventor of the '896 patent or the patent which was filed by LeBlanc et al and which was subsequently assigned to APT"); see also id. at p. 7 ("Defendant Environ's complaint [*11] in the Pennsylvania action did not name Plaintiff EBW as a party since Plaintiff EBW does not manufacture, use or sell the alleged infringed product nor does Plaintiff EBW own any right, title or interest in LeBlanc's patent application which is currently involved in an interference proceedings [sic] within the United State [sic] Patent and Trademark Office"). This argument directly conflicts with the rather specific allegations of EBW's complaint, which state as follows:

> Upon learning of the illegal conduct of Defendants, Plaintiff immediately petitioned the United States Patent Office to declare an interference between the application filed by Webb . . . and the pending application filed by LeBlanc . . . [Complaint, P 16]

> Defendants have misappropriated Plaintiff's intellectual property. . . . [Complaint, P 21]

> Defendants wrongfully converted the Plaintiff's confidential information by stealing said information and using said

information for their own use in applying for a patent, and in creating and manufacturing products which were copies of the Plaintiff's invention. [Complaint, P 32]

The Defendants have converted Plaintiff's valuable intellectual [*12] property for their own use . . . [Complaint, P 33]

Defendants have unfairly used confidential information obtained, in confidence, from Plaintiff, all for the profit and enrichment of Defendants. [Complaint, P 35]

In breach of their fiduciary duty to the Plaintiff, Defendants misappropriated valuable proprietary information belonging to the Plaintiff, using said information for the Defendants' own enrichment. [Complaint, P 39]

Defendants' asserted ownership of the above '896 patent creates a substantial threat that the Defendants will seek to enforce an invalid patent . . . [Complaint, P 46]

Plaintiff is entitled to a determination of inventorship from this Court, and an order requiring correction of the inventorship of the '896 patent. [Complaint, P 52]

Finally, as the court has previously noted, EBW's prayer for relief includes a demand

That this court compel the Defendants, to immediately execute an assignment of all right, title and interest in and to the '896 patent to the Plaintiff.

Id., P D. Under the circumstances, the court takes rather a dim view of EBW's argument that the two actions are not sufficiently related, [*13] finding this argument to be expressly contradicted by EBW's own pleading in this case.

Finally, the court will briefly address an additional meritless argument made by EBW--an argument that a transfer would merely shift the inconveniences from defendants Environ and Webb to EBW because the latter's employees and counsel are all within Michigan. Of course, the short answer to this argument is that the indi-

vidual who will most likely be EBW's key witness in this action--its president, LeBlanc--will already be appearing in the Pennsylvania action as a defendant. Moreover, EBW's counsel in the present action is already involved as self-described "lead counsel" for the defendants in the Pennsylvania action. See Reply Brief of Defendants in Further Support of Their Motion, Exhibit A (Proposed Case Management Plan in Environ Products, Inc. v. Advanced Polymer Technology et al.), at p. 2, P2. So much for EBW's argument about the mere shifting of conveniences; the conveniences were effectively shifted when Environ won the race to the courthouse by filing in Pennsylvania. The existence of that action in another federal court is a fact which this court cannot ignore, and nothing more [*14] need be said about this particular argument.

The defendants have included in their motion a request for an award of attorneys' fees, costs, and expenses pursuant to *28 U.S.C. § 1927*. This statute provides as follows:

### § 1927 Counsel's liability for excessive costs

Any attorney or other person admitted to conduct cases in any court of the United States or any Territory thereof who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct.

This statute is "designed as a sanction against dilatory litigation practices and is intended to require an attorney to satisfy personally the excess costs attributable to his misconduct." *In re Ruben, 825 F.2d 977, 983 (6th Cir. 1987)*. Although simple inadvertence or negligence will not support a sanction under § 1927,

There must be some conduct on the part of the subject attorney that trial judges, applying the collective wisdom of their experience on the bench, could agree falls short of the obligations owed by a member of the bar to the court and which, [*15] as a result, causes additional expense to the opposing party. . . .

*Id. at 984.*

1996 U.S. Dist. LEXIS 11922, *

Given EBW's counsel's misrepresentation of the law and, more notably, his misrepresentation of his client's claims (as framed by the complaint) in responding to the merits of this motion, the court would have no trouble concluding that counsel's conduct was intended to cause the defendants' needless additional expense and that such conduct "falls short of the obligations owed by a member of the bar to the court." Absent from EBW's response to the defendants' motion is any suggestion regarding how the two cases might as a practical matter proceed simultaneously before two different federal courts; counsel has omitted any such suggestion because he well knows that this should not and could not happen.

However, the defendants have requested that if the court is inclined to transfer this action to the Eastern District of Pennsylvania, this portion of their motion be transferred to that court for a ruling on the issue of attorneys' fees, costs, and expenses. Defendants' Brief in Support of Motion to Dismiss or, in the Alternative, to Transfer or Stay, at p. 16. n4 The court has concluded that a [*16] transfer is warranted, and will grant this request to transfer the § 1927 motion to the United States District Court for the Eastern District of Pennsylvania, which is well-equipped to resolve the issues presented by counsel's conduct.

n4 EBW has not responded to that portion of Environ's motion which seeks an award under § 1927. Instead, EBW has merely made a perfunctory request of its own for an award of fees and expenses. Given the court's conclusions herein and the obvious merit in Environ's position, the court finds that EBW is not entitled to an award of sanctions.

CONCLUSION

For the foregoing reasons, the court hereby grants the defendants' motion for a transfer and hereby transfers this action in its entirety to the United States District Court for the Eastern District of Pennsylvania, where there is currently pending an action involving the same subject matter, Environ Products, Inc. v. Advanced Polymer Technology, Inc. et al., No. 2:95cv7209 (E.D. Penn., Judge Robert Gawthrop, III). This [*17] transfer includes a transfer of the defendants' motion for sanctions under 28 U.S.C. § 1927, which, it is assumed, the defendants will pursue before that court.

So ordered this 8th day of JULY, 1996.

Wendell A. Miles, Senior Judge

# EXHIBIT  G

LEXSEE 2005 US DIST LEXIS 29182



Positive
As of: Feb 26, 2007

**GOOD SPORTSMAN MARKETING LLC, Plaintiff, vs. TESTA ASSOCIATES,
LLC, et al., Defendants**

**CASE NO. 6:05CV90, PATENT CASE**

**UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF
TEXAS, TYLER DIVISION**

*2005 U.S. Dist. LEXIS 29182*

**September 1, 2005, Decided
September 1, 2005, Filed**

**SUBSEQUENT HISTORY:** Patent interpreted by *Good
Sportsman Mktg. LLC v. Testa Assocs., 2006 U.S. Dist.
LEXIS 47295 (E.D. Tex., July 12, 2006)*

**COUNSEL:**  [*1]  For Good Sportsman Marketing,
LLC, A Texas Limited Liability Company, Plaintiff: Eric
William Buether, Greenberg Traurig -- Dallas, Dallas,
Tx; Michael Edwin Jones, Potter Minton, Tyler, TX; Roy
D Oppenheim, Oppenheim Pilelsky, Weston, FL; Steven
I Peretz, William R Trueba, Jr, Kluger Peretz Kaplan &
Peretz, Miami, FL.

For IP Holdings, Inc., Plaintiff: Eric William Buether,
Greenberg Traurig -- Dallas, Dallas, Tx.

For Testa Associates, LLC, A New York Limited Liabil-
ity Company, formerly known as Global Point Products,
LLC, Defendant: Kelly Haze Kolb, Milton Glenn
Hammond, Beirne Maynard & Parsons -- Dallas, Dallas,
TX; Brian B Shaw, Jeffrey J Calabrese, Harter Secrest &
Emery, Rochester, NY; Scott Dion Marrs, William C
Norvell, Jr, Beirne Maynard & Parsons, Houston, TX.

For EBSCO Industries, Inc., Defendant: Elizabeth G
Borland, Robert J Veal, Smith Gambrell & Russell, At-
lanta, GA; Kelly Haze Kolb, Beirne Maynard & Parsons
-- Dallas, Dallas, TX.

For Moultrie Products, LLC, Defendant: Robert J Veal,
Smith Gambrell & Russell, Atlanta, GA; Kelly Haze
Kolb, Beirne Maynard & Parsons -- Dallas, Dallas, TX.

For Good Sportsman Marketing, LLC, A Texas Limited
Liability [*2]  Company, Counter Defendant: Eric Wil-
liam Buether, Greenberg Traurig -- Dallas, Dallas, Tx.

**JUDGES:**  LEONARD DAVIS, UNITED STATES
DISTRICT JUDGE.

**OPINION BY:** LEONARD DAVIS

**OPINION:**

**MEMORANDUM OPINION AND ORDER**

Before the Court are Defendants EBSCO Industries,
Inc. ("EBSCO") and Moultrie Products, LLC's ("Moul-
trie") Motion to Dismiss Under *Federal Rule of Civil
Procedure 12(b)(1)* or to Transfer (Docket No. 27). Co-
defendant Testa Associates, LLC ("Testa") joins EBSCO
and Moultrie (collectively, "Defendants") in its own Mo-
tion to Dismiss Under *Rule 12(b)(1)* or to Transfer
(Docket No. 28). Also before the Court is Plaintiff Good
Sportsman Marketing, LLC's ("GSM") Motion for Leave
to Amend Complaint to Add IP Holdings as Co-Plaintiff
(Docket No. 36). Having considered the parties' written
submissions, the Court **DENIES** the motions to dismiss
or transfer and **GRANTS** the motion for leave to amend
the complaint.

**BACKGROUND**

GSM brought suit against Testa on March 17, 2005,
in the Eastern District of Texas ("Texas Action") and
alleged that Testa infringed on various claims of two of

its patents, *U.S. Patent Nos. 6,735,387* (the "'387 Patent") and [*3] *6,678,868* (the "'868 Patent").

On April 26, 2005, Moultrie filed a Declaratory Judgment Action against GSM, the licensee, and IP Holdings, Inc. ("IP Holdings"), GSM's parent and assignee of the patents, in the Northern District of Alabama ("Alabama Action"), seeking a declaration that the *387 Patent*, the *868 Patent*, and *U.S. Patent No. 6,384,162* (the "'162 Patent") are invalid, unenforable, and not infringed. GSM amended its complaint before the Court on May 23, 2005 and added EBSCO and Moultrie as defendants. On June 16, 2005, Defendants filed a motion to dismiss for lack of jurisdiction claiming that, as a licensee, GSM lacks standing to bring this suit. Alternatively, Defendants move to transfer venue to the Northern District of Alabama arguing that the Alabama Action was first filed and that Alabama is a more convenient forum. On July 6, 2005, GSM filed a motion seeking leave to amend its complaint to add IP Holdings as a co-plaintiff in this action. The deadline for adding additional parties to the suit was June 3, 2005.

IP Holdings owns the *387, 868* and *162 Patents* and licenses them to GSM under the EXCLUSIVE PATENT LICENSING AGREEMENT ("Agreement"). GSM and IP Holdings [*4] are closely related entities. Timothy Schnell owns IP Holdings and the Schnell Family Trust owns GSM.

Moultrie is a single member limited liability corporation owned by a wholly-owned subsidiary of EBSCO. In early 2005, EBSCO acquired Testa's allegedly infringing camera business through an asset purchase.

## MOTION TO DISMISS

### Standing to Bring Patent Infringement Suit

To bring a patent infringement lawsuit, the plaintiff must establish prudential standing under the Patent Act, *35 U.S.C. § 281*, in addition to Article III standing. *Intellectual Prop. Dev., Inc. v. TCI Cablevision of CA, Inc., 248 F.3d 1333, 1345 (Fed. Cir. 2001)*. For a plaintiff to have prudential standing under the Patent Act, it must possess all substantial rights under the patent. *Id.*

To determine if a licensee possesses all substantial patent rights under a licensing agreement, courts look at the substance of the transaction and the surrounding circumstances of the patentee's intent to transfer all substantial rights to the licensee. *Vaupel Textilmaschinen KG v. Meccanica Euro Italia S.P.A., 944 F.2d 870, 875 (Fed. Cir. 1991)*. The [*5] patentee's transferring the right to sue for patent infringement is particularly dispositive in determining if a patentee transferred all substantial rights to the licensee. *Id.* The right to sue includes "the right to

indulge infringements." *Id. at 875*; *Abbott Lab. v. Diamedix Corp., 47 F.3d 1128, 1132 (Fed. Cir. 1995)*.

A provision in an agreement that grants a licensee the exclusive right to license the patents renders the licensor's right to sue nugatory, even if the licensor retains the right to sue infringers because the licensee can grant an alleged infringer a royalty-free sublicense. *Speedplay, Inc. v. Bebop, Inc., 211 F.3d 1245 (Fed. Cir. 2000)*. In *Speedplay*, the licensing agreement granted the licensee the "sole right to enforce the Licensed Patents," while the licensor retained "the option to initiate appropriate legal proceedings in his/their own name" if the licensee had failed to halt infringement within three months. *Id. at 1251*. The agreement also granted the licensee the exclusive right to license the patents covered by the agreement. *Id.* The court found that under the licensing agreement, [*6] the licensee controlled enforcement of the patent for all practical purposes and had standing to bring a patent infringement suit without joining the patentee as a co-plaintiff. *Id.*

The Agreement between IP Holdings and GSM grants GSM "the right to enforce and defend the Licensed Patents, including . . . the right to take any and all actions . . . against any and all infringers of the Licensed Patents." The language does not explicitly give GSM the exclusive right to enforce the patents, but a subsequent provision restricts IP Holdings from granting other licenses and gives GSM the right to sublicense the patents. The Agreement only requires GSM to advise the IP Holdings of the grant of any sublicense and provide IP Holdings with a copy of the sublicense.

Even if the Agreement does not grant GSM the exclusive right to enforce the Licensed Patents, GSM's exclusive right to license the Licensed Patents renders ineffectual whatever enforcement rights IP Holdings retained. IP Holdings does not have veto power over GSM's sublicenses and does not have rights to any royalties GSM derives from its sublicensing agreements. GSM possesses all substantial rights to the Licensed Patents and, [*7] for all practical purposes, controls enforcement of the Licensed Patents. It therefore has standing to bring a patent infringement suit on the Licensed Patents without joining IP Holdings as a co-plaintiff. Accordingly, the Court denies Defendants' motions to dismiss.

### First-To-File

Defendants argue that the Court should dismiss this case in deference to the Alabama Action, which they claim is first filed. In patent cases where the parties dispute venue, courts generally favor trying the case in the first-filed forum. *Genentech, Inc. v. Eli Lilly & Co., 998 F.2d 931, 937 (Fed. Cir. 1993), overruled in part sub*

Case 1:07-cv-00067-MPT    Document 8-2    Filed 02/26/2007    Page 59 of 90

Page 3
2005 U.S. Dist. LEXIS 29182, *

*nom. Wilton v. Seven Falls Co., 515 U.S. 277, 289, 115 S. Ct. 2137, 132 L. Ed. 2d 214 (1995); Texas Instruments Inc. v. Micron Semiconductor, Inc., 815 F. Supp. 994, 997 (E.D. Tex. 1993)*(Hall, J.).

The first-to-file rule applies when the two actions involve closely related questions or subject matter or the core issues substantially overlap, but the core issues do not need to be identical. *Texas Instruments Inc., 815 F. Supp. at 997.* A subsequent action that does not have complete identity of the parties can still substantially [*8] overlap on the substantive issues of the first-filed action, warranting dismissal or transfer. *Superior Sav. Ass'n v. Bank of Dallas, 705 F. Supp. 326, 328-29 (N.D. Tex. 1989); see Save Power Ltd. v. Syntek Fin. Corp, 121 F.3d 947, 950 (5th Cir. 1997).*

Once it has been proven that the two actions might substantially overlap, the court with the second-filed action transfers the case to the court where the first-filed action is pending, and the court where the action was first-filed decides if the cases actually do substantially overlap and require consolidation. *Cadle Co. v. Whataburger of Alice, Inc., 174 F.3d 599 (5th Cir. 1999).* The underlying policies supporting the first-to-file rule are comity and the orderly administration of justice. *Superior Sav. Ass'n, 705 F. Supp. at 331.*

The core issues in the Texas and Alabama Actions substantially overlap. Both actions concern IP Holdings's patents, and the additional patent in the Alabama Action issued from a continuation of the application that eventually became the *387 Patent.* A continuation application can only claim the same invention disclosed in the earlier [*9] application and, though the continuation application can vary the scope of the claims, it cannot include any subject matter that would constitute a new matter if inserted in the original application. *37 C.F.R. § 1.53; Transco Prods. Inc. v. Performance Contracting, Inc., 38 F.3d 551, 555 (Fed. Cir. 1995)*(citing MPEP § 201.07).

The *162* and the *387 Patents,* though the scope of the claims may be different, disclose the same invention, have similar prosecution histories, and cover identical subject matter. Any inquiries into the enforceability and validity of the *387 patent* necessarily implicate the enforcability and validity of the *162 patent,* whether brought as a defense in the Texas Action or claimed in the Alabama Action.

The parties in the Texas and Alabama Actions are not identical, but that is not dispositive as "complete identity of parties is not required for dismissal or transfer of a case subsequently filed to a substantially related action." *Save Power Ltd., 121 F.3d at 950.* A subsequent action that does not have complete identity of parties can still substantially overlap on the substantive issues of the first-filed [*10] action, as is the case here. *Id.* The core

issues in the Texas and Alabama Actions substantially overlap. Therefore, the Texas Action is the first-filed action.

A court can decline to hear the first-filed action in compelling circumstances. *Mann Mfg., Inc. v. Hortex, Inc., 439 F.2d 403, 407 (5th Cir. 1971).* While exceptions to the first-to-file rule are not rare, "there must be sound reason that would make it unjust or inefficient to continue the first-filed action." *Genentech, Inc., 998 F.2d at 937.* No such compelling circumstances that warrant dismissing the case are present here. Therefore, the Court denies Defendants' motions to dismiss or transfer under the first-filed rule.

**MOTION TO TRANSFER**

A district court has the discretion, for the convenience of the parties and witnesses, in the interest of justice, to transfer an action to a district or division where it might have been brought. *28 U.S.C. § 1404(a).* The court must first determine if the plaintiff could have brought the claim in the judicial district to which transfer is sought. *In re Volkswagen AG, 371 F.3d 201, 203 (5th Cir. 2004).* [*11] To transfer a case, a court must find that the balance of the private and public interests substantially favor transferring the case to another district. *See LeDoux v. Isle of Capri Casinos Inc., 218 F. Supp. 2d 835, 837 (E.D. Tex. 2002)*(Cobb, J.). The private factors include: (1) the convenience and location of the parties and material witnesses; (2) the cost of obtaining witnesses to testify and the subpoena power of the court; (3) the location of the alleged wrong; (4) the accessability and location of the evidence; and (5) the possibility of delay and prejudice if the court transfers the case. *See Mohamed v. Mazda Motor Corp., 90 F. Supp. 2d 757, 771 (E.D. Tex. 2000)*(Heartfield, J.). The public factors include: (1) administrative difficulties resulting from court congestion; (2) the local interest in having local juries decide local issues; (3) the forum's familiarity with the governing law; and (4) avoiding unnecessary conflict of law problems involving the application of foreign law. *Id.* While a court should consider the plaintiff's forum choice, it is not by itself conclusive or determinative. *In re Horseshoe Entm't, 337 F.3d 429, 434 (5th Cir. 2003);* [*12] *Z-TEL Communs., Inc. v. SBC Communs., Inc., 331 F. Supp. 2d 567, 571 (E.D. Tex. 2004)*(Folsom, J.).

GSM does not contest that it could have brought this action in the Northern District of Alabama. Accordingly, the Court assumes that venue would be proper in the Northern District of Alabama.

**Private Interests**

The first private factor is the convenience of the parties and witnesses. EBSCO is one of the nation's 200 largest privately held companies and has operations

throughout the United States and overseas. Trying a case in Tyler hardly inconveniences a global company with assets and operations dispersed throughout the United States and the world. *Maurice Mitchell Innovations, L.P. v. Intel Corp.*, Case No. 2:04-CV-450 (Docket No. 15) (E.D. Tex. Mar. 30, 2005)(Davis, J.). Defendants' preference for another forum, without more, is insufficient to warrant a transfer, and a transfer is not warranted if the result is to simply shift the inconvenience from one party to another. *Kimball v. Schwartz, 580 F. Supp. 582, 588 (W.D. Pa. 1984)*. While transfer will benefit EBSCO and Moultrie, it will inconvenience GSM. Further, Testa [*13] and EBSCO's allegedly-infringing division remain in Rochester, New York, and witnesses from Rochester will be equally inconvenienced by traveling to Tyler as they would be by traveling to Birmingham, Alabama. This factor does not favor transfer.

The second private factor deals with the cost of obtaining the attendance of witnesses and the subpoena power of each court. This factor accords greater weight to the convenience of the non-party witnesses rather than the employee witnesses. *Gundle Lining Constr. Co. v. Fireman's Fund Ins. Co., 844 F. Supp. 1163, 1166 (S.D. Tex. 1994)*. Defendants claim that one non-party witness, Dan Stoneburner, will be greatly inconvenienced by traveling from Atlanta to Tyler, as opposed to Birmingham, since there are no direct flights from Atlanta to Tyler and there are daily direct flights from Atlanta to Birmingham. This reasoning, however, would allow a defendant to defeat a plaintiff's forum choice by simply adding a non-party witness who resides outside the state, an outcome that is not in the interests of justice and not warranted by *28 U.S.C. § 1404(a)*. While the Northern District of Alabama would be more [*14] convenient for EBSCO and Moultrie's Birmingham personnel, it will not be more convenient for Testa and EBSCO's employees who reside in Rochester. Although this factor slightly weighs in Defendants favor, it does not substantially favor transferring the case to the Northern District of Alabama.

The third factor is the place of the alleged wrong. GSM alleges that Defendants engaged in infringing activity by selling allegedly infringing products throughout the United States. A plaintiff holding all substantial rights in a patent may bring its action in any district where the alleged infringement occurred. *See Beam Laser Sys. Inc. v. Cox Communications, Inc., 117 F. Supp. 2d 515, 518-519 (E.D. Va. 2000)* (finding that the "nationwide character of the alleged infringement does not diminish [plaintiff's] choice of Virginia as its forum, however: If there is no center of infringement activity in a particular case, then, as long as the plaintiff brings its action in a forum where the alleged infringement is occurring, that choice should not be undermined by allega-

tions that infringing activities occur throughout the country.); *see also 28 U.S.C. § 1400(b)* [*15] . The allegedly-infringing goods were sold in the Eastern District of Texas, and therefore this factor does not favor transfer.

In analyzing the fourth factor, courts look at the accessability and location of the sources of proof. Defendants state that all of Moultrie's relevant documents relating to the design, research, development, testing, marketing, and sales for the allegedly infringing products are located in Birmingham. Additionally, Defendants state that all of Moultrie's files, correspondence, computer records, and purchase and sales records are in Birmingham and all of EBSCO's files are located in Birmingham and Farmington, New York. *Id.* However, the sources of proof will probably not be limited to those locations, as patent cases typically involve battles of documents and technical experts scattered across the nation. Further, records, or copies of records are easily transported, either physically or electronically. *See Smith Int'l Inc. v. Halliburton Energy Servs. Inc.*, 6:05-CV-93 (Docket No. 28)(E.D. Tex. Jun. 3, 2005)(Davis, J.); *see Am. Standard, Inc. v. Bendix Corp., 487 F.Supp. 254, 264 (W.D. Mo. 1980)*("But because usually many records, [*16] or copies thereof, are easily transported, their location is not entitled to great weight."). This factor does not support transfer.

Fifth, courts consider the possibility of delay or prejudice if the motion to transfer is granted or denied. GSM claims that it will be prejudiced if the case is transferred to the Northern District of Alabama because caseload statistics show that the Court will resolve this case faster than a court in the Northern District of Alabama. Defendants claim it will take the Northern District of Alabama, on average, an additional two and a half months to resolve the dispute. If the Court transfers the case to the Northern District of Alabama it will slightly prejudice GSM, and this factor slightly weighs against transfer. Taken together, the private interest factors do not warrant transferring the case to the Northern District of Alabama.

**Public Interests**

The first public interest factor, the administrative difficulties in granting or denying transfer, is similar to the fifth private interest factor and likewise does not substantially favor transfer.

The second public interest factor is the local interest in resolving local controversies. [*17] The allegedly infringing goods were sold in the Eastern District of Texas, and the residents of this district have a significant interest in making sure federal patent laws are enforced. *Cummins-Allison Corp. v. Glory Ltd., 2004 U.S. Dist. LEXIS 13839, No. Civ. A. 20-30-CV-385TJ, 2004 WL*

*1635534, \*5 (E.D.Tex. May 26, 2004)*(Ward, J.). This factor does not does not weigh in favor of transfer.

The third factor, the forum's familiarity with the governing law, does not favor transfer. Similarly, the fourth factor, the unnecessary conflict of law problems involving the application of foreign law, also does not favor transfer. This is a patent infringement action arising under federal patent laws, which on substantive patent matters is uniform in all circuits. There are no potential conflict of law problems, and both courts are equally capable of applying federal law. Overall, the public interest factors do not favor transfer. Defendants have not shown that the balance of conveniences and the interests of justice substantially weigh in favor of transfer to the Northern District of Alabama.

## MOTION FOR LEAVE TO AMEND COMPLAINT

*Rule 16(b)* allows a party to modify the Court's Docket Control Order [*18] upon a showing of good cause. *Fed. R. Civ. P. 16*. The good cause standard requires the party seeking relief to show that, despite its exercise of diligence, it cannot reasonably meet the scheduling deadlines. *S&W Enters., L.L.C. v. Southtrust Bank of Alabama, 315 F.3d 533, 535 (5th Cir. 2003)*. The Court has broad discretion to allow scheduling order modifications and considers four elements to determine if modification is appropriate: (1) the explanation for the party's failure to meet the deadline; (2) the importance of what the Court is excluding; (3) the potential prejudice if the Court allows the thing that would be excluded; and (4) the availability of a continuance to cure such prejudice. *Id. at 536*. A party's failure to meet a deadline due to mere inadvertence is equivalent to no explanation at all. *Id.*

GSM moved to amend its complaint to add IP Holdings as a co-plaintiff on July 6, 2005, one month after the deadline to add parties to the lawsuit. GSM claims that it is moving to add IP Holdings to moot Defendants' argument that it lacks standing to bring this suit, which Defendants made in their motion [*19] to dismiss filed after the deadline to add parties had passed. GSM's explanation for its delay is reasonable, and, with the absence of any evidence of bad faith, this factor weighs towards granting the motion to amend the complaint.

GSM states that IP Holdings will be a nominal party in this suit, as IP Holdings and GSM are affiliated entities. This supports granting the motion for leave to amend because adding IP Holdings as a co-plaintiff will not substantively or procedurally prejudice Defendants.

GSM and IP Holdings will have to prove the same infringement claims on the same patents and Defendants will assert the same invalidity, noninfringement, and unenforceability defenses. However, as GSM can bring this action without joining IP Holdings, GSMs's Motion for Leave to Amend is not important to the lawsuit, which makes this factor neutral as to allowing leave.

Although discovery has begun, Defendants are unlikely to be prejudiced by allowing GSM to join IP Holdings as a co-plaintiff because IP Holdings is unlikely to add additional infringement or invalidity issues to the lawsuit. Although the Court does not expect Defendants to be prejudiced if GSM is allowed to add IP Holdings, [*20] the Court can reset the trial date to overcome any prejudice Defendants do face. This factor favors granting the motion for leave to amend the complaint.

GSM has given a reasonable explanation for why it did not add IP Holdings as a co-plaintiff before the Court's Docket Control Order deadline and, although joining IP Holdings is not of great importance, Defendants will not be incurably prejudiced as a result. Thus, GSM has shown good cause to amend its complaint, and the Court grants its motion.

## CONCLUSION

GSM has all substantial rights to the *387* and *868 Patents* and has standing to sue Defendants for patent infringement. The core issues in the Texas and Alabama Actions substantially overlap, and therefore the Texas Action is the first-filed action. The exceptions to the first-to-file rule do not apply. The motion to dismiss is therefore **DENIED.**

As most factors do not favor transfer, the Court will not disturb GSM's choice of forum for this litigation. The motion to transfer to the Northern District of Alabama is **DENIED.**

GSM has given a reasonable explanation for why it did not meet the Docket Control Order deadline, and Defendants will not be incurably prejudiced [*21] if IP Holdings is joined as a co-plaintiff. The motion for leave to amend the complaint is **GRANTED.**

**So ORDERED and SIGNED this 1st day of September, 2005.**

**LEONARD DAVIS**

**UNITED STATES DISTRICT JUDGE**

# EXHIBIT   H

LEXSEE 1992 US APP LEXIS 4234



Analysis
As of: Feb 26, 2007

HARTFORD ACCIDENT & INDEMNITY COMPANY, Plaintiff-Appellant, v.
BARRY H. MARGOLIS; DONALD D. KINGSBOROUGH; ANGELO M.
PEZZANI; JOHN B. HOWENSTINE; RICHARD B. STEIN; WORLDS OF
WONDER; INC.; RLI INSURANCE CO.; HOME INSURANCE CO., Defendants-
Appellees.

No. 90-16626

UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

1992 U.S. App. LEXIS 4234

January 17, 1992, Argued and Submitted, San Francisco, California
March 5, 1992, Filed

**NOTICE:** [*1] THIS DISPOSITION IS NOT APPROPRIATE FOR PUBLICATION AND MAY NOT BE CITED TO OR BY THE COURTS OF THIS CIRCUIT EXCEPT AS PROVIDED BY THE 9TH CIR. R. 36-3.

**SUBSEQUENT HISTORY:** *Reported as Table Case at 956 F.2d 1166, 1992 U.S. App. LEXIS 009085.*

**PRIOR HISTORY:** Appeal from the United States District Court for the Northern District of California. D.C. No. CV-90-01841-JPV. John P. Vukasin, Jr., District Judge, Presiding.

**JUDGES:** Before: SCHROEDER, T.G. NELSON, Circuit Judges, and CALLISTER, District Judge **

\*\* Honorable Marion J. Callister, Senior United States District Judge for the District of Idaho, sitting by designation.

**OPINION:**

MEMORANDUM

Hartford's suggestion that the "first to file" rule should not be applied to the time of filing of the state court action later removed to federal court is not compelling. When an action is commenced in state court and

removed to federal court, the action remains the same. It is simply pending in a different court after removal than before. The district court's discretion was invoked when the motion to dismiss was filed under the first to file rule, and it did not abuse its discretion in refusing to fashion a separate rule for a case removed to a federal court.

Absolute identity of parties in the two cases is not required. *Landis v. North American Co., 299 U.S. 248, 254 (1936).* [*2] However, the absence of the named insured from the Texas litigation is troubling. Counsel for the officers and directors acknowledged at oral argument that the named insured could make a claim for coverage and a defense at a later time, although counsel characterized the possibility as "remote." A remote possibility is not the functional equivalent of no possibility, and Hartford should not be left to try to recreate its present favorable position, vis-a-vis the insured, if what is not "remote" becomes "actual." It is appropriate to stay this case rather than dismiss it until the situation with the named insured is clarified, or the other parties to this action demonstrate Hartford no longer has a "pressing" for continuation of the stay. *Id. at 255.*

The decision of the district is in all respects AFFIRMED, except that the judgment of dismissal is VACATED, and the case REMANDED, with directions to enter a stay on such conditions as the district court deems to be appropriate.

# EXHIBIT   I

LEXSEE 2003 US DIST LEXIS 8052



Positive
As of: Feb 26, 2007

**PEGASUS DEVELOPMENT CORPORATION and PERSONALIZED MEDIA COMMUNICATIONS, L.L.C., Plaintiffs v. DIRECTV, INC., HUGHES ELECTRONICS CORPORATION, THOMPSON CONSUMER ELECTRONICS CORPORATION, THOMSON CONSUMER ELECTRONICS, INC., and PHILIPS ELECTRONICS NORTH AMERICA CORPORATION, Defendants. AND RELATED COUNTERCLAIMS**

**Civil Action No. 00-1020-GMS**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE**

*2003 U.S. Dist. LEXIS 8052*

**May 14, 2003, Decided**

**SUBSEQUENT HISTORY:** As Amended September 4, 2003.

**PRIOR HISTORY:** *Pegasus Dev. Corp. v. Directv, Inc., 2002 U.S. Dist. LEXIS 6825 (D. Del., Apr. 18, 2002)*

**DISPOSITION:** [*1] Defendants' motion to stay pending patent reexamination granted. Plaintiffs' motion for leave to assert claim patent denied. Motions to dismiss denied.

**COUNSEL:** For Pegasus Development Corporation, Personalized Media Communications LLC, PLAINTIFFS: Rudolf E Hutz, Rudolf E Hutz, Connolly, Bove, Lodge & Hutz, Wilmington, DE USA.

For Directv Inc, Hughes Electronics Corporation, Thomson Consumer Electronics Inc, Thomson Multimedia, Inc, DEFENDANTS: Donald F Parsons, Jr, Mona A Lee, Morris, Nichols, Arsht & Tunnell, Wilmington, DE USA.

For Thomson Consumer Electronics Inc, DEFENDANT: Karen Jacobs Louden, Morris, Nichols, Arsht & Tunnell, Wilmington, DE USA.

For Philips Electronics North America Corporation, DEFENDANT: Steven J Balick, Steven T Margolin, Ashby & Geddes, Wilmington, DE USA.

**JUDGES:** Gregory M. Sleet, UNITED STATES DISTRICT JUDGE.

**OPINION BY:** Gregory Moneta Sleet

**OPINION:**

**MEMORANDUM AND ORDER**

**I. INTRODUCTION** [*2]

On December 4, 2000, Pegasus Development Corporation ("Pegasus") and Personalized Media Communications, L.L.C. ("PMC") filed a complaint against several defendants, alleging infringement of six patents, including *U.S. Patent Nos. 4,965,825* ("the '825 patent") and 5,335,277 ("the '277 patent"). Since that time, the original scheduling order has been revised several times. Currently, fact discovery is scheduled to close on August 22, 2003, and a trial is scheduled for February of 2004.

On February 4, 2003 and March 14, 2003, respectively, the defendant Thomson Consumer Electronics, Inc. ("Thomson") filed with the Patent and Trademark Office ("PTO") a request for *ex parte* reexaminations of the '825 and '277 patents. The request for reexamination of the *'825 patent* was granted on April 10, 2003. n1 Presently before the court is a joint motion by the defendants to stay the litigation pending the completion of the patent reexaminations (D.I. 459). After careful consideration of the parties' submissions, and for the reasons detailed below, the court will grant the motion.

2003 U.S. Dist. LEXIS 8052, *

n1 The court is not yet aware of a decision by the PTO regarding reexamination of the '277 patent.

[*3]

## II. DISCUSSION

The decision to stay a case is firmly within the discretion of the court. *Cost Bros., Inc. v. Travelers Indem. Co., 760 F.2d 58, 60 (3d Cir. 1985).* This authority applies equally to patent cases in which a reexamination by the PTO has been requested. *Ethicon, Inc. v. Quigg, 849 F.2d 1422, 1426-27 (Fed. Cir. 1988)* ("Courts have inherent power to manage their dockets and stay proceedings, including the authority to order a stay pending conclusion of a PTO reexamination.") (internal citation omitted); *see also Emhart Indus. v. Sankyo Seiki Mfg., 1987 U.S. Dist. LEXIS 15033, 3 U.S.P.Q. 2d 1889, 1890 (N.D. Ill. 1987)* ("In passing the legislation establishing the reexamination proceeding, Congress stated its approval of district courts liberally granting stays within their discretion."); *Gould v. Control Laser Corp., 705 F.2d 1340, 1342 (Fed. Cir. 1983)* (citing legislative history of reexamination statute). In determining whether a stay is appropriate, the court is guided by the following factors: "(1) whether a stay would unduly prejudice or present a clear tactical disadvantage to the non-moving [*4] party; (2) whether a stay will simplify the issues in question and trial of the case; and (3) whether discovery is complete and whether a trial date has been set." *Xerox Corp v. 3Comm Corp., 69 F. Supp.2d 404, 406 (W.D.N.Y. 1999)* (citing cases); *cf. United Sweetner USA, Inc. v. Nutrasweet Co., 766 F. Supp. 212, 217 (D. Del. 1991)* (stating a similar test).

In this case, there are two plaintiffs, four defendants, and several counter claimants, as well as six patents comprising dozens of claims. In addition, the written submissions in this case have been particularly voluminous; the briefing on claim construction alone, for example, constitutes 576 pages. *See* Report and Recommendation of Special Master Regarding Claim Construction at 2 (citing "copious briefing"). In these ways, the present suit is quite complex, although, perhaps, not extraordinarily so. The greater context of this suit is extraordinary, however: the plaintiffs have filed more than 300 related patent applications based upon an original patent application filed in 1981 and supplemented in 1987. Together, these applications contain an estimated 10,000 claims. Furthermore, as observed [*5] by the Special Master appointed in this case, the 1987 application alone constitutes over 300 columns of patent text and "is, by any measure, an extremely complex document." *Id.* at 2.

These related applications may become relevant to the present case in respect to several issues including claim construction, enablement, adequacy of written description, indefiniteness, and inequitable conduct. *See id.* at 21. Thus, in this case, more than many, the court would benefit from a narrowing of the issues.

The reexamination process will serve this purpose. For example, the court will gain the benefit of the PTO's particular expertise, in that all prior art presented to the court will have been first considered by that agency. *See Braintree Laboratories, Inc. v. Nephron-Tech, Inc., 1997 U.S. Dist. LEXIS 2372, 1997 WL 94237, at *9 (D. Kan. 1997); Hamilton Indus., Inc. v. Midwest Folding Products Mfg., 1990 U.S. Dist. LEXIS 3138, 1990 WL 37642, at *1-2 (N.D. Ill. 1990).* Other potential efficiencies resulting from the reexamination process are numerous: (1) many discovery problems relating to the prior art may be alleviated; (2) the record of the reexamination likely would be entered at trial, reducing the [*6] complexity and length of the litigation; (3) the issues, defenses, and evidence will be more easily limited in pretrial conferences following a reexamination; (4) the outcome of the reexamination process may encourage a settlement without further involvement of the court; and (5) if the patent is declared invalid, the suit likely will be dismissed as to that patent. *Id.* These efficiencies will result in a reduced cost of litigation for the parties and more effective utilization of the limited resources of the court. *Id.*

Thus, a stay may result in a simplification or reduction of issues for the court's consideration, or it may dispense with the litigation entirely. These are considerable economies indeed, particularly in this case. Given the involved prosecution history of the various patents-in-suit and hundreds of related patents, the number of claim terms at issue, the inordinate amount of prior art references, and the PTO's conclusion that all of the challenged claims warrant reexamination, the court finds particular merit in permitting an additional layer of review by the PTO before expending further judicial resources. *See Digital Magnetic Systems, Inc. v. Ainsley,* [*7] *213 U.S.P.Q.290,290 (W.D.Okla. 1982)* ("Congress enacted the reexamination procedure to provide an inexpensive, expedient means of determining patent validity which, if available and practical, should be deferred to by the courts."); *Softview Computer Products Corp. v. Haworth, Inc., 2000 U.S. Dist. LEXIS 4254, 2000 WL 1134471, at *3 (S.D.N.Y. 2000)* ("The grant of a stay will maximize the likelihood that neither the Court nor the parties expend their assets addressing invalid claims."). Furthermore, the court notes that discovery is not complete, and the trial, although scheduled, is some nine months in the future. In light of all these factors, and considering that the reexamination process will proceed

"with special dispatch," *35 U.S.C. 305*, the court concludes that a stay is the most compelling alternative.

The court recognizes that a stay will cause further delay in a case that has suffered several delays already, as well as considerable distress to the plaintiffs. The court is sensitive to the plaintiffs' right to have their day in court. Nonetheless, for the reasons already mentioned, the court is convinced that a stay is appropriate in this particular case. In addition, [*8] the court reminds the plaintiffs that they affirmatively invoked the rights of the patent statute; they can hardly be heard now to complain of the rights afforded others by that same statutory framework. Thomson is legally entitled to invoke the reexamination mechanism, and the PTO has determined that reexamination is warranted. There is nothing facially untoward in that. Moreover, the court notes that if, after reexamination, the plaintiffs' patents are again upheld, the plaintiffs' rights will only be strengthened, as the challenger's burden of proof becomes more difficult to sustain. *See Custom Accessories, Inc. v. Jeffrey-Allan Indus., Inc., 807 F.2d 955, 961 (Fed. Cir. 1986)* (holding that upon reissue, the burden of proving invalidity is 'made heavier') (quoting *Interconnect Planning Corp. v. Feil, 774 F.2d 1132, 1139 (Fed. Cir. 1985))*. In this light, and given the particular circumstances of this case, the court cannot find that the prejudice to the plaintiffs is undue.

Objecting to a stay, the plaintiffs also have complained of dilatory conduct by the defendants, who, in turn, have accused the plaintiffs of "burying" the PTO in claims and prior [*9] art references. *See, e.g.,* Mem. of Plaintiffs in Opp. to Defs.' Joint Motion to Stay (D.I. 488) at 5-22 (detailing ways in which the defendants allegedly "have repeatedly acted to complicate and delay the resolution of this litigation"); Defs.' Joint Brief in Support of Motion to Stay (D.I. 460) at 4 ("Many of the Harvey patents had vast numbers of cited prior art references of record, effectively burying the most relevant ones.") and 7 ("It appears that PMC sought to 'overwhelm' the PTO and the Courts.").

As a brief response to the accusation of dilatory conduct, the court notes that Thomson's request for reexamination of the *'825 patent* comprised 2,610 pages; its request regarding the '277 patent totaled 4,736 pages. It is presumed that such an effort requires an enormous expenditure of time and other resources; thus, the timing of Thomson's reexamination requests does not, necessarily, reflect undue delay. Furthermore, as noted above, Thomson was legally entitled to invoke the reexamination procedure when it did. As to the defendants' repeated complaint that the plaintiffs overwhelmed the PTO with prior art references during prosecution of the patents-in-suit, the implications [*10] of such alleged conduct will be explored at another time in the litigation,

if necessary. At this stage in the process, the court is satisfied that the PTO has found "substantial new questions of patentability" raised by each of the cited references, and has determined that all of the challenged claims of the *'825 patent* necessitate a reexamination. *See* PTO's Decision Granting Reexamination, Supp. Appendix to Defs.' Joint Brief in Support of Motion to Stay (D.I. 467) at 138. Although the court regrets a further delay in the present case, it is confident that the advantages of a stay outweigh the costs.

## III. CONCLUSION

Because the PTO's reexamination of one or more of the patents-in-suit may materially affect the issues in this case, the court will grant the defendants' motion to stay. The case is stayed pending a disposition of the PTO's reexamination of patent '825, and will be stayed pending reexamination of the '277 patent, if applicable. All pending motions will be denied without prejudice; the parties may refile them following the stay and upon the entry of a new scheduling order, if applicable.

Thus, for the aforementioned reasons, IT IS HEREBY ORDERED that: [*11]

> 1. The defendants' Motion to Stay Pending Reexamination by the U.S. Patent and Trademark Office (D.I. 459) is GRANTED. The proceedings are stayed from the date of this order until further notice.

> 2. The parties shall advise the court of any decision that results from the PTO's reexamination of the *'825 patent*, and any other decision of the PTO regarding reexamination of any of the other patents-in-suit.

> 3. The plaintiffs' Motion for Leave to Assert Claim 15 of U.S. Patent 4,965,825 (D.I. 399) is DENIED without prejudice.

> 4. Thomson's Motion to Dismiss or in the Alternative for Summary Judgment (D.I. 376) is DENIED without prejudice.

> 5. Phillips' Motion to Dismiss for Lack of Standing (D.I. 396) is DENIED without prejudice.

Gregory M. Sleet

UNITED STATES DISTRICT JUDGE

2003 U.S. Dist. LEXIS 8052, *

Date: May 14, 2003

# EXHIBIT   J

LEXSEE 2006 US DIST LEXIS 9834

### SONY ELECTRONICS, INC., SONY COMPUTER ENTERTAINMENT AMERICA, INC., SONY PICTURES ENTERTAINMENT, INC., SONY CONNECT, INC., SONY ONLINE ENTERTAINMENT, INC., SONY CORPORATION OF AMERICA, SONY BMG MUSIC ENTERTAINMENT, INC., SONY ERICSSON MOBILE COMMUNICATIONS (USA), INC., Plaintiffs, v. ORION IP, LLC, Defendant.

### C.A. No. 05-255 (GMS)

### UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE

### *2006 U.S. Dist. LEXIS 9834*

### March 14, 2006, Decided

**COUNSEL:** [*1] For Sony Electronics Inc, Sony Computer Entertainment America Inc., Sony Pictures Entertainment, Inc., Sony Connect Inc., Sony Online Entertainment Inc., Sony Corporation of America, Sony BMG Music Entertainment Inc., Sony Ericsson Mobile Communications (USA) Inc., Plaintiffs: Josy W. Ingersoll, Young, Conaway, Stargatt & Taylor, Wilmington, DE.

For Orion IP LLC, Defendant: Donald E. Reid, Morris, Nichols, Arsht & Tunnell, Wilmington, DE.

**JUDGES:** Gregory M. Sleet, UNITED STATES DISTRICT JUDGE.

**OPINION BY:** Gregory M. Sleet

**OPINION:**

#### MEMORANDUM

On November 23, 2004, Orion IP, LLC ("Orion"), a Delaware corporation headquartered in Texas, filed a patent infringement suit in the United States District Court for the Eastern District of Texas against fifteen individual defendants, none of whom are parties to this action. However, on February 10, 2005, Orion amended its complaint to add additional parties, including Sony Corporation of America ("SCA"). On April 7, 2005, SCA responded by filing an answer in the Texas action asserting the affirmative defenses of non-infringement and invalidity as to both patents in suit. Then, on May 2, 2005, SCA and seven other so-called non-SCA plaintiffs filed [*2] an action in this court seeking a declaratory judgment of non-infringement and invalidity with respect to the same patents as those asserted against SCA in the

Texas action. However, although the patents at issue are the same, the potentially-infringing products of the non-SCA plaintiffs -- their websites -- are allegedly different than the accused SCA website. Presently before the court is Orion's motion to either dismiss or stay this case under the first-filed rule, or alternatively, to transfer it to the Eastern District of Texas pursuant to *28 U.S.C.A. § 1404(a) (1993)*. (D.I. 11.)

Generally speaking, the first-filed rule is as simple as its name suggests: "where two patent lawsuits involving the same claims are filed in different jurisdictions, the Federal Circuit requires that the first-filed action be given preference absent special circumstances." *Corixa Corp. v. IDEC Pharm. Corp., 2002 U.S. Dist. LEXIS 2980, *304, No. 01-615-GMS, 2002 WL 265094, at *1 (D. Del. Feb. 25, 2002)*. The present case presents a small complication, however, because only one of the plaintiffs in this action is a defendant in the Texas action. But, that complication is not too difficult to overcome [*3] because "Civil Procedure *Rule 21* permits any claim against a party to be severed and proceeded with separately." *Triangle Conduit & Cable Co. v. Nat'l Elec. Prods. Corp., 125 F.2d 1008, 1009 (3d Cir. 1942)*. Moreover, "*Rule 21* permits a court to sever claims *sua sponte." United States v. AMTRAK, No. 86-1094, 2004 U.S. Dist. LEXIS 10867, at *21 (E.D. Pa. June 15, 2004)*. That being the case, and there being no discernable prejudice in severing SCA's claims against Orion, the court will exercise its power to do so. As a result, the court is confronted with a declaratory judgment action by SCA alone, the inverse of which (i.e., an infringement action) was filed about three months earlier in Texas. Therefore, pursuant to the first-filed rule, SCA must be dismissed from this case. *Cf. Triangle Conduit, 125 F.2d*

*at 1009* (holding that this district was under a duty to enjoin a patent-holding defendant in a declaratory/judgment action from pursuing an infringement action in another district against the declaratory judgment plaintiff, even though the infringement action in the other district would proceed against other parties in the absence of [*4] the declaratory judgment plaintiff).

With SCA out of the case, the court must still decide the fate of the non-SCA plaintiffs. Orion first argues that, like SCA itself, the non-SCA plaintiffs are subject to the first-filed rule under the holding of *Corixa,* where this court granted a motion to transfer a patent infringement action, based on the first-filed rule, to a district where a previous declaratory judgment action had been filed, even though one of the plaintiffs in the patent infringement action was not a defendant in the declaratory judgment action. *2002 U.S. Dist. LEXIS 2980, 2002 WL 265094, at *1-*2.* However, that plaintiff was a licensee of a defendant in the declaratory judgment action, and could therefore request permission to join that action after the transfer. *2002 U.S. Dist. LEXIS 2980, [WL] at *2.* In this case, the non-SCA plaintiffs cannot be licensees of SCA because SCA is not the patentee. Moreover, the "accused products" in this action are the websites of the non-SCA plaintiffs, which are allegedly different than the SCA website accused in the Texas action. Thus, *Corixa* is distinguishable, and the first-filed rule does not apply to the non-SCA plaintiffs.

Orion's next argument is that the action [*5] should be transferred pursuant to *§ 1404(a).* In *Jumara v. State Farm Insurance Co.,* the Third Circuit outlined six private interests and six public interests relevant to such a transfer. The private interests are:

(1) The plaintiff's forum preference as manifested in the original choice;

(2) The defendant's preference;

(3) Whether the claim arose elsewhere;

(4) The convenience of the parties as indicated by their relative physical and financial condition;

(5) The convenience of the witnesses -- but only to the extent that the witnesses may actually be unavailable for trial in one of the fora; and

(6) The location of books and records (similarly limited to the extent that the

files could not be produced in the alternative forum).

*55 F.3d 873, 879 (3d Cir. 1995).* Aside from Orion's preference for Texas and the non-SCA plaintiffs' preferences for Delaware, none of the other private interests are particularly relevant. Orion disagrees, and argues that convenience weighs in favor of transfer. Although Texas may indeed be more convenient for Orion, all of the non-SCA plaintiffs (and Orion) are incorporated in Delaware - a fact that [*6] certainly weighs against transfer. At best, then, the private interests are a wash.

The public interests outlined in *Jumara* include:

(1) The enforceability of the judgment;

(2) Practical considerations that could make the trial easy, expeditious, or inexpensive;

(3) The relative administrative difficulty in the two fora resulting from court congestion;

(4) The local interest in deciding local controversies at home;

(5) The public policies of the fora; and

(6) The familiarity of the trial judge with the applicable state law in diversity cases.

*Id. at 879-80.* Here, Orion argues that although it and the remaining plaintiffs are all Delaware corporations, the local interest favors Texas because Orion has offices in that state. In *Corixa,* three parties were Delaware corporations, and yet, that fact did not weigh against transferring the case to California because the "patents dealt with the treatment of lymphoma, . . . . [which] has far-reaching implications [beyond Delaware's borders]." *2002 U.S. Dist. LEXIS 2980 at *12, 2002 WL 265094, at *4.* By the same token, the fact that Orion has offices in Texas does not weigh in favor of transfer [*7] where the patents deal with technology used in internationally-accessible websites. Orion also argues that because litigation involving the same patents is already underway in Texas, judicial resources will be saved granting a transfer. Although there may be some efficiency to be gained by consolidating certain aspects of discovery, Orion ignores the possibility that collateral issues specific to any one of the many unrelated parties involved in both cases may create inefficiencies that would not arise if the pro-

ceedings remained separate. *See Codex Corp. v. Milgo Elec. Corp., 553 F.2d 735, 739 (1st Cir. 1977)* ("Nor are we fully convinced of the propriety of using another customer suit of another manufacturer, which, incidentally, may have very different collateral issues, as a magnet to draw a suit to a jurisdiction where it otherwise should not be."). Moreover, simply because Orion initiated an action in Texas involving one set of parties, it should not be able to "bootstrap itself into staying there" when subsequent litigation arises involving a different set of parties. *Id.*

In short, the *Jumara* interests do not weigh in favor of transfer, and therefore, [*8] Orion's motion must be denied as to the non-SCA plaintiffs.

Dated: March 14, 2006

    Gregory M. Sleet

UNITED STATES DISTRICT JUDGE

**ORDER**

IT IS HEREBY ORDERED THAT:

1. Orion's motion to dismiss (D.I. 11) be GRANTED in part and DENIED in part; and

2. The claims of SCA against Orion be SEVERED and DISMISSED.

Dated: March 14, 2006

    Gregory M. Sleet

    UNITED STATES DISTRICT JUDGE

# EXHIBIT   K

LEXSEE 2002 US DIST LEXIS 5653



Positive
As of: Feb 26, 2007

**STRATOS LIGHTWAVE, INC., Plaintiff/Counterclaim Defendant, v. E2O COMMUNICATIONS, INC., Defendant/Counterclaim Plaintiff.**

**Civil Action No. 01-309-JJF**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE**

*2002 U.S. Dist. LEXIS 5653*

**March 26, 2002, Decided**
**March 26, 2002, Filed**

**DISPOSITION:** [*1] Motion to transfer venue to Central District Of California denied.

**COUNSEL:** Attorneys for the plaintiff, Stratos Lightwave, Inc.: Joseph N. Hosteny, III, Arthur A. Gasey, Paul C. Gibbons, Niro, Scavone, Haller & Niro, Chicago, Illinois. Donald F. Parsons, Jr., Morris, Nichols, Arsht & Tunnell, Wilmington, DE.

Attorneys for the defendant, E2O Communications, Inc.: David P. Enziminger, Brett J. Williamson, David E. Lederman, O'Melveny & Meyers LLP, Los Angeles, California. William J. Wade, Richards, Layton & Finger, Wilmington, Delaware.

**JUDGES:** Joseph J. Farnan, UNITED STATES DISTRICT JUDGE.

**OPINION BY:** Joseph J. Farnan

**OPINION:**

### MEMORANDUM ORDER

Presently before the court is a Motion To Transfer Venue To The Central District of California (D.I. 11) filed by Defendant E2O Communications, Inc. ("E2O"). For the reasons discussed, the motion will be denied.

### BACKGROUND

Stratos Lightwave, Inc. ("Stratos") and E2O both manufacture and sell optoelectronic transceiver modules which are used in computer networks. (D.I. 8 at 1).

Stratos is a Delaware corporation with its headquarters in Chicago, Illinois and facilities in California. (D.I. 17 at 1). E2O is also incorporated [*2] in Delaware, but maintains its headquarters in Calabasas, California. (D.I. 8 at 2). The design and development of E2O's accused products is conducted in Californla, where the majority of E2O's domestic employees are located. (D.I. 8 at 2). The accused products are manufactured internationally, in Asia. (D.I. 8 at 2).

On May 5, 2001, Stratos filed this action against E2O alleging infringement of U.S. Patent Nos. 5,717,533, 5,734,558, 5,864,468, 5,879,173, Re. 36,820, 6,201,704B1, and 6,320,878BI. (D.I. 1). E2O subsequently filed the instant motion to transfer.

### DISCUSSION

By its motion, E2O contends that Delaware is an inconvenient forum because its corporate offices, where all the relevant documents and knowledgeable fact witnesses are located, are in California. (D.I. 8 at 7). E2O contends that litigation in Delaware would be not only expensive, but disruptive to the corporation. (D.I. 8 at 7). E2O further contends that Delaware is an inconvenient forum for the witnesses, none of whom reside in Delaware, and further that several non-party witnesses exist who would be beyond the Court's subpoena power. (D.I. 8 at 8). Additionally, E2O contends that the Central District of [*3] California is more convenient because the median time to trial is faster. (D.I. 8 at 11). Finally, E2O contends that California, not Delaware, has a local interest in deciding this controversy because the majority of the allegedly infringing activity took place in California. (D.I. 8 at 11). n1

n1 E2O continuously argues that Stratos' contacts with Delaware are "de minimis, at best;" however, the Court finds this argument to be immaterial in the context of a motion to transfer.

In opposition, Stratos contends that its choice of forum is entitled to substantial deference. (D.I. 17 at 4). Stratos contends that although Delaware is not its home turf, it chose to sue E2O in Delaware because E2O is incorporated in this state. (D.I. 17 at 5). Stratos further contends that E2O, a successful international company, is capable of financing litigation in Delaware, and transferring this action to California would merely shift the burden of expense to Stratos. (D.I. 17 at 7). By E2O's failure to identify non-party witnesses [*4] beyond subpoena power, Stratos contends that the convenience of the witnesses does not weigh in favor of transfer. (D.I. 17 at 11-10). Stratos further contends that adjudication of this action, pursuant to the Court's Scheduling Order (D.I. 15), will be faster than in California, where a new scheduling order would be put in place. (D.I. 17 at 12).

Transfer of a civil action is governed by *28 U.S.C. § 1404*(a) which provides, "for the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought." The purpose of § 1404(a) is "to prevent the waste of time, energy, and money and to protect litigants, witnesses, and the public against unnecessary inconvenience and expense." *Van Dusen v. Barrack, 376 U.S. 612, 616, 11 L. Ed. 2d 945, 84 S. Ct. 805 (1964)* (internal citations omitted). Because it is undisputed that Stratos could have brought the instant action in the Central District of California, the Court's only task is to determine whether the factors enumerated in § 1404(a) and by the United States Court of Appeals for the Third [*5] Circuit, warrant a transfer.

The Third Circuit has instructed that when reviewing a motion to transfer under *28 U.S.C. § 1404*(a) district courts must consider, among other things, private n2 and public n3 interests. See *Jumara v. State Farm Ins. Co., 55 F.3d 873 (3d Cir. 1995)*. When determining whether or not transfer is warranted in the circumstances presented, district courts must balance all of the relevant factors and respect that a plaintiff's choice of forum is entitled to substantial deference and should not be lightly disturbed. *Id. at 883*; see also *Shutte v. Armco Steel Corp., 431 F.2d 22, 25 (3d Cir. 1920)*. The burden is upon the movant to establish that the balance of the interests strongly weighs in favor of transfer, and a transfer will be denied if the factors are evenly balanced or weigh only slightly in favor of the transfer. See *Continental*

*Cas. Co. v. American Home Assurance Co., 61 F. Supp. 2d 128, 131 (D. Del. 1999)*.

n2 The private interests are:

(1) the plaintiff's choice of forum, (2) the defendant's preferred forum, (3) whether the claim arose elsewhere, (4) the convenience of the parties due to their relative physical and financial conditions, (5) the convenience of the expected witnesses, but only so far as the witnesses might be unavailable for trial if the trial is conducted in a certain forum, and (5) the location of books and records, to the extent that these books and records could not be produced in a certain forum.

*Jumara v. State Farm Ins. Co., 55 F.3d 873, 883 (3d Cir. 1995)*.

[*6]

n3 The public interests are:

(1) the enforceability of the judgment, (2) practical considerations regarding the ease, speed, or expense of trial, (3) the administrative difficulty due to court congestion, (4) the local interest in deciding local controversies in the home forum, (5) the public policies of the two fora, and (6) the trial judge's familiarity with the applicable state law in diversity cases.

*Id.*

# I. Private Interests

After a consideration of the relevant private interests, the Court concludes that the balance of these factors does not weigh strongly in favor of transfer. As stated previously, a plaintiff's choice of forum is entitled to substantial deference and should not be lightly disturbed. *Shutte, 431 F.2d at 25*. In the instant case, stratos' prefer-

ence for Delaware is not given as much deference because it, admittedly, has not chosen its home turf. See *Continental, 61 F. Supp. 2d at 131* (stating that "the transfer of a case will generally be regarded as less inconvenient to a plaintiff if the plaintiff has not chosen [*7] its home turf or a forum where the alleged wrongful activity occurred"). However, it is not appropriate to disregard a plaintiff's choice of forum where it had a rational and legitimate reason for choosing the forum. See *Joint Stock Society v. Heublein, Inc., 936 F.Supp 177, 187 (D. Del. 1996).* And the fact that E2O has incorporated in Delaware is a rational and legitimate reason for choosing to sue E2O in Delaware. In fact, E2O, having received the benefits of Delaware incorporation, should not now complain that another corporation has chosen to sue it here. *Critikon, Inc. v. Becton Dickinson Vascular Access, Inc., 821 F. Supp. 962, 965 (D. Del. 1993).* Therefore, Stratos' forum preference, as well as E2O's Delaware incorporation, weigh in favor of maintaining this action in Delaware.

The Court cannot conclude that the balance of the remaining factors strongly weigh in favor of transfer. No witness, reluctant to testify, beyond the subpoena power of the Court, has been identified. The relevant documents, books, and records can be easily transported to Delaware. The financial burden on Defendants to litigate in Delaware is not unduly harsh. In sum, [*8] the private interests weigh in favor of maintaining this action in Delaware.

**II. Public Interests**

In the Court's view, none of the public interests weigh in favor of transfer. Patent rights are not local or state matters and therefore cannot give rise to a local controversy, or implicate local public policy. Similarly, because this is a patent infringement action, the familiarity of the trial judge with the application of state law is not applicable. Further, in light of the Scheduling Order already in place, the Court is not persuaded that this case would be adjudicated faster in the Central District of California. Finally, as discussed above, the Court concludes that Delaware is not an unduly inconvenient forum for E2O to litigate this action in. Accordingly, the motion to transfer will be denied. n4

n4 The Court is aware of *Methode Electronics & Stratos Lightwave, Inc. v. Finisar, 205 F.R.D. 552 (N.D.Ca. 2001)* (the "Methode Case"), and its resolution. It is the Court's view that the Methode Case is irrelevant to the instant case, and the presence or absence of that action is not material to the Court's decision to retain jurisdiction over the instant case.

[*9]

NOW THEREFORE IT IS HEREBY ORDERED this 26 day of March 2002 that E2O's Motion To Transfer Venue To The Central District Of California (D.I. 11) is **DENIED**.

Joseph J. Farnan

UNITED STATES DISTRICT JUDGE

# EXHIBIT  L

LEXSEE 2004 US DIST LEXIS 28331



Positive
As of: Feb 26, 2007

**VERSUS TECHNOLOGY, INC. Plaintiff, v. HILLENBRAND INDUSTRIES, INC.,
HILL-ROM SERVICES, INC., HILL-ROM COMPANY, INC., VISONIC
TECHNOLOGIES LTD, and VT AMERICAS, INC., Defendants.**

**Case No. 1:04-CV-168**

**UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF
MICHIGAN, SOUTHERN DIVISION**

*2004 U.S. Dist. LEXIS 28331*

**November 23, 2004, Decided**

**SUBSEQUENT HISTORY:** Related proceeding at *Hill-Rom Servs. v. Technology, Inc., 2006 U.S. Dist. LEXIS 36477 (M.D.N.C., June 2, 2006)*

**COUNSEL:** [*1] For Plaintiff(s): Jon G. March, Craig H. Lubben, James R. Peterson, Salvatore W. Pirrotta, George Pazuniak, Gerard M. O'Rourke.

For Defendant(s): Timothy J. Abeska, Carl Edward Moore, Eugene J. Rath, III, Douglas H. Siegel, Lynn Campbell Tyler.

**JUDGES:** HON. GORDON J. QUIST.

**OPINION BY:** GORDON J. QUIST

**OPINION:**

OPINION

Plaintiff, Versus Technology, Inc. ("Versus"), filed its complaint in this case on March 15, 2004, against Defendants, Hillenbrand Industries, Inc. ("Hillenbrand"), Hill-Rom Services, Inc. ("HRS"), and Hill-Rom Company, Inc. ('HRC') (collectively referred to as the "Hillenbrand Defendants"), and Visonic Technologies Ltd. ("Visonic"), and Visonic Inc. Pursuant to a stipulated Order entered on June 3, 2004, Versus filed an amended complaint amending the caption to substitute VT Americas, Inc. ("VTA") for Visonic, Inc. as a defendant. Presently before the Court are the Hillenbrand Defendants' motions to transfer venue, to dismiss for failure to join an indispensable party, to dismiss Counts II, III, and VI of Versus's amended complaint, and to strike portions of the declaration of Gary T. Gaisser. Also before the Court are VTA's motion to dismiss for lack of personal jurisdiction [*2] and improper venue or, in the alternative, to transfer venue, and Visonic's motion to dismiss for lack of personal jurisdiction.

The Court heard oral argument on these motions by telephone on August 26, 2004. At the conclusion of the hearing, the Court granted the Hillenbrand Defendants' motion to dismiss Counts II, III, and VI with respect to Versus' misrepresentation and innocent misrepresentation claims for failure to comply with *Fed. R. Civ. P. 9(b)*, but allowed Versus to file an amended complaint to plead those claims with specificity. The Court took the remainder of that motion and the other motions under advisement. Versus has now filed a motion for leave to file a second amended complaint and supplemental complaint which, in addition to including more specific allegations in the misrepresentation claims, adds Elpas Electro-Optic Systems Ltd. as a defendant and identifies more precisely the patent infringement claims previously alleged against Visonic and VTA. Visonic and VTA oppose this motion and have filed a response.

For the reasons set forth below, the Court will allow Versus' proposed amendment but will transfer the case to the Middle District of North Carolina based [*3] upon the rule of comity among federal courts known as the "first-to-file" rule.

**I. Background**

Versus is a Delaware corporation with its principal place of business in Traverse City, Michigan. Versus develops and markets products that use infrared and radio frequency technology in various applications, including systems for locating and tracking people and equipment. Versus' locating systems are used in "nurse call" systems in hospitals. "Nurse call" systems are commonly associated with hospital beds and are used to provide notification during patient emergencies. Versus sells its locating systems directly to hospitals and to third-party original equipment manufacturers. Versus is the owner of *United States Patent 5,027,314* ("the '314 Patent"), entitled "Apparatus and Method for Position Reporting," and *United States Patent 6,154,139* ("the '139 Patent"), entitled "Method and System for Locating Subjects within a Tracking Environment." Versus is the exclusive licensee of *United States Patent 5,572,195* ("the '195 Patent"), entitled "Sensory and Control System for Local Area Networks," and *United States Reissue Patent 36,791* ("the '791 Patent"), entitled "Location System Adapted [*4] for Use in Multipath Environments." These patents cover the technology used in Versus' tracking and locating systems.

Hillenbrand is a Delaware corporation with its principal place of business in Batesville, Indiana. HRS and HRC are both Delaware corporations with principal places of business in Batesville, Indiana. Hillenbrand is a publicly-traded holding company, and HRS and HRC are two of its wholly-owned subsidiaries. HRC is a major supplier through sales, rentals, and service of hospital products, including beds, therapy surfaces, stretchers, furniture, communications systems and headwall systems. For several years, HRC and/or HRS has marketed throughout the United States "nurse call" systems that use integrated locating systems. HRC has marketed and sold the COMposer Communication System, which includes locator badges, and more recently has developed the COMLinx System, which includes or uses the COMLinx Local Positioning Module. HRS is the owner of now-expired United States Patent Reexamination Certificate No. RE 35,035 ("the '035 Patent"), entitled "Locating System and Method," and *United States Patent No. 6,462,656* ("the *'656 Patent*"), entitled "Personnel and Asset Tracking [*5] Method and Apparatus," both of which cover the technology used in HRC's locating systems.

Visonic is an Israeli holding company that owns three companies located in Israel. These companies manufacture integrated identification and facility management solutions incorporating local positioning, security, access control, and asset management. Elpas Electro-Optic Systems ("Elpas"), one of the companies, manufactures a product known as the Elpas Local Positioning System, which is used in the COMLinx system.

(Radomsky Decl. P 4, attached to Def. Visonic's Br. Supp. Mot. Dismiss.) Elpas sells this product in the United States through VTA, its sole distributor of the product in the United States. (Id.) VTA, in turn, sells the product to HRC for use in the COMLinx system. (Id.) VTA, a subsidiary of Elpas, is a Delaware corporation with its principal place of business in Bloomfield, Connecticut. (Id. P 3.)

On December 30, 2003, HRS filed a complaint in the United States District Court for the Middle District of North Carolina ("MDNC") against Versus and three of its distributors, A4 Health Systems, Inc., Healthcare Information Technology, Inc., and Surgical Information Systems, [*6] LLC. According to the Hillenbrand Defendants, HRS filed its complaint in the MDNC because Versus and one of its distributors installed an infringing system at Duke University Hospital located in the MDNC. The complaint alleged that Versus and its distributors are infringing the *'656 Patent* and had previously infringed the expired '035 Patent. Instead of serving the complaint, on January 6, 2004, William A. Morrison, HRS's Senior Intellectual Property Counsel, sent a copy of the complaint, a draft settlement agreement, and a letter outlining HRS's infringement claim, including damages, to Versus' President and CEO, Gary T. Gaisser. (Morrison Decl. P2 & Ex. A, Hillenbrand Defs.' Br. Supp. Mot. Transfer Ex. 4.) Williams indicated that HRS was serious about pursuing its infringement claims but extended an invitation to discuss an amicable resolution of the matter. Versus responded on February 12, 2004, through a letter from its counsel, Robert Tuttle, requesting additional information from HRS regarding its infringement claims. (Id. P 3 & Ex. B.) After exchanging correspondence several more times, representatives of HRS and Versus met to discuss the North Carolina lawsuit on or about [*7] March 5, 2004. (Id. P 6; Gaisser Decl. P11, Pl.'s Br. Resp. Hillenbrand Defs.' Mot. Transfer Ex. A.) The parties did not reach an agreement at the meeting.

Versus filed its complaint in this case on March 15, 2004. Versus alleges that in early 2000, Versus and Hillenbrand began negotiating a relationship in which: (1) Versus would grant Hillenbrand a license to use Versus' patents, which Hillenbrand was then infringing; (2) Hillenbrand would acquire an equity interest in Versus; (3) the parties would execute a development agreement, pursuant to which Versus would overlay its system on the existing Hillenbrand nurse call system and would develop new products for Hillenbrand over a five-year period; and (4) the parties would execute a supply agreement pursuant to which Versus would supply locating products to Hillenbrand on an exclusive basis for five years. (1st Am. Compl. P 15.) Versus alleges that the parties signed a "Non-Exclusive Patent License Agree-

ment" (Versus and HRS) and a Stock Purchase Agreement (Versus and Hillenbrand) on September 1, 2000. (Id. P 16.) According to Versus, Hillenbrand insisted that Versus execute the License Agreement and Stock Purchase Agreement first [*8] and represented that it would subsequently execute the five-year supply and development agreements. Versus claims that, contrary to these representations, Hillenbrand did not finalize the remaining agreements and did not overlay Versus' locating system onto Hillenbrand's nurse call systems. (Id. PP 19, 20.) Instead, Versus alleges, Hillenbrand began purchasing the locating technology for its COMLinx Local Positioning Module from Visonic (or VTA). (Id. P 20.)

Count I of the first amended complaint alleges that the Hillenbrand Defendants and Visonic (VTA) have infringed at least one claim of each of the '314, '195, '139, and '791 Patents by making, using, selling and/or offering to sell COMLinx outside the scope of the License Agreement. Counts II, III, IV, and V allege claims for misrepresentation, innocent misrepresentation, breach of contract, and promissory estoppel against the Hillenbrand Defendants based upon their failure to finalize the remaining agreements and to overlay their nurse call system with Versus' locating system. Count VI alleges a claim against the Hillenbrand Defendants and Visonic for infringement of Versus' patents in the event that the License Agreement [*9] is rescinded based upon the misrepresentation claims. Finally, Count VIII alleges various antitrust violations by the Hillenbrand Defendants.

On April 7, 2004, HRS filed an amended complaint in the North Carolina case adding Hillenbrand and HRC as plaintiffs and adding five declaratory judgment counts. In the declaratory judgment counts, Hillenbrand seeks a declaration that: (1) Hillenbrand is not infringing Versus' patents and Versus has released any claims for infringement against Hillenbrand as a result of the License Agreement; (2) the License Agreement is not rescindable and Hillenbrand has not breached the License Agreement; (3) Hillenbrand never made any enforceable agreement with or representations to Versus; (4) Versus has no claim against Hillenbrand for misrepresentation, innocent misrepresentation, or promissory estoppel; and (5) Hillenbrand has not committed any antitrust violation against Versus. On April 26, 2004, Versus and the other defendants in the North Carolina case moved to dismiss Counts II through VI of Hillenbrand's amended complaint. To this Court's knowledge, the North Carolina court has not ruled on that motion as of the date of this Opinion.

## II.    [*10] Discussion

As noted above, the Court has before it motions raising personal jurisdiction and venue issues as well as

dispositive issues. In addition, Versus requests leave to file a second amended and supplemental complaint which, among other things, clarifies Versus' patent infringement claims against Visonic and VTA. The Court will address Versus' motion to amend first and then consider the Hillenbrand Defendants' motion to transfer venue. Because the Court concludes that the case is governed by the first-to-file rule and that transfer is appropriate pursuant to that rule, the Court will not consider VTA's and Visonic's motions to dismiss for lack of personal jurisdiction and the Hillenbrand Defendants' dispositive motions.

## A. Motion to Amend

Versus seeks leave to file a second amended and supplemental complaint. Versus' proposed amendment contains additional factual allegations in order to comply with *Rule 9(b)* on the fraud and misrepresentation claims as required by the Court's August 26, 2004, Order. In addition, the proposed amendment adds Elpas as a defendant in this lawsuit and contains new allegations which identify Visonic's EIRIS Local Positioning System [*11] ("EIRIS LPS") as an infringing product separate from the COMLinx system identified in the amended complaint.

Under *Rule 15(a) of the Federal Rules of Civil Procedure*, once a responsive pleading has been filed, "a party may amend the party's pleading only by leave of court or by written consent of the adverse party." *Fed. R. Civ. P. 15(a)*. *Rule 15(a)* also provides that "leave shall be freely given when justice so requires." Id. The mandate that "leave shall be freely given" embodies "the principle that cases 'should be tried on their merits rather than the technicalities of the pleadings.'" *Moore v. City of Paducah, 790 F.2d 557, 559 (6th Cir. 1986)* (per curiam) (quoting *Tefft v. Seward, 689 F.2d 637, 639 (6th Cir. 1982))*. However, a court is not obliged to grant an amendment simply because a motion is made. See *Johnson v. Ventra Group, Inc., 1997 U.S. App. LEXIS 21714, No. 96-1463, 1997 WL 468332, (6th Cir. Aug. 13, 1997)* (per curiam). "A motion to amend a complaint should be denied if the amendment is brought in bad faith, for dilatory purposes, results in undue delay or prejudice to the opposing party, or would be futile." *Crawford v. Roane, 53 F.3d 750, 753 (6th Cir. 1995)*; [*12] see also *Foman v. Davis, 371 U.S. 178, 182, 9 L. Ed. 2d 222, 83 S. Ct. 227, 230 (1962)*.

Visonic and VTA argue that the Court should deny the motion because Versus has already had sufficient time to investigate its claims in this case and should have been aware that Elpas was a party to the supply agreement between HRS and VTA at the time it amended its complaint to add VTA as a defendant. Visonic and VTA further argue that by proposing yet another amendment,

Versus is changing the complexion of the case by expanding the scope of the alleged infringement beyond the scope of the COMLinx product, even though Versus alleged to VTA's predecessor as early as 2001 that Elpas products infringed Versus patents. Visonic and VTA assert that Versus seeks to add Elpas and the EIRIS LPS product as an infringing product merely to avoid dismissal based upon lack of personal jurisdiction.

The Court will grant Versus' motion and allow it to file its amended complaint because Visonic and VTA have not cited a sufficient basis to deny the motion. The Sixth Circuit has recently observed: "Delay by itself is not sufficient reason to deny a motion to amend. Notice and substantial prejudice to the opposing [*13] party are critical factors in determining whether an amendment should be granted." *Bridgeport Music, Inc. v. Dimension Films, 383 F.3d 390, 402 (6th Cir. 2004)* (quoting *Head v. Jellico Hous. Auth., 870 F.2d 1117, 1123 (6th Cir. 1989)* (quoting *Hageman v. Signal L.P. Gas, Inc., 486 F.2d 479, 484 (6th Cir. 1973))).* At most, Visonic and VTA have shown some delay, but they have not shown significant prejudice. That is, the amendment comes at an early stage in the litigation: a *Rule 16* conference has not been held and no scheduling order has been entered and, except for the limited discovery relating to personal jurisdiction, discovery on the substantive issues has not yet begun. See *Risten v. Youth For Understanding, Inc., 245 F. Supp. 2d 1, 4-5 (D.D.C. 2002)* (finding no prejudice to the defendants where the motion to amend was filed before entry of a scheduling order and before the commencement of discovery). Moreover, Versus has provided at least a plausible explanation for not adding Elpas as a defendant at an earlier time, namely, some confusion regarding the relationship among Visonic, its wholly-owned entities (VTA [*14] and Elpas), and VTA's predecessor, Elpas North America, Inc. In any event, the amendment will not result in substantial prejudice to Visonics and VTA, and it is consistent with the interests of justice in the prompt resolution of disputes because, at least at this point, the EIRIS LPS product and the COMLINX product appear to be the same.

**B. Motion to Transfer**

The Hillenbrand Defendants have moved for a transfer of venue to the MDNC pursuant to *28 U.S.C. § 1404(a)*. As part of their motion to transfer, the Hillenbrand Defendants have invoked the first-to-file rule, which provides a separate basis for transfer.

The first-to-file rule is a generally recognized doctrine of federal comity which provides that "'as a principle of sound judicial administration, the first suit should have priority,' absent special circumstances." *Kahn v. Gen. Motors Corp., 889 F.2d 1078, 1081 (Fed. Cir. 1989)* (quoting *William Gluckin & Co. v. Int'l Playtex*

*Corp., 407 F.2d 177, 178 (2d Cir. 1969)).* The rule allows a district court to decline jurisdiction over an action when a complaint involving the same parties and issues has already been [*15] filed in another district. *Pacesetter Sys., Inc. v. Medtronic, Inc., 678 F.2d 93, 94-95 (9th Cir. 1982).* The rule promotes the conservation of judicial resources and the comprehensive disposition of litigation by avoiding duplication of time and effort, interference in another court's affairs, conflicting results, and piecemeal resolution of issues that call for a uniform result. See *Sutter Corp. v. P & P Indus., Inc., 125 F.3d 914, 917 (5th Cir. 1997).* A court determines whether the first-to-file rule applies by examining: "(1) the chronology of the actions; (2) the similarity of the parties involved; and (3) the similarity of the issues at stake." *Plating Resources, Inc. v. UTI Corp., 47 F. Supp. 2d 899, 903-04 (N.D. Ohio 1999)* (citing *Alltrade, Inc. v. Uniweld Prods., Inc., 946 F.2d 622, 628 (9th Cir. 1991));* see also *Zide Sport Shop of Ohio, Inc. v. Ed Tobergte Assocs., Inc., 16 Fed. Appx. 433, 2001 WL 897452, at *3 (6th Cir. 2001)* ("The rule provides that when actions involving nearly identical parties and issues have been filed in two different district courts, 'the court in which the first [*16] suit was filed should generally proceed to judgment.'") (quoting *In re Burley, 738 F.2d 981, 988 (9th Cir. 1984)).* The claims in the two cases need not be identical; only substantial similarity of issues or substantial overlap in the cases need be shown. See Datamize, Inc. v. Fidelity Brokerage Servs., LLC, No. 2:03-CV-321-DF, 2004 WL 1683171, at *3-4 (E.D. Tex. Sept. 5, 2003) (citing *Superior Sav. Ass'n v. Bank of Dallas, 705 F. Supp. 326, 329 (N.D. Tex. 1989));* *Plating Resources, Inc., 47 F. Supp. 2d at 903* (stating that "courts should invoke the rule when two suits involving substantially the same parties and purpose have been filed in a concurrent jurisdiction"). Similarly, the rule does not require identical parties in both cases. See *Save Power Ltd. v. Syntek Fin. Corp., 121 F.3d 947, 951 (5th Cir. 1997)* (stating that "complete identity of parties is not required" to apply the rule); *Hartford Accident & Indem. Co. v. Margolis, 1992 U.S. App. LEXIS 4234, No. 90-16626,1992 WL 43484, at * 1 (9th Cir. Mar. 5, 1992)* ("Absolute identity of parties in the two cases is not required."); *Thomas & Betts Corp. v. Hayes, 222 F. Supp. 2d 994, 996 (W.D. Tenn. 2002)* [*17] (stating that "precise identity of the parties to both actions is not required") (citing *Plating Resources, Inc., 47 F. Supp. 2d at 904);* *EBW, Inc. v. Environ Prods., Inc., 1996 U.S. Dist. LEXIS 11922, No. 1:96-cv-144, 1996 WL 550020, at *3 (W.D. Mich. July 8, 1996)* (stating that "a precise identity of parties is simply not required").

Complicating the Court's resolution of this issue somewhat is the fact that Versus has filed a motion to dismiss Counts II-VI of the Hillenbrand Defendants' amended complaint in the MDNC action -- the declara-

Case 1:07-cv-00067-MPT     Document 8-2     Filed 02/26/2007     Page 82 of 90

Page 5
2004 U.S. Dist. LEXIS 28331, *

tory judgment claims that mirror Versus' claims in this case -- based upon the first-to-file rule. Further muddying the waters is the parties' dispute regarding whether this action or the MDNC action should be considered the first-filed action. This issue is of consequence because it is generally accepted that the court which first obtained jurisdiction should determine whether to apply the first-to-file rule. See *Daimler-Chrysler Corp. v. GMC, 133 F. Supp. 2d 1041, 1044 (N.D. Ohio 2001)* ("Leaving the decision of the first to file dispute to the court in which the first case was filed makes good sense, as it establishes a bright line rule, which is as easy to apply as it is to understand."); *Kimberly-Clark Corp. v. McNeil-PPC, Inc., 260 F. Supp. 2d 738, 741 (E.D. Wis. 2003)* (holding that "where identical, or nearly identical, actions are pending before two courts, it is the court in which the action was first filed that makes the determination of which court is to hear the case"). The present circumstances thus pose a risk of two courts reaching different conclusions based upon a procedural rule designed to maximize judicial economy and avoid inconsistent outcomes. However, in light of the parties' comments at oral argument indicating that the MDNC may be waiting for a decision from this Court before addressing Versus' motion to dismiss in that case, this Court will address the issue.

Chronologically, the MDNC complaint was filed first in time, which suggests that the MDNC action was the first-filed action. See *Kimberly-Clark Corp., 260 F. Supp. 2d at 740-41* ("The issue, however, is not which of the claims was filed first, but rather which action was filed first. And as to that issue there is no dispute. The action McNeil commenced in New Jersey District Court was filed first."). Versus contends that this case was the first-filed action because the claims were first made in this Court and this case includes parties that are not present in the MDNC action. Versus points out that the MDNC case was limited to patent infringement claims by HRS against Versus and three of its distributors, while this action includes patent infringement claims based upon different patents, as well as misrepresentation, breach of contract, and antitrust claims against HRS, HRC, Hillenbrand, and the Visonic Defendants.

Although Versus is correct that its claims were first raised in this case, several courts have held that a subsequently-filed amendment is prior to an earlier complaint where the amendment is made in the first-filed action. Some courts have relied upon the relation-back doctrine under *Fed. R. Civ. P. 15(c)* in order to conclude that the amendment was first-filed. See, e.g., *Nat'l Foam, Inc. v. Williams Fire & Hazard Control, Inc., 1997 U.S. Dist. LEXIS 16734, No. CIV. A. 97-3105, 1997 WL 700496,* [*18] *at *4-7 (E.D. Pa. Oct. 29, 1997)*. The Second Circuit, and several other courts following its lead, has held

that the first-filed rule applies in *any* case, where a plaintiff amends its complaint to add claims raised in a second-filed suit in another district. In *Mattel, Inc. v. Louis Marx & Co., 353 F.2d 421 (2d Cir. 1965)*, Marx sued Mattel in the District of New Jersey seeking a declaration of non-infringement and invalidity of Mattel's trademark. Soon thereafter, Mattel filed suit against Marx in the Southern District of New York alleging trademark infringement and a claim for patent infringement. Marx responded by amending its complaint in the New Jersey action to add a count for declaratory judgment of non-infringement and invalidity of the patent at issue in the New York action. The parties filed motions in both courts seeking a stay of the other parties' actions. The New York court enjoined Marx from proceeding in the New Jersey action because the New York action was the first action to pose all of the issues between the parties. The Second Circuit held that this "basic principle" was correct, but concluded that the district court should have applied it in [*19] favor of the first-filed New Jersey action:

> The New Jersey action was the first to bring both parties into court and the Marx complaint, as amended prior to the time Judge Sugarman heard argument on the Mattel motion to stay the New Jersey action, included the identical issues as the Mattel complaint in the New York action: validity and infringement both of the patent and of the trademark. The fact that these issues were not all spelled out in the New Jersey action until Marx had amended its complaint is immaterial. . . . Thus, the New Jersey suit was the first suit which made possible the presentation of all the issues and which, by amendment of the complaint did raise all the substantial issues between the parties.

*Id. at 424*. Accord *GT Plus. Ltd. v. Ja-Ru, Inc., 41 F. Supp. 2d 421, 424 (S.D.N.Y. 1998)* (stating that "by virtue of Ja-Ru's amended complaint, the issues in the New York action are no different than the issues in the Florida action, only fewer in number"); *Ainsworth v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 298 F. Supp. 479, 480 (W.D. Okla. 1969)* ("This suit was filed prior to the Texas action, and Defendants [*20] attempt to extricate themselves from the application of the [first-to-file] rule by pointing out that the issues of this case which are similar to those of the Texas case were not raised until plaintiffs amended their Complaint subsequent to the filing of the Texas action. However, this circumstance of amendment is not material in determining priority.").

2004 U.S. Dist. LEXIS 28331, *

In *SAES Getters S.P.A. v. Aeronex, Inc.,* 219 F. Supp. 2d 1081 (S.D. Cal. 2002), the court was confronted with the issue of whether to give priority to a second-filed action in another court which sought a declaration of non-infringement or to the defendant's proposed counterclaim in the first-filed case before it alleging infringement of the same patent at issue in the second-filed action. Relying on Mattel, Inc., in part, the court concluded that the proposed counterclaim, although filed after the second-filed suit, had priority, because "the forum with priority is the one where the parties initially sued each other, even if the parties raise a different claim in a subsequently filed suit in a different forum" *Id. at 1090*.

The Court concludes that the rationale in *Mattel, Inc.* makes good [*21] sense because it facilitates the policies of the first-to-file rule by allowing the first court in which all issues are raised to determine how the cases should proceed. Versus has not cited any authority to the contrary, and the Court finds no reason to reject this reasoning. Although this rationale provides a sufficient basis for this Court to defer to the MDNC action as the first-filed action, this result is also proper because, while the claims in the two cases are not exactly the same, there is ample basis for finding a substantial overlap between the cases. With regard to issues or claims, patent infringement claims are a central focus of both cases and the patents at issue are similar. Versus asserts that there is no similarity because the patents in the two suits "are different patents that were issued at different times to different inventors, and the patents cover different technologies." (Gaisser Decl. P 23.) On the other hand, the summary chart prepared by the Hillenbrand Defendants comparing the titles, abstracts, and excerpts from the written descriptions of HRS's and Versus' patents shows that while the patents may be different, they involve similar technology, i.e. [*22], locating systems for assets and personnel using infrared and radio signals, and are closely related. The court's observations in *SAES Getters S.P.A.* are particularly relevant here:

> Just a cursory glance over both patents reveals that they are markedly similar. Both patents claim to provide a method for purifying gases, and both use what appears to be a similar method for doing so. The Court believes that it will be important for the consistent interpretation of these two similar patents to have one court, rather than two, interpret them. Having a single court conduct the *Markman* hearings for both patents will ensure that the court is familiar with all the potential overlap (if any) in the claims made by the two pat-

ents. Furthermore, if the issues related to both patents are presented to one court, the parties can raise any issues of invalidity stemming from the relationship between the two patents before a court which will be well-versed in the technology presented by both patents. Thus, by bringing both patent claims before one court, the possibility of inconsistent judgments should be substantially minimized, if not removed.

*SAES Getters S.P.A.,* 219 F. Supp. 2d at 1092. [*23] Based upon a similar rationale, the Eastern District of Virginia recently transferred to this Court a patent infringement case, even though the patents were not the same as those in the first-filed case before this Court, because the patents in both cases involved the same "interactive whiteboard" technology and "litigating this singular issue in two different courts could result in conflicting judgments, undermining the enforcement of a court's decision." *Smart Techs., Inc. v. PolyVision Corp., 2004 U.S. Dist. LEXIS 29483, *8, No. 3:04CV545 (E.D. Va. Oct. 20, 2004).*

There is also sufficient similarity between the parties to warrant the application of the first-to-file rule. Versus says that there is little similarity because its distributors are involved in the MDNC action but not here, and HRS and Versus are the only parties common to both suits. However, HRS is closely related to HRC and Hillenbrand because Hillenbrand is the parent and HRS and HRC are wholly-owned subsidiaries of Hillenbrand. In addition, while the distributors are present only in the MDNC action, they are only peripheral to the main dispute between HRS and Versus because their involvement is limited to purchasing and/or reselling [*24] the accused device rather than manufacturing it. See *Corry v. CFM Majestic Inc., 16 F. Supp. 2d 660, 664 (E.D. Va. 1998).* Finally, the Visonic Defendants' presence in this suit does not detract from the similarity between the two suits because, as the supplier(s) of an accused product to HRS, the Visonic Defendants are essentially in the same position as HRS.

Based upon its conclusion that the MDNC is the first-filed court and that there is a substantial likelihood of overlap between the cases, the Court determines that the most appropriate course of action is to transfer this case to the MDNC to determine how the two cases should proceed. See *Cadle Co. v. Whataburger of Alice, Inc., 174 F.3d 599, 605-06 (5th Cir. 1999)* (holding that the district court properly transferred the second-filed case to the first-filed court after finding a likelihood of a

2004 U.S. Dist. LEXIS 28331, *

substantial overlap between the two cases) (citing *Mann Mfg. Inc. v. Hortex, Inc., 439 F.2d 403, 407 (5th Cir. 1971)).*

III. Conclusion

For the foregoing reasons, the Court will grant Versus' motion to file a second amended and supplemental complaint and will grant the Hillenbrand [*25] Defendants' motion to transfer venue upon the grounds that the MDNC action is the first-filed action. In light of the transfer, the Court will leave the decision on the Hillen-

brand Defendants' motions to dismiss and Visonic's motion to dismiss for lack of personal jurisdiction to the MDNC.

Dated: November 23, 2004

/s/ Gordon J. Quist

GORDON J. QUIST

UNITED STATES DISTRICT JUDGE

# EXHIBIT   M

LEXSEE 2006 US DIST LEXIS 46910

**ZOETICS, INC. and ZOEMAIL, LLC, Plaintiffs, v. YAHOO!, INC., Defendant.**

**Civil Action No. 06-108-JJF**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE**

*2006 U.S. Dist. LEXIS 46910*

**July 6, 2006, Decided**

**COUNSEL:** [*1] Josy W. Ingersoll, Esquire, Karen L. Pascale, Esquire, and Elena C. Norman, Esquire of YOUNG CONAWAY STARGATT & TAYLOR LLP, Wilmington, Delaware. Of Counsel: Paul K. Vickrey, Esquire, Douglas M. Hall, Esquire, and Frederick: C. Laney, Esquire, of NIRO, SCAVONE, HALLER & NIRO, Chicago, Illinois, for Plaintiff.

Mary B. Graham, Esquire, of MORRIS, NICHOLS, ARSHT & TUNNELL LLP, Wilmington, Delaware. Of Counsel: Michael A. Jacobs, Esquire, of MORRISON & FOERSTER LLP, San Francisco, California. Matthew M. D'Amore, Esquire, and Kyle W.K. Mooney, Esquire, of MORRISON & FOERSTER LLP, New York, New York, for Defendants.

For Zoemail LLC, Plaintiff: Karen L. Pascale, Young Conaway Stargatt & Taylor, LLP, Wilmington, DE.

**JUDGES:** Joseph J. Farnan Jr., District Judge.

**OPINION BY:** Joseph J. Farnan Jr.

**OPINION:**

### MEMORANDUM OPINION

July 6, 2006
Wilmington, Delaware

Joseph J. Farnan Jr.
**Farnan, District Judge**

Pending before the Court is Defendant's Motion To Stay Action And Transfer Action To The Southern District Of New York. (D.I. 10.) For the reasons set forth below, the Court will deny the Motion.

### BACKGROUND

Plaintiffs ZoEmail, a Delaware limited liability company, and [*2] Zoetics, a New York corporation, filed this action seeking damages, attorneys' fees, and injunctive relief from Defendant, a Delaware corporation, for its alleged infringement of two patents Plaintiffs recently purchased from AT&T, Inc. (D.I. 1.) On October 20, 2004, sixteen months before filing its Complaint, Zoetics filed for Chapter 11 bankruptcy in the United States Bankruptcy Court for the Southern District of New York. According to Defendant, Zoetics' resort to bankruptcy was spurred at least partially by its inability to pay AT&T for the patents it purchased. (D.I. 11 at 5.) In Bankruptcy Court, Zoetics announced its intention to emerge from bankruptcy by "realizing value from its Intellectual Property" by first "seeking a license with certain significant parties which have infringed upon its intellectual property" and thereafter retaining counsel to sue for infringement. (D.I. 13, Ex. 8 at 2-3.) According to Defendant, it is one of the "significant parties" to which Zoetics was referring. (D.I. 11 at 7.)

AT&T has filed a secured claim against Zoetics in Bankruptcy Court based on a purported security interest it retained in the Patents-in-Suit. Plaintiffs dispute the validity [*3] of AT&T's secured claim. (D.I. 16 at 4-5.) Meanwhile, the Bankruptcy Court has granted Zoetics leave to retain counsel to pursue its intellectual property claims. (D.I. 13, Ex. 10 at 4.)

### DISCUSSION

### I. Motion to Stay Action

Defendant contends that the Court should stay this action until the ownership of the Patents-in-Suit is resolved in the New York Bankruptcy Court because it will simplify the issues before this Court, it will not unduly prejudice Plaintiffs, and this proceeding is still at an early stage. Plaintiffs respond that no litigation regarding the ownership of the Patents-in-Suit is pending in the New York Bankruptcy Court, and that they would be

prejudiced by a stay at this time. Because there is no indication that the issue of patent ownership will be imminently resolved in the Bankruptcy Court and because granting a stay will prejudice Plaintiffs, the Court will deny Defendant's Motion to Stay.

A. Legal Standard

A Court has the "inherent power to conserve judicial resources by controlling its own docket," *Cost Bros., Inc. v. Travelers Indem. Co., 760 F.2d 58, 60 (3d Cir. 1985),* and the decision to stay a case is firmly within [*4] the discretion of the Court. Pegasus Development Corp. v. DirecTV, Inc., 2003 U.S. Dist. LEXIS 8052, at *3 (D. Del. May 14, 2003). In ruling on a motion to stay, courts are guided by three factors: "(1) whether a stay would unduly prejudice or present a clear tactical disadvantage to the non-moving party; (2) whether a stay will simplify the issues in question and trial of the case; and (3) whether discovery is complete and whether a trial date has been set." 2003 U.S. Dist. LEXIS 8052, at *3-4 (quoting *Xerox Corp. v. 3Com Corp., 69 F. Supp. 2d 404, 406 (W.D.N.Y. 1999))*f.

B. Analysis

Defendant is arguing for a stay pending a decision regarding ownership of the Patents-in-Suit by the Bankruptcy Court. Defendant bases its argument on a claim filed by AT&T, an alleged secured creditor of Zoetics. Leaving aside the fact that Plaintiffs dispute the validity of the secured claim (D.I. 16 at 4-5), Defendant has not pointed to any precedent granting a stay under such circumstances. Furthermore, there is nothing to indicate when the Bankruptcy Court will take up the issue of ownership, or even if it plans to do so at all. In fact, the Bankruptcy Court has allowed Zoetics [*5] to retain special intellectual property counsel to "prosecut[e] enforcement actions regarding the Intellectual Property Rights" (D.I. 13, Ex. 9 at 2), though Zoetics ultimately made plain its intention to recover on its intellectual property as part of its emergence strategy. (D.I. 13, Ex. 8 at 2.)

Defendant contends that granting a stay in this case will advance the objective of judicial economy (D.I. 11 at 10) without prejudicing Plaintiffs. ( Id. at 12.) The Court disagrees. Staying the action pending a non-parallel proceeding in which the issue in question may be addressed n1 leaves too much uncertainty to substantially advance judicial economy. The Bankruptcy Court has not evidenced an intention to take up the patent ownership issue; rather, it permitted Zoetics to retain patent counsel in order to pursue its claims.

n1 Defendant repeatedly insists that the issue of patent ownership will be addressed by the

Bankruptcy Court (D.I. 20 at 3) but can offer no support for that assertion except to say that Zoetics defaulted on its payment to AT&T and the latter has filed a secured claim in the Bankruptcy Proceeding. (Id.) All of the case law Defendant cites, on the other hand, involves pending proceedings that are either parallel, *Summa Four, 994 F. Supp. 575 at 581,* or directly related to the issue in dispute. *Landis v. N. Am. Co., 299 U.S. 248, 57 S. Ct. 163, 81 L. Ed. 153 (1966); Commissariat a L'Energie Atomique v. Dell Computer Corp., 2004 U.S. Dist. LEXIS 9107, 2004 WL 1554382 (D. Del. May 13, 2004).*

[*6]

A secured claim in a bankruptcy proceeding, furthermore, is not tantamount to a challenge to Zoetics' patent ownership. Zoetics has announced its intention to sue on its patents to emerge from bankruptcy (D.I. 13, Ex. 8 at 2), and the Bankruptcy Court has not objected. It is therefore conceivable that, even if AT&T has a genuine secured claim, Zoetics could win a patent infringement suit, pay AT&T from the proceeds, and retain the patents. Granting a stay pending the resolution of the bankruptcy proceedings would prejudice Zoetics by preventing it from carrying its reorganization plan to completion in a timely fashion.

The Court concludes that granting a stay would not simplify the issues in this case with such certainty as to substantially advance judicial economy, and that it would prejudice and disadvantage Plaintiffs. Because neither of these factors weighs in favor of granting a stay, the Court is not persuaded that a stay is warranted because the case is still at an early stage. Accordingly, the Court will deny Defendant's Motion to Stay Action.

II. Motion to Transfer Action

Defendant argues that substantial practical considerations, as well as other private and [*7] public factors, strongly favor transferring the action to the Southern District of New York. Plaintiffs contend that Defendant has not met its burden of clearly showing that transfer is appropriate. Because the Court agrees with Plaintiffs that the factors do not weigh heavily in favor of transfer, it will deny Defendant's Motion to Transfer.

A. Standard of Law

28 U.S.C. § 1404 (a) permits a court to transfer a case to any other district where it might have been brought n2 "for the convenience of parties and witnesses" or "in the interest of justice." The purpose of the statute is to "prevent the waste of time, energy, and money and to protect litigants, witnesses, and the public against unnecessary inconvenience and expense." *Van*

2006 U.S. Dist. LEXIS 46910, *

*Dusen v. Barrack, 316 U.S. 612, 616, 84 S. Ct. 805, 11 L. Ed. 2d 945 (1964).* In considering a *§ 1404 (a)* transfer, the Court must balance a number of private and public interests. *Reyno v. Piper Aircraft Co., 630 F.2d 149, 159 (3d Cir. 1980).* The relevant private interests are:

> (1) the plaintiff's choice of forum, (2) the defendant's preferred forum, (3) whether the claim arose elsewhere, (4) the convenience of the [*8] expected witnesses, but only so far as the witnesses might be unavailable for trial if the trial is conducted in a certain forum, and (5) the location of books and records, to the extent that these books and records could not be produced in a certain forum.

*Jumara v. State Farm Ins. Co., 55 F.3d 873, 883 (3d Cir. 1995).* The relevant public interests are:

> (1) the enforceability of the judgment, (2) practical considerations regarding the ease, speed, or expense of the trial, (3) the administrative difficulty due to court congestion, (4) the local interest in deciding local controversies in the home forum, (5) the public policies of the two fora, and (6) the trial judge's familiarity with the applicable state law in diversity cases.

Id. When ruling on a motion to transfer, a court must "balance all of the relevant factors and respect that a plaintiff's choice of forum is entitled to substantial deference and should not be lightly disturbed." Stratos Lightwave, Inc. v. E20 Communications, Inc., 2002 U.S. Dist. LEXIS 5653, at *5 (D. Del. Mar. 26, 2002). The moving party has the burden to establish that "the balance of interests [*9] strongly weighs in favor of the transfer," and the transfer will be denied if the factors balance evenly or weigh only slightly in favor. Id.

> n2 It is undisputed that this action could have been brought in the Southern District of New York. (D.I. 11 at 13.)

**B. Practical Considerations**

Defendant first contends that the public interests of practical considerations and judicial efficiency strongly favor transfer because the District Court for the Southern District of New York will be "better positioned to man-

age the case if and when it is appropriate to proceed." (D.I. 11 at 15.) Defendant also argues that judicial efficiency militates for transfer because Defendant may have to ask the Bankruptcy Court to lift the automatic litigation stay to allow it to pursue counterclaims or file for reexamination of the Patents-in-Suit, a decision that would be reviewed by the District Court for the Southern District of New York. (Id. at 15-16.) Finally, Defendant argues that the transferee court would be better [*10] positioned to adjudicate any standing disputes with regard to ownership of the patents, since it would have already heard any related appeals from the Bankruptcy Court. (Id. at 16.)

The Court concludes that these considerations do not weigh strongly in favor of transfer. As an initial matter, many of Defendant's arguments rely on the proposition that the issue of patent ownership will be imminently resolved by the Bankruptcy Court, which the Court concluded, supra, is not the case. Moreover, while this Court has previously transferred an action to a district where a Chapter 11 case was pending, it did so in large part because the case depended on the interpretation of orders already issued by the transferee judge, and because the case involved administrative claims inextricably intertwined with the bankruptcy proceeding. Bank of America, N.A. v. US Airways, Inc., 2005 U.S. Dist. LEXIS 34902, at *8-9 (D. Del. Dec. 21, 2005).

In this case, there are no existing rulings by Defendant's proposed transferee court that are necessary to resolve the issues. Nor are the details of Zoetics' reorganization plan currently relevant, since the plan has not been filed yet. [*11] (See D.I. 11 at 12.) Ownership of the patents-in-suit has not been challenged in the New York courts, and there is no parallel litigation already in progress. Most importantly, the bankruptcy proceeding is before the Bankruptcy Court, not the District Court, and were a transfer to be granted, the patent infringement case would not be heard by the judge who will be overseeing Zoetics' Chapter 11 case. Defendant attempts to avoid this problem by insisting that judicial efficiency would be advanced because the District Court "would have already heard any related appeals" (Id. at 16), but such speculation does not weigh strongly in favor of transfer. Defendant's argument that Defendant will need to petition the Bankruptcy Court to lift or modify the automatic litigation stay in order to file counterclaims or auxiliary claims runs into the same problem, and the argument that the District Court in the Southern District of New York would hear those appeals is again unpersuasive.

While it may have been marginally more expedient for this case to have been brought in the Southern District of New York, the considerations presented by Defendant do not militate in favor of transfer so [*12] as to

outweigh Plaintiffs' choice of forum. Simply put, the Court can find no compelling reason why the District of Delaware is not an appropriate venue to resolve the issue of patent ownership. In fact, a resolution of the ownership dispute in this Court could as easily assist the Bankruptcy Court in carrying out its function.

C. Convenience and Availability of Non-Party Witnesses

Defendant argues that the convenience of non-party witnesses weighs strongly in favor of transfer. "Convenience of the expected trial witnesses is the most important factor to consider when determining whether or not transfer is appropriate." Memminger v. Infocure Corp., 2000 U.S. Dist. LEXIS 22077 at *12-13 (D. Del. Nov. 14, 2000). Though the convenience of the non-party witnesses is only an issue to the extent that the witnesses "may actually be unavailable for trial," Mentor Graphics Corp. v. Quickturn Design Sys., 77 F. Supp. 2d 505, 510 (D. Del. 1999), "it is sufficient for purposes of venue transfer analysis if the witness is not subject to a Court's subpoena power." Nilssen v. OSRAM Sylvania, Inc., 2001 U.S. Dist. LEXIS 25570, at *8 (D. Del. [*13] May 1, 2001); see also Anic v. DVI Fin Servs., 2004 U.S. Dist. LEXIS 11562, at *8 (D. Del. June 23, 2004). The Court has the power to subpoena a witness who can be served within its District, or at a place within 100 miles of the courthouse. Fed. R. Civ. P. 45(b)(2).

Most of the witnesses whose convenience Defendant claims strongly favors transfer are located in AT&T's Florham Park, New Jersey facility or in Berkeley Heights, New Jersey. (D.I. 11 at 18-20.) However, Defendant admits that both of these locations are within 100 miles of Wilmington, Delaware using a straight-line measurement. (Id. at 19.) Defendant argues that their presence still militates in favor of transfer because using an "ordinary and usual travel route" measurement puts them outside of the Court's subpoena power while they would be within the subpoena power of the transferee court by any measure. (Id.) Thus, transferring would "avoid later disputes." (Id. at 21.) There is, however, no genuine dispute that Delaware courts apply the modern approach, which measures "distance by a straight line on a map," as this method is the better construction of Rule 45 and is easier to apply [*14] in practice. Hill v. Equitable Bank, Nat'l Ass'n, 115 F.R.D. 184, 186 (D. Del. 1987). By contrast, the cases cited by Defendant in favor of the "ordinary and usual travel route" approach are more than 50 years old and are from district courts outside of Delaware. (D.I. 11 at 20.) Thus, the Court concludes that these witnesses are within the subpoena power of the Court and considered available to testify for the purposes of venue transfer.

Defendant also asserts that two of the attorneys involved in prosecuting the Patents-in-Suit are outside the subpoena power of this Court, but within the subpoena power of the New York court, weighing heavily in favor of transfer. Defendant claims that these witnesses would testify to issues of claim construction and the validity and enforceability of the Patents-in-Suit.

In response, Plaintiffs argue that Defendant has not shown with sufficient specificity why the witnesses' testimony would be necessary, and that Defendant has not shown that either would be reluctant to travel to Delaware in order to testify. As to the first argument, the Court concludes that Defendant may have its reasons for calling the prosecuting attorneys, [*15] given the attorneys' first-hand involvement in prosecuting the patents and their knowledge thereof. (See D.I. 13, Ex. 17 and 18.) As to the second, Defendant bears no burden to show that the witnesses it plans to subpoena would be "reluctant" to testify. "It is sufficient... [that] the witness is not subject to a Court's subpoena power." Nilssen, 2001 U.S. Dist. LEXIS 25570, at *8. Thus, the Court concludes that the convenience of the prosecuting attorneys is a factor weighing in favor of transfer.

D. Convenience of the Parties

Defendant argues that because Plaintiffs' principal place of business is mere blocks away from the District Court for the Southern District of New York, the convenience of the parties weighs in favor of transfer. However, "a plaintiff's choice of forum is a paramount consideration not to be lightly disturbed." Mentor Graphics, 77 F. Supp. 2d. at 509. Furthermore, while the plaintiff's choice of forum is generally given less deference where the plaintiff has not chosen his home turf, a defendant's incorporation in the chosen forum is "a rational and legitimate reason for choosing the forum" that cannot be disregarded. [*16] Stratos, 2002 U.S. Dist. LEXIS 5653, at *6-7. Having incorporated in the forum state, the defendant "should not now complain that another corporation has chosen to sue it here." 2002 U.S. Dist. LEXIS 5653 at *7.

Defendant in this case is incorporated in Delaware and admits that "neither Delaware nor the Southern District of New York is significantly more convenient than the other" for itself. (D.I. 11 at 24). Thus, the convenience of Defendant is not a factor weighing in either direction. As for the convenience of Plaintiffs, they have chosen the forum of Defendant's incorporation - a "rational and legitimate" choice that is entitled to deference. Stratos, 2002 U.S. Dist. LEXIS 5653, at *7. The Court concludes that the convenience of the parties does not weigh in favor of transfer.

E. Local Interest in the Controversy

Finally, Defendant argues that because Zoetics is in bankruptcy in the Southern District of New York, the local interest in the controversy weighs in favor of transfer. However, as discussed supra, the bankruptcy proceeding and the patent infringement suit are neither identical nor parallel controversies. Further, as Defendant acknowledges, "[p]atent [*17] rights are not local or state matters and therefore cannot give rise to a local controversy, or implicate local public policy." Stratos, 2002 U.S. Dist. LEXIS 5653 at *8; see also Trilegiant Loyalty Solutions, Inc. v. Maritz, Inc., 2005 U.S. Dist. LEXIS 2825, at *8 (D. Del. Feb. 15, 2005). Therefore, the Court concludes that the Southern District of New York does not have a local interest in the controversy.

    F. Conclusion

Although "[c]onvenience of the expected trial witnesses is the most important factor to consider when determining whether or not transfer is appropriate," Memminger, 2000 U.S. Dist. LEXIS 22077 at *12-13, the Court concludes that the potential unavailability of the attorneys who prosecuted the patent - the sole factor weighing in favor of transfer - is insufficient to overcome the "paramount" consideration of Plaintiffs' choice of forum. *Mentor Graphics, 77 F. Supp. 2d. at 509*. Plaintiffs had a legitimate reason for choosing to sue in Delaware, and Defendant has not carried its burden of negating that choice. Accordingly, the Court will deny Defendant's Motion to Transfer Action to the District [*18] Court for the Southern District of New York.