IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| TIME WARNER CABLE INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 07-067-*** |
| | ) | Jury Trial Demanded |
| GPNE CORP., | ) | |
| | ) | |
| Defendant. | ) | |

**PLAINTIFF'S ANSWERING BRIEF IN OPPOSITION TO
DEFENDANT'S MOTION TO DISMISS, STAY OR TRANSFER**

RICHARDS, LAYTON & FINGER, P.A.
Frederick L. Cottrell, III (#2555)
Jeffrey L. Moyer (#3309)
Jameson A. L. Tweedie (#4927)
One Rodney Square
Wilmington, DE 19899
(302) 651-7700

*Attorneys for Plaintiff Time Warner Cable Inc.*

OF COUNSEL:

David S. Benyacar
Joel Katcoff
Daniel L. Reisner
KAYE SCHOLER LLP
425 Park Avenue
New York, NY 10022-3598
(212) 836-8000

Dated: March 15, 2007

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

PRELIMINARY STATEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

NATURE AND STAGE OF THE PROCEEDING . . . . . . . . . . . . . . . . . . . . . . . . 3

STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

    I.    THIS ACTION HAS PRIORITY AND SHOULD NOT BE
         DISMISSED OR STAYED . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

         1.    This Action Is The First-Filed Action . . . . . . . . . . . . . . . . . . . 4

         2.    The Texas Action Would Not Be Entitled To The
              Benefit Of The First-Filed Rule Because GPNE's Filing
              In Texas Was Motivated By Forum Shopping . . . . . . . . . . . . . . 7

         3.    Even If The Texas Action Were The First-Filed Action
              And GPNE Selected Texas For Reasons Other Than Forum
              Shopping, This Action Would Still Have Priority Under
              *Genentech* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

         4.    GPNE's Suit Against TWI Instead Of TWC In The Texas
              Action Was Not A Mistake, And GPNE Is Not Entitled To
              The Benefit Of Fed. R. Civ. P. 15(c) . . . . . . . . . . . . . . . . . . . . 9

    II.   GPNE HAS FAILED TO CARRY ITS BURDEN TO SHOW
         THAT THIS CASE SHOULD BE TRANSFERRED TO TEXAS . . . . 12

         1.    The Private Factors Weigh Against Transfer . . . . . . . . . . . . . . 13

         2.    The Public Factors Weigh Against Transfer . . . . . . . . . . . . . . 15

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

## TABLE OF AUTHORITIES

### CASES

*APV N. Am., Inc. v. Sig Simonazzi N. Am., Inc.,*
  295 F. Supp. 2d 393 (D. Del. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Auto. Techs., Int'l, Inc. v. Am. Honda Motor Co.,*
  2006 WL 3783477 (D. Del. Dec. 21, 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Capitol Records, Inc. v. Optical Recording Corp.,*
  810 F. Supp. 1350 (S.D.N.Y. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Engel v. Minissale,*
  1993 WL 21232 (E.D. Pa. Jan. 29, 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Foster Wheeler Energy Corp. v. Intermarine, Inc.,*
  1999 WL 1129630 (E.D. Pa. Nov. 30, 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Genentech, Inc. v. Eli Lilly & Co.,*
  998 F.2d 931 (Fed. Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 7, 8

*Joint Stock Soc'y v. Heublein, Inc.,*
  936 F. Supp. 177 (D. Del. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Jumara v. State Farm Ins. Co.,*
  55 F.3d 873 (3d Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 13

*Kahn v. Gen. Motors Corp.,*
  889 F.2d 1078 (Fed. Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Kemper v. Ureco,*
  1991 U.S. Dist. LEXIS 8843 (E.D. Pa. June 28, 1991) . . . . . . . . . . . . . . . . 10, 11

*Mallinckrodt Med., Inc. v. Nycomed Imaging AS,*
  49 U.S.P.Q.2d 1474 (E.D. Mo. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Potts v. Allis-Chalmers Corp.,*
  118 F.R.D. 597 (N.D. Ind. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Roadmaster Corp. v. NordicTrack, Inc.,*
  29 U.S.P.Q.2d 1699 (N.D. Ill. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

ii

*Rockwell Techs. LLC v. Spectra-Physics Lasers, Inc.*,
    2002 U.S. Dist. LEXIS 5180 (D. Del. Mar. 26, 2002) . . . . . . . . . . . . . . . . . . . 10

*SRI Int'l, Inc. v. Internet Sec. Sys., Inc.*,
    2005 WL 851126 (D. Del. Apr. 13, 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Save Power Ltd. v. Syntek Fin. Corp.*,
    121 F.3d 947 (5th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6-7

*Stratos Lightwave, Inc. v. E2O Communications, Inc.*,
    2002 U.S. Dist. LEXIS 5653 (D. Del. Mar. 26, 2002) . . . . . . . . . . . . . . . . . . . 14

*Superior Savings Ass'n. v. Bank of Dallas*,
    705 F. Supp. 326 (N.D. Tex. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Tegal Corp. v. Tokyo Electron Co.*,
    248 F.3d 1376 (Fed. Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Turn of the Century Solution, L.P. v. Int'l Rectifier Corp.*,
    2006 WL 1653143 (D. Del. June 15, 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Winner Int'l Royalty Corp. v. Wang*,
    202 F.3d 1340 (Fed. Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Zoetics, Inc. v. Yahoo!, Inc.*,
    2006 U.S. Dist. LEXIS 46910 (D. Del. July 6, 2006) . . . . . . . . . . . . . . . . 13, 14

## STATUTES

28 U.S.C. § 1404(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

D. Del. L.R. 7.1.3(c)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

Fed. R. Civ. P. 15(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 10, 11

## PRELIMINARY STATEMENT

Defendant's motion is premised almost entirely on its improper application of law from other circuits as support for its assertion that a Texas action filed against a shareholder of plaintiff Time Warner Cable Inc. ("TWC") is entitled to priority over this action pursuant to the first-to-file rule. Relying predominantly on Fifth Circuit law, defendant GPNE Corp. ("GPNE") argues that identity of parties is not required between two actions as a predicate to application of the first-to-file rule, so long as the issues in the two actions "substantially overlap." The District of Delaware, however, has expressly rejected the "substantial overlap" test and *does* require that the two actions have the *same* parties and involve the *same* issues in order for the first-filed action to be entitled to priority under the first-to-file rule. For this reason alone, this action is the first-filed action, and defendant's motion should be denied.

Notwithstanding this dispositive fact, the case for denying GPNE's motion transcends reliance on a difference of law between the circuits. Even the Fifth Circuit's "substantial overlap" test requires denial of GPNE's motion. Under that test, the jurisdiction first seized of a substantial number of the substantive issues common to the two cases is deemed the first-filed case. The two primary substantive issues in this case are whether or not TWC infringes the asserted patent and whether or not the asserted patent is valid. Delaware is the first jurisdiction seized of both of these issues (to this day, the issue of validity has still not been raised in the Texas action). Accordingly, even applying Fifth Circuit law, this action is the first-filed action, and GPNE's motion to dismiss or stay should be denied.

Indeed, even if GPNE's suit against a TWC shareholder could be deemed the first-filed suit, it still should not be awarded priority pursuant to the first-to-file rule because GPNE's decision to sue in Texas was motivated solely by forum shopping and because Delaware is the most convenient and appropriate forum for resolution of the issues presented. Both TWC and GPNE are Delaware corporations. GPNE, which alleges that it has a place of business in Hawaii, has not identified a single connection it has with Texas. In contrast, Delaware is the "home turf" of both TWC and GPNE, the majority of TWC's witnesses and documents are in close geographic proximity to Delaware (and not to Texas), and the majority of potential third-party witnesses and documents are in close geographic proximity to Delaware (and not to Texas). For this additional independent reason, GPNE's motion to dismiss or stay should be denied.

Finally, GPNE's argument in favor of transfer of this action relies on its erroneous casting of itself as the plaintiff when applying the strong legal presumption that the plaintiff's choice of forum should not be disturbed. *TWC is the plaintiff in this case, not GPNE.* The fact that GPNE is the plaintiff in another case against different parties, before another court, does not help GPNE in the transfer analysis. The Court should not transfer this action.

For all of these reasons, Delaware is the district in which TWC and GPNE should litigate their dispute. The Court should therefore deny GPNE's motion in its entirety.

2

## NATURE AND STAGE OF THE PROCEEDING

This is a declaratory judgment action seeking, *inter alia*, a declaration that plaintiff Time Warner Cable Inc. does not infringe U.S. Patent No. 6,282,406 and that the patent is invalid. Plaintiff filed this action on February 2, 2007. On February 26, 2007, defendant GPNE moved to dismiss, stay or transfer this action.

## STATEMENT OF FACTS

As defendant GPNE states in its brief, it filed a patent infringement lawsuit in the Eastern District of Texas on January 31, 2007 ("Texas Action") against three different parties alleging infringement of U.S. Patent No. 6,282,406 (the "'406 patent"). Those three parties are Comcast Cable Communications LLC ("Comcast"), Charter Communications, Inc. ("Charter") and Time Warner, Inc. ("TWI"). *See generally* Compl. in *GPNE Corp. v. Time Warner Inc. et al.*, Case No. 6:07cv60 (attached as Ex. A). GPNE accused all three defendants of infringement based on the allegation that each of them "manufactures, uses and sells products that infringe at least Claim 1 of the '406 patent, including for example and without limitation all DOCSIS certified cable modems, as well as any other cable modems or other devices acting or capable of acting in the manner described and claimed in the '406 patent." Ex. A ¶¶ 13-15.

TWI is a shareholder of plaintiff TWC, which is a separate Delaware corporation independently publicly traded on the New York Stock Exchange. Block Decl. ¶ 4. TWC filed this action on its "home turf" on February 2, 2007, alleging that it does not infringe the '406 patent and that the '406 patent is invalid. More than three weeks later, on February 26, 2007, GPNE filed an Amended Complaint in the Texas

3

Action adding TWC as a defendant. Ex. B to GPNE Br. (D.I. 8). On that same day,

GPNE filed its motion to dismiss, stay or transfer in this action.

## ARGUMENT

I.     **THIS ACTION HAS PRIORITY AND SHOULD NOT BE DISMISSED OR STAYED**

GPNE correctly cites the *Genentech* case as setting forth the general rule

that the first-filed case, even if it is a declaratory judgment action, is favored over a

second-filed patent infringement action. *See generally Genentech, Inc. v. Eli Lilly & Co.*,

998 F.2d 931 (Fed. Cir. 1993) (dismissal in favor of second-filed case was improper

where there were "sound reasons" for the choice of forum in the first-filed declaratory

judgment case and the "only stated reason for the district court's discretionary dismissal"

was that a direct action was later brought elsewhere). However, *Genentech* is of no avail

to GPNE because, as discussed below, *Genentech* and its progeny teach that the present

action is favored over the Texas Action because the present action is the first-filed action.

Moreover, even if the present action were not the first-filed action, it would still be

preferred over the Texas Action because GPNE's choice of Texas was motivated solely

by forum shopping and because Delaware is the most convenient and appropriate forum

for resolution of the issues presented.

1.     **This Action Is The First-Filed Action**

GPNE's initial complaint in the Texas Action (Ex. A) named TWI as a

defendant, not TWC. TWI is a completely different company than TWC. TWC and TWI

are separately traded companies on the New York Stock Exchange. Block Decl. ¶ 4.

4

None of the senior executive officers of TWC responsible for the management of TWC's business operation are officers or directors of TWI, and none of the directors of TWC are directors of TWI. *Id.* ¶ 5. TWC has approximately 45,000 of its own employees. *Id.* ¶ 3. TWI is simply a shareholder in TWC.[1] *Id.* ¶ 4. TWC therefore is not an "alter ego" or "agent" of TWI and cannot subject TWI to liability for patent infringement based on its actions. *Tegal Corp. v. Tokyo Electron Co.*, 248 F.3d 1376, 1379 (Fed. Cir. 2001) ("[I]n the absence of evidence showing that the parent company either was an alter ego of the subsidiary or controlled the conduct of the subsidiary," the parent is not liable for infringement for "mere inaction . . . in the face of infringement by a subsidiary."); *SRI Int'l, Inc. v. Internet Sec. Sys., Inc.*, 2005 WL 851126, at *3 (D. Del. Apr. 13, 2005)[2] ("A parent company is not liable for the actions of a subsidiary solely because it is a subsidiary. A finding of liability requires piercing the corporate veil." (citation omitted)). Thus, the Eastern District of Texas did not have jurisdiction over TWC when GPNE brought suit on January 31, 2007, and the Texas Action cannot be deemed the first-filed action as to TWC based on commonality of the parties. GPNE does not dispute this.

Instead, relying predominantly on Fifth Circuit law, GPNE attempts to avoid the fact that its initial lawsuit was against TWI instead of TWC by arguing that the first-to-file rule does not require that "both actions include identical parties," and that a subsequent action without identical parties "can still substantially overlap on the

---

[1]    Thus, GPNE is simply mistaken when it alleges that TWC is a "subsidiary" of TWC. GPNE Br. at 3. The relationship between the two is much further removed than that.

[2]    Unreported decisions are attached as Ex. B.

substantive issues of the first-filed action, warranting dismissal or transfer." GPNE Br. at

3. The Delaware courts, however, have expressly rejected this Fifth Circuit

jurisprudence:

> [Defendant] contends that identicality between the issues is not
> required to invoke the first-filed rule. [Defendant] contends that it
> is sufficient for the two actions to have "substantial overlap." The
> "substantial overlap" inquiry is used by the Court of Appeals for
> the Fifth Circuit in determining whether the first-filed rule should
> apply. However, *the Court has been unable to locate any case law
> suggesting that this is the test to be used in this Circuit.*

*APV N. Am., Inc. v. Sig Simonazzi N. Am., Inc.*, 295 F. Supp. 2d 393, 397 (D. Del. 2002)

(emphasis added). Judge Farnan described the first-to-file rule, as applied in this judicial

district, as follows:

> The first-filed rule is a judicial construct aimed at conserving
> judicial resources and safeguarding litigants by preventing
> concurrent duplicative litigation of the *same issues* between the
> *same parties* in more than one federal court. Under this rule,
> priority is given to an earlier filed action, such that any
> subsequently filed action involving the *same parties and the same
> issues* should be stayed and/or transferred to the court in which the
> earlier filed action is pending.

*Id.* at 396 (emphasis added) (citation omitted). There can be no legitimate dispute that,

using the first-filed doctrine as articulated in *APV*, this action is the first-filed action.

The case for denial of GPNE's motion to dismiss or stay is so

overwhelming, however, that it transcends any difference in law between the circuits.

Indeed, *even applying the Fifth Circuit "substantial overlap" test, this is still the first-

filed action.* As the Fifth Circuit stated in *Save Power Ltd. v. Syntek Finance Corp.*, 121

F.3d 947, 950 (5th Cir. 1997), on which GPNE relies (*see* GPNE Br. at 3), if two cases

substantially overlap on substantive issues, "'the cases would be required to be

6

consolidated in . . . the jurisdiction first seized of the issues.'"[3] The two dominant

substantive issues in this action are whether or not TWC infringes the '406 patent, and

whether or not the '406 patent is valid. TWC's complaint in this action was the first to

join the issue of whether or not TWC infringes the '406 patent, and TWC's complaint in

this action contains the first (and currently the only)[4] allegation that the '406 patent is

invalid. The only issues in the Texas Action as originally filed were the alleged

infringement of Comcast, Charter and TWI. Thus, even under the Fifth Circuit

"substantial overlap" test, this is the first-filed action.

### 2.    The Texas Action Would Not Be Entitled To The Benefit Of The First-Filed Rule Because GPNE's Filing In Texas Was Motivated By Forum Shopping

Even if this Court finds that the Texas Action is the first-filed case, the

first-filed rule does not apply "when forum shopping was the only motive for the filing."

*Genentech*, 998 F.2d at 938. *Accord*, *Kahn v. Gen. Motors Corp.*, 889 F.2d 1078, 1081

(Fed. Cir. 1989) (first-filed rule does not apply "where forum shopping alone motivated

the choice of sites for the first suit"); *Capitol Records, Inc v. Optical Recording Corp.*,

810 F. Supp. 1350, 1353 (S.D.N.Y. 1992) (observing that one of the "special

circumstances" justifying an exception to the first-filed rule is "when the plaintiff in the

first action is solely motivated by forum shopping in the choice of forum for the first

suit"). "Forum shopping, as condemned in *Genentech*, is seeking out a forum solely on

---

[3]    As alternatively stated in *Superior Savings Ass'n. v. Bank of Dallas*, 705 F. Supp. 326, 331 (N.D. Tex. 1989), also cited by GPNE, the first-to-file rule is based in part on "deference to power already being exercised."

[4]    None of the defendants have yet filed answers in the Texas Action.

the basis of having the suit heard in a forum where the law or judiciary is more favorable to one's cause than in another." *Roadmaster Corp. v. NordicTrack, Inc.*, 29 U.S.P.Q.2d 1699, 1701 (N.D. Ill. 1993). That is exactly the case here — GPNE chose the Eastern District of Texas simply because it is regarded as favorable by plaintiffs in patent cases.

In its motion, GPNE does not explain why it filed its suit against TWI or the other defendants in Texas because there can be no reason other than forum shopping. GPNE itself is a Delaware corporation, Ex. A ¶ 1, TWC is a Delaware corporation, and GPNE's amended complaint in the Texas Action alleges that the other defendants are Delaware corporations as well. GPNE Br. Ex. B ¶¶ 3-4. Moreover, GPNE has not identified a single connection between itself and the Eastern District of Texas or any reason why the convenience of the parties or the interests of judicial economy would be advanced by proceeding in Texas (in fact, as discussed below, the convenience of the parties would be greatly increased by proceeding in Delaware). Thus, if GPNE had been motivated by anything other than forum shopping, it would have filed its initial complaint in Delaware, not in Texas. As discussed above, the law simply does not countenance using the first-to-file rule as a forum shopping tool.

3. **Even If The Texas Action Were The First-Filed Action And GPNE Selected Texas For Reasons Other Than Forum Shopping, This Action Would Still Have Priority Under** ***Genentech***

Even if GPNE had some basis other than forum shopping for choosing Texas, there are "sound reasons" relating to the location of the parties, witnesses, and documents for TWC's choice of the Delaware forum that defeat GPNE's motion. *Genentech*, 998 F.2d at 938. TWC is a Delaware corporation, making Delaware its

8

"home turf." *Joint Stock Soc'y v. Heublein, Inc.*, 936 F. Supp. 177, 186 (D. Del. 1996) ("'Home turf' now refers to the forum closest to the plaintiff's residence or principal place of business in which the party can effect personal service over the principal defendant."); Block Decl. ¶ 3. GPNE also is a Delaware Corporation. Ex. A ¶ 1. There are sound reasons why Delaware should adjudicate this dispute between two of its residents.

The potential witnesses and documents are also much closer to Delaware than they are to Texas. TWC's corporate headquarters are in Connecticut. Block Decl. ¶ 3. The TWC corporate research and development facility responsible for the design and implementation of the cable system technology at issue here is located in Herndon, Virginia. Cannon Decl. ¶ 4. That is where most of the TWC engineers who worked on the general system design of TWC's high speed online systems are located and also where most of the relevant documents are located. *Id.* In addition, the vendors who make much of the equipment used by TWC to deliver high speed online service through its cable systems are located in Horsham, Pennsylvania (near Philadelphia) and Atlanta, Georgia, substantially closer to Delaware than to Texas. *Id.* ¶ 5.[5]

### 4.    GPNE's Suit Against TWI Instead Of TWC In The Texas Action Was Not A Mistake, And GPNE Is Not Entitled To The Benefit Of Fed. R. Civ. P. 15(c)

GPNE does not assert in its brief that it named TWI instead of TWC as a defendant in the Texas Action by mistake, and does not assert that it is entitled to the

---

[5]    In addition, at least the Pennsylvania third-party witnesses would be within the subpoena power of this Court, whereas none of these witnesses could be subpoenaed by the Eastern District of Texas.

9

benefit of the relation back provisions of Fed. R. Civ. P. 15(c). Thus, GPNE is not

entitled to raise this argument in its reply brief,[4] and TWC need not and will not address

all of the reasons why such an argument would be meritless. Nonetheless, it is worth

mentioning at least one fact which demonstrates beyond dispute that GPNE's naming of

TWI instead of TWC as a defendant in the Texas Action was not a mistake, which is the

reason why Rule 15(c) is unavailing to GPNE.

Only last year, the same lawyers and law firms that represent GPNE in this

action filed another patent infringement action on behalf of USA Video Technology

Corp. ("USA Video") in the Eastern District of Texas, C.A. No. 2:06cv239, in which

they named TWI instead of TWC as the defendant. The briefing in the USA Video action

dealt extensively with the fact that TWI and TWC are completely different corporate

entities. Thus, GPNE, through its counsel, was undeniably aware of the distinction

between TWI and TWC before it filed the Texas Action.

Despite this knowledge, GPNE still sued TWI instead of TWC in the

Texas Action, and still waited weeks after TWC filed this suit to amend the complaint in

Texas. Moreover, even if GPNE's counsel did not have prior actual knowledge of the

difference between TWI and TWC, a minimal brief investigation would have revealed

that TWC and TWI are totally different companies. *See Kemper v. Ureco*, 1991 U.S.

---

[4]    *See* D. Del. L.R. 7.1.3(c)(2) ("The party filing the opening brief shall not reserve
material for the reply brief which should have been included in a full and fair
opening brief."); *Rockwell Techs. LLC v. Spectra-Physics Lasers, Inc.*, 2002 U.S.
Dist. LEXIS 5180, at *8 (D. Del. Mar. 26, 2002) ("tactic of reserving new
arguments for [a] reply brief amounts to impermissible 'sandbagging'" and new
arguments are not to be considered by the court).

Dist. LEXIS 8843, at *5 (E.D. Pa. June 28, 1991) ("Plaintiff's diligence in researching

which defendant to sue is also relevant [to relation back].").  Because GPNE's decision to

sue TWI cannot reasonably be attributed to a mistake, relation back under Fed. R. Civ. P.

15(c) is not permitted, and this case must be considered the first-filed case.  *See Foster*

*Wheeler Energy Corp. v. Intermarine, Inc.*, 1999 WL 1129630, at *9 (E.D. Pa. Nov. 30,

1999) (no relation back where plaintiff could have discovered the proper defendant

"through reasonable diligence" and had actual knowledge that the named defendant was

improper); *Mallinckrodt Med. Inc. v. Nycomed Imaging AS*, 49 U.S.P.Q.2d 1474, 1478

(E.D. Mo. 1998) (amended complaint adding a defendant did not relate back to the

original complaint for purposes of the first-to-file rule when there was "a strong inference

that [plaintiff] believed or knew" who the proper defendant was); *Engel v. Minissale*,

1993 WL 21232, at *3 (E.D. Pa. Jan. 29, 1993) (no relation back where plaintiffs "were

not diligent in their efforts to ascertain the identity" of the proper defendant); *Kemper*,

1991 U.S. Dist. LEXIS 8843, at *1-*6, *14 (reviewing case law on this issue and holding

that the relation back rule did not apply); *Potts v. Allis-Chalmers Corp.*, 118 F.R.D. 597,

608-09 (N.D. Ind. 1987) (where plaintiff should have been aware of the proper defendant

at the outset of a case, plaintiff's delay in amending complaint could appear to potential

defendant as strategy rather than mistake).

    Obviously, however, the best evidence that GPNE's failure to name TWC

in the Texas Action was not a mistake is that GPNE does not allege that it was a mistake.

If it was a mistake, GPNE would have said so in its opening papers.  GPNE is therefore

not entitled to the benefit of Rule 15(c).

## II. GPNE HAS FAILED TO CARRY ITS BURDEN TO SHOW THAT THIS CASE SHOULD BE TRANSFERRED TO TEXAS

In patent cases, motions to transfer under 28 U.S.C. § 1404(a) are governed by the law of the regional circuit. *Winner Int'l Royalty Corp. v. Wang*, 202 F.3d 1340, 1352 (Fed. Cir. 2000). As GPNE recognizes, under Third Circuit law, "[t]he burden of showing the need for a transfer is on the movant." GPNE Br. at 5 (citing *Jumara v. State Farm Ins. Co.*, 55 F.3d 873, 879 (3d Cir. 1995)). "[T]he plaintiff's choice of venue should not be lightly disturbed," *Jumara*, 55 F.3d at 879, and accordingly the moving party must "'establish that the balance of convenience of the parties and witnesses strongly favors the defendants.'" *Turn of the Century Solution, L.P. v. Int'l Rectifier Corp.*, 2006 WL 1653143, at *1 (D. Del. June 15, 2006) (quoting *Bergman v. Brainin*, 512 F. Supp. 972, 973 (D. Del. 1981)). "'Unless the balance is strongly in favor of a transfer, the plaintiff's choice of forum should prevail.'" *Id.* (quotation omitted).

The Third Circuit has set forth six private and six public interest factors that should be considered on a motion to transfer. *See Jumara*, 55 F.3d at 879-80. The six private factors are:

(1)     the plaintiff's forum preference as evidenced by his or her original choice,

(2)     the defendant's preference,

(3)     whether the claim arose elsewhere,

(4)     the convenience of the parties due to their relative physical and financial condition,

(5)     the convenience of the expected witnesses, but only so far as the witnesses might be unavailable for trial if the trial is conducted in a certain forum, and

12

(6)     the location of books and records, to the extent that the books and
records could not be produced in a certain forum.

The six public factors presented in *Jumara* are:

(1)     the enforceability of the judgment,

(2)     practical considerations regarding the ease, speed, or expense of
trial,

(3)     the administrative difficulty due to court congestion,

(4)     the local interest in deciding local controversies in the home forum,

(5)     the public policies of the two fora, and

(6)     the trial judge's familiarity with the applicable state law in
diversity cases.

Thus, GPNE has the burden of showing that the balance of these 12 factors weighs
"strongly in favor of a transfer."

### 1.     The Private Factors Weigh Against Transfer

GPNE asserts that there are "only two relevant private factors" — "the
plaintiff's choice of forum and the defendant's preferred forum" — and that the plaintiff's
forum choice "weighs heavily" in favor of GPNE because "it is plaintiff in the first-filed
action." GPNE Br. at 5. The fatal flaw with this analysis, of course, is that **TWC, not
GPNE, is the plaintiff in this case.** Accordingly, TWC's choice of this forum "'is
entitled to substantial deference and should not be lightly disturbed.'" *Id.* (quoting
*Zoetics, Inc. v. Yahoo!, Inc*, 2006 U.S. Dist. LEXIS 46910, at *8 (D. Del. July 6, 2006)).
GPNE is apparently trying to combine and conflate the legal standards for application of
the first-to-file rule with the legal standards for transfer to create a new rule that a "first-
filed plaintiff's choice of forum is entitled to substantial deference by the Court before

13

whom the second-filed action is brought." There is simply no authority for this GPNE-created proposition.[5]

GPNE cites *Stratos Lightwave, Inc v E2O Communications, Inc.*, 2002 U.S. Dist. LEXIS 5653 (D. Del. Mar. 26, 2002), and *Zoetics*, 2006 U.S. Dist. LEXIS 46910, in support of its position that this action should be transferred, but neglects to mention that those cases **denied** motions to transfer because, *inter alia*, Delaware was the defendant's place of incorporation and the defendant therefore could not complain that another corporation had chosen to sue it in Delaware. Thus, in *Stratos*, 2002 U.S. Dist. LEXIS 5653, at \*7 (cited in GPNE's Brief at 5, 6), the Court stated:

> [I]t is not appropriate to disregard a plaintiff's choice of forum where it had a rational and legitimate reason for choosing the forum. And the fact that [defendant] has incorporated in Delaware is a rational and legitimate reason for choosing to sue [the defendant] in Delaware. In fact, [defendant], having received the benefits of Delaware incorporation, should not now complain that another corporation has chosen to sue it here.

(Citation omitted). *Accord, Zoetics*, 2006 U.S. Dist. LEXIS 46910, at \*15, \*16 (cited in GPNE's Brief at 4, 5) ("defendant's incorporation in the chosen forum is 'a rational and legitimate reason for choosing the forum' that cannot be disregarded" and "is entitled to deference"); *Auto. Techs., Int'l, Inc v. Am. Honda Motor Co.*, 2006 WL 3783477, at \*2 (D. Del. Dec. 21, 2006) (citing *Stratos*). Of course, the same is true here, where both TWC and GPNE are Delaware corporations.

---

[5]    Of course, even if there were authority, for all of the reasons discussed herein, this action is the first-filed action, not the Texas Action.

**2.    The Public Factors Weigh Against Transfer**

GPNE correctly lists the relevant public factors, and then proceeds to

explain precisely why they do **not** weigh in favor of transfer:

> The judgment would be enforceable in both jurisdictions, there is
> not special administrative difficulty due to court congestion, the
> public policies of the two fora regarding patents do not differ, and
> this is not a diversity case requiring application of state laws. . . .
> Patent rights are not local or state matters and therefore cannot give
> rise to a local controversy, or implicate local public policy.

GPNE Br. at 6. GPNE is in effect admitting that none of these factors weighs in any way

in favor of transfer and that Texas does not offer a single advantage with respect to any

public factor that is not present in Delaware. Plainly, then, GPNE does not carry its

heavy burden of showing that the relevant factors weigh "strongly" in favor of transfer by

stating merely that those factors are neutral as to the jurisdiction in which the case

proceeds.

In addition, GPNE conveniently omits the public factor regarding "the

local interest in deciding local controversies in the home forum," which weighs heavily in

favor of Delaware, which is home to both TWC and GPNE. Thus, far from weighing

strongly in favor of transfer, the public factors actually weigh against transfer.

In sum, GPNE has entirely failed to show that the balance of the *Jumara*

factors "strongly" favors transfer. Plaintiff TWC's choice of Delaware as the forum for

this dispute should therefore be respected, and GPNE's motion to transfer should be

denied. If the Texas Action is to be consolidated with this action, Delaware is the most

natural and convenient forum for the consolidated action to proceed, as it would be the

"home turf" to all of the parties in the consolidated proceeding.

## CONCLUSION

GPNE has failed to carry its heavy burden justifying dismissal, stay or

transfer. Accordingly, its motion should be denied.

RICHARDS, LAYTON & FINGER, P.A.

Frederick L. Cottrell, III (#2555)
cottrell@rlf.com
Jeffrey L. Moyer (#3309)
moyer@rlf.com
Jameson A. L. Tweedie (#4927)
tweedie@rlf.com
One Rodney Square
Wilmington, DE 19899
(302) 651-7700

*Attorneys for Plaintiff Time Warner Cable Inc.*

OF COUNSEL:

David S. Benyacar
Joel Katcoff
Daniel L. Reisner
KAYE SCHOLER LLP
425 Park Avenue
New York, NY 10022-3598
(212) 836-8000

Dated: March 15, 2007

16

## CERTIFICATE OF SERVICE

I hereby certify that on March 15, 2007,  I electronically filed the foregoing document

with the Clerk of Court using CM/ECF which will send notification of such filing(s) and Hand

Delivered to the following:

Richard K. Herrmann, Esquire
Morris James, LLP
500 Delaware Avenue, suite 1500
Wilmington, DE   19801-1494


I hereby certify that on March 15, 2007, I have sent by Federal Express, the foregoing

document to the following non-registered participants:

Edward W. Goldstein
Corby R. Vowell
Goldstein, Faucett & Prebeg, LLP
1177 West Loop South, Suite 400
Houston, Texas  77027

Jameson Tweedie (#4927)
tweedie@rlf.com

# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TYLER DIVISION

| | | |
|---|---|---|
| GPNE CORP., | § | |
| | § | |
| Plaintiff | § | |
| | § | |
| v. | § | Case No: 6:07cv60 |
| | § | |
| TIME WARNER INC.; COMCAST | § | |
| CABLE COMMUNICATIONS, LLC; | § | |
| CHARTER COMMUNICATIONS, INC. | § | **JURY TRIAL DEMANDED** |
| | § | |
| Defendants | § | |
| | § | |
| | § | |
| | § | |
| | § | |
| | § | |
| | § | |

## PLAINTIFF'S ORIGINAL COMPLAINT

Plaintiff, GPNE Corp. ("Plaintiff"), files this Original Complaint against Defendants, Time

Warner, Inc. ("Time Warner"), Comcast Cable Communications, L.L.C. ("Comcast"), and Charter

Communications, Inc. ("Charter"), and alleges as follows:

### THE PARTIES

1.    Plaintiff is a Delaware corporation with its principal place of business at 2556 Lemon Road,

B101 Honolulu, Hawaii 96815.

2.    Time Warner, on information and belief, is a corporation organized under the laws of the

State of New York. Time Warner is doing business in Texas, and, on information and belief,

has a principal place of business at 1 Time Warner Center, New York, NY 10019-8016.

1

Time Warner may be served with process by serving its registered agent, the CT Corporation System, 701 Brazos Street, Suite 360, Austin, TX 78701.

3.    Comcast, on information and belief, is a corporation organized under the laws of the State of Delaware. Comcast is doing business in Texas, and, on information and belief, has a principal place of business at 1500 Market Street, Philadelphia, PA 19102-2148. Comcast may be served with process by serving its registered agent, Comcast Capital Corporation at 1201 Market Street, Suite 1000, Wilmington, DE 19801.

4.    Charter, on information and belief, is a corporation organized under the laws of the State of Delaware. Charter is doing business in Texas, and, on information and belief, has a principal place of business at 12405 Powerscourt Drive, St. Louis, MO 63131. Charter may be served with process by serving its registered agent, Corporation Service Company DBA CSC-Lawyers Incorporating Service Company, 701 Brazos, Suite 1050, Austin, TX 78701.

**JURISDICTION & VENUE**

5.    This is an action for infringement of a United States patent. Accordingly, this action arises under the patent laws of the United States of America, 35 U.S.C. § 1 et. seq. and jurisdiction is properly based on Title 35 United States Code, particularly § 271, and title 28 United States Code, particularly § 1338(a).

6.    Time Warner, upon information and belief, transacts business in this judicial district by manufacturing, using, selling, or offering to sell products as described and claimed in United States Patent No. 6,282,406, the patent at issue in this lawsuit, and/or by conducting other business in this judicial district.

2

7.    Comcast, upon information and belief, transacts business in this judicial district by manufacturing, using, selling, or offering to sell products as described and claimed in United States Patent No. 6,282,406, the patent at issue in this lawsuit, and/or by conducting other business in this judicial district.

8.    Charter, upon information and belief, transacts business in this judicial district by manufacturing, using, selling, or offering to sell products as described and claimed in United States Patent No. 6,282,406, the patent at issue in this lawsuit, and/or by conducting other business in this judicial district.

9.    Venue is proper in this court under Title 28 United States Code § 1391(b) and 1400(b).

## PATENT INFRINGEMENT COUNT

10.    On August 28, 2001, United States Patent No. 6,282,406 ("the '406 patent") entitled "Paging Method and Apparatus" was duly and legally issued. A true and correct copy of the '406 patent is attached as Exhibit A.

11.    Pursuant to 35 U.S.C. § 282, the above-listed United States Patent is presumed valid.

12.    Plaintiff, GPNE Corp., is the owner of the '406 patent.

13.    Time Warner, on information and belief, manufactures, uses, and sells products that infringe at least Claim 1 of the '406 patent, including for example and without limitation all DOCSIS certified cable modems, as well as any other cable modems or other devices acting or capable of acting in the manner described and claimed in the '406 patent.

14.    Comcast, on information and belief, manufactures, uses, and sells products that infringe at least Claim 1 of the '406 patent, including for example and without limitation all DOCSIS

certified cable modems, as well as any other cable modems or other devices acting or capable of acting in the manner described and claimed in the '406 patent.

15.   Charter, on information and belief, manufactures, uses, and sells products that infringe at least Claim 1 of the '406 patent, including for example and without limitation all DOCSIS certified cable modems, as well as any other cable modems or other devices acting or capable of acting in the manner described and claimed in the '406 patent.

16.   The infringement of the '406 patent alleged above has injured the Plaintiff and thus, it is entitled to recover damages adequate to compensate for Time Warner, Comcast, and Charter's infringement, which in no event can be less than a reasonable royalty.

**DEMAND FOR JURY TRIAL**

17.   Plaintiff hereby demands a jury trial on all claims and issues.

**PRAYER FOR RELIEF**

Wherefore, Plaintiff prays for entry of judgment:

A.   that Defendants, Time Warner, Comcast, and Charter, have infringed one or more claims of the '406 patent;

B.   that Defendants, Time Warner, Comcast, and Charter, account for and pay to Plaintiff all damages caused by the infringement of the '406 patent, which by statute can be no less than a reasonable royalty;

C.   that Plaintiff be granted pre-judgment and post-judgment interest on the damages caused to them by reason of Defendants, Time Warner, Comcast, and Charter's infringement of the '406 patent;

D.   that Plaintiff be granted its attorneys' fees in this action;

4

E.    that costs be awarded to Plaintiff;

F.    that Plaintiff be granted such other and further relief as the Court may deem just and

proper under the current circumstances.


                                        Respectfully submitted,


Date: 01/31/2007                        /s/ John Ward, Jr.
                                        T. John Ward, Jr.
                                        Texas Bar No. 00794818
                                        Law Office of T. John Ward, Jr., P.C.
                                        111 W. Tyler Street
                                        Longview, Texas 75601
                                        Telephone: (903) 757-6400
                                        Facsimile:  (903) 757-2323
                                        E-mail:     jw@jwfirm.com

                                        Edward W. Goldstein
                                        LEAD ATTORNEY
                                        Texas Bar No. 08099500
                                        E-mail: egoldstein@gfpiplaw.com
                                        Christopher M. Faucett
                                        Texas Bar No. 00795198
                                        E-mail:  cfaucett@gfpiplaw.com
                                        Matt Prebeg
                                        Texas Bar No. 00791465
                                        E-mail:  mprebeg@gfpiplaw.com
                                        Corby R. Vowell
                                        Texas Bar No. 24031621
                                        E-mail:  cvowell@gfpiplaw.com
                                        GOLDSTEIN,  FAUCETT & PREBEG L.L.P
                                        1177 West Loop South, Suite 400
                                        Houston, TX 77027
                                        Telephone: (713) 877-1515
                                        Facsimile:  (713) 877-1737

                                        *ATTORNEYS FOR PLAINTIFF*

F:\CLIENT44763\GFNE\004\DOCS\S\Pleadings\Complaint DOCSIS.doc

5

# EXHIBIT A

US006282406B1

## (12) United States Patent
### Wong et al.

(10) Patent No.: **US 6,282,406 B1**
(45) Date of Patent: ***Aug. 28, 2001**

(54) **PAGING METHOD AND APPARATUS**

(75) Inventors: **Gabriel K. Wong; Po S. Tsui**, both of Honolulu, HI (US)

(73) Assignee: **Digicomm, Ltd.**, Honolulu, HI (US)

(*) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days

This patent is subject to a terminal disclaimer

(21) Appl. No.: **09/594,662**

(22) Filed: **Jun. 15, 2000**

### Related U.S. Application Data

(63) Continuation of application No. 08/264,973, filed on Jun. 24, 1994, now Pat. No. 5,542,115

(51) Int. Cl.[7] .............................................. H04B 7/00
(52) U.S. Cl. ..................................................... 455/31.3
(58) Field of Search ............................... 455/38.1, 38.4, 455/31.1, 31.2, 31.3, 509, 510, 515, 517, 224; 340/825.44, 825.2; 370/330, 336, 350, 436, 450

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | |
|---|---|---|
| Re 32,365 | 5/1987 | Sebestyen |
| Re 33,417 | 10/2000 | Bhagat et al |
| 4,224,150 | 9/1980 | Neustein |
| 4,345,491 | 8/1992 | Fascenda et al |
| 4,644,347 | 2/1987 | Lucas et al |
| 4,644,351 | 2/1987 | Zabarsky et al |
| 4,713,808 | 12/1987 | Gaskill et al |
| 4,747,122 | 5/1988 | Bhagat et al |
| 4,823,123 | 4/1989 | Siwiak |
| 4,845,491 | 7/1989 | Fascenda et al |
| 4,870,402 | 9/1989 | DeLuca et al |
| 4,875,038 | 10/1989 | Siwiak et al |
| 4,882,579 | 11/1989 | Siwiak |
| 4,914,649 | 4/1990 | Schwendeman et al |
| 4,940,963 | 7/1990 | Gutman et al |
| 4,978,944 | 12/1990 | Andros et al |
| 5,043,721 | 8/1991 | May |
| 5,086,501 | 2/1992 | DeLuca et al |
| 5,109,400 | 4/1992 | Patsiokas et al |
| 5,111,197 | 5/1992 | Ichikawa |
| 5,117,449 | 5/1992 | Metroka et al |
| 5,142,279 | 8/1992 | Jasinski et al |
| 5,153,582 | 10/1992 | Davis |
| 5,170,487 | 12/1992 | Peek |
| 5,206,855 | 4/1993 | Schwendeman et al |
| 5,224,150 | 6/1993 | Neustein |
| 5,247,700 | 9/1993 | Wohl et al |
| 5,260,986 | 11/1993 | Pershan |
| 5,285,496 | 2/1994 | Frank et al |

(List continued on next page.)

*Primary Examiner*—Thanh Cong Le
(74) *Attorney, Agent, or Firm*—Beyer Weaver & Thomas, LLP

(57) **ABSTRACT**

A two-way paging system utilizes four local frequencies for transmissions between pager units (22) and a central control station (20). A first local frequency ($f_1$) carries a local clock; a second local frequency ($f_2$) carries communications packets from the central control station to paging units; a third local frequency ($f_3$) carries communication packets from the pager units to the central control station; and a fourth local frequency ($f_4$) carries a status or request signal from the paging units (22) to the central control station (20). Transmissions on the fourth local frequency ($f_4$) are in accordance with a time divided slot allocation among pager units accessing the central control station (20). For a two-way paging system having a plurality of central control stations ($420_x$) servicing a corresponding plurality of cells, a total of eight frequencies are utilized within any one cell. Four of the utilized frequencies are the local frequencies ($f_1$–$f_4$) [which may differ from cell to cell], and four of the utilized frequencies are lower power common frequencies or switching frequencies ($C_1$–$C_4$) which are used to switch or handoff a pager unit (422) traveling from one cell to another

16 Claims, 13 Drawing Sheets



## US 6,282,406 B1

Page 2

U S  PATENT DOCUMENTS

| | | |
|---|---|---|
| 5,396,496 | 3/1995 | Ito et al |
| 5,396,537 | 3/1995 | Schwendenman et al |
| 5,463,675 | 10/1995 | Gerszberg |
| 5,485,463 | 1/1996 | Godoroja |

| | | | |
|---|---|---|---|
| 5,491,469 | | 2/1996 | Schwendeman |
| 5,542,115 | * | 7/1996 | Wong ........................ 455/507 |
| 5,689,807 | * | 11/1997 | Wong et al ............. 455/38 1 |

* cited by examiner



FIG. 1

U.S. Patent          Aug. 28, 2001          Sheet 2 of 13          US 6,282,406 B1



FIG. 2

Case 1:07-cv-00067-MPT    Document 14-2    Filed 03/15/2007    Page 12 of 34
Case 6:07-cv-00060-LED    Document 1-2    Filed 01/31/2007    Page 6 of 25

## FIG. 3





FIG. 4



FIG. 5

# FIG. 6



CLOCK TRANSMITTER FREQUENCY $f_1$

CENTRAL COMPUTER TRANSMITTER FREQUENCY $f_2$

PAGER TRANSMITTER FREQUENCY $f_3$

PAGER REQUEST FLAG TRANSMITTER FREQUENCY $f_4$

TIME

$P_1$ TELL THE COMPUTER IT GOT THE REPLY (STEP 140)

$P_1$ PERMISSION SIGNAL (STEP 136)

$P_1$ REQUESTING TO SEND (STEP 214)

COMPUTER TELLS $P_1$ HAD RECEIVED THE MESSAGE (STEP 140)

$P_2$ TELLS THE COMPUTER THAT IT GOT THE MESSAGE (STEP 220)

GIVE $P_2$ PERMISSION TO SEND (STEP 136)

$P_2$ REQUEST TO TRANSMIT (STEP 214)

COMPUTER SENDING MESSAGE TO $P_2$ (STEP 140)

$P_1$ SENDING MESSAGE TO COMPUTER (STEP 220)

GIVE $P_1$ PERMISSION TO TRANSMIT (STEP 136)

$P_1$ REQUEST TO TRANSMIT (STEP 214)

Case 1:07-cv-00067-MPT    Document 14-2    Filed 03/15/2007    Page 16 of 34
Case 6:07-cv-00060-LED    Document 1-2    Filed 01/31/2007    Page 10 of 25

# FIG. 7



Case 1:07-cv-00067-MPT    Document 14-2    Filed 03/15/2007    Page 17 of 34
Case 6:07-cv-00060-LED    Document 1-2    Filed 01/31/2007    Page 11 of 25

U.S. Patent        Aug. 28, 2001        Sheet 8 of 13        US 6,282,406 B1



FIG. 8

Case 1:07-cv-00067-MPT    Document 14-2    Filed 03/15/2007    Page 18 of 34
Case 6:07-cv-00060-LED    Document 1-2    Filed 01/31/2007    Page 12 of 25

# FIG. 9



MESSAGE

MESSAGE

ACTIVE FREQUENCIES OF $P_1$

$P_1$ ALIGN ITS CLOCK WITH $S_2$ FROM $C_1$ (STEP 504)
$P_1$ DETECTED NEW SYSTEM INFORMATION ON $C_2$ (STEP 508)
$P_1$ REQUESTING NEW FREQUENCIES (STEP 510)
$S_2$ TELLS PAGER TO IDENTIFY ITSELF (STEP 616)
$P_1$ SENDS ITS ID INFORMATION ON $C_3$ (STEP 516)
NEW TIME SLOT AND NEW FREQUENCIES
INFORMATION GIVEN ON $C_2$ FROM $S_2$ (STEPS 632 AND 634)

Case 1:07-cv-00067-MPT    Document 14-2    Filed 03/15/2007    Page 19 of 34
Case 6:07-cv-00060-LED    Document 1-2    Filed 01/31/2007    Page 13 of 25

U.S. Patent          Aug. 28, 2001          Sheet 10 of 13          US 6,282,406 B1



FIG. 10

# FIG. 11



Case 1:07-cv-00067-MPT    Document 14-2    Filed 03/15/2007    Page 21 of 34
Case 6:07-cv-00060-LED    Document 1-2    Filed 01/31/2007    Page 15 of 25



**FIG. 12**



FIG. 13

US 6,282,406 B1

1

## PAGING METHOD AND APPARATUS

This is a continuation of application Ser. No. 08/264,973, filed Jun. 24, 1994, now U.S. Pat. No. 5,542,115, issued Jul. 30, 1996, entitled "PAGING METHOD AND APPARATUS", naming Wong et al. as inventors.

### RELATED APPLICATION DATA

The present application also relates to a number of commonly assigned, copending U.S. patent applications, including U.S. patent application Ser. No. 08/609,976, filed on Feb. 29, 1996, now U.S. Pat. No. 5,689,807, issued Nov. 18, 1997, entitled "PAGING METHOD AND APPARATUS", naming Wong et al. as inventors; U.S. patent application Ser. No. 08/608,629, filed on Feb. 29, 1996, now U.S. Pat. No. 5,729,827, issued Mar. 17, 1998 entitled "PAGER WITH STATION SWITCH REQUEST", naming Wong et al. as inventors; U.S. patent application Ser. No. 08/609,978, filed on Feb. 29, 1996, now U.S. Pat. No. 5,613,212, issued Mar. 18, 1997 entitled "PAGING METHOD AND APPARATUS", naming Wong et al. as inventors; and U.S. patent application Ser. No. 09/259,417, filed on Dec. 9, 1997, entitled "PAGING METHOD AND APPARATUS", naming Wong et al. as inventors. Each of the disclosures of these applications is incorporated herein by reference in its entirety for all purposes.

### BACKGROUND

#### 1. Field of Invention

This invention pertains to communications paging, and particularly to two-way paging method and apparatus.

#### 2. Related Art and Other Considerations

Over the last several decades, pagers have proven to be important communication devices for contacting remotely situated personnel. Whereas primitive pagers provided primarily only a tonal and/or vibratory output, more modern pagers have enhanced output capabilities such as message-bearing alphanumeric displays.

Paging systems have historically been one-way systems. That is, the user receives a paging message from a central terminal but has no way of responding to that message with the pager. Prior art attempts to provide two-way communication capabilities for a pager have included efforts to connect the pager to a telephone (e.g., to a mobile radio telephone). See, for example, U.S. Pat. No. RE 33,417 to Bhagat et al. (which combines an entire radio pager and radiotelephone linked through an automatic dialer) and U.S. Pat. No. 5,117,449 to Metroka, et al. (which purports to combine paging and cellular radiotelephone functions in a single unit).

Some pagers have the capability of providing an acknowledgment or response to a paging signal. In some such "ack-back" systems, a user operates a reply input device (e.g., a toggle switch, pushbutton switch, or keyboard) when paged. Typically such ack-back systems involve a complex acknowledgement transmission scheme, involving numerous frequencies or frequency sub-bands. Hand-off of the pager, as the pager travels between differing geographic regions or "cells" served by differing central stations, becomes technically cumbersome when multitudinous frequencies are involved.

### SUMMARY

A two-way paging system utilizes four local frequencies for transmissions between pager units and a central control

2

station. A first local frequency carries a local clock; a second local frequency carries communications packets from the central control station to paging units; a third local frequency carries communication packets from the pager units to the central control station; and a fourth local frequency carries a status or request signal from the paging units to the central control station. Transmissions on the fourth local frequency are in accordance with a time divided slot allocation among pager units accessing the central control station.

For a two-way paging system having a plurality of central control stations servicing a corresponding plurality of cells, a total of eight frequencies are utilized within any one cell. Four of the utilized frequencies are the local frequencies, (which may differ from cell to cell), and four of the utilized frequencies are lower power common frequencies or switching frequencies which are used to switch or hand-off a pager unit traveling from one cell to another.

### BRIEF DESCRIPTION OF THE DRAWINGS

The foregoing and other objects, features, and advantages of the invention will be apparent from the following more particular description of preferred embodiments as illustrated in the accompanying drawings in which reference characters refer to the same parts throughout the various views. The drawings are not necessarily to scale, emphasis instead being placed upon illustrating the principles of the invention.

FIG. 1 is a schematic view of a central control station included in a paging system of an embodiment of the invention.

FIG. 2 is a schematic view of a pager unit included in a paging system for use with the central control station of FIG. 1.

FIG. 3 is a flowchart depicting steps executed by the central control station of FIG. 1.

FIG. 4 is a flowchart depicting steps executed by the pager unit of FIG. 2 when in a transmit mode.

FIG. 5 is a flowchart depicting steps executed by the pager unit of FIG. 2 when in a receive mode.

FIG. 6 is a timing diagram reflecting communications between the central control station of FIG. 1 and the pager unit of FIG. 2.

FIG. 7 is a schematic view of a central control station included in a paging system of a second embodiment of the invention.

FIG. 8 is a schematic view of a pager unit included in a paging system for use with the central control station of FIG. 7.

FIG. 9 is a hybrid schematic view and timing diagram for representing switching operations for the paging system of the second embodiment of the invention.

FIG. 10 is a flowchart depicting steps executed by the pager unit of FIG. 8 in connection with a channel switching operation.

FIG. 11 is a flowchart depicting steps executed by the central control station of FIG. 7 in connection with a channel switching operation.

FIG. 12 is a schematic view of a format of a communications packet utilized with embodiments of the invention.

FIG. 13 is a schematic view illustrating a time divided slot allocation technique according to the invention.

### DETAILED DESCRIPTION OF THE DRAWINGS

FIG. 1 shows a central control station 20 according to a first embodiment of the invention; FIG. 2 shows a paging unit 22 suitable for use with central control station 20.

US 6,282,406 B1

3

As shown in FIG. 1, central control station 20 includes central computer 30; transmitter 32; receiver 34; and computerized telephone answering system 36. Transmitter 32 transmits, via transmitting antenna 42, two local frequencies, namely frequency $f_1$ and frequency $f_2$. Receiver 34 is connected to receiver antenna 44 for reception of two local frequencies, namely frequency $f_3$ and frequency $f_4$. Computerized telephone answering system 36 is connected to a bank of telephones 48.

Central computer 30 of central control station 20 comprises a conventional computer equipped with typical components including a CPU 50; I/O interface 52; and memory 54. Although shown only generally in FIG. 1, it should be understood that memory 54 includes a number of unillustrated memory devices, including (for example) a hard disk drive, RAM, and ROM. FIG. 1 shows that memory 54 has stored therein (among other things) a pager registration file 55 and a pager directory file 56. Pager files 55 and 56 are typically stored on a hard disk drive of central computer 30, and upon start-up are loadable into a RAM portion of memory 54.

Central computer 30 of central control station 20 further includes a decoder 57 (connected between receiver 34 and I/O interface 52 for decoding in-coming communications information from one or more pager units 22), as well as encoder 58 (connected between I/O interface 52 and transmitter 32 for encoding out-going communications information).

Central control station 20 also includes a clock unit 59 which generates a local clock signal $f_1$clk (which, in turn, is used to modulate frequency $f_1$).

As illustrated further herein, CPU 50 of central control station 20 prepares communications packets for transmission on frequency $f_2$. As generally illustrated in FIG. 12, the communications packets are of a predetermined format, having fields for identification of the addressed pager unit(s) 22, for an operation code, for (optionally) alphanumeric information, and for other conventional packet-type information such as checksum, error correction, and postamble. The preamble and postamble are specially chosen patterns which can be recognized and distinguished from data for the purpose of determining the beginning and ending of a packet. The alphanumeric information can be in a customary binary 8-bit format. The format of FIG. 12 is illustrative only, as such information as the order of the fields can be varied in other embodiments.

Central control station 20 communicates with a plurality of pager units $22_1$, $22_2$, ... $22_N$. Only one such pager unit, generically referenced as pager unit 22, is specifically illustrated and described herein, it being understood that the construction and operation of other pager units may be similar to the one illustration.

As shown in FIG. 2, pager unit 22 includes a pager receiver antenna 60 which is connected to pager receiver 62. Pager receiver 62 is, in turn, connected through S/D converter 64 within pager computer 70. Receiver 62 receives the two local frequencies $f_1$ and $f_2$, which frequencies have been modulated to carry in-coming communications information (described in more detail below) to pager computer 70. On a communications output side, pager computer 70 outputs out-going communications information to pager transmitter 72 via D/S converter 74. Transmitter 72 broadcasts, on pager antenna 76, the out-going communications information on the two local frequencies $f_3$ and $f_4$.

As also shown in FIG. 2, pager computer 70 includes pager microprocessor 80 which is connected to each of an

4

arithmetic processor 82; a memory system 84 (including both ROM and RAM); and I/O interface 86. I/O interface 86 is connected to a clock unit 87. I/O interface 86 is also connected to receive in-coming decoded communications information from an 8-bit decoder 88 and to output out-going uncoded communications information to an 8-bit encoder 90. Decoder 88 is connected to receive in-coming coded communications information from S/D converter 64; encoder 90 is connected to output out-going coded communications information to D/S converter 74.

Clock unit 87 is settable by suitable inputs thereto so that clock unit 87 generates a local clock signal $f_1$clk having a frequency corresponding to its input. It should be understood that, in other embodiments, the function of clock unit 87 can be performed at least partially by microprocessor 80 using programmed execution.

I/O interface 86 is also connected to supply an on/off signal on line 92 to pager transmitter 72, as well as to facilitate input and output with numerous input/output devices. The input/output devices connected to I/O interface 86 include keyboard 93; beeper 94; vibrator 95; and LCD (alphanumeric) display 96.

Upon manufacture, pager unit 22 is preprogrammed with an identification serial number (e.g., a 7-digit alphanumeric pre-assigned ID number) which is stored in memory 84 (ROM). Pager unit 22 is activated (e.g., at the time of purchase) by inserting a time slot assignment (explained below) both into a predetermined address in memory 84 of pager unit 22 and into pager directory file 56 (stored in memory 54 of central control station 20).

OPERATION OF FIRST EMBODIMENT

Communication between central control station 20 and pager unit 22 occurs on the four local frequencies, in particular the frequencies $f_1$, $f_2$, $f_3$, and $f_4$ mentioned above. The first frequency ($f_1$) carries the local clock-aligning signal from central control station 20 to paging unit 22. The second frequency ($f_2$) carries a pager command and alphanumeric data from central control station 20 to paging unit 22. The third frequency ($f_3$) carries pager status data and alphanumeric data from, paging unit 22 to central control station 20. The fourth frequency ($f_4$) carries a pager request signal from paging unit 22 to central control station 20. In the illustrated embodiment, the frequencies $f_1$–$f_4$ are preferably chosen so that $f_1 \neq f_2 \neq f_3 \neq f_4$.

As explained in more detail below and illustrated in FIG. 13, in normal non-cell-switching operation, the pager request signal on frequency $f_4$ is transmitted in a predetermined time slot assigned to paging unit 22. The predetermined time slot on frequency $f_4$ is related to the clock-aligning signal (carried by frequency $f_1$) and assigned whereby the fourth frequency is utilizable by a plurality of other paging units. For example, as shown in FIG. 13, a first time slot on frequency $f_4$ is assigned to a pager P1; a second time slot is assigned to page P2, and so on up to time slot n assigned to pager Pn. In the illustrated embodiment, the number of time slots (and accordingly the number of pagers) may be as many as ten thousand or more.

FIG. 3 shows steps executed by CPU 50 of central control station 20 in processing communications to and from one or more paging units. The steps depicted in FIG. 3 are indicative of instructions stored in a ROM portion of memory 54 of central control station 20.

When central control station 20 is started up (step 100), an initialization process (step 102) is conducted. Included in the initialization process is activation of transmitter 32 (so that

Case 1:07-cv-00067-MPT    Document 14-2    Filed 03/15/2007    Page 25 of 34
Case 6:07-cv-00060-LED    Document 1-2    Filed 01/31/2007    Page 19 of 25

US 6,282,406 B1

5

transmitter 32 can transmit at the two frequencies $f_1$ and $f_2$) and activation of receiver 34 (so that receiver 34 can receive the two frequencies $f_3$ and $f_4$) Moreover, frequency $f_3$ is modulated to carry the local clock-aligning signal generated by local clock 59 Then, at step 104, the pager registration file 55 and the pager directory file 56 are loaded from hard disk into a RAM section of memory 54 (step 104)

After initialization and loading of the files 55 and 56, CPU 50 repetitively executes an instruction loop 106 Loop 106 involves checking to determine (at step 108) whether a telephone message is being received (via answering system 36 from one of the telephones in bank 48) and checking to determine (at step 110) whether a pager message is being received (via transmitter 32 from one of the pager units 22)

As used herein, a message, whether originated from a telephone or from a pager, may require a plurality of packets for transmission from a central station 20 to a pager 22 or vise versa In the ensuing discussion, transmission and reception of messages subsumes transmission and reception one or more packets In general, the packetization of messages will be invisible to the user, meaning that a user enters a message without regard to the number of packets which might be required to transmit the message The message typically ends with a user-entered message termination character or message delimiter character The transmitting device (either central station 20 or pager 22), allocates the message to one or more packets having a format similar to that of FIG. 12, with the last packet in the message bearing the message termination character Alternatively, the packets may be formatted in a manner to indicate the number of consecutively related packets emanating from a transmitter (e g , there may be a separate packet field indicating the continuation number of related packets)

Central computer 30 can distinguish between receipt of a telephone message (at step 108) and a pager message (at step 110) by virtue of the fact that I/O interface 52 generates different type of interrupts to CPU 50 depending on the type of message received If it is determined at step 108 that a telephone message is being received, steps 112, 114, and 116 of FIG 3 are executed

In processing a received telephone message, at step 112 central computer 30 extracts out-going communications information from the predeterminately sequenced telephone-entered data The telephone-entered data, entered via a touchpad of a calling one of the telephones in bank 48, includes by convention an identification (e g , telephone number) of the calling telephone; an identification of the called pager (e g , the 7-digit alphanumeric pre-assigned ID number); and any character data for transmission followed by a termination character This out-going communications information is received at central computer 30 in standard DTMF format

At step 114, using the ID number of the called pager (obtained at step 112) central computer 30 checks the pager registration file 55 and directory file 56 to determine whether the called pager unit 22 is registered with central control station 20 Assuming that the called pager is so registered, at step 114 the central computer 30 also obtains from pager directory file 56 the slot assignment for the called pager unit

At step 116, central control station 30 transmits communications information to the called pager unit In this regard, central control station 20 prepares and transmits (on frequency $f_2$) a communications message which includes, among other things, the ID of the called pager unit and the character data received from the telephone for transmission of the pager unit 22 After step 116 is executed, processing returns to loop 106

6

If it is determined at step 110 that a pager message is being received, even numbered steps 132–140 of FIG 3 are executed (prior to returning to loop 106) As will be seen hereinafter with respect to FIG 4, a sending pager unit 22 transmits, in its assigned time slot, a request signal on frequency $f_4$ when the sending pager unit 22 desires to send a message As central control station 20 is always monitoring frequency $f_4$, a request signal carried by frequency $f_4$ from any pager unit 22 is noted With reference to the local clock 59, at step 132 CPU 50 determines in what time slot on frequency $f_4$ the request signal is detected Upon detection of the time slot at step 132, at step 134 CPU 50 consults the pager directory file 56 to determine the identification number of the particular pager unit 22 which originated the request signal

With the identity of the requesting pager unit 22 now known, at step 136 central control station 20 authorizes the requesting pager unit 22 to transmit its message In particular, CPU 50 directs preparation of a communications message for transmission on frequency $f_2$. The particular communications packet prepared at step 136 includes an identification of the requesting pager unit (the addressee of the packet), as well as an operation code ("op" code) which commands/authorizes the requesting pager unit 22 to send its message

At step 138, central control station 20 receives a communications message on frequency $f_3$ sent from the sending (e g , requesting) pager unit 22 The communications message prepared and sent by the sending pager unit 22 includes packets of similar format to that shown in FIG 12, and includes an identification of a pager to which the message is ultimately addressed as well as its own identification At step 138, CPU 50 checks to ensure that the ultimate addressee pager unit is registered in pager files 55 and 56 At step 140, CPU 50 makes any necessary reformatting and/or information substitution in the message, and causes the message to be transmitted on frequency $f_2$. The transmission on frequency $f_2$ required by step 140 includes the identification of the ultimate addressee (e g , a pager unit 22) as well as an operation code indicating that the transmission includes a relayed message from another pager unit

Steps executed by a pager unit 22 in connection with its transmission mode are depicted in FIG. 4. Steps executed by a pager unit 22 in connection with its receive mode are depicted in FIG 5 The term "mode" as used herein does not connote exclusivity at any particular moment, for it should be remembered that at all times pager unit 22 is receiving transmissions on frequencies $f_1$ and $f_2$

In its transmission mode (see FIG 4), after start-up (step 200) microprocessor 80 of the transmitting pager unit 22 executes a loop 202 wherein user alphanumeric characters (entered via keyboard 93) are repetitively fetched (at step 204) until an end of message delimiter is detected (at step 206) As entered, the characters fetched at step 204 are displayed on LCD display 96 Entry of the delimiter character at step 206 causes microprocessor 80 to exit loop 202 By convention, the message must include an addressee ID, which addressee ID is likely the ID of another one of the pager units to which the message entered in step 204 is directed

After entry of the message awaits entry from keyboard 93 of a transmit command at step 212 Assuming that the transmit command is entered at step 212, microprocessor 80 prepares and sends a request signal on frequency $f_4$ As indicated before, the request signal is transmitted on frequency $f_4$ in a time slot assigned to the requesting pager unit

US 6,282,406 B1

7

8

22 It should be kept in mind that pager unit 22 is all the while receiving the local clock-aligning signal on frequency $f_3$, which enables microprocessor 80 to cause transmission of the request signal on frequency $f_4$ at a time corresponding to the specific time slot allotted to the particular sending pager unit 22

In the above regard, in accordance with time division techniques, each pager unit $22_1$–$22_N$ (e g , pagers $P_1$–$P_n$ in FIG. 13) is assigned a selected one of N number of time slots on frequency $f_4$

After transmission of the request signal at step 214, pager unit 22 awaits receipt of a transmit command from central control station 20 Preparation and transmission of the transmit command/authorization from central control station 20 is described with reference to FIG 3 Upon receipt of the transmit command/authorization from central control station 20 (step 216), microprocessor 80 prepares (at step 218) a communications message with one or more packets having a format much like that of FIG 12 The addressee ID and alphanumeric field of packets of the communications message is filled with the message entered in loop 202 At step 220, the sending pager unit 22 broadcasts the communications packet on frequency $f_3$

If a transmit command is not entered at step 212, or after transmission of the message at step 220, microprocessor 80 awaits entry of at least one of several possible special function keys at step 222 For example, the user may press a function key which requires storage of the message (whether yet transmitted or not) [see step 228] Alternatively, the user may press function keys which facilitate editing or erasure of the message (see steps 224 and 226, respectively) To complete the message and begin work on another message, a special function key for an exit operation (step 230) must be pressed

FIG 5 depicts steps executed by microprocessor 80 of pager unit 22 when in a receive mode After start-up (step 302), and as indicated by step 304, pager unit 22 receives transmissions from central control station 20 on frequency $f_2$. Once a complete packet is received (determined at step 306), a check is made (at step 308) whether the addressee ID in the communications packet (see packet format of FIG 12) is the ID of the receiving pager unit 22 If the determinations of either step 306 or 308 are negative, pager unit 22 awaits either completion of the communications packet (in the case of step 306) or receipt of another communications packet (in the case of step 308) by looping back to step 304

Assuming that the received communications packet is designated for this particular receiving pager unit 22, at step 310 microprocessor 80 consults the operation code field of the communications packet (see FIG 12) to determine if the operation code indicates that the message includes a command If the operation code indicates a command, a command processing routine (framed by broken lines 312 in FIG 5) is executed

Assuming for the moment that the operation code does not indicate a command, at step 314 microprocessor 80 of pager unit 22 stores the alphanumeric field portion of the communications packet (which at least partially forms the message) in a RAM portion of memory 84 Since a message communicated from central processing station 20 may require several communications packets for completion of the message (with subsequent communication packets providing continuations of the message content), microprocessor 80 checks at step 316 to ensure that the entire message has been received If not, processing continues back at step 304 for reception of a further communications packet

Upon reception of an entire communications message, at step 318 microprocessor 80 determines whether pager unit 22 is in a beep mode or a vibrate mode In this regard, there are numerous ways of setting paging unit 22 to the desired mode, either by a specially dedicated switch on paging unit 22 or by data entry using keyboard 93 If pager unit 22 is in a beep mode, microprocessor 80 outputs a signal which causes I/O interface 86 to issue a further signal to activate beeper 94 (step 320) Alternatively, if pager unit 22 is in a vibrate mode, microprocessor 80 outputs a signal which causes I/O interface 86 to issue a further signal to activate vibrator 95 (step 322)

At step 324, microprocessor 80 directs I/O interface 86 to send the alphanumeric message data to LCD display 96, so that the received message can be viewed by the user

After notification to the user (either via beeper 94 and/or vibrator 95), and display (on LCD 96) of the received alphanumeric data, microprocessor 80 returns to step to 304 to check whether further communications packets are being received

The command processing routine (framed by broken lines 312 in FIG 5) first determines (step 330) which particular operation is being commanded This determination is based on the content of the operation code, which is different for different command types If the operation code indicates an error shut-down, execution jumps to an error shut-down sub-routine which begins at step 340 If the operation code indicates a time slot change, execution jumps to a change time slot sub-routine which begins at step 350 If the operation code requires transmitter shut-down, execution jumps to a transmitter shut-down sub-routine which begins at step 360 If the operation code requires transmitter re-enablement, execution jumps to a transmitter re-enable sub-routine which begins at step 370 If the operation code requires clock re-set, execution jumps to a clock re-set sub-routine which begins at step 380

In connection with the error shut down sub-routine, at step 342 microprocessor 80 obtains an indication of error type from the communications packet The error type is stored in memory 84 (step 344) and then displayed on LCD display 96 (step 346) Then microprocessor 80 issues a command (at step 348) to shut down pager unit 22, which shut-down occurs at step 349

In connection with the time slot changing sub-routine, at step 352 microprocessor 80 extracts, from the received communications packet, information indicative of the new time slot assigned to the receiving pager unit 22 The new time slot is entered (at step 354) into memory 84 and thereafter utilized (until further change) in connection with transmission of request signals on frequency $f_4$ (see, for example, step 214 of FIG 4) The time slot changing sub-routine may also include other operations, if desired, including (for example) eliminating unused time slots (thereby increasing scanning rate); diagnosing and trouble shooting; and avoiding interruption of service from malfunctioning or ill-functioning equipment

In connection with the transmitter shut down sub-routine, at step 362 microprocessor 80 directs I/O interface 86 to issue an OFF command to transmitter 72 In connection with the transmitter re-enable sub-routine, at step 372 microprocessor 80 directs I/O interface 86 to issue an ON command to transmitter 72

In connection with the clock re-set sub-routine, at step 382 microprocessor 80 directs that clock 59 of pager unit 22 be set

After execution of steps 354, 362, 372, or 382, execution continues back to step 304 for processing of potential further

US 6,282,406 B1

9

communications packets Thus, unless an error shutdown is noted, each entry of the command processing routine (framed by broken lines 312 in FIG 5) is followed by a loop back to step 304.

FIG 6 is a timing diagram showing the frequencies $f_1$–$f_4$ and integration of the steps depicted in FIGS 3–5, particularly in the context of a request by a sending pager unit P1 for sending a message to a sendee pager unit P2 As employed in FIG 6, "computer" refers to central control station 20 It should be understood that the sending pager unit P1 and the sendee pager unit P2 operate in both the transmission mode as depicted in FIG 4 and in the receiver mode as depicted in FIG 5. In general, FIG 6 shows transmission of a message from pager unit P1 (via central control station 20) to pager unit P2; transmission of a confirmation message from pager unit P2 (via central control station 20) to pager unit P1; and transmission of a message from pager unit P1 to central control station 20 indicating that pager unit P1 received the confirmation message from pager unit P2.

STRUCTURE OF SECOND EMBODIMENT

FIG 7 shows a central control station 420 according to a second embodiment of the invention; FIG 8 shows a paging unit 422 suitable for use with central control station 420

FIG 9 shows a wide area paging system including a plurality of central control stations S1–S8 (each identical to central control station 420), each preferably geographically centered within a respective cell. Each central control station S1 –S8 broadcasts its own local frequencies, as well as a set of common or switching frequencies $C_1$–$C_4$ The common frequencies $C_1$–$C_4$ are broadcast at a lower power, so that reception thereof occurs only in a relatively small neighborhood or common frequency reception region (CFRR) [also referred to as a "switching region"] about the central control station. The local frequencies are broadcast at a significantly greater power for reception substantially throughout the cell For example, in FIG 9, central control station S1 broadcasts its lower power common frequencies $C_1$–$C_4$ to CFRR$_1$ and its higher power local frequencies $f_1$–$f_4$ to CELL$_1$; central control station S2 broadcasts its lower power common frequencies $C_1$–$C_4$ to CFRR$_2$ and its higher power local frequencies $f_5$–$f_8$ to CELL$_2$.

As also shown in FIG 9, CELL$_1$ and CELL$_2$ overlap in an overlap region shown in FIG 9. Station S1 utilizes a set of local frequencies $f_1$–$f_4$; station S2 utilizes a different set of local frequencies $f_5$–$f_8$ Both stations S1 and S2 utilize the same set of common or switching frequencies $C_1$–$C_4$ Thus, each central control station utilizes two sets of frequencies, there being four frequencies in each set, resulting in a total of eight frequencies handled per station

Thus, the second embodiment of the invention is suitable for a system having a plurality of central control stations 420$_{x...z}$. Each central control station 420$_x$ transmits and receives a set of local frequencies $f_{L1}$, $f_{L2}$, $f_{L3}$, $f_{L4}$ in an associated geographical area or cell, as well as the set of common or switch frequencies $C_1$, $C_2$, $C_3$, $C_4$ While the values of the local frequencies $f_{L1}$, $f_{L2}$, $f_{L3}$, $f_{L4}$ vary from cell to cell (e g , differ for differing central control stations 420$_x$), the values of the common or switch frequencies $C_1$, $C_2$, $C_3$, $C_4$ are uniform through the system (e g , for all central control stations 420$_x$)

Although not shown in FIG 9, it should be understood that the pattern of central control stations repeats in like manner in all compass directions in accordance with the prescribed geographical boundaries of the paging system.

10

Moreover, although not specifically illustrated in FIG 9, it should also be understood that each central control station 420 has an associated CFRR

The common or switching frequencies $C_1$–$C_4$ have an analogous function to the corresponding local frequencies $f_1$–$f_4$, respectively In this regard, frequency $C_1$ carries a clock frequency transmitted by central control station(s), although the clock rate on common frequency $C_1$ preferably varies among central control stations Frequency $C_2$ is used to transmit information from central control station(s) to pager unit(s); frequency $C_3$ is used to transmit information from a pager unit to a central control station; frequency $C_4$ is used by pager units to issue a request signal Frequency $C_2$ carries packets having a format similar to that of FIG 12 In analogous manner to frequency $f_2$, the packets carried by frequency $C_2$ may have command codes Among the $C_2$ command codes are a SYSTEM COMMAND CODE; a LOCAL FREQUENCY DOWNLOAD COMMAND CODE; a SLOT RECOGNITION COMMAND CODE; and a SLOT ASSIGNMENT COMMAND CODE

As shown in FIG 7, central control station 420 resembles central control station 20 of the embodiment of FIG 1 (similar components being assigned the same reference numerals for simplicity) However, central control station 420 is augmented by inclusion of a further transmitter, known as common frequency transmitter 432, together with its common frequency transmission antenna 442, for transmitting the common frequencies $C_1$ and $C_2$ In contrast to the high power transmitter 32, transmitter 432 is a low power transmitter Further, central control station 420 is augmented by inclusion of a further receiver, known as the common frequency receiver 434, together with its common frequency receiver antenna 444, for reception of the common frequencies $C_3$ and $C_4$

Central control station 420 of FIG 7 includes a clock unit 59' which generates two clocking signals—a first or local clocking signal $f_L$clk and a second or common clocking signal $C_1$clk The local clocking signal $f_L$clk is used to modulate frequency $f_1$; the common clocking signal is used to modulate the common frequency $C_1$

The central computers 30 of the central control stations 420$_x$ are serially connected to one another by an output line 486A and an input line 486B In particular, although not expressly shown as such in FIG 7, computer 30 of FIG 7 (like that of FIG 1) includes an I/O interface to which the serial lines 486A and 486B are connected. Serial lines 486A and 486B are used, for example, to update contents of the pager registration file 55 and the pager directory file 56

As shown in FIG 8, pager unit 422 resembles pager unit 22 of the embodiment of FIG 2 (similar components again being assigned the same reference numerals for simplicity)

However, pager unit 422 (in like manner as central control station 420) is augmented by inclusion of a further transmitter, known as common frequency transmitter 572, together with its common frequency transmission antenna 576, for transmitting the common frequencies $C_3$ and $C_4$ Further, central control station 420 is augmented by inclusion of a further receiver, known as the common frequency receiver 434, together with its common frequency receiver antenna 444, for reception of the common frequencies $C_1$ and $C_2$

The operational frequencies of transmitter 72 and receiver 62 are changeable in accordance with values transmitted on "frequency control" lines from computer 70 In particular, the frequency control lines are connected to I/O interface 86 in computer 70 As described in more detail below, when a

US 6,282,406 B1

11                                                          12

pager unit 422 migrates into a new CFRR, signals are applied on the frequency control lines in order to switch pager unit 422 from the local frequencies of an old cell to the local frequencies of a new cell associated with the new CFRR into which pager unit 422 migrates.

Pager 422 includes a clock unit 83' which is capable of separately generating local clocking signals $f_s$clk and the common clocking signals $f_{-1}$clk for use by microprocessor 80. These clocking signals are initiated and their frequencies set by appropriate respective inputs to clock unit 83'.

FIG. 8 also shows that pager unit 422 has data I/O unit 596 which includes both an alphanumeric graphic display and a pressure sensitive writing pad. The alphanumeric graphic display is a dot matrix device which can display characters and graphics. The writing pad has a 16×48 dot area.

OPERATION OF SECOND EMBODIMENT

As shown in FIG. 9, a pager unit P1 is assumed to have been operating in CELL$_1$ and to have previously received the common frequencies $C_1$–$C_4$ and local frequencies $f_1$–$f_2$ from station S1. Now pager unit P1 travels on a route indicated by broken arrow-headed line ROUTE. In travelling along the ROUTE, pager unit P1 continues to operate on local frequencies $f_1$–$f_2$, even as it travels through the cellular overlap region. However, when page unit P1 enters a new common frequency reception region (i e , CFRR$_2$), a switching or hand-off operation occurs. In the switching operation, as explained in more detail below, pager unit P1 obtains common frequencies $C_1$–$C_4$ from central control station S2 and, as a result, can switch from the local frequencies $f_1$–$f_4$ of CELL$_1$ to the local frequencies $f_5$–$f_8$ of CELL$_2$. In order to effect the switching or hand-off operation, pager unit P1 executes a channel switching routine; the central control station S2 executes a switching enabling routine.

In connection with the channel switching routine and the switching enabling routine, when pager unit P1 moves into CFRR$_2$, pager unit P1 will receive the clocking signal on frequency $C_1$ from station S2. At such point, pager unit P1 will automatically align its clock unit with the clocking signal from station S2.

Referring now to the channel switching routine executed by pager P1 subsequent to start-up (step 500), at step 506 pager unit P1 obtains information characterizing the system centered about station S2. Such characterizing information is referred to as system identification or system ID information.

At step 508, microprocessor 80 of pager unit P1 checks to determine if there is any new system ID information acquired on frequency $C_2$. That is, microprocessor 80 checks to determine if system ID information is received on frequency $C_2$ (which can occur only in a CFRR) and, if so, compares the system ID information to the immediately previously-stored system ID information. If the previous and most recently-acquired system IDs are the same, pager unit P1 realizes that it is still in the jurisdiction of the same station (e g , station S1). If not, pager unit P1 realizes that it has now wandered into a CFRR of a new station (e g , station S2) and, at step 510, initiates a request on frequency $C_4$ for communication with the central control station (e g , station S2) for CELL$_2$.

In the above regard, since pager unit P1 has not yet been assigned a time slot for CELL$_2$, the request on frequency $C_4$ is randomly made. However, pager unit P1 keeps track of the time slot in which it makes its request to the new central control station (e g , station S2)

Thereafter, pager unit P1 continues to monitor (step 512) communications packets from station S2 on frequency $C_2$, waiting for station S2 to issue a message which references the time slot at which pager unit P1 made its request of step 510. In particular, pager unit P1 awaits a message from station S2 on frequency $C_2$ that includes both a SLOT RECOGNITION COMMAND CODE and information stored in the same time slot which pager unit P1 randomly generated. Since the message including the SLOT RECOGNITION COMMAND CODE includes station S2 as the sender and mirrors the slot randomly generated by pager unit P1, pager unit P1 recognizes the message as being addressed to pager unit P1 and considers issuance of such a message by station S2 (see step 612 of FIG. 11) to constitute authority for pager unit P1 to communicate further with station S2. In this regard, at step 514 microprocessor 80 of pager unit P1 determines if there is a match between the time slot of a received message and the time slot at which the random request was made at step 510.

Assuming a match is eventually found at step 514, at step 516 pager unit P1 sends a communications packet on frequency $C_3$ to station S2, with the communications packet including the identification or ID of pager unit P1. Using pager registration file 55, station S2 verifies that the ID of pager unit P1 is a valid ID, and thereafter sends (on frequency $C_2$) to pager unit P1 a message with the command code LOCAL FREQUENCY DOWNLOAD, which message informs pager unit P1 of the values of the local frequencies handled by station S2 (e g , frequencies $f_5$–$f_8$). Thereafter, as also reflected by step 518, station S2 sends (on frequency $C_2$) to pager unit P1 a message with the command code SLOT ASSIGNMENT COMMAND CODE, which message informs pager unit P1 of its slot assignment on frequency $f_8$. Microprocessor 80 thee changes its slot allocation by steps which are similar to those discussed with the afore-mentioned change time slot routine (see steps 350, 352, and 354 of FIG. 5). Step 518 of FIG. 10 reflects reception of the local frequency values and reception of the slot assignment.

After acquisition of all local frequencies and the slot assignment is completed (step 520), microprocessor 80 implements (at step 522) a switch to the new local frequencies (e g , frequencies $f_5$–$f_8$). In this regard, microprocessor 80 instructs I/O interface 86 to change transmitter 72 from frequencies $f_3$, $f_1$ to frequencies $f_7$, $f_8$; and to change receiver 62 from frequencies $f_1$, $f_2$ to frequencies $f_5$, $f_6$. I/O interface 86 accomplishes the frequency changes by applying appropriate values on the frequency control lines connecting the I/O interface to transmitter 72 and receiver 62, respectively.

After the switch to new local frequencies at step 522, microprocessor 80 loops back to step 506, ultimately to determine when any further switching may be required.

Steps involved in the switching enabling routine executed by a central control station (e g , station S2) are depicted in FIG. 11. After start-up (step 600), CPU 50 determines executes a loop 602 which enables CPU 50 to clean up its pager directory file 56 and to check if any new pager units have wandered into the cell which it administers.

In particular, at step 604 CPU 50 determines whether its central control station (e g , S2) has been advised by any other central control station (e g , S3) that a pager unit has, formerly under the control of its central control station (e g , S2), has come under the control of the other central control station (e g , S3). Such advisement occurs on the serial links connecting the central control stations 420$_n$, and particularly input serial link 486B. If such advisement occurs, the ID for

US 6,282,406 B1

13

14

the wandered-away pager is deleted from the pager directory file 56 for station S2 (as reflected by steps 606 and 608)

At step 610, CPU 50 causes messages with a SYSTEM COMMAND CODE to be transmitted on frequency $C_2$. As indicated before, messages transmitted on frequency $C_2$ include a packet(s) having a format such as that shown in FIG. 12. The message with the SYSTEM COMMAND CODE particularly includes the central station ID number in its alphanumeric data field

At step 612, central control station 420 checks to determine if a request signal has been transmitted by any pager unit 422 on frequency $C_4$ (as occurred, for example, in context of the discussion of FIG. 10, particularly step 510). Such a request signal would likely be issued from a pager unit 422 which has just wandered into the CFRR controlled by the central control station (e.g., into CFRR₂ controlled by station S2). If no such request signal is detected, loop 602 is again repeated

In the event that a request signal is detected at step 612, central control station 420 notes specifically the time slot on frequency $C_4$ at which the request occurred (step 614). At this point, such time slot is the only way central control station 420 can identify the in-wandering pager unit 422. Central control station 420 desires for the in-wandering pager unit 422 to transmit its identification (ID), but cannot specifically address the in-wandering pager other than with reference to the detected time slot. Accordingly, at step 616, central control station 420 prepares and transmits a message on frequency $C_2$ which has a SLOT RECOGNITION COMMAND CODE. The message including the SLOT RECOGNITION COMMAND CODE includes station S2 as the sender and mirrors the slot randomly generated by pager unit P1 (e.g., the time slot at which the in-wandering pager unit 422 issued its request). This transmission on frequency $C_2$ constitutes authority for pager unit P1 to transmit its identification

Step 618 denotes acquisition by central control station 420 of the identification (ID) of the in-wandering pager unit 422. At step 620, central control station 420 checks its pager registration file 55 to determine if the pager ID is a valid ID. If not, an error message is generated and transmitted (at step 622), followed by a command for pager unit P1 to shut down (see step 624)

Assuming that the identification of pager unit 422 was validated at step 620, CPU 50 checks (at step 630) its pager directory file 56 to locate an available time slot for the in-wandering pager unit 422, and then associates the available time slot with the ID of the in-wandering pager unit 422. Then, at step 632, using a message on frequency $C_2$ with a LOCAL FREQUENCY DOWNLOAD COMMAND CODE, central control station 420 sends the values of its local frequencies (e.g., $f_5$, $f_6$, $f_7$, $f_8$) to the in-wandering pager unit 422. The central control station then (at step 634) assigns to the in-wandering pager unit 422 a new time slot on its local frequencies using a message on frequency $C_2$ with a SLOT ASSIGNMENT COMMAND CODE. Processing of the change time slot command by the in-wandering pager unit 422 is understood with analogous reference to FIG. 5, particularly steps 350, 352, and 354

Upon completion of step 634, the in wandering pager unit 422 is fully initiated into its new cell (e.g., CELL₂), and has left the jurisdiction of its former control station (e.g., CELL, and station S1). Accordingly, at step 636, CPU 50 requests its I/O interface to issue a command on serial line 486A which advises (using pager ID) that the in-wandering pager 422 is now under its jurisdiction, so that former jurisdictions

(e.g., S1) can delete this pager unit from their pager directory files 56. Such deletion is understood with reference to steps 604–608 as above-described

In addition to illustrating geographical location of pager P1, stations S1 and S2, and cells CELL₁ and CELL₂, FIG. 9 shows the relative timing of communications occurring on common frequencies $C_1$–$C_4$. FIG. 9 specifically relates the timing of communications transmissions to specific ones of the aforedescribed steps executed by central control station 420 (the switching enabling routine of FIG. 11) and by pager unit 422 (the channel switching routine of FIG. 10)

Although the central control stations $420_x$ use the same common frequencies $C_1$–$C_4$, there is no interference or confusion of these signals transmitted from the control stations $420_x$. The common frequencies $C_1$–$C_4$ are broadcast at a relatively lower power than the local frequencies $f_1$–$f_4$, so that reception of the common frequencies $C_1$–$C_4$ occurs only in a limited neighborhood (CFRR) about the central control station $420_x$. Accordingly, pager units 422 traveling through the system receive common frequencies $C_1$–$C_4$ only in the limited and non-overlapping CFRRs

System operational characteristics, such as cell diameter, CFRR diameter, power level of the local frequencies (e.g., $f_1$–$f_4$), and power level of the common frequencies ($C_1$–$C_4$) can be field adjusted to suit numerous factors, including particularly the terrain and topography of the geographical region covered by the system. By way of non-limiting example, in one embodiment, the radius of each cell is on the order of about 20 miles; while the radius of each CFRR is on the order of about 10 miles or less. In the same example, the power for transmission of the local frequencies can be in a range of from about 3 watts to 1000 watts; while the power for transmission of the common frequencies $C_1$–$C_4$ is preferably less than 2 watts

Thus, the invention provides a two-way paging system which operates independently from a telephone system for wireless data communication between users. The invention minimizes use of available frequencies allowed by the Federal Communications Commission (FCC), using only four local frequencies $f_1$–$f_4$ for any given cell and (for expanded, multi-cellular coverage) only four common or switching frequencies $C_1$–$C_4$. In order to minimize the number of frequencies (e.g., channels) utilized, techniques of time division sharing and synchronization are employed. A transmission power differential between the local frequencies and the common frequencies is also employed. These techniques allow data transmission to be kept separate from different pagers and thus eliminates merging of data

The switching technique of the present invention provides extended geographical coverage and minimizes paging time by increasing the number of frequencies utilized in a cell from four (e.g., the four local frequencies) to eight (the four local frequencies plus the four common frequencies)

In connection with verification of pager ID, it should be understood that a single pager registration file might be stored in a memory file only one of a plurality of central control stations, and that in such case verification would constitute issuing a search command (on the serial links 486) to locate a pager ID in the one (remote) memory file, with the results of the search being reported back to the inquiring central control station

The keyboards illustrated herein can, in some embodiments, be multi-language keyboards or writing pads which permit typing of English, Chinese, or Japanese languages, for example. The writing pad is especially useful in countries such as Japan, Thailand, the middle East or

US 6,282,406 B1

15

China where English-like alphabets are not used. The writing pad could also be used to sketch and transmit graphics. Moreover, data compression/de-compression techniques can be utilized in connection with data transfer.

While the invention has been particularly shown and described with reference to the preferred embodiments thereof, it will be understood by those skilled in the art that various alterations in form and detail may be made therein without departing from the spirit and scope of the invention. For example, it should be understood that repeaters may be employed within cells to facilitate transmission when a pager unit ventures far from a central control station.

The embodiments of the invention in which an exclusive property or privilege is claimed are defined as follows:

1. A method of operating a data communication system, the data communication system including a communication controller and a plurality of nodes, the method comprising:

transmitting a first signal from the communication controller to a first node, said first signal specifying a timeslot in which the first node may transmit a capacity request signal to the communication controller;

when the first node has data to transmit, and upon receipt of the first signal, transmitting a capacity request signal from the first node to the communication controller, said capacity request signal including a request for an allocation of bandwidth capacity to transmit data from the first node to the communication controller;

in response to the capacity request signal, transmitting a data grant signal from the communication controller to the node, said data grant signal specifying at least one timeslot for the first node to transmit data to the communication controller; and

in response to receiving the data grant signal, transmitting data from the first node to the communication controller

2. The method of claim 1 further comprising transmitting data from the first node to the communication controller at a timeslot specified by the data grant signal

3. The method of claim 1, wherein the capacity request signal is a time slotted signal carried on a predetermined frequency

4. The method of claim 1, wherein said capacity request signal and said data are transmitted to the communication controller via a first channel, and wherein the data grant signal and the first signal are transmitted to the first node via a second channel

5. The method of claim 4, wherein the first channel is a time-slotted channel carried on a first frequency, and wherein the second channel is a time-slotted channel carried on a second frequency

6. The method of claim 1 wherein said system is a pager system, wherein said communication controller comprises a base station, and wherein said first node is a pager device

7. A method of operating a data communication network, the data communication network including a communication controller and a plurality of nodes, the method comprising:

transmitting a request-enabling signal from the communication controller to a first node;

when the first node has data to transmit, and in response to receiving the request-enabling signal, transmitting a request signal from the first node to the communication controller;

16

in response to receiving the request signal from the first node, transmitting an authorization signal from the communication controller to the first node; and

in response to receiving the authorization signal, transmitting data from the node to the communication controller

8. The method of claim 7, wherein the request-enabling signal is a time slotted signal carried on a predetermined frequency, said request-enabling signal specifying a particular time slot for the first node to transmit said request signal to the communication controller

9. The method of claim 7, wherein said request signal and said data are transmitted to the communication controller via a first channel. and wherein the authorization signal and the request-enabling signal are transmitted to the first node via a second channel

10. The method of claim 9, wherein the first channel is a time-slotted channel carried on a first frequency, and wherein the second channel is a time-slotted channel carried on a second frequency

11. The method of claim 7 wherein said network is a pager network, wherein said communication controller comprises a base station, and wherein said first node is a pager device

12. A data communication system comprising:

a communication controller; and

a plurality of nodes in communication with the communication controller;

the communication controller being configured or designed to transmit a request-enabling signal to a first node;

the first node being configured or designed to transmit a request signal to the communication controller in response to receiving the request-enabling signal, the request signal relating to data to be transmitted to the communication controller;

the communication controller being further configured or designed to transmit an authorization signal to the first node in response to receiving the request signal;

the first node being further configured or designed to transmit data to the communication controller in response to receiving the authorization signal

13. The system of claim 12, wherein the request-enabling signal is a time slotted signal carried on a predetermined frequency, said request-enabling signal specifying a particular time slot for the first node to transmit said request signal to the communication controller.

14. The system of claim 12, wherein said request signal and said data are transmitted to the communication controller via a first channel, and wherein the authorization signal and the request-enabling signal are transmitted to the first node via a second channel

15. The system of claim 14, wherein the first channel is a time-slotted channel carried on a first frequency, and wherein the second channel is a time-slotted channel carried on a second frequency

16. The system of claim 12 wherein said system is a pager system, wherein said communication controller comprises central control station, and wherein said first node is a pager device.

*    *    *    *    *

UNITED STATES PATENT AND TRADEMARK OFFICE
# CERTIFICATE OF CORRECTION

PATENT NO.    : 6,282,406 B1                                        Page 1 of 1
DATED         : August 28, 2001
INVENTOR(S)   : Wong et al.

It is certified that error appears in the above-identified patent and that said Letters Patent is
hereby corrected as shown below:

Title page,
Item [63], **Related U.S. Application Data,** please delete the text reading:
"Continuation of application No. 08/264,973, filed on Jun. 24, 1994, now Pat. No.
5,542,115." and replace it with it following:
-- Continuation of application No. 09/259,417, filed on Dec. 9, 1997, now Pat. No.
6,108,520, issue August 22, 2000, which is a continuation of 08/608,629 filed Feb. 29,
1996 now Pat. No. 5,729,827, issued March 17, 1998, which is a divisional of
08/264,973 filed June 24, 1994, now Pat. No. 5,542,115, issued July 30, 1996. --

Signed and Sealed this

Thirteenth Day of April, 2004

JON W. DUDAS
*Acting Director of the United States Patent and Trademark Office*

℅JS 44  (Rev 11/04)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet   (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

| I. (a)  PLAINTIFFS | DEFENDANTS |
|---|---|
| GPNE CORP. | Time Warner, Inc., Comcast Cable Communications, L.L.C., and Charter Communications, Inc. |

**(b)** County of Residence of First Listed Plaintiff _____
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant _____
(IN U.S. PLAINTIFF CASES ONLY)
NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE
LAND INVOLVED.

**(c)** Attorney's (Firm Name, Address, and Telephone Number)
See attached.

Attorneys (If Known)

## II. BASIS OF JURISDICTION  (Place an "X" in One Box Only)

☐ 1   U.S. Government
      Plaintiff

☒ 3   Federal Question
      (U.S. Government Not a Party)

☐ 2   U.S. Government
      Defendant

☐ 4   Diversity
      (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff
(For Diversity Cases Only)                          and One Box for Defendant)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT  (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury - | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product | Med. Malpractice | ☐ 625 Drug Related Seizure | 28 USC 157 | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | Liability | ☐ 365 Personal Injury - | of Property 21 USC 881 | | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault. Libel & | Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 460 Deportation |
| & Enforcement of Judgment | Slander | ☐ 368 Asbestos Personal | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 470 Racketeer Influenced and |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' | Injury Product | ☐ 650 Airline Regs. | ☒ 830 Patent | Corrupt Organizations |
| ☐ 152 Recovery of Defaulted | Liability | Liability | ☐ 660 Occupational | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| Student Loans | ☐ 340 Marine | **PERSONAL PROPERTY** | Safety/Health | | ☐ 490 Cable/Sat TV |
| (Excl. Veterans) | ☐ 345 Marine Product | ☐ 370 Other Fraud | ☐ 690 Other | | ☐ 810 Selective Service |
| ☐ 153 Recovery of Overpayment | Liability | ☐ 371 Truth in Lending | **LABOR** | **SOCIAL SECURITY** | ☐ 850 Securities/Commodities/ |
| of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 380 Other Personal | ☐ 710 Fair Labor Standards | ☐ 861 HIA (1395ff) | Exchange |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle | Property Damage | Act | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge |
| ☐ 190 Other Contract | Product Liability | ☐ 385 Property Damage | ☐ 720 Labor/Mgmt. Relations | ☐ 863 DIWC/DIWW (405(g)) | 12 USC 3410 |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal | Product Liability | ☐ 730 Labor/Mgmt Reporting | ☐ 864 SSID Title XVI | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | Injury | | & Disclosure Act | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 740 Railway Labor Act | **FEDERAL TAX SUITS** | ☐ 892 Economic Stabilization Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate | ☐ 790 Other Labor Litigation | ☐ 870 Taxes (U.S. Plaintiff | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 442 Employment | Sentence | ☐ 791 Empl. Ret. Inc | or Defendant) | ☐ 894 Energy Allocation Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ | **Habeas Corpus:** | Security Act | ☐ 871 IRS—Third Party | ☐ 895 Freedom of Information |
| ☐ 240 Torts to Land | Accommodations | ☐ 530 General | | 26 USC 7609 | Act |
| ☐ 245 Tort Product Liability | ☐ 444 Welfare | ☐ 535 Death Penalty | | | ☐ 900Appeal of Fee Determination |
| ☐ 290 All Other Real Property | ☐ 445 Amer. w/Disabilities - | ☐ 540 Mandamus & Other | | | Under Equal Access |
| | Employment | ☐ 550 Civil Rights | | | to Justice |
| | ☐ 446 Amer. w/Disabilities - | ☐ 555 Prison Condition | | | ☐ 950 Constitutionality of |
| | Other | | | | State Statutes |
| | ☐ 440 Other Civil Rights | | | | |

## V. ORIGIN   (Place an "X" in One Box Only)

☒ 1  Original
     Proceeding

☐ 2  Removed from
     State Court

☐ 3  Remanded from
     Appellate Court

☐ 4  Reinstated or
     Reopened

☐ 5  Transferred from
     another district
     (specify)

☐ 6  Multidistrict
     Litigation

☐ 7  Appeal to District
     Judge from
     Magistrate
     Judgment

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
35 U.S.C. § 1

Brief description of cause:
Patent infringement

## VII. REQUESTED IN   COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION
UNDER F.R.C.P. 23

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND:  ☒ Yes  ☐ No

## VIII. RELATED CASE(S)   IF ANY

(See instructions):    JUDGE _____    DOCKET NUMBER _____

DATE
01/31/2007

SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT # _____  AMOUNT _____  APPLYING IFP _____  JUDGE _____  MAG. JUDGE _____

Attachment to Civil Cover Sheet

1.  T. John Ward, Jr.
    Texas Bar No. 00794818
    Law Office of T. John Ward, Jr., P.C.
    111 W. Tyler Street
    Longview, Texas 75601
    Telephone:    (903) 757-6400
    Facsimile:    (903) 757-2323
    E-mail:        jw@jwfirm.com

2.  Edward W. Goldstein
    LEAD ATTORNEY
    Texas Bar No. 08099500
    E-mail:  egoldstein@gfpiplaw.com

    Christopher M. Faucett
    Texas Bar No. 00795198
    E-mail:  cfaucett@gfpiplaw.com

    Matt Prebeg
    Texas Bar No. 00791465
    E-mail:  mprebeg@gfpiplaw.com

    Corby R. Vowell
    Texas Bar No. 24031621
    E-mail:  cvowell@gfpiplaw.com

    GOLDSTEIN, FAUCETT & PREBEG L.L.P
    1177 West Loop South, Suite 400
    Houston, TX 77027
    Telephone:    (713) 877-1515
    Facsimile:    (713) 877-1737

## LIST OF PARTIES

**PLAINTIFF**

    1.    GPNE CORP.

**DEFENDANT**

    1.    TIME WARNER INC.
    2.    COMCAST CABLE COMMUNICATIONS, LLC
    3.    CHARTER COMMUNICATIONS, INC.

# EXHIBIT B

Westlaw.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 851126 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

Page 1

**H**
Briefs and Other Related Documents
SRI Intern., Inc. v. Internet Security
Systems, Inc.D.Del.,2005.Only the Westlaw
citation is currently available.
    United States District Court,D. Delaware.
    SRI INTERNATIONAL, INC., Plaintiff,
                      v.
    INTERNET SECURITY SYSTEMS, INC.
    and Symantec Corporation, Defendants.
              **No. Civ. 04-1199-SLR.**

             April 13, 2005.

Timothy Devlin, of Fish & Richardson,
Wilmington, Delaware, Howard G. Pollack,
and Michael J. Curley, of Fish & Richardson,
Redwood City, California, for Plaintiff.
Richard L. Horwitz, and David E. Moore, of
Potter Anderson & Corroon, Wilmington,
Delaware, for Defendant Internet Security
Systems, Inc.. Holmes J. Hawkins, III, and
Natasha H. Moffitt, of King & Spalding,
Atlanta, Georgia, of counsel.
Richard K. Herrmann, of Blank Rome,
Wilmington, Delaware, for Defendant
Symantec Corporation, Lloyd R. Day, Jr.,
Robert M. Galvin, and Paul S. Grewal, of Day
Casebeer Madrid & Batchelder, Cupertino,
California, of counsel.

       MEMORANDUM OPINION
ROBINSON, Chief J.

## I. INTRODUCTION

**\*1** On August 26, 2004, plaintiff SRI
International, Inc. ("SRI") filed this suit
against defendants Internet Security Systems,
Inc. ("ISS-DE") and Symantec Corporation
("Symantec") alleging infringement of four of
its patents by Symantec and two of its patents
by ISS-DE. (D.I.1)

**\*1** This court has jurisdiction over this action
pursuant to 28 U.S.C. § 1331. Pending before
this court are ISS-DE's motion to dismiss or
sever and transfer the action to the Northern
District of Georgia, and Symantec's motion to
sever and transfer this action to the Northern
District of California. (D.I.10, 14)

## II. BACKGROUND

**\*1** According to ISS-DE, it is a Delaware
corporation and serves as the holding
company for Internet Security Systems, Inc.
("ISS-GA"). (D.I. 12, Ex. C at ¶ 4) SRI
argues that ISS-DE is more than just a holding
company because only one entity is listed
with the Securities and Exchange Commission
("SEC"), Internet Security Systems INC/GA,
and it is listed as incorporated in Delaware.
(D.I.19, Ex. B) ISS-GA is headquartered in
Georgia. (*Id.* at ¶ 1) ISS-GA researches and
develops computer network security products,
including the accused Proventia and
SiteProtector products, at its engineering
facilities in Georgia. (*Id.* at ¶ 3)

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                      Page 2
Not Reported in F.Supp.2d, 2005 WL 851126 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

**\*1** ISS-DE asserts that it does not develop, manufacture or sell any products, it is strictly a holding company for ISS-GA (*Id* at ¶ 4) SRI argues, however, that ISS-DE's Form 10-K, filed with the Securities and Exchange Commission ("SEC"), makes clear that it offers "a proactive line of security solutions that provide protection against a variety of ever-changing threats for gateways, networks, servers and desktops, and includes security software and appliances. (D.I. 19, Ex. B at 3) Furthermore, SRI contends that the Form 10-K indicates that ISS-DE grossed over \$240 million in revenue in 2002 and employs over 1,100 people. (*Id* at 18 and 27) The two companies allegedly maintain separate accounting records and have their own officers and employees. (*Id* at ¶¶ 5, 6) ISS-DE admits that it has "regulatory and oversight obligations" for ISS-GA, but asserts that the day-to-day production activities are controlled by ISS-GA. (*Id* at ¶ 6) Dun & Bradstreet, however, classifies ISS-DE as one operational entity, headquartered in Georgia, but incorporated in Delaware. (D.I.18, Ex. D) Dun & Bradstreet does not classify ISS-DE as a holding company, but instead states that ISS-DE is in the business of "prepackaged software and custom computer programming." (*Id.*)

**\*1** Symantec is a Delaware corporation with its principal place of business in Cupertino, California. (D.I 15 at 3) Symantec offers software and services to help businesses secure and manage computer networks. (*Id.*) Symantec is the maker of the accused product, ManHunt. (*Id* at 4)

**\*1** SRI is a California non-profit research institute. (D.I. 18 at 3) SRI developed a system to detect and stop certain activity on computer networks and to identify network security breaches. (*Id* at 4) SRI received numerous patents on its systems.

**\*2** In January of 2004, SRI initiated licensing negotiations with Symantec. (D.I. 19, Ex. J at ¶ 5; D.I. 15 at 5) SRI and Symantec negotiated via letter, telephone and met at SRI's headquarters in Menlo Park, California. (D.I. 15 at 3) The negotiations were unsuccessful and no agreement was reached between the parties. (*Id.*)

**\*2** SRI then contacted Symantec's competitor ISS via letter stating that it believed ISS's products infringed some of SRI's patents and that SRI was undergoing negotiations with a number of companies and would be "open to discussing license terms with ISS." [FN1] (D.I. 12, Ex. C at ¶ 7; D.I. 19, Ex. H at ¶ 2) After numerous communications, including a second letter from SRI indicating that it "takes intellectual property matters seriously," the two companies began license negotiations. (D.I. 12, Ex. C at ¶ 8; D.I. 19, Ex. H at ¶¶ 3-10)

> FN1. It is unclear whether the letter was intended for ISS-GA or ISS-DE.

**\*2** On August 17, 2004, ISS-GA filed a declaratory judgment action against SRI in the Northern District of Georgia seeking a declaration that its products do not infringe

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 851126 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

SRI's <u>United States Patents Nos. 6,321,338</u> ("the '338 patent"), <u>6,484,203</u> ("the '203 patent"), <u>6,704,874</u> ("the '874 patent"), <u>6,708,212</u> ("the '212 patent") and <u>6,711,615</u> ("the '615 patent"). [FN2] (D.I. 12, Ex. C at ¶ 10) On August 20, 2004, there was a telephone conference between SRI and ISS-GA, in which ISS-GA's engineers asked SRI engineers questions regarding SRI's technology. (D.I. 19, Ex. H at ¶ 24) At the close of the conversation, ISS-GA's engineers asked for copies of various technical papers written by SRI scientists on the technology, which were sent to ISS-GA on August 20.

> FN2. According to SRI, license negotiations between ISS-GA and SRI were still ongoing at the time the declaratory judgment action was filed. (D.I. 19, Ex. H at ¶ 26)

**\*2** On August 26, 2004, SRI filed this action against ISS-DE and Symantec. (D.I.1) SRI states that Symantec's ManHunt product infringes the '338, '203, '212 and <u>'615 patents.</u> SRI further alleges that ISS-DE's Site Protector and Proventia products infringe the '615 and <u>'203 patents.</u> SRI alleges that it filed its claims against Symantec and ISS-DE in one case in order to enforce its patent rights in an efficient manner. (D.I. 18 at 6)

### III. ISS-DE'S MOTION TO DISMISS

#### A. Standard of Review

**\*2** Because the parties have referred to matters outside the pleadings, Idd-DE's motion to dismiss shall be treated as a motion for summary judgment. *See* <u>Fed.R.Civ.P. 12(b)(6)</u>. A court shall grant summary judgment only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." <u>Fed.R.Civ.P. 56(c)</u>. The moving party bears the burden of proving that no genuine issue of material fact exists. *See <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 n. 10 (1986)</u>*. "Facts that could alter the outcome are 'material,' and disputes are 'genuine' if evidence exists from which a rational person could conclude that the position of the person with the burden of proof on the disputed issue is correct." *<u>Horowitz v. Fed. Kemper Life Assurance Co., 57 F.3d 300, 302 n. 1 (3d Cir.1995)</u>* (internal citations omitted). If the moving party has demonstrated an absence of material fact, the nonmoving party then "must come forward with 'specific facts showing that there is a genuine issue for trial.' " *<u>Matsushita,</u> 475 U.S. at 587* (quoting <u>Fed.R.Civ.P. 56(e)</u>). The court will "view the underlying facts and all reasonable inferences therefrom in the light most favorable to the party opposing the motion." *<u>Pa. Coal Ass'n v. Babbitt,</u> 63 F.3d 231, 236 (3d Cir.1995)*. The mere existence of some evidence in support of the nonmoving party, however, will not be sufficient for denial of a motion for summary judgment; there must be enough evidence to enable a

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                        Page 4
Not Reported in F.Supp.2d, 2005 WL 851126 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

jury reasonably to find for the nonmoving party on that issue. See *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249 (1986). If the nonmoving party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof, the moving party is entitled to judgment as a matter of law. See *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986).

### B. Discussion

**\*3** SRI asserts that ISS-DE is liable for any alleged patent infringement. ISS-DE claims it is not liable because it does not directly manufacture or sell the accused products and is merely ISS-GA's sole shareholder.

**\*3** A parent company is not liable for the actions of a subsidiary solely because it is a subsidiary. See *United States v. Bestfoods,* 524 U.S. 51, 61 (1998). A finding of liability requires piercing the corporate veil. *Id.* Prior case law establishes two distinct tests for determining when piercing the corporate veil is appropriate: (1) the alter ego test; or (2) agency test. See, e.g., *Pearson v. Component Tech. Corp.,* 247 F.3d 471, 484-486 (3d Cir.2001); *C.R. Bard Inc. v. Guidant Corp.,* 997 F.Supp. 556, 559-560 (D.Del.1998); *Mobil Oil Corp. v. Linear Films, Inc.,* 718 F.Supp. 260, 265-272 (D.Del.1989).

### 1. Alter Ego Test

**\*3** A corporate subsidiary can be considered the alter ego of its parent corporation where there is a lack of attention to corporate formalities or complete domination and control by the parent corporation. See *Mobil Oil Corp.,* 718 F.Supp. at 266. Under Delaware law, however, a close connection alone is not sufficient, there must be a showing that the parent/subsidiary relationship would work a fraud, injustice or inequity. See *C.R. Bard, Inc.,* 997 F.Supp. at 559; *Mobil Oil Corp.,* 718 F.Supp. at 267.

**\*3** Based on the record, it is unclear whether ISS-GA is ISS-DE's alter ego. ISS-DE is listed by the SEC and Dunn & Bradestreet as headquartered in Atlanta. ISS-DE is described as being in the business of producing network security products, as opposed to being listed as a holding company. From the facts of record, it is unclear what the relationship is between ISS-DE and ISS-GA; therefore, it is unclear whether their relationship will work an injustice on the patent system.

### 2. Agency Test

**\*3** If a parent corporation directs the allegedly infringing activity, it can be liable for its subsidiary's infringement. The focus of this test is on "the arrangement between the parent and the subsidiary, the authority given in that arrangement, and the relevance of that arrangement to the plaintiff's claim." *C.R. Bard, Inc.,* 997 F.Supp. at 560. In order for the parent corporation to be liable under this test, there must be "a close connection between the relationship of the corporations

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 5
Not Reported in F.Supp.2d, 2005 WL 851126 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

and the cause of action." *Id*

**\*3** Because it is unclear what the relationship is between ISS-DE and ISS-GA, it is unclear how much control ISS-DE has over ISS-GA. It is undisputed that ISS-DE has some control over ISS-GA because it has oversight and regulatory obligations for ISS-GA. At some point, it must be able to direct ISS-GA's activities to fulfill these obligations. However, it is unclear whether it directed the alleged infringing activities at issue.

**\*3** Therefore, ISS-DE's motion to dismiss is denied without prejudice to renew if, as discovery proceeds, it becomes evident that ISS-DE cannot be liable either independently or under the alter ego or agency tests.

## IV. MOTIONS TO SEVER

**\*4** Federal Rule of Civil Procedure 21 gives courts discretion to sever parties due to misjoinder. Under Federal Rule of Civil Procedure 20(a), defendants can be joined together if
**\*4** there is asserted against them jointly, severally, or in the alternative, any right to relief in respect of or arising out of the same transaction, occurrence, or series of transactions or occurrences and if any question of law or fact common to all defendants will arise in the action.

**\*4** Fed. R. Civ. Proc. 20(a) (2005) (emphasis added). This court finds that there are common transactions or occurrences, and

questions of fact or law that warrant joinder of the defendants.

**\*4** Plaintiff alleges patent infringement, which will require this court to hold *Markman* hearings and construe the asserted claims. Plaintiff has asserted four patents against Symantec and only two of those patents against ISS-DE. Nonetheless, all of the patents asserted arise out of computer network protection systems. It is the experience of this court that patents over the same technology often give rise to the same questions of law and fact (e.g., same prior art references, same level of ordinary skill in the art).

**\*4** Both ISS-DE and Symantec have asserted invalidity defenses that will require this court to consider the validity of the asserted patents. These defenses will require the court to determine the date of conception and reduction to practice, the relevance of prior art and the level of ordinary skill in the art. It would be an inefficient use of judicial resources for this court to perform all of these tasks twice, once for ISS-DE and once for Symantec. Therefore, ISS-DE's and Symantec's motions to sever are denied at this stage of the proceedings.

## V. MOTIONS TO TRANSFER

**\*4** Under 28 U.S.C. § 1404(a), a district court may transfer any civil action to any other district where the action might have been brought for the convenience of parties and witnesses and in the interests of justice.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                Page 6
Not Reported in F.Supp.2d, 2005 WL 851126 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

Congress intended § 1404 to give district courts discretion "to adjudicate motions for transfer according to an 'individualized, case-by-case consideration of convenience and fairness." ' *Stewart Org., Inc. v. Ricoh Corp.,* 487 U.S. 22, 29 (1988) (quoting Van Dusen v. Barrack, 376 U.S. 612, 622 (1964)); *Affymetrix, Inc. v. Synteni, Inc.,* 28 F.Supp.2d 192, 208 (D.Del.1998).

**\*4** The burden of establishing the need to transfer rests with the movant "to establish that the balance of convenience of the parties and witnesses strongly favors the defendants." *Bergman v. Brainin,* 512 F.Supp. 972, 973 (D.Del.1981) (citing *Shutte v. Armco Steel Corp.,* 431 F.2d 22, 25 (3d Cir.1970). "Unless the balance is strongly in favor of a transfer, the plaintiff's choice of forum should prevail". *ADE Corp. v. KLA-Tencor Corp.,* 138 F.Supp.2d 565, 567 (D.Del.2001); *Shutte,* 431 F.2d at 25.

**\*4** The deference afforded plaintiff's choice of forum will apply as long as a plaintiff has selected the forum for some legitimate reason. *C.R. Bard, Inc. v. Guidant Corp.,* 997 F.Supp. 556, 562 (D. Del 1998); *Cypress Semiconductor Corp. v. Integrated Circuit Systems, Inc.,* 2001 WL 1617186 (D.Del. Nov. 28, 2001); *Continental Cas. Co. v. Am. Home Assurance Co.,* 61 F.Supp.2d 128, 131 (D.Del.1999). Although transfer of an action is usually considered as less inconvenient to a plaintiff if the plaintiff has not chosen its " 'home turf' or a forum where the alleged wrongful activity occurred, the plaintiff's choice of forum is still of paramount

consideration, and the burden remains at all times on the defendants to show that the balance of convenience and the interests of justice weigh strongly in favor of transfer." *In re M.L.-Lee Acquisition Fund II, L.P.,* 816 F.Supp. 973, 976 (D.Del.1993).

**\*5** Here, the plaintiff chose Delaware because both defendants are Delaware corporations and Delaware is the only forum with jurisdiction over both ISS-DE and Symantec. As already stated by this court, defendants are properly joined in order to conserve judicial resources and ensure a uniform evaluation of the patents in suit. In the interest of efficiency and justice, this court declines to transfer their respective cases, as neither forum would have jurisdiction over both defendants.[FN3]

> FN3. ISS-DE argues that SRI's claims against it should be transferred to the District of Georgia because ISS-GA filed a declaratory judgment action against SRI in that district before SRI filed the suit at bar. "When a declaratory action can resolve the various legal relations in dispute and afford relief from the controversy that gave rise to the proceeding, and absent sound reason for a change of forum, a first-filed declaratory action is entitled to precedence as against a later-filed patent infringement action." *Genentec, Inc. v. Eli Lilly Co.,* 998 F.2d 931, 938 (Fed.Cir.1993), *abrogated on other grounds, Wilton v. Seven Falls Co.,* 515 U.S. 277 (1995). As the court has

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                      Page 7
Not Reported in F.Supp.2d, 2005 WL 851126 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

already stated, the relationship between ISS-DE and ISS-GA is unclear; therefore, it is also unclear whether the Georgia suit will adjudicate the issue facing this court (i.e., whether ISS-DE infringed the asserted patents). If ISS-DE and ISS-GA are in fact two distinct companies, as ISS-DE argues, then the first to file rule would not apply.

## VI. CONCLUSION

**\*5** For the reasons stated, ISS-DE's motion to dismiss is denied without prejudice. ISS-DE's and Symantec's motions to sever are denied, as are their motions to transfer. An order consistent with this memorandum opinion shall issue.

## ORDER

**\*5** At Wilmington this 13th day of April, 2005, consistent with the memorandum opinion issued this same date;

**\*5** IT IS ORDERED that:

**\*5** 1. Defendant ISS-DE's motion to dismiss (D.I.10) is denied without prejudice;

**\*5** 2. Defendant ISS-DE's motion to sever and transfer (D.I.10) is denied; and

**\*5** 3. Defendant Symantec's motion to sever and transfer (D.I.14) is denied.

D.Del.,2005.
SRI Intern., Inc. v. Internet Security Systems, Inc.
Not Reported in F.Supp.2d, 2005 WL 851126 (D.Del.)

Briefs and Other Related Documents (Back to top)

- 2006 WL 3025488 () Invalidity Expert Report of L. Todd Heberlein (Apr. 21, 2006) Original Image of this Document (PDF)
- 2006 WL 2093983 () Expert Report of Daniel Teal (Apr. 19, 2006)
- 2006 WL 1204471 (Trial Motion, Memorandum and Affidavit) Non-Party PNC Bancorp, Inc.'s Objections and Responses to Plaintiff/Counterclaim Defendant Sri International, Inc.'s Subpoena (Mar. 29, 2006) Original Image of this Document (PDF)
- 2005 WL 3242226 (Trial Pleading) First Amended Complaint for Patent Infringement; Demand for Jury (Apr. 25, 2005) Original Image of this Document (PDF)
- 1:04cv01199 (Docket) (Aug. 26, 2004)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2002 U S  Dist  LEXIS 5180, *

LEXSEE 2002 U.S. DIST. LEXIS 5180

**ROCKWELL TECHNOLOGIES, LLC, Plaintiff, v. SPECTRA-PHYSICS LASERS, INC. and OPTO POWER CORPORATION, Defendants.**

**C.A. No. 00-589 GMS**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE**

*2002 U.S. Dist. LEXIS 5180*

**March 26, 2002, Decided**

**DISPOSITION:** [*1] Plaintiff's motion for partial summary judgement was granted in part and denied in part. Plaintiff's request to file a further motion for summary judgment on inequitable conduct was denied.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff sued defendants, alleging that defendants infringed plaintiff's patented process for forming an epitaxial film of semiconductors, but defendants asserted that the patent was invalid based on the inequitable conduct of plaintiff in the prosecution of the patent application. Plaintiff moved for summary judgment with regard to the issue of inequitable conduct.

**OVERVIEW:** Defendants contended that the inventor and plaintiff's patent attorney failed to disclose material references to patented prior art which were cited by foreign patent offices in addressing plaintiff's foreign patent applications. Defendants' admitted that neither plaintiff itself, as a corporate entity, nor the declaration filed by the inventor during the patent process, were subject to allegations of inequitable conduct. However, factual issues required resolution concerning whether the undisclosed references were material and

whether the inventor and the attorney had the requisite knowledge and intent to support a finding of inequitable conduct. Despite plaintiff's allegation that the inventor and the attorney were unaware of the prior art references, the citation of the references by the foreign patent offices raised at least inferences that the references were material and that the failure to disclose them was intentional.

**OUTCOME:** Plaintiff's motion for summary judgment was granted in part with regard to the alleged inequitable conduct on the part of the corporate plaintiff or the inventor's declaration, but the motion was denied with regard to the alleged inequitable conduct of the inventor and plaintiff's attorney.

**CORE TERMS:** patent, inequitable conduct, summary judgment, materiality, genuine, in-house, issues of material fact, reply brief, non-moving, inventor, partial, clear and convincing evidence, reasonable jury, moving party, reserved, procedural history, corporate entity, presently, prosecute, assessing

**LexisNexis(R) Headnotes**

*Civil Procedure > Discovery > Methods >*

Case 1:07-cv-00067-MPT    Document 14-3    Filed 03/15/2007    Page 10 of 60

Page 2
2002 U.S. Dist. LEXIS 5180, *

*General Overview*
*Civil Procedure > Summary Judgment > Standards > Genuine Disputes*
*Civil Procedure > Summary Judgment > Standards > Materiality*
[HN1] The court may grant summary judgment if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *Fed. R. Civ. P. 56(c).*

*Civil Procedure > Summary Judgment > Standards > Genuine Disputes*
*Civil Procedure > Summary Judgment > Standards > Materiality*
[HN2] The court may grant summary judgment only if the moving party shows that there are no genuine issues of material fact that would permit a reasonable jury to find for the non-moving party. A fact is material if it might affect the outcome of the suit. An issue is genuine if a reasonable jury could possibly find in favor of the non-moving party with regard to that issue. In deciding the motion, the court must construe all facts and inferences in the light most favorable to the non-moving party.

*Patent Law > Inequitable Conduct > Effect, Materiality & Scienter > Effect of Inequitable Conduct*
[HN3] Patent applicants and their legal representatives have a duty to prosecute applications with candor, good faith, and honesty. Breach of this duty can lead to a finding that the applicant engaged in inequitable conduct before the United States Patent and Trademark Office. The effect of such inequitable conduct is to render the affected patent unenforceable.

*Evidence > Procedural Considerations > Burdens of Proof > Clear & Convincing Proof*

*Patent Law > Inequitable Conduct > Burdens of Proof*
*Patent Law > Inequitable Conduct > Effect, Materiality & Scienter > General Overview*
[HN4] In order to prove inequitable conduct, the defendants bear the burden of providing clear and convincing evidence that: (1) omitted or false information was material; (2) the applicant had knowledge of the existence and material nature of the information; and (3) the applicant intended to deceive the United States Patent and Trademark Office. Materiality and intent to deceive are distinct factual inquiries, and each must be shown by clear and convincing evidence. Information is considered material when there is a substantial likelihood that a reasonable examiner would have considered the information important in deciding whether to allow the application to issue as a patent. The court may infer intent from the facts and circumstances surrounding the applicant's overall conduct. However, in making its inferences, the court must be aware that, although the intent element of fraud or inequitable conduct may be proven by a showing of acts the natural consequence of which were presumably intended by the actor, this requires the fact finders to evaluate all the facts and circumstances in each case. Such an evaluation is rarely enabled in summary proceedings.

*Patent Law > Inequitable Conduct > Effect, Materiality & Scienter > General Overview*
[HN5] The failure to cite to the United States Patent and Trademark Office a material reference cited elsewhere in the world justifies a strong inference that the withholding was intentional.

**COUNSEL:** For ROCKWELL AUTOMATION TECHNOLOGIES, LLC, plaintiff: Steven J. Balick, Steven T. Margolin, Ashby & Geddes, Wilmington, DE.

For SPECTRA-PHYSICS LASERS, INC.,

OPTO POWER CORPORATION, defendants: William J. Marsden, Jr., Fish & Richardson, P.C., Wilmington, DE.

For ROCKWELL AUTOMATION TECHNOLOGIES, LLC, counter-defendant: Steven J. Balick, Steven T. Margolin, Ashby & Geddes, Wilmington, DE.

For SPECTRA-PHYSICS LASERS, INC., OPTO POWER CORPORATION, counter-claimants: William J. Marsden, Jr., Fish & Richardson, P.C., Wilmington, DE.

**JUDGES:** Gregory M. Sleet, UNITED STATES DISTRICT JUDGE.

**OPINION BY:** Gregory Moneta Sleet

**OPINION:**

## MEMORANDUM AND ORDER

## I. INTRODUCTION

The plaintiff, Rockwell Technologies, LLC ("Rockwell") filed the above-captioned action against Spectra-Physics Lasers, Inc. ("Spectra") and Opto Power Corporation ("Opto") on June 16, 2000. In its complaint, Rockwell alleges that Spectra and Opto are infringing U.S. Patent No. 4,368,098 ("the '098 patent"). **[*2]**

Presently before the court is Rockwell's motion for partial summary judgment. In this motion, Rockwell asks the court to find that the '098 patent is not invalid due to alleged inequitable conduct that occurred in the prosecution of the patent application. For the reasons that follow, the court will grant this motion in part and deny it in part.

## II. STANDARD OF REVIEW

[HN1] The court may grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no

genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Fed R. Civ P 56 (c); see also Boyle v County of Allegheny, Pennsylvania, 139 F 3d 386, 392 (3d Cir 1998).* Thus, [HN2] the court may grant summary judgment only if the moving party shows that there are no genuine issues of material fact that would permit a reasonable jury to find for the non-moving party *See Boyle, 139 F 3d at 392.* A fact is material if it might affect the outcome of the suit. *Id* (citing *Anderson v Liberty Lobby, Inc , 477 U S 242, 247-248, 91 L Ed 2d 202, 106 S Ct 2505 (1986))* **[*3]** An issue is genuine if a reasonable jury could possibly find in favor of the non-moving party with regard to that issue. *Id.* In deciding the motion, the court must construe all facts and inferences in the light most favorable to the non-moving party *Id , see also Assaf v. Fields, 178 F 3d 170, 173-174 (3d Cir 1999).*

With these standards in mind, the court will describe the facts and procedural history that led to the motion presently before the court.

## III. BACKGROUND

### A. Prosecution of the  '098 Patent

The patent-in-suit relates to a process for forming "an epitaxial film of group III-V semiconductor disposed on a single crystal substrate." Dr. Harold Manasevit ("Manasevit") developed the process described in the '098 patent. On February 13, 1968, Rockwell filed a patent application with the United States Patent and Trademark Office ("PTO"). As the application contained both process and product claims, the PTO required that Rockwell choose one to proceed with first. Rockwell elected to give precedence to the product claims.

In 1978, Rockwell retained the law firm of Staas and Halsey to prosecute the Manasevit patent application **[*4]** with respect to the process claims. Jack Staas ("Staas") was the

Staas and Halsey attorney primarily responsible for this prosecution. On April 7, 1978, Rockwell filed a divisional application seeking a patent for the process claims. This application issued as the '098 patent on January 11, 1983. It expired on January 11, 2000.

## B. Alleged Prior Art

In 1957, Thomas R. Scott obtained patents from Japan (the "Japanese Scott patent") and the United Kingdom (the "UK Scott patent"). Spectra and Opto allege that the UK Scott patent came to the attention of Rockwell's in-house patent attorneys while Rockwell was prosecuting the Manasevit process patent application in Great Britain. In response to that application, the UK Patent Office identified the UK Scott patent and five other prior art references. The UK Patent Office directed Rockwell's attention to those references.

Rockwell's UK patent counsel informed Rockwell's in-house patent counsel Robert Rogers ("Rogers") of the UK Scott patent and the five other references on September 29, 1972. In response to the UK patent counsel's request on how to respond to that information, Rockwell employee Martin E. Gerry prepared [*5] detailed instructions for amending Rockwell's claims to avoid the cited references. The UK patent counsel subsequently informed Rogers that it was removing from the application the original prior art cited in the application because the UK Scott patent and the other references constituted "the closest prior art."

Rockwell also applied for a Japanese patent on Manasevit's invention. On that application, Rockwell listed Frederick Hamann ("Hamann") as its representative. Hamann supervised Rockwell's in-house patent department from 1970 to 1995. As in the prosecution of the UK patent application, Scott's work was cited against the Japanese patent application.

On June 18, 1974, the Japanese patent office issued a rejection against the pending claims in Rockwell's Japanese patent application. n1 Rockwell's Japanese patent counsel sent the rejection to Hamann on July 6, 1974, along with a discussion of the Japanese Scott patent. The Japanese counsel also sent Hamann a copy of this patent. Rockwell's in-house patent counsel G. Donald Weber ("Weber") responded by asking for an English abstract of the Japanese Scott patent. The Japanese patent counsel complied on August 8, 1974. Weber [*6] subsequently sent them instructions on how to amend Rockwell's Japanese claims in light of the Scott patent.

> n1 Spectra and Opto allege that the claims in Rockwell's Japanese patent application were substantively the same as the claims in the '098 patent.

## C. Procedural History

On August 30, 1993, Rockwell brought an action against the United States in the United States Court of Federal Claims. In May 1995, Rockwell initiated an action against Spectra in the Northern District of California. Spectra then intervened in the Court of Federal Claims action as a third-party defendant. The Northern District of California stayed its action pending a resolution of that action.

In 1998, the United States and Rockwell settled. This settlement deprived the Claims Court of jurisdiction over the dispute between Rockwell and Spectra. Thus, on January 13, 1999, the Northern District of California court lifted its stay and reopened the matter. On July 24, 2001, the court denied Rockwell's motion for partial [*7] summary judgment on the issue of inequitable conduct.

Rockwell brought the present infringement action on June 16, 2000.

## IV. DISCUSSION

Spectra and Opto assert that the inventor, Dr. Harold M. Manasevit, and Rockwell's attorney Jack Staas were guilty of inequitable conduct by failing to disclose material references to the PTO. n2

> n2 Spectra and Opto deny basing their inequitable conduct claims on the Rule 132 Declaration that Manasevit filed with the PTO (the "Manasevit Declaration") Further, in their opposition papers, Spectra and Opto state that they do not oppose the portion of Rockwell's summary judgment motion directed to the Manasevit Declaration. Likewise, they deny alleging that Rockwell itself, as a corporate entity, could be liable for inequitable conduct. Accordingly,

As an initial matter, Rockwell argues for the first time in its reply brief that Spectra and Opto failed to plead inequitable conduct with particularity in their answer to the complaint and have thus waived [*8] their right to assert this affirmative defense. However, Rockwell's tactic of reserving new arguments for its reply brief amounts to impermissible "sandbagging." *See Jordan v. Bellinger, 2000 U.S. Dist LEXIS 19233, *18 (D. Del. April 28, 2000)* (declining to address new arguments reserved for the reply brief); *see also* D. DEL. L.R. 7.1.3(c)(2) (1995) Accordingly, the court declines to address Rockwell's arguments on this issue and will turn instead to the substantive merits of the motion.

[HN3] Patent applicants and their legal representatives have a duty to prosecute applications with candor, good faith, and honesty *See Molins PLC v Textron, Inc, 48 F.3d 1172, 1178 (Fed Cir 1995)* Breach of this duty can lead to a finding that the applicant

engaged in inequitable conduct before the PTO. *See Life Tech, Inc v Clontech Lab, Inc, 224 F.3d 1320, 1324 (Fed. Cir. 2000)*. The effect of such inequitable conduct is to render the affected patent unenforceable. *See id.*

[HN4] In order to prove inequitable conduct, the defendants bear the burden of providing clear and convincing evidence that: (1) omitted or false information was [*9] material; (2) the applicant had knowledge of the existence and material nature of the information; and (3) the applicant intended to deceive the PTO. *See Molins, 48 F.3d at 1178* "Materiality and intent to deceive are distinct factual inquiries, and each must be shown by clear and convincing evidence." *Life Tech, 224 F.3d at 1324* Information is considered material "when there is a substantial likelihood that a reasonable examiner would have considered the information important in deciding whether to allow the application to issue as a patent." *Molins, 48 F.3d at 1179* The court may infer intent from the facts it is undisputed that only Manasevit's and counsel for Rockwell's conduct is at issue and circumstances surrounding the applicant's overall conduct. *See Merck & Co. v. Danbury Pharmacal, Inc, 873 F.2d 1418, 1422 (Fed. Cir. 1989)* However, in making its inferences, the court must be aware that "although the intent element of fraud or inequitable conduct may be proven by a showing of acts the natural consequence of which were presumably intended by the actor, this requires the fact finders to evaluate all [*10] the facts and circumstances in each case. Such an evaluation is rarely enabled in summary proceedings." *KangaROOS U.S.A., Inc v. Caldor, Inc, 778 F.2d 1571, 1577 (Fed Cir 1985)* (citation omitted).

In its moving papers, Rockwell declines to address the materiality of the Scott references. The Scott patents, however, were cited by foreign patent offices against Manasevit's process This raises at least an inference that the references are material. *See Molins, 48*

2002 U S  Dist  LEXIS 5180, *

*F.3d at 1180* Further, Rockwell amended the claims in its foreign patents to overcome the Scott references. Accordingly the court finds that there is a triable issue of fact with regard to the materiality of the Scott patents.

The court likewise concludes that granting summary judgment on the issue of intent would be improvident. Rockwell submits that Manasevit and Staas have each stated that they were unaware of the Scott patents. The Federal Circuit has stated, however, that [HN5] "failure to cite to the PTO a material reference cited elsewhere in the world justifies a strong inference that the withholding was intentional." *Molins, 48 F 3d at 1182.* Moreover, the court [*11] expresses concern over Rockwell's argument that the named inventor of the '098 patent, who is also the named inventor of the British and Japanese patents that were amended in light of the Scott patents, was not aware of the Scott patents.

When faced with a similar motion for summary judgment based on inequitable conduct with regard to these parties, the District Court for the Northern District of California explicitly reserved judgment on whether the actions of Staas and his fellow Rockwell attorneys were inequitable. n3 See *Rockwell v SDL, Inc.*, No. C-95-1729, at 12, n. 11 (N. D. Cal July 24, 2000). That court further expressed a concern identical to that which the court has in the present case arising from Manasevit's failure to disclose the Scott patents to the PTO.

    n3 Based on the California court's denial of summary judgment on a similar issue, Spectra and Opto argue that Rockwell is now collaterally estopped from further litigating this issue. The court must disagree because a determination that there remain genuine issues of material fact is not a "final decision." See *Johnson v  Jones, 515 U.S. 304, 313, 132 L. Ed. 2d 238, 115 S. Ct. 2151 (1995)*, see also  *Whitford v.*

*Boglino, 63 F 3d 527, 530 (7th Cir. 1995)* (stating that the denial of summary judgment is not a final judgement, but rather an interlocutory order in the *res judicata* context.)

[*12]

While mindful of the heavy burden the defendants bear, the court is persuaded that there remain substantial questions regarding Manasevit's and Staas's knowledge and intent that are better left to trial. See  *Baker  Oil Tools, Inc. v  Geo Vann, Inc , 828 F 2d 1558, 1566 (Fed  Cir  1988)* (noting that, "if the facts of materiality or intent are reasonably disputed the issue is not amenable to summary disposition.")

Finally, Rockwell requests leave to file a further motion for summary judgment on inequitable conduct. Rockwell contends that this is appropriate because it was waiting for Spectra's and Opto's expert reports assessing the materiality of additional prior art references that were allegedly not disclosed to the PTO. However, as Spectra and Opto argue, the references at issue are articles that Manasevit himself wrote. Manasevit's and Rockwell's own experts were surely capable of assessing the materiality of Manasevit's work. Accordingly, the court declines to grant Rockwell additional time to file a motion that could have been filed with the instant motion for summary judgment.

## V. CONCLUSION

The parties do not dispute that the corporate [*13] entity Rockwell is not being accused of inequitable conduct. Nor do they dispute that the charges of inequitable conduct are not based on the Manasevit Declaration. Thus, the court will grant Rockwell's motion with regard to these issues. However, there remain genuine issues of material fact with regard to the remaining inequitable conduct allegations.

For these reasons, IT IS HEREBY ORDERED

2002 U S  Dist  LEXIS 5180, *

that:

1. Rockwell's motion for partial summary judgement (D. I. 149) is GRANTED in part and DENIED in part.

2. Rockwell's request to file a further motion for summary judgment on inequitable conduct

(D. I. 149) is DENIED.

Date: March 26, 2002

    Greogry M. Sleet

    UNITED STATES DISTRICT JUDGE

1991 U S  Dist  LEXIS 8843, *

LEXSEE 1991 US DIST LEXIS 8843

**MARK D. KEMPER v. URECO**

**Civil Action No. 88-9618**

**UNITED STATES DISTRICT COURT FOR THE EASTERN
DISTRICT OF PENNSYLVANIA**

*1991 U.S. Dist. LEXIS 8843*

**June 28, 1991
June 28, 1991, Filed**

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff product user filed a products liability action against defendant manufacturer. The product user filed a motion to add an additional defendant pursuant to *Fed. R. Civ. P. 15(c)*.

**OVERVIEW:** The product user argued that he made a mistake as to the identity of the party to be sued and that the party to be added did know or was aware that, had the product user known of its identity, an action would have been brought. The product user also argued that this mistake occurred within the applicable limitations period for bringing an action against the party to be added. The court rejected the product user's argument and denied his motion to add an additional party. The court noted that the product user had known for some time of the involvement of the party to be added. The court pointed out that the product user had admitted he had learned of the involvement of the party to be added long before the expiration of the statute of limitations and this justified a finding that the party to be added had believed that the product user had made a deliberate choice in deciding not to include it in the lawsuit. The court also rejected the product

user's argument that the party to be added was estopped from asserting a statute of limitations defense or that the product user was misled as to the identity of the proper party to sue.

**OUTCOME:** The court denied the product user's motion to join an additional party as a defendant.

**CORE TERMS:** successor, truck, notice, proper party, product line, join, statute of limitations, manufactured, general rule, expiration, knowingly, misled, original manufacturer, statutory period, third party, pro se, transferor, amend, successor liability, diligence, asserting, estopped, lawsuit, admits

**LexisNexis(R) Headnotes**

*Civil Procedure > Pleading & Practice > Pleadings > Amended Pleadings > Relation Back*
[HN1] *Fed. R. Civ. P. 15(c)* provides that an amendment changing the party against whom a claim is asserted relates back to the date of the original pleading only under certain circumstances. For such a motion to succeed, a plaintiff must establish: (1) the basic claim

1991 U S Dist LEXIS 8843, *

must have arisen out of the conduct set forth in the original pleading; (2) the party to be brought in must have received such notice that it will not be prejudiced in maintaining its defense; (3) that party must or should have known that, but for a mistake concerning identity, the action would have been brought against it; and (4) the second and third requirements must have been fulfilled within the prescribed limitations period.

*Civil Procedure > Pleading & Practice > Pleadings > Amended Pleadings > Relation Back*

[HN2] To demonstrate compliance with the third prong of *Fed R. Civ. P. 15(c)*, a plaintiff must have made a mistake concerning the identity of the defendant about which the potential defendant should have known. In contexts other than misnomer, courts should use something akin to a reasonableness test to determine whether the party should have known he was the one intended to be sued. Relation back will be refused only if the court finds that there is no reason why the party to be added should have understood that he was not named due to a mistake.

*Business & Corporate Law > Mergers & Acquisitions > Liabilities & Rights of Successors > General Overview*
*Commercial Law (UCC) > Bulk Sales (Article 6) > Statutes of Limitations*
*Torts > Vicarious Liability > Corporations > Predecessor & Successor Corporations*

[HN3] The general rule is that when one company sells or transfers all of its assets a successor company, the successor does not acquire the liabilities of the transferor corporation merely because of its succession to the transferor's assets.

**COUNSEL:** [*1]

JOSEPH LURIE, GALFAND, BERGER, LURIE & MARCH, Philadelphia, Pennsylvania, PETER M. PATTON, GALFAND, BERGER, LURIE & MARCH, Philadelphia, Pennsylvania, for Plaintiff.

GLENN C. MC CARTHY, COZEN AND O'CONNOR, Philadelphia, Pennsylvania, for Defendant.

**JUDGES:**

Thomas N. O'Neill, Jr., United States District Judge.

**OPINION BY:**

O'NEILL

**OPINION:**

Memorandum and Order

AND NOW, this 28th day of June, 1991, upon consideration of plaintiff's motion to join Paccar, Inc. as a defendant in this action and of the supporting and opposing memoranda, it is hereby ORDERED that said motion is DENIED.

This is a products liability action. Plaintiff filed a complaint on December 19, 1988 naming Dart Truck Company and Unit Rig and Equipment Company as defendants. n1 The trial is scheduled for July 29, 1991. Plaintiff now moves pursuant to *Fed R Civ P. Rule 15(c)* to add as a defendant Paccar, Inc., which sold substantially all of the assets of Dart Truck Company to Unit Rig and Equipment Company in 1984.

n1 By Order dated August 14, 1989, I approved the parties' stipulation that Dart Truck Company would be dismissed and that the action would proceed against URECO, the successor to Unit Rig & Equipment Company.

[*2]

Plaintiff does not dispute that the relevant statute of limitations expired on September 28, 1989. Plaintiff's Memorandum at 9-10.

However, plaintiff contends that he should be permitted to amend his complaint to add Paccar, Inc. as a defendant because the amendment would sufficiently "relate back" under *Fed R Civ P Rule 15(c)* to his original complaint, which was filed within the statutory period.

[HN1] Rule 15(c) provides that an amendment changing the party against whom a claim is asserted relates back to the date of the original pleading only under certain circumstances. The parties agree that for plaintiff's motion to succeed, plaintiff must satisfy the standard articulated by the Supreme Court in *Schiavone v. Fortune, 477 U.S. 21 (1986)*. Plaintiff must meet each of four factors:

(1) the basic claim must have arisen out of the conduct set forth in the original pleading;
(2) the party to be brought in must have received such notice that it will not be prejudiced in maintaining its defense;
(3) that party must or should have known that, but for a mistake concerning identity, the action would have been brought against it; and
(4) the second and third requirements **[*3]** must have been fulfilled within the prescribed limitations period.

*Schiavone, 477 U.S. at 29.*

[HN2] To demonstrate compliance with the third prong of Rule 15(c), plaintiff must have made a mistake concerning the identity of the defendant about which the potential defendant should have known. In contexts other than misnomer, courts should use "something akin to a reasonableness test to determine whether the party 'should have known' he was the one intended to be sued. Relation back will be refused only if the court finds that there is no reason why the party to be added should have understood that he was not named due to a mistake." 6A C. Wright & A. Miller, Federal Practice and Procedure § 1498 at 139 (1990). See *Kilkenny v. Arco Marine, Inc., 800 F 2d*

*853, 857-58 (9th Cir. 1986),* cert. denied, *480 U.S. 934 (1987)* (no relation back because "Rule 15(c) was never intended to assist a plaintiff who ignores or fails to respond in a reasonable fashion to notice of a potential party, nor was it intended to permit a plaintiff to engage in piecemeal litigation."); *Curry v. Johns-Manville Corp., 93 F.R.D. 623 (E.D. Pa. 1982)* **[*4]** (no relation back where third party defendant was impleaded five months before plaintiffs attempted to add them as direct defendants because third party defendants could have inferred that plaintiffs' decision was deliberate tactical choice not error); *Keller v. U.S., 667 F. Supp. 1351 (S.D. Cal 1987),* aff'd without op, *930 F.2d 920 (9th Cir. 1991)* (although potential defendant was aware of the action prior to the expiration of the statute, plaintiff's inaction in failing to move to amend could have been viewed by it as an intentional decision not to sue, rather than a mistake in identity); *Potts v. Allis-Chalmers Corp., 118 F.R.D. 597 (N.D. Ind. 1987)* (where plaintiff should have been aware of proper defendant at outset, delay in amending complaint could appear to potential defendant as strategy rather than mistake; no relation back); *Rylewicz v. Beaton Servs., Ltd., 698 F.Supp 1391 (N.D. Ill. 1988)* (no relation back where joined defendants were not omitted from the original complaint due to a mistake concerning the identity of the proper party; plaintiff admitted that he lacked knowledge as to the **[*5]** proper defendants at the time the original complaint was filed).

Plaintiff's diligence in researching which defendant to sue is also relevant. The discussion in Wright & Miller is instructive on this issue:

A few cases tend to suggest that if plaintiff's own inexcusable neglect was responsible for the failure to name the correct party, an amendment substituting the proper party will not be allowed, notwithstanding adequate notice to the new party. Although this factor is germane to the question of permitting an

Case 1:07-cv-00067-MPT    Document 14-3    Filed 03/15/2007    Page 19 of 60

Page 4
1991 U.S. Dist. LEXIS 8843, *

amendment, it is more closely related to the trial court's exercise of discretion under Rule 15(a) whether to allow the change than it is to the satisfaction of the notice requirements of Rule 15(c).

6A Wright & Miller § 1498 at 142-43. See e.g., Mathews v. KFC National Management Company, C.A. 86-1181 (E.D. Pa. Nov. 20, 1986) slip op. at 3 (relation back not permitted because "while Kentucky Fried Chicken may have spun a tangled corporate web, the identity of the various family members could have been discovered through discovery and a trademark search. Indeed, plaintiff's present counsel through their own investigation apparently have been able to identify the appropriate [*6] corporate actors").

Defendant Ureco concedes that plaintiff has met the first two requirements under Schiavone but argues that the motion should fail because plaintiff has not met the third and fourth requirements. n2 See Defendant's Memorandum of Law in Opposition to Plaintiff's Motion to Join Paccar Inc. as a Party Defendant at 4. Defendant contends that Paccar did not and should not have known within the statute of limitations that but for plaintiff's mistake concerning the identity of the proper defendant that the action would have been brought against Paccar.

n2 Although Ureco argues that "there is no interrelationship of the parties [Ureco and Paccar] so that notice to one of the parties would be operative on the other," Ureco represents in the next sentence that Paccar had actual notice of this suit within the statutory period: "Paccar Inc. was aware of this lawsuit since at least March of 1989 . . . " Defendant's Memorandum at 7. Moreover, in its Answer to plaintiff's motion, Ureco admits that "Paccar Inc. had notice of this action . . ." Answer at para. 18; see also Plaintiff's

Memorandum at 2 (March, 1989 letter from Ureco's counsel explained that Paccar would direct defense).

[*7]

Plaintiff represents that he made two "mistakes" concerning the identity of the proper defendant in this litigation. The first concerns which company designed and manufactured the truck plaintiff was operating at the time of the accident. The second concerns whether Ureco is a corporate successor to which the product line exception to corporate successor liability applies.

Plaintiff has known for some time that Paccar was connected to this case. In March, 1989, defendant sent plaintiff the March 9, 1984 Agreement for Purchase and Sale of Assets between Paccar, Inc. and Unit Rig and Equipment Company. See Plaintiff's Exh. H. The Agreement provides in part: "PACCAR Inc . . . through its Dart Truck company division ("Dart") presently conducts the business of manufacturing, assembling and marketing Dart trucks . . ." Id. at 1. Also in March, 1989, in a cover letter accompanying the Answer defendant Unit Rig and Equipment Company served on plaintiff, defendant's counsel explained:

As I advised, I am defending this case pursuant to an indemnity agreement between Paccar, Inc. and Unit Rig and Equipment Company. Paccar has assumed the defense and indemnity obligations for this [*8] lawsuit.

See Plaintiff's Exh. C.

Plaintiff represents that he did not move to join Paccar until May, 1991 because he "proceeded under the mistaken impression that Dart Truck Company had manufactured the hauler truck at issue," as alleged in his complaint. See Complaint at paras. 2, 5. Plaintiff alleges that defendant's Answer was misleading because it stated that Dart Truck Company was no longer in existence, see

1991 U.S. Dist. LEXIS 8843, *

Answer at para. 2, when "Defendant Unit Rig and Equipment Company and proposed Defendant PACCAR, Inc. knew that PACCAR, Inc. in fact sold the truck in question, but this fact was obfiscated [sic] by Defendant."

Plaintiff was provided with the Agreement between Paccar and Unit Rig and with the letter from Unit Rig's counsel within a few months of filing his complaint. In light of plaintiff's admission that he learned of Paccar's involvement in this case at the latest by March, 1989, which was well before the expiration of the statute of limitations, I find that the defendant and the proposed defendant may have believed plaintiff made a deliberate choice rather than a "mistake" in deciding not to join Paccar. Under these circumstances, I cannot hold that plaintiff **[*9]** has complied with the third and fourth requirements of Schiavone.

Plaintiff argues that Paccar should be estopped from asserting a statute of limitations defense. Plaintiff contends that Paccar and Ureco "knowingly allowed Plaintiff to think he sued the proper party." Plaintiff's Memorandum at 9; see 6A Wright & Miller § 1500 at 152 (if party to be added knowingly allows plaintiff to think he has sued proper party, new defendant may be estopped from asserting time bar). I have addressed this contention above as it relates to the correct identity of the manufacturer and seller of the truck. Plaintiff claims also that Ureco misled plaintiff to believe that it would litigate this case on the merits rather than on the issue of who should be the proper defendant.

Plaintiff asserts that he "did not move to join PACCAR, Inc. . . . . because defendant URECO's position, as shown in its Pre-Trial Memorandum, was that it was a successor to the corporation which manufactured the truck in question." Plaintiff's Reply Memorandum at 2; see also Plaintiff's Memorandum at 8-9 ("Paccar, Inc.'s initial strategy of not contesting the issue of successorship effectively led plaintiff not to join **[*10]** Paccar, Inc."). Ureco

stated in its Pre-Trial Memorandum, filed September 12, 1990, that "the defendant is a successor to a corporation which manufactured a 55 ton off-the-road haulage truck in 1962" and that "this is a products liability suit with no unusual legal issues." Defendant's Pre-trial Memorandum at 1, 4.

Plaintiff's reliance on these statements as evidence that Ureco conceded it was the proper or only party to be sued was misplaced. **[HN3]** The general rule is that "when one company sells or transfers all of its assets a successor company, the successor does not acquire the liabilities of the transferor corporation merely because of its succession to the transferor's assets." *Dawejko v. Jorgensen Steel Co., 290 Pa. Super. 15, 434 A.2d 106, 107 (1981),* see also discussion below.

It is not relevant to the pending motion whether Ureco should or should not be held liable under an exception to the general rule of corporate successor nonliability but it is relevant whether defendant misled plaintiff to believe that Ureco would not contest the issue of whether it was the proper defendant. In support of his contention that he was misled, plaintiff cites **[*11]** the Pretrial Memorandum quoted above; defendant's statement in its Answer that the originally named defendant Dart Truck no longer existed; the participation of Ureco's counsel in the depositions of plaintiff and four witnesses; defendant's retention of an expert witness and the order of a defense medical exam. Plaintiff's Memorandum at 3.

Ureco admits that it defended this case on the merits but contends that "at no time did such conduct waive any relevant defenses including the defense of corporate successor liability." Answer to Plaintiff's Motion at para. 7. Plaintiff is correct that defendant did not specifically raise in its Answer the defense that it was not the proper party to be sued. Ureco did deny the allegations in the Complaint, including the paragraph in which plaintiff alleged that at all times set forth, "defendants

were engaged in the business of designing, manufacturing and selling dump trucks," Complaint at para. 8, and Ureco did assert the affirmative defense that the Complaint failed to state a cause of action upon which relief could be granted.

Moreover, I do not read Ureco's Answer in isolation nor do I understand its other actions without reference to its correspondence [*12] with plaintiff. The same day that defendant filed its Answer, Ureco delivered to plaintiff the asset transfer agreement between Paccar and Unit Rig and the letter explaining Paccar's role. In light of defendant's explicit disclosure of Paccar's role to plaintiff, neither Ureco nor Paccar can be charged with "knowingly allow[ing] plaintiff to think he has sued the proper party or actually mislead[ing] him as to the identity of the party that should be held responsible." 6A Wright & Miller § 1500 at 152. Plaintiff's own diligence is to be considered. For example, Ureco represents that the response to plaintiff's Request for Admissions which prompted this motion, by which Ureco denied it was a successor to KW-Dart Truck Company, would have been the same had plaintiff asked earlier than March, 1991. See Defendant's Memorandum at 3.

Plaintiff asserts that his "mistake" concerning whether Ureco is a corporate successor to which the product line exception applies also has to do with the status in Pennsylvania of this area of law. In *Conway v White Trucks, 885 F.2d 90 (3d Cir. 1989),* the Court of Appeals for the Third Circuit predicted that if the Pennsylvania Supreme [*13] Court were to adopt a product line exception to the general rule of nonliability for successors, that it "would require the virtual destruction of the plaintiff's remedies against the original manufacturer caused by the successor's acquisition." *Id. at 97.* In other words, the Conway court held that the product line exception would not apply in cases in which the claimant had a potential remedy against the original manufacturer but failed to

exercise all available means to assert such claim. *Id. at 95,* see also *Tracey v. Winchester Repeating Arms, Co., 745 F.Supp. 1099, 1107 n. 14 (E.D. Pa. 1990),* aff'd *928 F.2d 937 (3d Cir. 1991).* The Court of Appeals for the Third Circuit decided Conway on September 12, 1989 and amended the opinion on October 10, 1989.

The "mistake" that plaintiff points to stems from the prediction by the Court of Appeals for the Third Circuit that the Pennsylvania product line exception would be narrower than some district courts in the Circuit had believed prior to the Conway decision; yet plaintiff did not alter his litigation strategy in light of Conway until now. [*14] Under this circumstance, I do not believe that Paccar "should have understood that [it] was not named due to a mistake." 6A Wright & Miller § 1498 at 139. Although Ureco does not explain what view Paccar held of plaintiff's litigation strategy, I find as I stated above that Paccar may have believed that plaintiff deliberately chose not to join Paccar. n3 I agree therefore with Ureco's statement that "at no time during the period of the statute of limitations did Paccar Inc. know or should of [sic] known that the actions was being brought against Ureco as a result of the mistake or misapprehension on the part of the plaintiff." Defendant's Memorandum at 5.

> n3 Although Ureco asserts that at the time that the action was filed "it was legally liable under the product line exception to the general rule of corporate liability," Defendant's Memorandum at 5, I do not decide this issue.

I find plaintiff's other arguments also without merit. Plaintiff urges that I find an "identity of interest" between Ureco and Paccar and that [*15] I hold therefore that Paccar should have known that the action would have been brought against it if not for a mistake. Plaintiff's Memorandum at 6. Judge Stapleton has explained this concept:

This theory is a judicial gloss on Rule 15(c) which provides that notice of the action to the original party constitutes notice to the added party when the original and added parties are so closely connected in their business and other activities that it is fair to presume that the added party learned of the action from the notice given to the original party. The theory is often applied where the original and added parties are a parent and its wholly owned subsidiary are two related corporations whose officers, directors, or shareholders are substantially identical and who have similar names or share office space.

*Gabriel v. Kent General Hosp, Inc., 95 F R D 391, 394 n 3 (D Del 1982)* Paccar and Ureco are not related in any of these ways. Defendant's Memorandum at 7.

Plaintiff relies on *Taliferro v Costello, 467 F Supp 33 (E D Pa 1979)* in support of his argument that the mistake requirement "seems designed to ensure that, prior to the expiration **[*16]** of the limitation period, the new defendant knew (or should have known) that his joinder was a distinct possibility." *Id at 36*

Taliferro predates the Supreme Court's 1986 decision in Schiavone, which did not adopt this concept of mistake under Rule 15(c); nor does plaintiff contend that the Court of Appeals for the Third Circuit has adopted the Taliferro concept, and see *Kindness v Bethlehem Steel Corp, 1988 U S Dist LEXIS 16843* (M D Pa June 8, 1988), aff'd without op sub nom *Kindness v Spang, 865 F 2d 251 (3d Cir 1988),* cert denied, *490 U S 1066 (1989)* n4

> n4 In addition, Judge Pollak permitted the relation back in Taliferro in part because of the leniency due the inexpert pleadings of the pro se litigant, a consideration not relevant here. See *Taliferro, 467 F Supp at 36* ("plaintiffs' failure to sue the City reflected a narrow view of the causes of action set forth in their pro se complaint which would probably not have been taken had a lawyer familiar with the legal terrain drawn their first pleading").

**[*17]**

Westlaw.

Not Reported in F.Supp.2d                                                                 Page 1
Not Reported in F.Supp.2d, 1999 WL 1129630 (E.D.Pa.), 2000 A.M.C. 709
**(Cite as: Not Reported in F.Supp.2d)**

**C**
Briefs and Other Related Documents
Foster Wheeler Energy Corp. v. Intermarine,
Inc.E.D.Pa.,1999.
United States District Court, E.D.
Pennsylvania.
FOSTER WHEELER ENERGY CORP.
v.
INTERMARINE, INC.
v.
PENN TERMINALS, INC.
**No. CIV. A. 98-5106.**

Nov. 30, 1999.

Raymond T. Letulle, Cozen and O'Connor,
Philadelphia, Lan Hoang, Donovan, Parry,
Carbin, MC, Dermott and Radzik, New York,
NY, Edward V. Cattell, Jr., Hollstein,
Keating, Cattell, Johnson & Goldstein, P.C.,
Philadelphia, for Foster Wheeler Energy
Corp., Plaintiffs.
Ann-Michele Higgins, Rawle & Henderson,
Philadelphia, Ann-Michele Higgins, Rawle
and Henderson, Marlton, NJ, for Intermarine,
Inc., Defendants.

MEMORANDUM AND ORDER
BECHTLE, J.
**\*1** Presently before the court are defendant
Intermarine, Inc.'s ("Intermarine") motion for
summary judgment, plaintiff Foster Wheeler
Energy Corp.'s ("Foster Wheeler") motion to
amend the complaint and to compel service of

process and the responses thereto. For the
reasons set forth below, the court will grant
Intermarine's motion and deny Foster
Wheeler's motion.

I. BACKGROUND

**\*1** This action arises out of damage to Foster
Wheeler's cargo during its loading onto the
M/V COSMAN II on February 12, 1996.
Plaintiff Foster Wheeler manufactures large
industrial machinery. Defendant Intermarine
is the agent for Industrial Maritime Carriers
(Bahamas) Inc. ("IMCI"), which is the owner,
operator or charterer of the M/V COSMAN
II.[FN1] Third Party Defendant Penn Terminals
was the stevedore hired by Intermarine and
was responsible for loading Foster Wheeler's
cargo onto the M/V COSMAN II.

> FN1. It is disputed whether
> Intermarine is a "carrier" under the
> Carriage of Goods by Sea Act, 46
> U.S.C. 1300 *et seq.*

**\*1** The freight invoices for Foster Wheeler's
cargo were issued on a form with the name
"INTERMARINE INCORPORATED" in
large type, followed by "As Agents For" in
small type, followed by "Industrial Maritime
Carriers, Inc."in type smaller than
Intermarine's designation, but larger than the
"As Agents For" type. (Foster Wheeler's Ans.
to Mot. for Summ. J., Attachments.) In

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                      Page 2
Not Reported in F.Supp.2d, 1999 WL 1129630 (E.D.Pa.), 2000 A.M.C. 709
**(Cite as: Not Reported in F.Supp.2d)**

addition, the damaged cargo was covered by a Bill of Lading issued by Intermarine as agents for IMCI. *Id.*

**\*1** Foster Wheeler notified Intermarine that its claim for damages would be $154,693.00. Subsequently, Foster Wheeler and Intermarine engaged in settlement discussions. Because the statute of limitations under the Carriage of Goods by Sea Act ("COGSA"), 46 U.S.C. § 1303(6), is one year, an extension to file suit was granted by IMCI.[FN2]

> FN2. The document extending the time in which to file suit under COGSA appears on Intermarine letterhead, but reads:
> Extension of Time for Suit is hereby granted by Industrial Maritime Carriers, Inc., only, to and including 30 JULY 1998
> This extension is limited to the quantum and character of the alleged claim as originally presented, reserving to Industrial Maritime Carriers Inc. its rights and defenses under law or contained in the bill of lading[.]
> (Intermarine's Mot. for Summ. J. Ex. B.)

**\*1** Foster Wheeler then filed suit against Intermarine on July 30, 1998, in the United States District Court for the District of New Jersey. Through Foster Wheeler's negotiations with Intermarine, the action was transferred here on September 22, 1998. On October 21, 1998, counsel for Intermarine telephoned local counsel for Foster Wheeler, advised him that Intermarine was improperly named in the Complaint and stated that IMCI was the carrier on the Bill of Lading and the only entity that had granted an extension of time under COGSA. [FN3] (Higgins Aff. ¶¶ 4 & 5.) On November 3, 1998, the court entered a Pretrial Order in the action in accordance with <u>Federal Rule of Civil Procedure 16</u>. Foster Wheeler's local counsel entered an appearance on November 19, 1998. On November 24, 1998, Intermarine entered an appearance and filed its Answer. In its Answer, Intermarine asserted that it was improperly named and that IMCI was the proper defendant in this action. (Intermarine's Ans. ¶¶ 3, 4, 5 & Sixteenth Separate Defense.) On December 9, 1998, Intermarine filed a Third Party Complaint against Penn Terminals under <u>Federal Rule of Civil Procedure 14</u>. Intermarine has not yet served Penn Terminals with the Third Party Complaint. On April 30, 1999, Intermarine filed the instant motion for summary judgment. Also on April 30, 1999, Foster Wheeler filed the instant motion to amend to add IMCI and to compel Intermarine to serve Penn Terminals with process.

> FN3. Intermarine's counsel also requested a copy of the Complaint from Foster Wheeler's local counsel which she later received.

## II. *LEGAL STANDARDS*

### A. *Summary Judgment*

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                              Page 3
Not Reported in F.Supp.2d, 1999 WL 1129630 (E.D.Pa.), 2000 A.M.C. 709
**(Cite as: Not Reported in F.Supp.2d)**

**\*2** Summary judgment shall be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). Whether a genuine issue of material fact is presented will be determined by asking if "a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).

**\*2** On a motion for summary judgment, the non-moving party has the burden to produce evidence to establish prima facie each element of its claim *Celotex Corp. v. Catrett,* 477 U.S. 317, 322-23 (1986). Such evidence and all justifiable inferences that can be drawn from it are to be taken as true. *Anderson,* 477 U.S. at 255. However, if the non-moving party fails to establish an essential element of its claim, the moving party is entitled to judgment as a matter of law. *Celotex,* 477 U.S. at 322-23.

### B. *Motion to Amend*

**\*2** Under the Federal Rules of Civil Procedure, a party may amend its pleading by leave of court, and "leave shall be freely given when justice so requires." Fed.R.Civ.P. 15(a). The grant or denial of a motion to amend is within the discretion of the district court. *See Foman v. Davis,* 371 U.S. 178, 182 (1962) (stating that while decision is within

discretion of district court, "outright refusal to grant the leave without any justifying reason ... is ... an abuse of that discretion"). The Third Circuit has stated that "the grounds that could justify a denial of leave to amend are undue delay, bad faith, dilatory motive, prejudice, and futility." *In re Burlington Coat Factory Sec. Litig.,* 114 F.3d 1410, 1434 (3d Cir.1997); *see Foman,* 371 U.S. at 182 (stating grounds that justify denial of leave to amend).

### III. *DISCUSSION*

**\*2** Intermarine's motion for summary judgment and Foster Wheeler's motion to amend the complaint and to compel service of process overlap. Intermarine asserts that because only IMCI granted an extension to file suit under COGSA, Foster Wheeler's claim against Intermarine is barred. Intermarine also argues that it is not a carrier and is not the proper defendant in this action. Intermarine further argues that Foster Wheeler cannot now amend its Complaint to add IMCI as it would be futile because Foster Wheeler has missed the statute of limitations within which to bring suit against IMCI and because any amendment could not relate back to the date of the Original Complaint under Federal Rule of Civil Procedure 15(c)(3) ("Rule 15").

**\*2** On the other hand, Foster Wheeler asserts that any COGSA extensions granted were on behalf of the "carrier interests," which they assert includes Intermarine. In addition, Foster Wheeler asserts that it may amend its

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                        Page 4
Not Reported in F.Supp.2d, 1999 WL 1129630 (E.D.Pa.), 2000 A.M.C. 709
**(Cite as: Not Reported in F.Supp.2d)**

Complaint to add IMCI and have it relate back to the date of the Original Complaint under Rule 15(c)(3).

**\*3** The court will grant Intermarine's motion for summary judgment and deny Foster Wheeler's motion to amend the complaint and to compel service of process. Initially, the court will address why Foster Wheeler's claims against Intermarine are barred by COGSA's one year limitation of suit provision. Then, the court will address why it will deny Foster Wheeler leave to amend its Complaint to add IMCI.

### A. *Foster Wheeler's Claims Against Intermarine Are Barred by COGSA's One Year Limitation of Suit Provision*

**\*3** This action involving damage to Foster Wheeler's cargo covered by a Bill of Lading issued by Intermarine on behalf of IMCI is governed by COGSA. *See* 46 U.S.C. § 1300 (stating that [e]very bill of lading ... which is evidence of a contract for the carriage of goods by sea to or from ports of the United States ... shall have effect subject to the provisions of this chapter"). (Intermarine's Mot. for Summ. J. ¶ 2.; Foster Wheeler's Resp. ¶ 2.) COGSA provides for a one year limitation period in which to bring suit. 46 U.S.C. § 1303(6). By agreement, the parties to an action under COGSA may extend the limitation period in which to bring suit. *See Ferrostaal, Inc. v. M/V YVONNE, 10 F.Supp.2d 610, 613 (E.D.La.1998)* (stating that "a carrier may waive the right to invoke

the one-year time limit imposed by COGSA"). However, the terms of a waiver of the limitation of suit period under COGSA "must be strictly construed." *Id.* (citations omitted).

**\*3** Here, the document extending the time in which to file suit until July 30, 1998 was granted by IMCI. While the document is printed on letterhead of IMCI's agent, Intermarine, the extension clearly indicates that it is granted by IMCI only. (Intermarine's Mot. for Summ. J. Ex. B.) Consequently, because Intermarine did not agree to an extension of the one year limitation of suit provision under COGSA, the court finds that Foster Wheeler's July 30, 1998 Complaint was filed beyond the time period allowable under COGSA. Foster Wheeler's claims against Intermarine are time barred under 46 U.S.C. § 1303(6). Thus, the court will grant summary judgment in favor of Intermarine. [FN4]

> FN4. Because the court will grant summary judgment in favor of Intermarine, it need not decide whether Intermarine is a "carrier" under COGSA.

### B. *Futility Prevents the Court from Granting Leave to Foster Wheeler to Amend Its Complaint to Add IMCI.*

**\*3** Both parties' arguments on their motions are primarily based on Foster Wheeler's ability to add IMCI by amendment and have it relate back to the filing of the Original Complaint under Rule 15(c)(3). (Foster

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                      Page 5
Not Reported in F.Supp.2d, 1999 WL 1129630 (E.D.Pa.), 2000 A.M.C. 709
**(Cite as: Not Reported in F.Supp.2d)**

Wheeler's Ans. to Intermarine's Mot. for Summ. J. ¶ 5. (stating that "to the extent that the extension was granted as to [IMCI], and the motion of Foster Wheeler to amend the complaint to stay the claim against [IMCI], relating back to the date of filing the complaint against Intermarine, Inc is granted, then the presence of Intermarine, Inc. as a defendant in this action is unnecessary"); Intermarine's Mem. in Support of Mot. for Summ. J. at 8 (stating that failure to comply with Fed.R.Civ.P. 15(c)(3)(B) requires dismissal of action) ) Under Rule 15,

**\*4** [a]n amendment of a pleading relates back to the date of the original pleading when

**\*4** (2) the claim or defense asserted in the amended pleading arose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading, or

**\*4** (3) the amendment changes the party or the naming of the party against whom a claim is asserted if the foregoing provision (2) is satisfied and, within the period provided by Rule 4(m) for service of the summons and complaint, the party to brought in by amendment (A) has received such notice of the institution of the action that the party will not be prejudiced in maintaining a defense on the merits, and (B) knew or should have known that, but for a mistake concerning the identity of the proper party, the action would have been brought against the party.

**\*4** Fed.R.Civ.P. 15(c).

**\*4** Here, Foster Wheeler meets the initial requirements of Rule 15(c)(3). The motion to amend seeks only to add IMCI and does not seek to add additional facts or claims. See Fed.R.Civ.P. 15(c)(2) & (3). (Foster Wheeler's Mem. in Support of Mot. to Amend, at 7; Am. Compl. ¶ 4.)

**\*4** In addition, it appears that Foster Wheeler has met the requirement of Rule 15(c)(3)(A) that, within the 120 day period under Rule 4(m), IMCI received such notice of the action against it that it would not be prejudiced in maintaining a defense on the merits. Foster Wheeler asserts that Intermarine's agency relationship with IMCI, as exhibited through its negotiations with Foster Wheeler, indicates that IMCI has had knowledge of the action against it since the time that Intermarine has had such knowledge. Intermarine does not contest this assertion by Foster Wheeler and the court finds that there exists an identity of interest sufficient to impute knowledge of the action to IMCI within the time provided for under Rule 15(c)(3). (Intermarine's Reply Brief in Support of Mot. for Summ. J. at 2 (stating that "it is factor (B) of Rule 15(c)(3) that is at issue here, and not factor (A)").) See In re Integrated Resources Real Estate Ltd. Partnership Sec. Litig., 815 F.Supp. 620, 646 (S.D.N.Y.1993) (stating that "identity of interests concept ... provides that the institution of the action serves as constructive notice to the parties added after the limitations period expired, when the original and added parties are so closely related in business or other activities that it is fair to presume the added parties learned of the institution of the actions shortly after it was commenced"); G.F. Co. v. Pan Ocean Shipping Co., Ltd., 23

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                      Page 6
Not Reported in F.Supp.2d, 1999 WL 1129630 (E.D.Pa.), 2000 A.M.C. 709
**(Cite as: Not Reported in F.Supp.2d)**

F.3d 1498, 1503 (9th Cir.1994) (holding that Rule 15(c)(3)(A) was satisfied because "community of interest" existed where named party was claims agent for shipping company sought to be added and where both companies had same attorney). Here the court's finding with respect to Rule 15(c)(3)(A) is bolstered by the fact that Intermarine's attorney was able to grant an extension on behalf of IMCI, which was printed on Intermarine letterhead.

**\*5** However, because Foster Wheeler cannot satisfy Rule 15(c)(3)(B), the court will deny its motion to amend due to futility of amendment. Under Rule 15(c)(3)(B), the court must consider whether "within the same 120 day time period required for notice, the new defendant 'knew or should have known that his joinder was a distinct possibility' or whether that defendant maintained a 'reasonably held belief that the failure to join him was a deliberate strategy.' In the former case, the plaintiff's claim may relate back, in the latter, it may not. The plaintiff carries the burden to prove both the notice and 'mistake' requirements." *Wine v. EMSA Ltd. Partnership,* 167 F.R.D. 34, 38 (E.D.Pa.1996); *see Trant v. Towamencin Township,* No. 99-134, 1999 WL 317032, at \*6 (E.D.Pa. May 20, 1999) (stating that "[t]he mistake condition is intended to insure that the new defendant knew or should have known within the relevant time that failure to join was not simply a legal strategy, ... but that his joinder was a 'distinct possibility' "); *Heinly v. Queen,* 146 F.R.D. 102, 106-107 (E.D.Pa.1993) (stating that "[t]he mistake aspect of [Rule 15(c)(3) ] is designed to insure

that the new defendant knew or should have known within the relevant time period that his joinder was a distinct possibility ... [i]n contrast, to a reasonable belief that the failure to join a new defendant was a deliberate strategy").

**\*5** To meet the "mistake" prong of Rule 15(c)(3), Foster Wheeler asserts that "[b]ut for an error caused by the prominent display of Intermarine's name and identity on the shipping documents and the inconspicuous ... identification of [IMCI] in the same documents, [IMCI] would have been named as the defendant." (Foster Wheeler Mem. in Opp. to Mot. for Summ. J. at 3.) In addition, Foster Wheeler points to several instances in this litigation where Intermarine held itself out as the responsible party, and thus, neglected to inform Foster Wheeler that IMCI, and not Intermarine, was the proper defendant in this case. Specifically, the affidavit of Foster Wheeler's counsel, Lan Hoang, Esq., describes several instances throughout the litigation where Intermarine failed to inform Foster Wheeler that it was not a proper defendant. For example, in a phone conversation between Intermarine's counsel and Foster Wheeler's counsel on August 17, 1998, the day Intermarine was served, Intermarine's counsel took no exception to having been named as the defendant carrier in the case. (Hoang Aff. ¶¶ 6 & 12.) Also, in negotiating a transfer of the action to this court, Intermarine did not "at any point object to its having been named as a defendant in this matter, raise the issue of [IMCI] having been the actual carrier, or express any

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 7
Not Reported in F.Supp.2d, 1999 WL 1129630 (E.D.Pa.), 2000 A.M.C. 709
(Cite as: Not Reported in F.Supp.2d)

intention other than joining Penn Terminals and properly focusing on the settlement of the case." (Hoang Aff. ¶ 12.)

*5 Despite these events which support Foster Wheeler's assertion of "mistake," other events show that Foster Wheeler, with the exercise of reasonable diligence, should have known of IMCI's potential liability before the statute of limitations had run on July 30, 1998. Initially, both the invoices and Bill of Lading identify IMCI. In fact, Foster Wheeler admits that the Bill of Lading identifies IMCI as the carrier. (Foster Wheeler Mot. to Amend ¶ 8.) In addition, the document extending the time in which to bring suit under COGSA was granted on behalf of IMCI. (Intermarine's Mot. for Summ. J. Ex. B.) Foster Wheeler interpreted this document as an extension granted on behalf of the carrier interests in the case. (Foster Wheeler Ans. to Mot. for Summ. J. ¶ 5.) However, at the very least, this document should have prompted Foster Wheeler to inquire into the identity and potential liability of IMCI and its relationship to Intermarine and the M/V COSMAN II. However, no such inquiry was conducted by Foster Wheeler.

*6 In addition, Foster Wheeler has had actual knowledge that IMCI should have been a named defendant since the fall of 1998, yet did not seek to add IMCI by amendment until April 30, 1999. On October 21, 1998, counsel for Intermarine notified local counsel for Foster Wheeler by telephone that Intermarine was improperly named and that IMCI was the carrier on the bill of lading and that IMCI was

the only entity that granted an extension under COGSA. (Higgins Aff. ¶¶ 4 & 5.) Additionally, Intermarine's November 24, 1998 Answer to Foster Wheeler's Complaint made clear that IMCI was a proper defendant in the case. In its Answer, Intermarine denied that it was a common carrier or that it owned, operated, managed, chartered or otherwise controlled the M/V COSMAN II. (Intermarine's Ans. ¶ 3.) Intermarine also denied that it issued the Bill of Lading dated February 12, 1996. *Id.* By way of further answer, Intermarine indicated that IMCI issued the Bill of Lading dated February 12, 1996. (Intermarine's Ans. ¶¶ 3, 4 & 5.) Furthermore, in its affirmative defenses, Intermarine alleged that it:

*6 was not the owner of the vessel, nor the carrier of the goods, nor did Intermarine enter into any contract with [Foster Wheeler,] and Intermarine cannot be liable to [Foster Wheeler] for any of the matters alleged in the complaint. The only activities carried on by Intermarine for the vessel COSMAN II were those of general agent for a disclosed principal and as such it is not subject to any liability to [Foster Wheeler]

*6 (Intermarine's Ans., Sixteenth Separate Defense.)

*6 Although Foster Wheeler admits that Intermarine's Answer asserted that it was not a proper defendant, Foster Wheeler, for whatever reason, decided not to seek immediate leave of court to add IMCI by amendment, but instead waited until April 30, 1999, when it discovered that Intermarine

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 1999 WL 1129630 (E.D.Pa.), 2000 A.M.C. 709
(Cite as: Not Reported in F.Supp.2d)

would be seeking dismissal. In lieu of a response to this delay, Foster Wheeler argues that although Intermarine's Answer raised the issue of IMCI's potential liability, Intermarine misled Foster Wheeler by filing a Third Party Complaint against Penn Terminals. Foster Wheeler asserts that "had Intermarine seriously intended to pursue the issue of mistaken identity with the filing of its answer in November, 1998 ... the appropriate vehicle would have been a motion ... to dismiss the complaint for failure to state a claim." (Foster Wheeler's Ans. to Mot. for Summ. J. ¶ 14.) Regardless of what Foster Wheeler believed Intermarine's strategy to be in filing a third party complaint against Penn Terminals, that action does not change the fact that Intermarine eventually notified Foster Wheeler of its mistake in naming Intermarine instead of IMCI.

**\*6** *G.F. Co. v. Pan Ocean Shipping Co., Ltd., 23 F.3d 1498, 1503 (9th Cir.1994),* is instructive here. *G.F. Co.* involved damage to cargo aboard the M/V Pan Queen. *Id.* at 1500. Three days before the statute of limitations was to run, the plaintiff filed a Complaint, naming Panobulk, a claims agent, but not Pan Ocean, the owner of the vessel. *Id.* Once the statute of limitations had expired with respect to Pan Ocean, Panobulk filed its Answer, asserting that it was an agent for a disclosed principal and thus not liable to the plaintiff. *Id.* Also, the plaintiff did not become aware that Pan Ocean was the owner of the vessel until sometime later, when Panobulk filed a motion for summary judgment, which for the first time explained Panobulk's and Pan

Ocean's relationship to the vessel. *Id.* The plaintiff then sought to amend its Complaint to name Pan Ocean and have the amendment relate back under Rule 15(c)(3). *Id.*

**\*7** Pan Ocean argued that the amendment was futile because it did not know the plaintiff made a mistake. *Id.* at 1503 (quoting *Kilkenny v. Arco Marine Inc.,* 800 F.2d 853, 857 (9th Cir.1986) (stating that "[a] plaintiff's failure to amend its complaint to add a defendant after being notified of a mistake concerning the identity of a proper party ... may cause the unnamed party to conclude that it was not named because of strategic reasons rather than as a result of plaintiff's mistake")). Pan Ocean argued that Panobulk's Answer sufficiently alerted the plaintiff as to its mistake, and that under *Kilkenny,* Pan Ocean had reason to believe the plaintiff "was simply making a tactical decision not to sue it." *Id.* The court rejected Pan Ocean's argument and allowed the amendment, reasoning that Pan Ocean's argument:

**\*7** would have more force if Panobulk's answer had actually stated that Pan Ocean was the proper defendant. Instead, the answer ambiguously recited that "Panobulk is, and at all material times herein was[,] an agent of a disclosed principal or principals, and is therefore not liable to Plaintiff for its alleged loss." The complaint, which erroneously asserted that Panobulk owned, operated, and controlled that Pan Queen, illustrates that [the plaintiff] was mistaken. This mistake is confirmed by the affidavit of [the plaintiff's] counsel, who explained that the omission of Pan Ocean was due to inadvertence rather

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                    Page 9
Not Reported in F.Supp.2d, 1999 WL 1129630 (E.D.Pa.), 2000 A.M.C. 709
**(Cite as: Not Reported in F.Supp.2d)**

than strategy, and by the fact that [the plaintiff] immediately sought to amend its complaint when Panobulk filed its summary judgment motion (explaining for the first time *why* it was not a proper defendant).

**\*7** *Id.* at 1503-04.

**\*7** Our case differs from *G.F. Co.*, in three important aspects. First, unlike Panobulk's Answer in *G.F. Co.*, Intermarine's Answer actually states that IMCI was the proper defendant. This is further bolstered by the Bill of Lading naming IMCI as the carrier, the information naming IMCI in the document extending the statute of limitations under COGSA and by Intermarine's counsel's phone call of October 21, 1998, alerting Foster Wheeler that IMCI rather than Intermarine was the proper defendant. Second, unlike plaintiff's affidavit confirming the mistake in *G.F. Co.*, the court has no sworn statement by Foster Wheeler's counsel stating that its failure to name IMCI was due to inadvertence rather than strategy. While Foster Wheeler argues "mistake" in its response to Intermarine's motion for summary judgment, no sworn affidavit confirming the mistake was submitted by Foster Wheeler. Last, unlike the plaintiff's timing in seeking amendment in *G.F. Co.*, Foster Wheeler failed to immediately seek amendment upon learning *why* Intermarine was not a proper defendant. Instead, Foster Wheeler waited until April 30, 1999 before filing its motion to amend.

**\*7** Recently, one court interpreting *G.F. Co.*, described the case as a "situation in which a plaintiff seeks to add defendants after the statute of limitations has run ... when the information about the additional defendant's identity is within the defendant's control but the defendants are not forthcoming." *Brink v. First Credit Resources,* 57 F.Supp.2d 848, 856-57 (D.Ariz.1999). In interpreting Rule 15(c)(3), the court held that in such a case "the 'mistake concerning ... identity' requirement may be satisfied when the plaintiff was unaware of the new defendant's identity at the time the complaint was filed and learns the identity of the new defendant only after the statute of limitations has expired because the named defendant failed to provide the information sooner." *Id.* at 857.

**\*8** In *Brink,* at the time the plaintiff filed his Complaint he was unaware of the defendants he sought to add later by amendment. *Id.* However, the plaintiff did actively seek their names through discovery. *Id.* The named defendant delayed their answer to the plaintiff's discovery requests by seeking a protective order and objecting to interrogatories. *Id.* The court allowed the amendment, holding that it was "inappropriate for a defendant to withhold information that the plaintiff is seeking and then use the statute of limitations as a defense when the plaintiff finally gains the information and attempts to use it." *Id.*

**\*8** Our case differs from *Brink* in two important aspects. While in *Brink* the plaintiff had no knowledge of the defendants sought to be added until after the statute of limitations expired, Foster Wheeler had the name of

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                        Page 10
Not Reported in F.Supp.2d, 1999 WL 1129630 (E.D.Pa.), 2000 A.M.C. 709
**(Cite as: Not Reported in F.Supp.2d)**

IMCI in the Bill of lading and in the document extending the time in which to file suit under COGSA. Any confusion over the IMCI name in those documents should have caused Foster Wheeler to inquire as to the relationship of IMCI to the case. However, unlike the plaintiff in *Brink*, Foster Wheeler took no additional steps toward uncovering the identity and the potential liability of IMCI.

**\*8** Several courts have held that if an "unnamed defendant's potential liability is so apparent that the plaintiff, with the exercise of reasonable diligence, should know of such potential liability, the plaintiff's failure to name the defendant may well appear as a deliberate strategy rather than a mistake." *Kemp Indus., Inc. v. Safety Light Corp.,* No. 92-95, 1994 WL 532130, at *15 (D.N.J. Jan. 25, 1994) (stating that "[p]laintiff's failure to name [the defendant] in spite of the ease of discovering [the defendant's] potential liability reasonably indicates [the defendant] was intentionally omitted from the Complaint"); *see Engel v. Minissale,* No. 90-4400, 1993 WL 21232, at *3 (E.D.Pa. Jan. 29, 1993) (denying leave to amend and stating that "it appears that Plaintiffs were not diligent in their efforts to ascertain the identity" of defendant sought to be added); *Kemper v. Ureco,* No. 88-9618, 1991 WL 125178, at *2-3 (E.D. Pa. June 28, 1991) (noting that plaintiff's diligence in researching which defendant to sue is relevant consideration and denying leave to amend where plaintiff had known for some time that defendant sought to be added was connected to case); *Potts v. Allis-Chalmers Corp.,* 118

F.R.D. 597, 609 (N.D.Ind.1987) (denying leave to amend where plaintiff "was or should have been fully aware" that defendant sought to be added was proper party to litigation).

**\*8** In addition, other courts have held that a plaintiff's own delay in bringing a motion to amend may be grounds for a defendant's reasonable belief that the plaintiff made a tactical decision not to sue rather than a mistake. *See Kemp,* 1994 WL 532130, at *15 (holding that three month delay in failing to seek amendment adding party after discovering its involvement indicated that defendant was not mistakenly omitted from Complaint); *Campbell v. Ward,* 792 F.Supp. 1150, 1153 (E.D.Mo.1992) (holding in case where plaintiff did not learn of possible role of defendant until almost a year after the statute of limitations had expired that "[e]ven after plaintiff learned that [the defendant to be added] had a possible role in the suit, he waited several months before filing an amended complaint ... [and thus,] ... Plaintiff's inaction could have been viewed as an intentional decision not to sue"); *Keller v. U.S.,* 667 F.Supp. 1351, 1357-58 (S.D.Cal.1987) (holding same where plaintiffs waited three months before filing motion to amend).

**\*9** Here, based on the Bill of Lading and the document extending the time in which to bring suit under COGSA, which indicates that the extension was granted on behalf of IMCI (even though it was printed on Intermarine letterhead), the court finds that Foster Wheeler, through reasonable diligence, could

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                    Page 11
Not Reported in F.Supp.2d, 1999 WL 1129630 (E.D.Pa.), 2000 A.M.C. 709
**(Cite as: Not Reported in F.Supp.2d)**

have easily discovered IMCI's identity and potential liability before the statute of limitations ran on July 30, 1998. Foster Wheeler's failure to conduct such inquiry into the identity of IMCI weighs against the court granting leave to allow Foster Wheeler to add IMCI at this late date.

**\*9** Additionally, the court finds that as of October 21, 1998, and at the very latest, November 24, 1998, Foster Wheeler had direct and actual notice-through Intermarine's counsel's phone call to Foster Wheeler's counsel and through Intermarine's Answer-that Intermarine was improperly named and that IMCI was the proper defendant. Foster Wheeler's April 30, 1999 motion to amend was not filed until almost six months after it received such direct and actual notice. This factor also weighs against the court granting leave to allow Foster Wheeler to add IMCI at this late date.

**\*9** In sum, the court finds that Foster Wheeler's lack of diligence in discovering IMCI's identity and potential liability and delay in bringing its motion to amend could have reasonably caused IMCI to conclude that it was not named because of strategy rather than as a result of Foster Wheeler's mistake. Thus, under <u>Rule 15(c)</u>, any amendment adding IMCI would not relate back to the date of Foster Wheeler's Original Complaint. Because the statute of limitations under COGSA has already passed with respect to IMCI, allowing leave to amend here would be futile. Thus, the court will deny Foster Wheeler's motion to amend. *See Foman v.*

*Davis,* 371 U.S. 178, 182 (1962) (stating futility as proper ground for denying amendment); *In re Burlington Coat Factory Sec. Litig.,* 114 F.3d 1410, 1434 (3d Cir.1997) (same).

## IV. *CONCLUSION*

**\*9** For the foregoing reasons, the court will grant Intermarine's motion for summary judgment and deny Foster Wheeler's motion to amend the complaint and to compel service of process.

**\*9** An appropriate Order follows.

## ORDER

**\*9** AND NOW, TO WIT, this 30th day of November, 1999, upon consideration of defendant Intermarine, Inc.'s motion for summary judgment, plaintiff Foster Wheeler Energy Corp.'s motion to amend the complaint and to compel service of process and the responses thereto, IT IS ORDERED that:
**\*9** 1. defendant Intermarine, Inc.'s motion for summary judgment is GRANTED; and
**\*9** 2. plaintiff Foster Wheeler Energy Corp.'s motion to amend the complaint and to compel service of process is DENIED.

**\*9** Judgment is entered in favor of defendant Intermarine, Inc. and against plaintiff Foster Wheeler Energy Corp.

E.D.Pa.,1999.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                        Page 12
Not Reported in F.Supp.2d, 1999 WL 1129630 (E.D.Pa.), 2000 A.M.C. 709
**(Cite as: Not Reported in F.Supp.2d)**


Foster Wheeler Energy Corp. v. Intermarine,
Inc.
Not Reported in F.Supp.2d, 1999 WL
1129630 (E.D.Pa.), 2000 A.M.C. 709

Briefs and Other Related Documents (Back to
top)

• 2:98cv05106 (Docket) (Sep. 25, 1998)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.                                                                Page 1
Not Reported in F.Supp., 1993 WL 21232 (E.D.Pa.), 25 Fed.R.Serv.3d 289
**(Cite as: Not Reported in F.Supp.)**

**H**
Briefs and Other Related Documents
Engel v. MinissaleE.D.Pa.,1993.
United States District Court, E.D.
Pennsylvania.
Scott W. ENGEL and Geraldine Hart Engel,
Plaintiffs,
v.
Anthony A. MINISSALE, D.O. and
Metropolitan Hospital-Parkview Division
and John Doe Friedman, D.O., Defendants.
**Civ. A. No. 90-4400.**

Jan. 29, 1993.

Donald J.P. Sweeney, Sweeney, Sheehan &
Spencer, Andrew Siegeltuch, Philadelphia,
PA, for plaintiffs.
Naomi Plakins O'Neill, Law Offices of Naomi
Plakins O'Neill, Doylestown, PA, Donald J.
Matthews, Jr., Goldfein & Joseph, Dean F.
Murtagh, German, Gallagher & Murtagh,
Philadelphia, PA, James Lewis Griffith,
Griffith & Burr, Bala Cynwyd, PA, for
defendants.

MEMORANDUM
ROBERT F. KELLY, District Judge.
**\*1** This medical malpractice action was
commenced on July 2, 1990 and arose out of
the allegedly negligent performance of a
bilateral hernia repair. Plaintiffs named John
Doe Friedman, D.O. as a Defendant in their
Complaint. Plaintiffs now seek leave to

amend their Complaint to name David
Friedman, D.O. as the proper defendant. For
the reasons set forth below, Plaintiffs' Motion
for Leave to Amend their Complaint is hereby
denied.

**\*1** Plaintiffs allege that Defendant Anthony
A. Minissale, D.O. ("Defendant Minissale")
performed bilateral indirect inguinal
hernioplasties on Plaintiff Scott W. Engel
("Plaintiff") on or about March 31, 1969.
Plaintiffs also allege that Defendant John Doe
Friedman, D.O. assisted Defendant Minissale
in performing this bilateral indirect inguinal
hernioplasties on Plaintiff and/or may have
performed certain portions of the operation
himself. Plaintiffs further maintain that on
October 5, 1988 and January 25, 1989
exploratory surgeries performed on Plaintiff
established that the cause of Plaintiff's
azoospermia [FN1] was the severance of his right
and left vas deferens which occurred during
the bilateral indirect inguinal herniplasties
performed in March of 1969.

**\*1** As stated above, this case was commenced
on July 2, 1990. During the pendency of this
case, Defendant Metropolitan
Hospital-Parkview Division ("Defendant
Metropolitan") entered bankruptcy
proceedings and on October 10, 1990, this
Court entered an Order suspending the case
until the bankruptcy stay was lifted.
Furthermore, on November 26, 1990, this
Court entered an Order which stated in part
that Plaintiffs had forty-five (45) days from

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1993 WL 21232 (E.D.Pa.), 25 Fed.R.Serv.3d 289
**(Cite as: Not Reported in F.Supp.)**

Page 2

the date the bankruptcy stay was lifted in which to serve the Summons and Complaint on Defendant John Doe Friedman, D.O. The bankruptcy stay was lifted on or about October 30, 1991. On October 5, 1992, during the deposition of Defendant Minissale, Defendant Minissale identified John Doe Friedman, D.O. as David Friedman, D.O. of Lansdale, Pennsylvania. Plaintiffs thereafter filed this Motion for Leave to Amend their Complaint on October 27, 1992.

**\*1** Plaintiffs maintain that they should be permitted to amend their Complaint pursuant to <u>Rule 15(a) of the Federal Rules of Civil Procedure</u>. <u>Rule 15(a)</u> provides that leave to amend a complaint "shall be freely given when justice so requires." However, in the present case, the statute of limitations on Plaintiffs' claims has already expired. Under Pennsylvania law, the statute of limitations for a medical malpractice action is two years. <u>42 Pa.C.S.A. § 5524</u>. At the latest, Plaintiffs knew or should have known of their potential claims on January 25, 1989. Plaintiffs filed this Motion for Leave to Amend their Complaint to add David Friedman, D.O. as a defendant on October 27, 1992. Therefore, allowing Plaintiffs to amend their Complaint to add David Friedman, D.O. will have no effect absent a "relation back" of the amendment to the date of the original filing on July 2, 1990.

**\*2** <u>Rule 15(c) of the Federal Rules of Civil Procedure</u> governs when an amendment relates back to the original pleading. <u>Rule 15(c)</u> provides in relevant part that:

**\*2** An amendment of a pleading relates back to the date of the original pleading when

**\*2** (2) the claim or defense asserted in the amended pleading arose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading, or

**\*2** (3) the amendment changes the party or the naming of the party against whom a claim is asserted if the foregoing provision (2) is satisfied and, within the period provided by Rule 4(j) for service of the summons and complaint, the party to be brought in by amendment (A) has received such notice of the institution of the action that the party will not be prejudiced in maintaining a defense on the merits, and (B) knew or should have known that, but for a mistake concerning the identity of the proper party, the action would have been brought against the party.

**\*2** <u>Fed.R.Civ.P. 15(c)</u>. <u>Rule 4(j) of the Federal Rules of Civil Procedure</u> requires that service of the summons and complaint be made within 120 days of the filing of the complaint or longer if good cause can be shown by the plaintiff. The Third Circuit has held that "[r]eplacing a 'John Doe' caption with a party's real name amounts to 'changing a party' within the meaning of <u>Rule 15(c)</u>." <u>*Varlack v. SWC Caribbean, Inc.,* 550 F.2d 171, 174 (3d Cir.1977)</u>. This type of an amendment will relate back only if the requirements of <u>Rule 15(c)</u> are met. *Id.*

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1993 WL 21232 (E.D.Pa.), 25 Fed.R.Serv.3d 289
**(Cite as: Not Reported in F.Supp.)**

**\*2** This Court must determine whether Plaintiffs have met their burden under Rule 15(c). Pursuant to Rule 15(c), Plaintiffs must establish three requirements. First, Plaintiff must establish that the cause of action in the proposed amended complaint arises out of the same facts as the original complaint. Second, Plaintiff must establish that the proposed defendant had notice of the proposed action within 120 days of the filing of the complaint or longer for good cause shown. Third, Plaintiff must establish that the proposed defendant knew or should have known within this same period that, but for a mistake in the identity of the party, the action would have been brought against the proper party.

**\*2** The first requirement has been met in this case. The cause action in the proposed amended complaint arises out of the same facts as the original complaint, *i.e.*, the allegedly negligent performance of Plaintiff's bilateral hernia repair. In regard to the second requirement, Plaintiffs have presented no evidence that Dr. David Friedman received any express notice of this action such as a letter or a copy of the complaint within the applicable time period. The next question is whether sufficient facts exist in the record from which to conclude that there was constructive notice within the applicable time period. *See Hurst v. Beck,* No. 91-2492, 1992 WL 189496, at \* 3 (E.D.Pa. Aug. 3, 1992) (citations omitted).

**\*3** In *Hurst,* the plaintiff claimed sexual discrimination under Title VII. The plaintiff's complaint was based upon alleged discriminatory statements made by defendant Dr. Beck and defendant Dr. John Doe to the plaintiff's potential employer. The plaintiff later determined that the identity of Dr. John Doe was Dr. Tsaltas. The plaintiff sought leave to file a second amended complaint naming Dr. Tsaltas as the proper defendant. The *Hurst* court found that Dr. Tsaltas had received constructive notice of the action within 120 days of the filing of the complaint. *Id.* at \* 4. Drs. Tsaltas and Beck were both members of the Obstetrics and Gynecology Department at Pennsylvania Hospital. The court stated that due to the size of the department, the fact that both doctors supervised the plaintiff and only one doctor was sued, there was an inference that Dr. Tsaltas received notice of the pending action. Moreover, the court went on to state that **\*3** [t]he fact that the plaintiff specifically alleged that the John Doe defendant was an attending physician and made specific allegations regarding the defendant's statements raises the inference that Dr. Tsaltas knew that but for the mistaken identity, he would be a defendant in the pending that suit.

**\*3** *Id.* The court, applying the Rule 12(b)(6) standard, found that the plaintiff had met her burden under Rule 15(c) and demonstrated sufficient notice under subsection (c)(2) and the defendant's knowledge of the mistaken identity under subsection (c)(3). *Id.*

**\*3** This case is clearly distinguishable from *Hurst.* In the present case, Plaintiffs have not established that Dr. Friedman received any constructive notice of this action within the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                          Page 4
Not Reported in F.Supp., 1993 WL 21232 (E.D.Pa.), 25 Fed.R.Serv.3d 289
**(Cite as: Not Reported in F.Supp.)**

applicable time period. The allegedly negligent surgery in this case occurred in 1969. Dr. Friedman no longer works at Defendant Metropolitan. No evidence exists in the record from which to infer that Dr. Friedman had any reason to know of the pending action. I conclude that Plaintiffs have not met their burden under Rule 15(c). Plaintiffs have failed to demonstrate that Dr. David Friedman had sufficient notice under subsection (c)(2) and his knowledge of the mistaken identity under subsection (c)(3).

**\*3** Moreover, Plaintiffs are not entitled to a "relation back" for good cause shown. Based upon the present record, it appears that Plaintiffs were not diligent in their efforts to ascertain the identity of Dr. John Doe Friedman. Plaintiffs filed this action on July 2, 1990. This Court entered an Order which stated in part that Plaintiffs had forty-five (45) days from the date the bankruptcy stay was lifted in which to serve the Summons and Complaint on Defendant John Doe Friedman, D.O. The bankruptcy stay was lifted on or about October 30, 1991. It was not until October 5, 1992 that Plaintiffs deposed Defendant Minissale who identified John Doe Friedman, D.O. as David Friedman, D.O. of Lansdale, Pennsylvania.

**\*3** Therefore, I shall enter the following Order:

ORDER

**\*4** AND NOW, this 29th day of January,

1993, upon consideration of Plaintiffs' Motion for Leave to File an Amended Complaint, it is hereby ORDERED that said Motion is DENIED.

> FN1. Plaintiff was evaluated for infertility through much of 1988 and 1989. Plaintiffs allege that semen analyses performed during this period demonstrated that he suffered from azoospermia.

E.D.Pa.,1993.
Engel v. Minissale
Not Reported in F.Supp., 1993 WL 21232 (E.D.Pa.), 25 Fed.R.Serv.3d 289

Briefs and Other Related Documents (Back to top)

• 2:90cv04400 (Docket) (Jul. 03, 1990)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Slip Copy
Slip Copy, 2006 WL 1653143 (D.Del.)
**(Cite as: Slip Copy)**

Page 1

**C**
Briefs and Other Related Documents
Turn of the Century Solution, L.P. v.
International Rectifier
Corp.D.Del.,2006.Only the Westlaw citation
is currently available.
    United States District Court,D Delaware.
    TURN OF THE CENTURY SOLUTION,
L.P., Plaintiff,
    v.
    INTERNATIONAL RECTIFIER
    CORPORATION, Defendant.
    **No. Civ. 05-816-SLR.**

June 15, 2006.

Jack B. Blumenfeld, Morris, Nichols, Arsht &
Tunnell,Wilmington, DE, for Plaintiff.
Richard L. Horwitz, Kenneth Laurence
Dorsney, Potter Anderson & Corroon, LLP,
Wilmington, DE, for Defendant.

MEMORANDUM ORDER
ROBINSON, J.
**\*1** At Wilmington this 15th day of June, 2006,
having considered defendant's motion to
transfer and the papers submitted in
connection therewith;

**\*1** IT IS ORDERED that said motion to
transfer (D.I.9) is denied, for the reasons that
follow:

**\*1** 1. Introduction. On November 29, 2005,

plaintiff Turn of the Century Solution, L.P.
("TOCS") filed a complaint for patent
infringement against defendant International
Rectifier Corporation ("IRC"). (D.I.1) The
patents-in-suit are U.S. Patent No. 5,600,836
and U.S. Patent No. 5,835,909 (collectively
"patents-in-suit") (*Id.*) TOCS contends that
IRC conceded infringement of the
patents-in-suit during its defense of a 2004
California state breach of contract case.<sup>FN1</sup>
IRC filed an answer and asserted several
affirmative defenses. (D.I.6) IRC then filed
this motion to transfer to the Central District
of California. (D.I.9, 10) TOCS opposes the
motion (D.I.12) and IRC has filed its reply.
(D.I.14)

> FN1. *Anthony Sneed v. Niel
> Armstrong and International Rectifier
> Corporation,* Los Angeles Superior
> Court Case No. BC 296142.

**\*1** 2. Background. TOCS is a Pennsylvania
limited partnership with its principal place of
business in Ambler, Pennsylvania. (D.I. 1 at ¶
1) It has no employees and its annual revenue
has never exceeded $500,000 during its
decade of existence. (D.I. 12 at 6)

**\*1** 3. IRC is a Delaware corporation with its
principal place of business in El Segundo,
California. (D.I. 1 at ¶ 2) IRC has 6,000
employees in twenty countries and at least
four states and had a revenue of over one
billion dollars in fiscal 2005. (D.I. 12 at 6)

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2006 WL 1653143 (D.Del.)
(Cite as: Slip Copy)

IRC does not have any offices or employees in Delaware. (D.I. 10 at 1)

*1 4. In 2004, IRC was sued for breach of a Non-Disclosure Agreement by Anthony Sneed for its purported use of Sneed's Y2K remediation. (D.I. 11 at 2) IRC defended the *Sneed* case by showing that the Y2K remediation it used was a technique previously described in the patents-in-suit. (*Id.*) TOCS alleges that IRC's description of its Y2K remediation technique during its defense of the *Sneed* case was a concession to infringing on the patents-in-suit. IRC indicates that its four witnesses to testify in the *Sneed* case regarding its Y2K remediation technique are also "percipient to the facts showing non-infringement in this case." (*Id.*) All four witnesses currently reside in California, and only two of the four are currently IRC employees. (*Id.* at 2-3)

*1 5. Standard of Review. Under 28 U.S.C. § 1404(a), a district court may transfer any civil action to any other district where the action might have been brought for the convenience of parties and witnesses and in the interests of justice. Congress intended through § 1404 to place discretion in the district court to adjudicate motions to transfer according to an individualized, case-by-case consideration of convenience and the interests of justice. *Stewart Org., Inc. v. Ricoh Corp.,* 487 U.S. 22, 29, 108 S.Ct. 2239, 101 L.Ed.2d 22 (1988); *Affymetrix, Inc. v. Synteni, Inc.,* 28 F.Supp.2d 192, 208 (D.Del.1998).

*1 6. The burden of establishing the need to

transfer rests with the movant "to establish that the balance of convenience of the parties and witnesses strongly favors the defendants." *Bergman v. Brainin,* 512 F.Supp. 972, 973 (D.Del.1981) (citing *Shutte v. Armco Steel Corp.,* 431 F.2d 22, 25 (3d Cir.1970). "Unless the balance is strongly in favor of a transfer, the plaintiff's choice of forum should prevail", *ADE Corp. v. KLA-Tencor Corp.,* 138 F.Supp.2d 565, 567 (D.Del.2001); *Shutte,* 431 F.2d at 25.

*2 7. The deference afforded plaintiff's choice of forum will apply as long as a plaintiff has selected the forum for some legitimate reason. *C.R. Bard, Inc. v. Guidant Corp.,* 997 F.Supp. 556, 562 (D.Del.1998); *Cypress Semiconductor Corp. v. Integrated Circuit Systems, Inc.,* 2001 WL 1617186 (D.Del. Nov.28, 2001); *Continental Cas. Co. v. American Home Assurance Co.,* 61 F.Supp.2d 128, 131 (D.Del.1999). Although transfer of an action is usually considered as less inconvenient to a plaintiff if the plaintiff has not chosen its " 'home turf' or a forum where the alleged wrongful activity occurred, the plaintiff's choice of forum is still of paramount consideration, and the burden remains at all times on the defendants to show that the balance of convenience and the interests of justice weigh strongly in favor of transfer." *In re M.L.-Lee Acquisition Fund II, L.P.,* 816 F.Supp. 973, 976 (D.Del.1993).

*2 8. The Third Circuit Court of Appeals has indicated that the analysis for transfer is very broad. *Jumara v. State Farm Ins. Co.,* 55 F.3d 873, 879 (3d Cir.1995). Although

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                    Page 3
Slip Copy, 2006 WL 1653143 (D.Del.)
**(Cite as: Slip Copy)**

emphasizing that "there is no definitive formula or list of factors to consider," *id.*, the Court has identified potential factors it characterized as either private or public interests. The private interests include: "(1) plaintiff's forum preference as manifested in the original choice; (2) defendant's preference; (3) whether the claim arose elsewhere; (4) the convenience of the parties as indicated by their relative physical and financial condition; (5) the convenience of the witnesses but only to the extent that the witnesses may actually be unavailable for trial in one of the fora; and (6) location of books and records (similarly limited to the extent that the files could not be produced in the alternative forum)." *Id.* (citations omitted).

**\*2** 9. The public interests include: "(1) the enforceability of the judgment; (2) practical considerations that could make the trial easy, expeditious or inexpensive; (3) the relative administrative difficulty in the two fora resulting from court congestion; (4) the local interest in deciding local controversies at home; (5) the public policies of the fora; and (6) the familiarity of the trial judge with the applicable state law in diversity cases." *Id.* (citations omitted).

**\*2** 10. Discussion. IRC asserts that the most compelling reason to transfer the case is that its four key witnesses reside in California, and two of the four are third-party witnesses not within the subpoena power of the court. (D.I. 10 at 5) IRC further argues that its burden and expense would be greatly reduced by litigating in California, where the witnesses

and evidence are located and where the alleged infringement occurred. (*Id.* at 7) IRC also contends that plaintiff's choice of forum should be given little deference because plaintiff has "no alleged connection to Delaware." (*Id.* at 5)

**\*2** 11. TOCS opposes the motion to transfer on several grounds. TOCS first points out that its principal place of business is only 33 miles from Wilmington, Delaware in Ambler, Pennsylvania, so its choice of forum should be afforded deference because Delaware is considered its "home turf." (D.I. 12 at 4) TOCS contends that it had legitimate reasons to file suit in Delaware based on its geographic proximity and past experiences with this jurisdiction. (*Id.* at 4-5) Further, since IRC is a Delaware corporation enjoying all the benefits and protections of this state's laws, it cannot credibly contend that litigation in the state is inconvenient. (*Id.* at 5)

**\*3** 12. Weighing the arguments against the *Jumara* balancing test, the court finds that the asserted advantages of moving the case to the Central District of California are insufficient to warrant a transfer. Defendant's complaints about litigating here are outweighed by the fact that IRC has enjoyed the benefits and protections of incorporation in Delaware and that the state has an interest in litigation regarding companies incorporated within its jurisdiction.

**\*3** 13. IRC has demonstrated that it would be more costly and more inconvenient for its four main witnesses from the *Sneed* case to provide

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                Page 4
Slip Copy, 2006 WL 1653143 (D.Del.)
**(Cite as: Slip Copy)**

testimony in Delaware. Considering that discovery can be conducted at any location convenient to the parties and their employees, the only event that will take place in Delaware is the trial. The travel expenses and inconveniences incurred for that purpose, by a Delaware defendant conducting world-wide business, is not overly burdensome. Regarding IRC's two witnesses outside of the court's subpoena power, IRC has not attempted to show that either would be unwilling to travel to Delaware to testify. Rather, IRC merely speculates that the time required for cross-country travel would be too burdensome for these two witnesses to be able to testify in Delaware [FN2] (D.I. 14 at 4)

> FN2. From a practical standpoint, much of the testimony presented at trial these days is presented via recorded depositions, as opposed to witnesses traveling and appearing live. There certainly is no obstacle to IRC's embracing this routine trial practice.

**\*3 14.** IRC devotes much of its argument to showing why the plaintiff's choice of forum should be given little or no deference by the court. IRC first downplays the significance of the court's "home turf" rule and then contends that the location of the alleged infringement is the preferred forum for litigation. (D.I. 14 at 4-6) In doing so, IRC relies almost exclusively on cases outside this jurisdiction while ignoring the case law within this jurisdiction that gives great deference to the plaintiff's choice of forum. *See, e.g., C.R.*

*Bard, Inc., 997 F.Supp. at 562.*

**\*3 15.** Conclusion. For the reasons stated, defendant's motion to transfer (D.I.9) is denied.

D.Del.,2006.
Turn of the Century Solution, L.P. v. International Rectifier Corp.
Slip Copy, 2006 WL 1653143 (D.Del.)

Briefs and Other Related Documents (Back to top)

• 2006 WL 1199996 (Trial Motion, Memorandum and Affidavit) Reply Brief of Defendant International Rectifier Corporation in Support of its Motion to Transfer (Mar. 31, 2006) Original Image of this Document (PDF)
• 2006 WL 1199995 (Trial Motion, Memorandum and Affidavit) Plaintiff's Answering Brief in Opposition to Defendant's Motion to Transfer (Mar. 17, 2006) Original Image of this Document (PDF)
• 2006 WL 1199994 (Trial Motion, Memorandum and Affidavit) Opening Brief of Defendant International Rectifier Corporation in Support of its Motion to Transfer (Mar. 3, 2006) Original Image of this Document (PDF)
• 1:05cv00816 (Docket) (Nov. 29, 2005)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2006 U.S. Dist. LEXIS 46910, *

LEXSEE 2006 US DIST LEXIS 46910

## ZOETICS, INC. and ZOEMAIL, LLC, Plaintiffs, v. YAHOO!, INC., Defendant.

### Civil Action No. 06-108-JJF

### UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE

### *2006 U.S. Dist. LEXIS 46910*

### July 6, 2006, Decided

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff patent owners sued defendant for patent infringement. Defendant moved to stay the action and to transfer under *28 U.S.C.S. § 1404(a)* to the Southern District of New York.

**OVERVIEW:** The owners claimed that defendant had infringed two patents that the owners purchased from a third party. One of the owners had filed for Chapter 11 bankruptcy in the United States Bankruptcy Court for the Southern District of New York, and the third party had filed a claim based on a purported security interest in the patents. The bankruptcy court had granted the debtor owner leave to pursue its intellectual property claims. The instant court found that a stay was unwarranted because there was no indication that the issue of patent ownership would be imminently resolved in the bankruptcy court; also, a stay would prevent the debtor owner from timely carrying out its reorganization plan. Transfer under § 1404(a) also was unwarranted; although two of the attorneys who prosecuted the patents were allegedly outside the instant court's subpoena power under *Fed. R. Civ. P. 45(b)(2)*, that factor did not outweigh the paramount consideration of the owners' choice of forum. The owners' decision to file suit in

the state where defendant was incorporated was rational, legitimate, and entitled to deference.

**OUTCOME:** Defendant's motion to stay and to transfer was denied.

**CORE TERMS:** convenience, ownership, patent, weigh, subpoena power, choice of forum, secured claim, bankruptcy proceeding, intellectual property, issue of patent, local interest, prosecuting, transferee, weighing, travel, judicial efficiency, patent infringement, judicial economy, simplify, militate, venue, legitimate reason, important factor, incorporation, disadvantage, measurement, unavailable, paramount, choosing, admits

### LexisNexis(R) Headnotes

*Civil Procedure > Judicial Officers > Judges > Discretion*
*Civil Procedure > Pretrial Matters > General Overview*
[HN1] A court has the inherent power to conserve judicial resources by controlling its own docket, and the decision to stay a case is firmly within the discretion of the court. In ruling on a motion to stay, courts are guided by three factors: (1) whether a stay would unduly prejudice or present a clear tactical

Case 1:07-cv-00067-MPT    Document 14-3    Filed 03/15/2007    Page 44 of 60

Page 2
2006 U.S. Dist. LEXIS 46910, *

disadvantage to the non-moving party; (2) whether a stay will simplify the issues in question and trial of the case; and (3) whether discovery is complete and whether a trial date has been set.

*Civil Procedure > Venue > Federal Venue Transfers > Convenience Transfers*

[HN2] *28 U.S.C.S. § 1404(a)* permits a court to transfer a case to any other district where it might have been brought for the convenience of parties and witnesses or in the interest of justice. The purpose of the statute is to prevent the waste of time, energy, and money and to protect litigants, witnesses, and the public against unnecessary inconvenience and expense.

*Civil Procedure > Venue > Federal Venue Transfers > Convenience Transfers*

[HN3] In considering a *28 U.S.C.S. § 1404(a)* transfer, a court must balance a number of private and public interests. The relevant private interests are: (1) the plaintiff's choice of forum, (2) the defendant's preferred forum, (3) whether the claim arose elsewhere, (4) the convenience of the expected witnesses, but only so far as the witnesses might be unavailable for trial if the trial is conducted in a certain forum, and (5) the location of books and records, to the extent that these books and records could not be produced in a certain forum. The relevant public interests are: (1) the enforceability of the judgment, (2) practical considerations regarding the ease, speed, or expense of the trial, (3) the administrative difficulty due to court congestion, (4) the local interest in deciding local controversies in the home forum, (5) the public policies of the two fora, and (6) the trial judge's familiarity with the applicable state law in diversity cases.

*Civil Procedure > Venue > Federal Venue Transfers > Convenience Transfers*

*Civil Procedure > Venue > Motions to Transfer > Choice of Forum*
*Civil Procedure > Pretrial Matters > Subpoenas*
*Evidence > Procedural Considerations > Burdens of Proof > Allocation*

[HN4] When ruling on a motion to transfer under *28 U.S.C.S. § 1404(a)*, a court must balance all of the relevant factors and respect that a plaintiff's choice of forum is entitled to substantial deference and should not be lightly disturbed. The moving party has the burden to establish that the balance of interests strongly weighs in favor of the transfer, and the transfer will be denied if the factors balance evenly or weigh only slightly in favor.

*Civil Procedure > Venue > Federal Venue Transfers > Convenience Transfers*

*Civil Procedure > Venue > Motions to Transfer > Convenience of Witnesses*

[HN5] Convenience of the expected trial witnesses is the most important factor to consider when determining whether or not transfer under *28 U.S.C.S. § 1404(a)* is appropriate. Though the convenience of the non-party witnesses is only an issue to the extent that the witnesses may actually be unavailable for trial, it is sufficient for purposes of venue transfer analysis if the witness is not subject to a court's subpoena power.

*Civil Procedure > Pretrial Matters > Subpoenas*

[HN6] A district court has the power to subpoena a witness who can be served within its district, or at a place within 100 miles of the courthouse. *Fed. R. Civ. P. 45(b)(2)*.

*Civil Procedure > Pretrial Matters > Subpoenas*

[HN7] In determining whether a witness falls within a federal district court's subpoena power, Delaware courts apply the modern

Case 1:07-cv-00067-MPT    Document 14-3    Filed 03/15/2007    Page 45 of 60

Page 3
2006 U.S. Dist. LEXIS 46910, *

approach, which measures distance by a straight line on a map, as this method is the better construction of *Fed. R. Civ. P. 45* and is easier to apply in practice.

*Civil Procedure > Venue > Motions to Transfer > Convenience of Witnesses*
*Civil Procedure > Pretrial Matters > Subpoenas*
[HN8] For purposes of a motion to transfer under *28 U.S.C.S. § 1404(a)*, a defendant bears no burden to show that the witnesses it plans to subpoena would be "reluctant" to testify. It is sufficient that the witness is not subject to a court's subpoena power.

*Civil Procedure > Venue > Motions to Transfer > Choice of Forum*
[HN9] In deciding whether to transfer a case under *28 U.S.C.S. § 1404(a)*, a plaintiff's choice of forum is a paramount consideration not to be lightly disturbed. While the plaintiff's choice of forum is generally given less deference where the plaintiff has not chosen his home turf, a defendant's incorporation in the chosen forum is a rational and legitimate reason for choosing the forum that cannot be disregarded. Having incorporated in the forum state, the defendant should not complain that another corporation has chosen to sue it there.

*Civil Procedure > Venue > Federal Venue Transfers > Convenience Transfers*
*Civil Procedure > Venue > Motions to Transfer > General Overview*
*Patent Law > General Overview*
[HN10] For purposes of a motion to transfer under *28 U.S.C.S. § 1404(a)*, patent rights are not local or state matters and therefore cannot give rise to a local controversy or implicate local public policy.

**COUNSEL:** [*1] Josy W. Ingersoll, Esquire, Karen L. Pascale, Esquire, and Elena C.

Norman, Esquire of YOUNG CONAWAY STARGATT & TAYLOR LLP, Wilmington, Delaware. Of Counsel: Paul K. Vickrey, Esquire, Douglas M. Hall, Esquire, and Frederick C. Laney, Esquire, of NIRO, SCAVONE, HALLER & NIRO, Chicago, Illinois, for Plaintiff.

Mary B. Graham, Esquire, of MORRIS, NICHOLS, ARSHT & TUNNELL LLP, Wilmington, Delaware. Of Counsel: Michael A. Jacobs, Esquire, of MORRISON & FOERSTER LLP, San Francisco, California. Matthew M. D'Amore, Esquire, and Kyle W.K. Mooney, Esquire, of MORRISON & FOERSTER LLP, New York, New York, for Defendants.

For Zoemail LLC, Plaintiff: Karen L. Pascale, Young Conaway Stargatt & Taylor, LLP, Wilmington, DE.

**JUDGES:** Joseph J. Farnan Jr., District Judge.

**OPINION BY:** Joseph J. Farnan Jr.

**OPINION:**

### MEMORANDUM OPINION

July 6, 2006
Wilmington, Delaware

Joseph J. Farnan Jr.
**Farnan, District Judge**

Pending before the Court is Defendant's Motion To Stay Action And Transfer Action To The Southern District Of New York. (D.I. 10.) For the reasons set forth below, the Court will deny the Motion.

### BACKGROUND

Plaintiffs ZoEmail, a Delaware limited liability company, and [*2] Zoetics, a New York corporation, filed this action seeking damages, attorneys' fees, and injunctive relief from Defendant, a Delaware corporation, for its

Case 1:07-cv-00067-MPT    Document 14-3    Filed 03/15/2007    Page 46 of 60

Page 4
2006 U.S. Dist. LEXIS 46910, *

alleged infringement of two patents Plaintiffs recently purchased from AT&T, Inc. (D.I. 1.) On October 20, 2004, sixteen months before filing its Complaint, Zoetics filed for Chapter 11 bankruptcy in the United States Bankruptcy Court for the Southern District of New York. According to Defendant, Zoetics' resort to bankruptcy was spurred at least partially by its inability to pay AT&T for the patents it purchased. (D.I. 11 at 5.) In Bankruptcy Court, Zoetics announced its intention to emerge from bankruptcy by "realizing value from its Intellectual Property" by first "seeking a license with certain significant parties which have infringed upon its intellectual property" and thereafter retaining counsel to sue for infringement. (D.I. 13, Ex. 8 at 2-3.) According to Defendant, it is one of the "significant parties" to which Zoetics was referring. (D.I. 11 at 7.)

AT&T has filed a secured claim against Zoetics in Bankruptcy Court based on a purported security interest it retained in the Patents-in-Suit. Plaintiffs dispute the validity [*3] of AT&T's secured claim. (D.I. 16 at 4-5.) Meanwhile, the Bankruptcy Court has granted Zoetics leave to retain counsel to pursue its intellectual property claims. (D.I. 13, Ex. 10 at 4.)

## DISCUSSION

### I. Motion to Stay Action

Defendant contends that the Court should stay this action until the ownership of the Patents-in-Suit is resolved in the New York Bankruptcy Court because it will simplify the issues before this Court, it will not unduly prejudice Plaintiffs, and this proceeding is still at an early stage. Plaintiffs respond that no litigation regarding the ownership of the Patents-in-Suit is pending in the New York Bankruptcy Court, and that they would be prejudiced by a stay at this time. Because there is no indication that the issue of patent ownership will be imminently resolved in the Bankruptcy Court and because granting a stay

will prejudice Plaintiffs, the Court will deny Defendant's Motion to Stay.

### A. Legal Standard

[HN1] A Court has the "inherent power to conserve judicial resources by controlling its own docket," *Cost Bros., Inc. v. Travelers Indem. Co., 760 F.2d 58, 60 (3d Cir. 1985)*, and the decision to stay a case is firmly within [*4] the discretion of the Court. Pegasus Development Corp. v. DirecTV, Inc., 2003 U.S. Dist. LEXIS 8052, at *3 (D. Del. May 14, 2003). In ruling on a motion to stay, courts are guided by three factors: "(1) whether a stay would unduly prejudice or present a clear tactical disadvantage to the non-moving party; (2) whether a stay will simplify the issues in question and trial of the case; and (3) whether discovery is complete and whether a trial date has been set." 2003 U.S. Dist. LEXIS 8052, at *3-4 (quoting *Xerox Corp. v. 3Com Corp., 69 F.Supp. 2d 404, 406 (W.D.N.Y. 1999)*)f.

### B. Analysis

Defendant is arguing for a stay pending a decision regarding ownership of the Patents-in-Suit by the Bankruptcy Court. Defendant bases its argument on a claim filed by AT&T, an alleged secured creditor of Zoetics. Leaving aside the fact that Plaintiffs dispute the validity of the secured claim (D.I. 16 at 4-5), Defendant has not pointed to any precedent granting a stay under such circumstances. Furthermore, there is nothing to indicate when the Bankruptcy Court will take up the issue of ownership, or even if it plans to do so at all. In fact, the Bankruptcy Court has allowed Zoetics [*5] to retain special intellectual property counsel to "prosecut[e] enforcement actions regarding the Intellectual Property Rights" (D.I. 13, Ex. 9 at 2), though Zoetics ultimately made plain its intention to recover on its intellectual property as part of its emergence strategy. (D.I. 13, Ex. 8 at 2.)

Defendant contends that granting a stay in this case will advance the objective of judicial economy (D.I. 11 at 10) without prejudicing

Plaintiffs. ( Id. at 12.) The Court disagrees. Staying the action pending a non-parallel proceeding in which the issue in question may be addressed n1 leaves too much uncertainty to substantially advance judicial economy. The Bankruptcy Court has not evidenced an intention to take up the patent ownership issue; rather, it permitted Zoetics to retain patent counsel in order to pursue its claims.

> n1 Defendant repeatedly insists that the issue of patent ownership will be addressed by the Bankruptcy Court (D.I. 20 at 3) but can offer no support for that assertion except to say that Zoetics defaulted on its payment to AT&T and the latter has filed a secured claim in the Bankruptcy Proceeding. (Id.) All of the case law Defendant cites, on the other hand, involves pending proceedings that are either parallel, *Summa Four, 994 F. Supp. 575 at 581*, or directly related to the issue in dispute. *Landis v. N. Am Co., 299 U.S. 248, 57 S. Ct. 163, 81 L Ed. 153 (1966)*; *Commissariat a L'Energie Atomique v. Dell Computer Corp., 2004 U.S. Dist. LEXIS 9107, 2004 WL 1554382 (D. Del. May 13, 2004)*

[*6]

A secured claim in a bankruptcy proceeding, furthermore, is not tantamount to a challenge to Zoetics' patent ownership. Zoetics has announced its intention to sue on its patents to emerge from bankruptcy (D.I. 13, Ex. 8 at 2), and the Bankruptcy Court has not objected. It is therefore conceivable that, even if AT&T has a genuine secured claim, Zoetics could win a patent infringement suit, pay AT&T from the proceeds, and retain the patents. Granting a stay pending the resolution of the bankruptcy proceedings would prejudice Zoetics by preventing it from carrying its reorganization plan to completion in a timely fashion.

The Court concludes that granting a stay would not simplify the issues in this case with such certainty as to substantially advance judicial economy, and that it would prejudice and disadvantage Plaintiffs. Because neither of these factors weighs in favor of granting a stay, the Court is not persuaded that a stay is warranted because the case is still at an early stage. Accordingly, the Court will deny Defendant's Motion to Stay Action.

## II. Motion to Transfer Action

Defendant argues that substantial practical considerations, as well as other private and [*7] public factors, strongly favor transferring the action to the Southern District of New York. Plaintiffs contend that Defendant has not met its burden of clearly showing that transfer is appropriate. Because the Court agrees with Plaintiffs that the factors do not weigh heavily in favor of transfer, it will deny Defendant's Motion to Transfer.

### A. Standard of Law

[HN2] *28 U.S.C. § 1404 (a)* permits a court to transfer a case to any other district where it might have been brought n2 "for the convenience of parties and witnesses" or "in the interest of justice." The purpose of the statute is to "prevent the waste of time, energy, and money and to protect litigants, witnesses, and the public against unnecessary inconvenience and expense." *Van Dusen v. Barrack, 316 U.S. 612, 616, 84 S. Ct. 805, 11 L. Ed. 2d 945 (1964)*. [HN3] In considering a *§ 1404 (a)* transfer, the Court must balance a number of private and public interests. *Reyno v. Piper Aircraft Co., 630 F. 2d 149, 159 (3d Cir. 1980)*. The relevant private interests are:

> (1) the plaintiff's choice of forum, (2) the defendant's preferred forum, (3) whether the claim arose elsewhere, (4) the convenience of the [*8] expected witnesses, but only so far as the witnesses might be unavailable for trial if the trial is conducted in a certain forum,

2006 U.S. Dist. LEXIS 46910, *

and (5) the location of books and records, to the extent that these books and records could not be produced in a certain forum.

*Jumara v. State Farm Ins. Co., 55 F.3d 873, 883 (3d Cir. 1995)*. The relevant public interests are:

> (1) the enforceability of the judgment, (2) practical considerations regarding the ease, speed, or expense of the trial, (3) the administrative difficulty due to court congestion, (4) the local interest in deciding local controversies in the home forum, (5) the public policies of the two fora, and (6) the trial judge's familiarity with the applicable state law in diversity cases.

*Id.* [HN4] When ruling on a motion to transfer, a court must "balance all of the relevant factors and respect that a plaintiff's choice of forum is entitled to substantial deference and should not be lightly disturbed." Stratos Lightwave, Inc. v. E20 Communications, Inc., 2002 U.S. Dist. LEXIS 5653, at *5 (D. Del. Mar. 26, 2002). The moving party has the burden to establish that "the balance of interests [*9] strongly weighs in favor of the transfer," and the transfer will be denied if the factors balance evenly or weigh only slightly in favor. *Id.*

> n2 It is undisputed that this action could have been brought in the Southern District of New York. (D.I. 11 at 13.)

B. Practical Considerations

Defendant first contends that the public interests of practical considerations and judicial efficiency strongly favor transfer because the

District Court for the Southern District of New York will be "better positioned to manage the case if and when it is appropriate to proceed." (D.I. 11 at 15.) Defendant also argues that judicial efficiency militates for transfer because Defendant may have to ask the Bankruptcy Court to lift the automatic litigation stay to allow it to pursue counterclaims or file for reexamination of the Patents-in-Suit, a decision that would be reviewed by the District Court for the Southern District of New York. (Id. at 15-16.) Finally, Defendant argues that the transferee court would be better [*10] positioned to adjudicate any standing disputes with regard to ownership of the patents, since it would have already heard any related appeals from the Bankruptcy Court. (Id. at 16.)

The Court concludes that these considerations do not weigh strongly in favor of transfer. As an initial matter, many of Defendant's arguments rely on the proposition that the issue of patent ownership will be imminently resolved by the Bankruptcy Court, which the Court concluded, supra, is not the case. Moreover, while this Court has previously transferred an action to a district where a Chapter 11 case was pending, it did so in large part because the case depended on the interpretation of orders already issued by the transferee judge, and because the case involved administrative claims inextricably intertwined with the bankruptcy proceeding. Bank of America, N.A. v. US Airways, Inc., 2005 U.S. Dist. LEXIS 34902, at *8-9 (D. Del. Dec. 21, 2005).

In this case, there are no existing rulings by Defendant's proposed transferee court that are necessary to resolve the issues. Nor are the details of Zoetics' reorganization plan currently relevant, since the plan has not been filed yet. [*11] (See D.I. 11 at 12.) Ownership of the patents-in-suit has not been challenged in the New York courts, and there is no parallel litigation already in progress. Most importantly, the bankruptcy proceeding is before the Bankruptcy Court, not the District

Case 1:07-cv-00067-MPT    Document 14-3    Filed 03/15/2007    Page 49 of 60

Page 7
2006 U S. Dist. LEXIS 46910, *

Court, and were a transfer to be granted, the patent infringement case would not be heard by the judge who will be overseeing Zoetics' Chapter 11 case. Defendant attempts to avoid this problem by insisting that judicial efficiency would be advanced because the District Court "would have already heard any related appeals" (Id. at 16), but such speculation does not weigh strongly in favor of transfer. Defendant's argument that Defendant will need to petition the Bankruptcy Court to lift or modify the automatic litigation stay in order to file counterclaims or auxiliary claims runs into the same problem, and the argument that the District Court in the Southern District of New York would hear those appeals is again unpersuasive.

While it may have been marginally more expedient for this case to have been brought in the Southern District of New York, the considerations presented by Defendant do not militate in favor of transfer so [*12] as to outweigh Plaintiffs' choice of forum. Simply put, the Court can find no compelling reason why the District of Delaware is not an appropriate venue to resolve the issue of patent ownership. In fact, a resolution of the ownership dispute in this Court could as easily assist the Bankruptcy Court in carrying out its function.

C. Convenience and Availability of Non-Party Witnesses

Defendant argues that the convenience of non-party witnesses weighs strongly in favor of transfer. [HN5] "Convenience of the expected trial witnesses is the most important factor to consider when determining whether or not transfer is appropriate." *Memminger v. Infocure Corp.*, 2000 U.S. Dist. LEXIS 22077 at *12-13 (D. Del. Nov. 14, 2000). Though the convenience of the non-party witnesses is only an issue to the extent that the witnesses "may actually be unavailable for trial," *Mentor Graphics Corp. v. Quickturn Design Sys., 77 F. Supp. 2d 505, 510 (D. Del. 1999)*, "it is sufficient for purposes of venue transfer

analysis if the witness is not subject to a Court's subpoena power." *Nilssen v. OSRAM Sylvania, Inc.*, 2001 U.S. Dist. LEXIS 25570, at *8 (D. Del. [*13] May 1, 2001); see also *Anic v. DVI Fin Servs.*, 2004 U.S. Dist. LEXIS 11562, at *8 (D. Del. June 23, 2004) [HN6] The Court has the power to subpoena a witness who can be served within its District, or at a place within 100 miles of the courthouse. *Fed. R. Civ. P. 45(b)(2)*.

Most of the witnesses whose convenience Defendant claims strongly favors transfer are located in AT&T's Florham Park, New Jersey facility or in Berkeley Heights, New Jersey. (D.I. 11 at 18-20.) However, Defendant admits that both of these locations are within 100 miles of Wilmington, Delaware using a straight-line measurement. (Id. at 19.) Defendant argues that their presence still militates in favor of transfer because using an "ordinary and usual travel route" measurement puts them outside of the Court's subpoena power while they would be within the subpoena power of the transferee court by any measure. (Id.) Thus, transferring would "avoid later disputes." (Id. at 21.) There is, however, no genuine dispute that [HN7] Delaware courts apply the modern approach, which measures "distance by a straight line on a map," as this method is the better construction of *Rule 45* and is easier to apply [*14] in practice. *Hill v. Equitable Bank, Nat'l Ass'n, 115 F.R.D. 184, 186 (D. Del. 1987)*. By contrast, the cases cited by Defendant in favor of the "ordinary and usual travel route" approach are more than 50 years old and are from district courts outside of Delaware. (D.I. 11 at 20.) Thus, the Court concludes that these witnesses are within the subpoena power of the Court and considered available to testify for the purposes of venue transfer.

Defendant also asserts that two of the attorneys involved in prosecuting the Patents-in-Suit are outside the subpoena power of this Court, but within the subpoena power of the New York court, weighing heavily in favor of

transfer Defendant claims that these witnesses would testify to issues of claim construction and the validity and enforceability of the Patents-in-Suit.

In response, Plaintiffs argue that Defendant has not shown with sufficient specificity why the witnesses' testimony would be necessary, and that Defendant has not shown that either would be reluctant to travel to Delaware in order to testify. As to the first argument, the Court concludes that Defendant may have its reasons for calling the prosecuting attorneys, [*15] given the attorneys' first-hand involvement in prosecuting the patents and their knowledge thereof. (See D.I. 13, Ex. 17 and 18.) As to the second, [HN8] Defendant bears no burden to show that the witnesses it plans to subpoena would be "reluctant" to testify. "It is sufficient… [that] the witness is not subject to a Court's subpoena power." Nilssen, 2001 U.S. Dist. LEXIS 25570, at *8. Thus, the Court concludes that the convenience of the prosecuting attorneys is a factor weighing in favor of transfer.

D. Convenience of the Parties

Defendant argues that because Plaintiffs' principal place of business is mere blocks away from the District Court for the Southern District of New York, the convenience of the parties weighs in favor of transfer. However, [HN9] "a plaintiff's choice of forum is a paramount consideration not to be lightly disturbed." Mentor Graphics, 77 F. Supp. 2d at 509. Furthermore, while the plaintiff's choice of forum is generally given less deference where the plaintiff has not chosen his home turf, a defendant's incorporation in the chosen forum is "a rational and legitimate reason for choosing the forum" that cannot be disregarded. [*16] Stratos, 2002 U.S. Dist. LEXIS 5653, at *6-7. Having incorporated in the forum state, the defendant "should not now complain that another corporation has chosen to sue it here." 2002 U.S. Dist. LEXIS 5653 at *7.

Defendant in this case is incorporated in

Delaware and admits that "neither Delaware nor the Southern District of New York is significantly more convenient than the other" for itself. (D.I. 11 at 24). Thus, the convenience of Defendant is not a factor weighing in either direction. As for the convenience of Plaintiffs, they have chosen the forum of Defendant's incorporation - a "rational and legitimate" choice that is entitled to deference. Stratos, 2002 U.S. Dist. LEXIS 5653, at *7. The Court concludes that the convenience of the parties does not weigh in favor of transfer.

E. Local Interest in the Controversy

Finally, Defendant argues that because Zoetics is in bankruptcy in the Southern District of New York, the local interest in the controversy weighs in favor of transfer. However, as discussed supra, the bankruptcy proceeding and the patent infringement suit are neither identical nor parallel controversies. Further, as Defendant acknowledges, [HN10] "[p]atent [*17] rights are not local or state matters and therefore cannot give rise to a local controversy, or implicate local public policy." Stratos, 2002 U.S. Dist. LEXIS 5653, at *8; see also Trilegiant Loyalty Solutions, Inc. v. Maritz, Inc., 2005 U.S. Dist. LEXIS 2825, at *8 (D. Del. Feb. 15, 2005). Therefore, the Court concludes that the Southern District of New York does not have a local interest in the controversy.

F. Conclusion

Although "[c]onvenience of the expected trial witnesses is the most important factor to consider when determining whether or not transfer is appropriate," Memminger, 2000 U.S. Dist. LEXIS 22077 at *12-13, the Court concludes that the potential unavailability of the attorneys who prosecuted the patent - the sole factor weighing in favor of transfer - is insufficient to overcome the "paramount" consideration of Plaintiffs' choice of forum. Mentor Graphics, 77 F. Supp. 2d at 509. Plaintiffs had a legitimate reason for choosing to sue in Delaware, and Defendant has not

2006 U.S. Dist. LEXIS 46910, *

carried its burden of negating that choice. Accordingly, the Court will deny Defendant's Motion to Transfer Action to the District [*18]

Court for the Southern District of New York.

2002 U.S. Dist. LEXIS 5653, *

LEXSEE 2002 U.S. DIST. LEXIS 5653

**STRATOS LIGHTWAVE, INC., Plaintiff/Counterclaim Defendant, v. E2O COMMUNICATIONS, INC., Defendant/Counterclaim Plaintiff.**

**Civil Action No. 01-309-JJF**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE**

*2002 U.S. Dist. LEXIS 5653*

**March 26, 2002, Decided
March 26, 2002, Filed**

**DISPOSITION:** [*1] Motion to transfer venue to Central District Of California denied.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff patent owner filed an action against defendant alleged patent infringer claiming infringement of several United States patents. The alleged infringer moved to transfer venue.

**OVERVIEW:** After a consideration of the relevant private interests, the court concluded that the balance of the factors did not weigh strongly in favor of transfer. The alleged infringer incorporated in Delaware and that was a rational and legitimate reason for choosing to sue the alleged infringer in Delaware. Therefore, the patent owner's forum preference, as well as the alleged infringer's Delaware incorporation, weighed in favor of maintaining the action in Delaware. None of the public interests weighed in favor of transfer. Patent rights are not local or state matters, and therefore, cannot give rise to a local controversy, or implicate local public policy. Similarly, the familiarity of the trial judge with the application of state law was not applicable because it was a patent infringement action.

**OUTCOME:** The alleged infringer's motion to transfer venue was denied.

**CORE TERMS:** stratos, weigh, choice of forum, convenience, motion to transfer, substantial deference, inconvenient forum, subpoena power, faster, turf, legitimate reason, civil action, incorporation, disturbed, choosing, lightly, local interest, headquarters, familiarity, non-party, litigate, unduly

**LexisNexis(R) Headnotes**

*Civil Procedure > Venue > Federal Venue Transfers > Convenience Transfers*
[HN1] Transfer of a civil action is governed by *28 U.S.C.S. § 1404*(a).

*Civil Procedure > Venue > Federal Venue Transfers > General Overview*
[HN2] See *28 U.S.C.S. § 1404*(a).

*Civil Procedure > Venue > Federal Venue Transfers > Convenience Transfers*
[HN3] When reviewing a motion to transfer under *28 U.S.C.S. § 1404*(a) district courts must consider, among other things, private and

public interests. When determining whether or not transfer is warranted in the circumstances presented, district courts must balance all of the relevant factors and respect that a plaintiff's choice of forum is entitled to substantial deference and should not be lightly disturbed. The burden is upon the movant to establish that the balance of the interests strongly weigh in favor of transfer, and a transfer will be denied if the factors are evenly balanced or weigh only slightly in favor of the transfer.

*Civil Procedure > Venue > Federal Venue Transfers > Convenience Transfers*
[HN4] The private interests considered in a *28 U.S.C.S. § 1404* motion are: (1) a plaintiff's choice of forum; (2) a defendant's preferred forum; (3) whether the claim arose elsewhere; (4) the convenience of the parties due to their relative physical and financial conditions; (5) the convenience of the expected witnesses, but only so far as the witnesses might be unavailable for trial if the trial is conducted in a certain forum; and (5) the location of books and records, to the extent that these books and records could not be produced in a certain forum.

*Civil Procedure > Venue > Federal Venue Transfers > Convenience Transfers*
*Civil Procedure > Federal & State Interrelationships > Erie Doctrine*
[HN5] The public interests considered in a *28 U.S.C.S. § 1404* motion are: (1) the enforceability of the judgment; (2) practical considerations regarding the ease, speed, or expense of trial; (3) the administrative difficulty due to court congestion; (4) the local interest in deciding local controversies in the home forum; (5) the public policies of the two fora; and (6) the trial judge's familiarity with the applicable state law in diversity cases.

*Civil Procedure > Venue > Federal Venue*

*Transfers > General Overview*
[HN6] The transfer of a case will generally be regarded as less inconvenient to a plaintiff if the plaintiff has not chosen its home turf or a forum where the alleged wrongful activity occurred. However, it is not appropriate to disregard a plaintiff's choice of forum where it had a rational and legitimate reason for choosing the forum.

*Patent Law > Jurisdiction & Review > Personal Jurisdiction & Venue > General Overview*
[HN7] Patent rights are not local or state matters, and therefore, cannot give rise to a local controversy, or implicate local public policy.

COUNSEL: Attorneys for the plaintiff, Stratos Lightwave, Inc.: Joseph N. Hosteny, III, Arthur A. Gasey, Paul C. Gibbons, Niro, Scavone, Haller & Niro, Chicago, Illinois. Donald F. Parsons, Jr., Morris, Nichols, Arsht & Tunnell, Wilmington, DE.

Attorneys for the defendant, E2O Communications, Inc.: David P. Enziminger, Brett J. Williamson, David E. Lederman, O'Melveny & Meyers LLP, Los Angeles, California. William J. Wade, Richards, Layton & Finger, Wilmington, Delaware.

JUDGES: Joseph J. Farnan, UNITED STATES DISTRICT JUDGE.

OPINION BY: Joseph J. Farnan

OPINION:

### MEMORANDUM ORDER

Presently before the court is a Motion To Transfer Venue To The Central District of California (D.I. 11) filed by Defendant E2O Communications, Inc. ("E2O"). For the reasons discussed, the motion will be denied.

### BACKGROUND

Stratos Lightwave, Inc. ("Stratos") and E2O both manufacture and sell optoelectronic transciever modules which are used in computer networks. (D.I. 8 at 1). Stratos is a Delaware corporation with its headquarters in Chicago, Illinois and facilities in California. (D.I. 17 at 1). E2O is also incorporated [*2] in Delaware, but maintains its headquarters in Calabasas, California. (D.I. 8 at 2). The design and development of E2O's accused products is conducted in California, where the majority of E2O's domestic employees are located. (D.I. 8 at 2). The accused products are manufactured internationally, in Asia. (D.I. 8 at 2).

On May 5, 2001, Stratos filed this action against E2O alleging infringement of U.S. Patent Nos. 5,717,533, 5,734,558, 5,864,468, 5,879,173, Re. 36,820, 6,201,704B1, and 6,320,878B1. (D.I. 1). E2O subsequently filed the instant motion to transfer.

## DISCUSSION

By its motion, E2O contends that Delaware is an inconvenient forum because its corporate offices, where all the relevant documents and knowledgeable fact witnesses are located, are in California. (D.I. 8 at 7). E2O contends that litigation in Delaware would be not only expensive, but disruptive to the corporation. (D.I. 8 at 7). E2O further contends that Delaware is an inconvenient forum for the witnesses, none of whom reside in Delaware, and further that several non-party witnesses exist who would be beyond the Court's subpoena power. (D.I. 8 at 8). Additionally, E2O contends that the Central District of [*3] California is more convenient because the median time to trial is faster. (D.I. 8 at 11). Finally, E2O contends that California, not Delaware, has a local interest in deciding this controversy because the majority of the allegedly infringing activity took place in California. (D.I. 8 at 11). n1

n1  E2O continuously argues that Stratos' contacts with Delaware are "de

minimis, at best;" however, the Court finds this argument to be immaterial in the context of a motion to transfer.

In opposition, Stratos contends that its choice of forum is entitled to substantial deference. (D.I. 17 at 4). Stratos contends that although Delaware is not its home turf, it chose to sue E2O in Delaware because E2O is incorporated in this state. (D.I. 17 at 5). Stratos further contends that E2O, a successful international company, is capable of financing litigation in Delaware, and transferring this action to California would merely shift the burden of expense to Stratos. (D.I. 17 at 7). By E2O's failure to identify non-party witnesses [*4] beyond subpoena power, Stratos contends that the convenience of the witnesses does not weigh in favor of transfer. (D.I. 17 at 11-10). Stratos further contends that adjudication of this action, pursuant to the Court's Scheduling Order (D.I. 15), will be faster than in California, where a new scheduling order would be put in place. (D.I. 17 at 12).

[HN1] Transfer of a civil action is governed by *28 U.S.C. § 1404*(a) which provides, [HN2] "for the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought." The purpose of § 1404(a) is "to prevent the waste of time, energy, and money and to protect litigants, witnesses, and the public against unnecessary inconvenience and expense." *Van Dusen v. Barrack, 376 U.S. 612, 616, 11 L. Ed. 2d 945, 84 S. Ct. 805 (1964)* (internal citations omitted). Because it is undisputed that Stratos could have brought the instant action in the Central District of California, the Court's only task is to determine whether the factors enumerated in § 1404(a) and by the United States Court of Appeals for the Third [*5] Circuit, warrant a transfer.

The Third Circuit has instructed that [HN3] when reviewing a motion to transfer under *28 U.S.C. § 1404*(a) district courts must consider,

among other things, private n2 and public n3 interests. See *Jumara v. State Farm Ins. Co.,* 55 F.3d 873 (3d Cir. 1995). When determining whether or not transfer is warranted in the circumstances presented, district courts must balance all of the relevant factors and respect that a plaintiff's choice of forum is entitled to substantial deference and should not be lightly disturbed. *Id.* at 883, see also *Shutte v. Armco Steel Corp.,* 431 F.2d 22, 25 (3d Cir. 1920). The burden is upon the movant to establish that the balance of the interests strongly weighs in favor of transfer, and a transfer will be denied if the factors are evenly balanced or weigh only slightly in favor of the transfer. See *Continental Cas. Co. v. American Home Assurance Co.,* 61 F. Supp. 2d 128, 131 (D. Del. 1999).

n2 [HN4] The private interests are:

(1) the plaintiff's choice of forum, (2) the defendant's preferred forum, (3) whether the claim arose elsewhere, (4) the convenience of the parties due to their relative physical and financial conditions, (5) the convenience of the expected witnesses, but only so far as the witnesses might be unavailable for trial if the trial is conducted in a certain forum, and (5) the location of books and records, to the extent that these books and records could not be produced in a certain forum.

*Jumara v. State Farm Ins. Co.,* 55 F.3d 873, 883 (3d Cir. 1995).

[*6]

n3 [HN5] The public interests are:

(1) the enforceability of the judgment, (2) practical considerations regarding the ease, speed, or expense of trial, (3) the administrative difficulty due to court congestion, (4) the local interest in deciding local controversies in the home forum, (5) the public policies of the two fora, and (6) the trial judge's familiarity with the applicable state law in diversity cases.

*Id.*

## I. Private Interests

After a consideration of the relevant private interests, the Court concludes that the balance of these factors does not weigh strongly in favor of transfer. As stated previously, a plaintiff's choice of forum is entitled to substantial deference and should not be lightly disturbed. *Shutte,* 431 F.2d at 25. In the instant case, stratos' preference for Delaware is not given as much deference because it, admittedly, has not chosen its home turf. See *Continental,* 61 F. Supp. 2d at 131 (stating that [HN6] "the transfer of a case will generally be regarded as less inconvenient to a plaintiff if the plaintiff has not chosen [*7] its home turf or a forum where the alleged wrongful activity occurred"). However, it is not appropriate to disregard a plaintiff's choice of forum where it had a rational and legitimate reason for choosing the forum. See *Joint Stock Society v. Heublein, Inc.,* 936 F.Supp. 177, 187 (D. Del. 1996). And the fact that E2O has incorporated in Delaware

is a rational and legitimate reason for choosing to sue E2O in Delaware. In fact, E2O, having received the benefits of Delaware incorporation, should not now complain that another corporation has chosen to sue it here. *Critikon, Inc v Becton Dickinson Vascular Access, Inc., 821 F Supp 962, 965 (D Del 1993)*. Therefore, Stratos' forum preference, as well as E2O's Delaware incorporation, weigh in favor of maintaining this action in Delaware.

The Court cannot conclude that the balance of the remaining factors strongly weigh in favor of transfer. No witness, reluctant to testify, beyond the subpoena power of the Court, has been identified. The relevant documents, books, and records can be easily transported to Delaware. The financial burden on Defendants to litigate in Delaware is not unduly harsh. In sum, [*8] the private interests weigh in favor of maintaining this action in Delaware.

## II. Public Interests

In the Court's view, none of the public interests weigh in favor of transfer. [HN7] Patent rights are not local or state matters and therefore cannot give rise to a local controversy, or implicate local public policy. Similarly, because this is a patent infringement action, the familiarity of the trial judge with the

application of state law is not applicable. Further, in light of the Scheduling Order already in place, the Court is not persuaded that this case would be adjudicated faster in the Central District of California. Finally, as discussed above, the Court concludes that Delaware is not an unduly inconvenient forum for E2O to litigate this action in. Accordingly, the motion to transfer will be denied n4

> n4 The Court is aware of *Methode Electronics & Stratos Lightwave, Inc v Finisar, 205 F R D 552 (N D Ca 2001)* (the "Methode Case"), and its resolution. It is the Court's view that the Methode Case is irrelevant to the instant case, and the presence or absence of that action is not material to the Court's decision to retain jurisdiction over the instant case.

[*9]

NOW THEREFORE IT IS HEREBY ORDERED this 26 day of March 2002 that E2O's Motion To Transfer Venue To The Central District Of California (D.I. 11) is **DENIED**.

Joseph J. Farnan

UNITED STATES DISTRICT JUDGE

Westlaw.

Slip Copy                                                                    Page 1
Slip Copy, 2006 WL 3783477 (D.Del.)
**(Cite as: Slip Copy)**

Briefs and Other Related Documents
Automotive Technologies Int'l, Inc. v.
American Honda Motor Co.,
Inc.D.Del.,2006.Only the Westlaw citation
is currently available.

United States District Court,D. Delaware.
AUTOMOTIVE TECHNOLOGIES INT'L,
INC., Plaintiff,
v.
AMERICAN HONDA MOTOR CO., INC.,
et al, Defendants.
**Civil Action No. 06-187 GMS.**

Dec. 21, 2006.

Richard K. Herrmann, Morris James LLP,
Wilmington, DE, for Plaintiff.
Thomas C. Grimm, Benjamin J. Schladweiler,
Morris, Nichols, Arsht & Tunnell,
Wilmington, DE, Timothy Q. Delaney, for
Defendants.

***MEMORANDUM***
GREGORY M. SLEET, United States District
Judge.

## I. INTRODUCTION

**\*1** On March 17, 2006, the plaintiff,
Automotive Technologies International, Inc.
("ATI") filed the above-captioned action
against American Honda Motor Company
("Honda"), Elesys North America Inc.

("Elesys"), and General Motors Corporation
("GM"), (collectively the "Defendants"),
alleging infringement of United States Patent
Nos. 5,901,978; 6,242,701; 6,325,414;
6,397,136; 6,422,595; 6,869,100; 6,757,602;
6,712,387; 6,942,248; 6,950,022; and
6,958,451, which are generally related to
technology in automobile seats. On May 3,
2006, ATI filed a First Amended Complaint,
adding two additional patents, U.S. Patent
Nos. 6,484,080 and 6,850,824, and
withdrawing one of the previously asserted
patents, U.S. Patent No. 6,950,022.

**\*1** On June 16, 2006, ATI filed a separate
action, C.A. No. 06-391, against Hyundai
Motor America ("Hyundai"), BMW of North
America LLC ("BMWNA"), and Kia Motors
America Inc. ("Kia"). Ten of the 12 asserted
patents in the above-captioned action are
asserted in ATI's suit against Defendants
Hyundai, BMWNA and Kia. Presently before
the court are motions to transfer this action,
and the related action, to the Eastern District
of Michigan, pursuant to 28 U.S.C. § 1404(a).
For the following reasons, the court will deny
the motion.

## II. DISCUSSION

**\*1** Pursuant to Section 1404(a), the court may
transfer a civil action "for the convenience of
parties and witnesses, in the interest of justice,
... to any other district ... where it might have
been brought." 28 U.S.C. § 1404(a). It is the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                   Page 2
Slip Copy, 2006 WL 3783477 (D.Del.)
**(Cite as: Slip Copy)**

movant's burden to establish the need to transfer, and "the plaintiff's choice of venue [will] not be lightly disturbed." *Truth Hardware corp. v. Ashland Prods., Inc.,* No. C.A. 02-1541 GMS, 2003 WL 118005, at * 1 (quoting *Jumara v. State Farm Ins. Co.,* 55 F.3d 873, 879 (3d Cir.1995)). In other words, "unless the balance of convenience strongly favors a transfer in favor of defendant, the plaintiff's choice of forum should prevail." *Shutte v. Armco Steel Corp.,* 431 F.2d 22, 25 (3d Cir.1970).

**\*1** When considering a motion to transfer, the court must determine "whether on balance the litigation would more conveniently proceed and the interest of justice be better served by transfer to a different forum." *Jumara,* 55 F.3d at 879. This inquiry requires "a multi-factor balancing test," embracing not only the statutory criteria of convenience of the parties and the witnesses and the interest of justice, but all relevant factors, including certain private and public interests. *Id.* at 875. These private interests include the plaintiff's choice of forum; the defendant's preference; whether the claim arose elsewhere; the convenience of the parties; the convenience of the expected witnesses; and the location of books and records, to the extent that they could not be produced in the alternative forum.[FN1] *Id.* at 879. Among the relevant public interests are: "the enforceability of the judgment; practical considerations that could make the trial easy, expeditious, or inexpensive; the relative administrative difficulty in the two fora resulting from court congestion; the local interest in deciding local

controversies at home; [and] the public policies of the fora." *Id.* at 879-80.

> FN1. The first three of these private interest factors collapse into other portions of the *Jumara* analysis. Thus, the court will consider them in the context of the entire inquiry only. *See Afymetrix, Inc. v. Synteni, Inc.,* 28 F.Supp.2d 192 (D.Del.1998).

**\*2** As an initial matter, the court notes that it will afford less deference to ATI's choice of Delaware as a forum because it is not its "home turf," or principal place of business. *See Waste Distillation Tech., Inc. v. Pan Am. Res., Inc.,* 775 F.Supp. 759, 764 (D.Del.1991). Nonetheless, the court should not disregard a plaintiff's choice of forum where it has a rational and legitimate reason for choosing the forum. *See Joint Stock Soc'y v. Heublein, Inc.,* 936 F.Supp. 177, 187 (D.Del.1996). With these principles in mind, after consideration of the relevant factors, the court finds that the Defendants have not met their burden of demonstrating that transfer is appropriate.

**\*2** In the present case, ATI submits the following rationale for suing the Defendants in Delaware: "ATI, and at least one of the Defendants are incorporated in Delaware, all parties are subject to personal jurisdiction in this forum, this forum's docket is noticeably faster to resolution of complex cases than the proposed transferee court and many others, and there was no other forum in which witnesses had a markedly more convenient

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2006 WL 3783477 (D.Del.)
**(Cite as: Slip Copy)**

Page 3

location than this one." (D.I. 22 at 2.) The court finds that ATI's explanation is a rational and legitimate reason for choosing to sue the Defendants in Delaware. *See Stratos Lightwave, Inc. v. E20 Communications, Inc., No. C.A. 01-309-JJF, 2002 WL 500920, at * 2 (D.Del. Mar.26, 2002)*. Further, having received the benefits of Delaware incorporation, a Defendant cannot now complain that another corporation has chosen to sue it here. *See id.*

**\*2** The court also finds that the location of books and records weighs against granting the Defendants' motion to transfer. The Defendants contend that their books and records necessary for litigation are in Michigan. A court should consider the location of books and records in its analysis. It must only do so, however, to the extent that the files could not be produced in the alternative forum. *Jumara, 55 F.3d at 879*. Here, the Defendants do not suggest that their documents could not be produced in Delaware, especially in this day and age where large-scale "document" productions are reduced to digitized records that parties transfer via electronic media. Accordingly, this factor does not weigh in favor of granting a transfer.

**\*2** The Defendants also contend that non-party witness convenience weighs in favor of a transfer. The briefs set forth in detail the parties' positions with regard to this factor. Essentially, the Defendants contend that travel to Delaware is less convenient than travel to Michigan for its third-party

witnesses. (D.I. 18 at 6-7.) The court is not persuaded by the Defendants' arguments. Further, as this court has previously held, a flight to Delaware is not an onerous task warranting transfer. *Truth Hardware Corp. v. Ashland Prods., Inc., No. C.A. 02-1541 GMS, 2003 WL 118005, at * 2 (D. Del. Jan 13, 2003)*. The court concludes that the convenience of the witnesses does not favor transfer in this case.

**\*3** Additionally, the court finds that the public interest factors do not weigh strongly in favor of transfer to Michigan. First, the court is not persuaded that any disparity in court congestion will be so great as to weigh strongly in favor of a transfer.[FN2] Second, it is well settled that patent rights are not considered state or local matters and do not implicate local interests. *Jones Pharma, Inc. v. KV Pharm. Co., No. Civ. A. 03-786 JJF, 2004 WL 323109, at * 3 (D.Del. Feb.17, 2004)*. The court, therefore, finds no strong local interest in litigating in the transferee forum. Third, ATI's pending litigation in Michigan involves different patents. Thus, the court believes that this is not a relevant consideration in favor of transfer. *See Mentor Graphics Corp. v. Quickturn Design Sys., Inc., 77 F.Supp.2d 505, 513 (D.Del.1999)* (refusing to give "any weight whatsoever" to a mirror image action filed by the defendant)

> FN2. Even accepting Defendants' position on the percentage of cases over three years old pending in the Eastern District of Michigan, this

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                  Page 4
Slip Copy, 2006 WL 3783477 (D.Del.)
**(Cite as: Slip Copy)**

district's percentage appears to be lower. *Compare* (D.I. 22 at 24) *with* (D.I. 23 at 3, fn. 2).

**\*3** Finally, the court notes that the circumstances driving the court's decision to transfer in *Alloc, Inc. v. Unilin Decor N.V.*[FN3] are distinguishable from those in the present case. As ATI remarked in its letter of December 12, 2006 (D.I.52), the patents before this court in *Alloc* involved the same patents at issue in the transferee forum. Here, the court is not aware of a single patent in this lawsuit that is asserted in any action in the Eastern District of Michigan. The court agrees with ATI that nothing in the Detroit lawsuits yields any potential savings in judicial economy, given the attenuated connection between those patents and the patents here in suit. Accordingly, the court concludes that public interest factors do not favor transfer in the instant case.

> FN3. *Alloc, Inc. v. Unilin Decor N.V.,* C.A. Nos. 03-253-GMS, 05-587-GMS, 2006 WL 3050815 (D.Del. Oct.26, 2006).

### *ORDER*

**\*3** For the reasons stated in the court's Memorandum of this same date, IT IS HEREBY ORDERED that:

**\*3** The defendants' Motion to Transfer the above-captioned matter to the United States District Court for the Eastern District of

Michigan (D.I.17) is DENIED.

D.Del.,2006.
Automotive Technologies Int'l, Inc. v. American Honda Motor Co., Inc.
Slip Copy, 2006 WL 3783477 (D.Del.)

Briefs and Other Related Documents (Back to top)

• 2006 WL 1864444 (Trial Pleading) Plaintiff's First Amended Complaint for Patent Infringement (May 3, 2006) Original Image of this Document (PDF)
• 2006 WL 850652 (Trial Pleading) Complaint for Patent Infringement (Mar. 17, 2006) Original Image of this Document (PDF)
• 1:06cv00187 (Docket) (Mar. 17, 2006)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.